ANTHONY ALEXIS (DC Bar #384545)
DEBORAH MORRIS (Admitted to the NY Bar)
MICHAEL G. SALEMI (IL Bar #6279741)
MELANIE HIRSCH (DC Bar #989310)
EDWARD KEEFE (DC Bar #490713)
Melanie.Hirsch@cfpb.gov
1700 G Street NW
Washington, DC 20552
Phone: 202-435-7944
Fax: 202-435-7722

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>                 Plaintiff,<br><br>      v.<br><br>NATIONWIDE BIWEEKLY ADMINISTRATION, INC., LOAN PAYMENT ADMINISTRATION LLC, AND DANIEL S. LIPSKY,<br><br>             Defendants. | Case No. _____<br><br>**COMPLAINT** |

The Consumer Financial Protection Bureau ("Bureau") alleges the following against Nationwide Biweekly Administration, Inc., Loan Payment Administration LLC, and their founder and president, Daniel S. Lipsky (collectively, "Defendants").

**INTRODUCTION**

1.     The Bureau brings this action under the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531(a), 5536(a), 5564(a), 5565, and the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6105(d), and its implementing regulation, the Telemarketing Sales Rule ("TSR"), 16 C.F.R. §§ 310.1-9 (2010). The Bureau

seeks to obtain permanent injunctive relief, restitution, civil money penalties, and other relief as set forth below.

## JURISDICTION

2.      This Court has subject-matter jurisdiction over this matter because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

## VENUE

3.      Venue is proper in this district because Defendants do business here and a substantial part of events or omissions giving rise to the claims occurred here. 28 U.S.C. § 1391(b); 12 U.S.C. § 5564(f).

## INTRADISTRICT ASSIGNMENT

4.      Assignment to the San Francisco Division or the Oakland Division is proper because Defendants have advertised and sold their products and services to consumers who reside in the counties in these divisions, as well as consumers nationwide.

## PARTIES

5.      The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products and services under federal consumer financial law. 12 U.S.C. § 5491(a). It has independent litigating authority to enforce the CFPA and federal consumer financial laws, 12 U.S.C. § 5564, as well as the authority to enforce the TSR with respect to the offering or provision of a consumer financial product or service subject to the CFPA. 15 U.S.C. § 6105(d).

6.      Defendant Nationwide Biweekly Administration, Inc. ("Nationwide") is an Ohio corporation based in Xenia, Ohio. Nationwide acts as a custodian of consumer funds and transmits funds from consumers to their mortgage lenders or servicers, which is a consumer financial product or service covered by the CFPA. 12 U.S.C. § 5481(5), (15)(A)(iv). Nationwide is a "covered person" under the CFPA. 12 U.S.C. § 5481(6). Nationwide is a "seller" and "telemarketer" under the TSR. 16 C.F.R. § 310.2(aa), (cc).

2

7.     Defendant Loan Payment Administration LLC ("LPA") is a wholly owned subsidiary of Nationwide. It engages in offering Nationwide's services and also provides material services to Nationwide in connection with the offering or provision of a consumer financial product or service covered by the CFPA. LPA is a "covered person" under the CFPA. 12 U.S.C. § 5481(6), (26)(A).

8.     Defendant Daniel S. Lipsky ("Lipsky") is the founder, president, sole officer, and sole owner of Nationwide. He has managerial responsibility for Nationwide and LPA, and he has formulated, directed, controlled, or participated in the acts and practices of Nationwide and LPA, including the acts and practices set forth in this Complaint. Lipsky is a "related person" under the CFPA. 12 U.S.C. § 5481(25)(C)(i)-(ii). As a "related person," he is deemed a "covered person" for purposes of the CFPA. 12 U.S.C. § 5481(25)(B). Lipsky is a "seller" under the TSR. 16 C.F.R. § 310.2(aa).

## FACTS

### Nationwide and the "Interest Minimizer" Program

9.     Nationwide's primary product or service is the "Interest Minimizer" ("IM") program for mortgages. Most consumers who enroll in the IM program divide their monthly mortgage payment in half and remit that payment to Nationwide every two weeks. Nationwide holds the funds and promises to send the consumer's monthly payments to the mortgage lender or servicer in advance of the monthly due date.

10.    Because there are 52 weeks in a year, consumers who make biweekly payments through the IM program remit 26 payments to Nationwide each year. A typical consumer's mortgage, however, requires only 12 monthly payments. Accordingly, making 26 biweekly payments results in the equivalent of an extra monthly payment each year.

11.    Most months, participants in the IM program will make two biweekly payments. Every six months, there will be a month in which three biweekly payments will be made.

12.    The first time these consumers make a third biweekly payment in a month, Nationwide keeps that payment, up to $995, as a setup fee.

3

Complaint

13.     After Nationwide collects the setup fee, Nationwide directs subsequent extra biweekly payments to the consumer's mortgage lender or servicer to be applied against the loan principal.

14.     Nationwide collects a processing fee of $3.50 with each biweekly payment. These fees amount to $91.00 per consumer each year.

15.     Some consumers in the IM program make weekly payments. These consumers divide their monthly mortgage payment into quarters and remit one quarter to Nationwide every week. Most months, these consumers will make four weekly payments. Every three months, there will be a month in which five weekly payments are made.

16.     The first two times these consumers make a fifth weekly payment in a month, Nationwide keeps those payments, up to $995, as a setup fee.

17.     The processing fee for each weekly payment is $1.95. These fees amount to $101.40 per consumer each year.

18.     Some consumers in the IM program make semi-monthly payments. The amount of an extra monthly payment is divided among the 24 semi-monthly debits, and Nationwide keeps as a setup fee the extra funds collected in the first six months.

19.     The processing fee for each semi-monthly payment is $3.50. These fees amount to $84.00 per consumer each year.

20.     From August 2011 until September 2014, Nationwide collected approximately $49 million in setup fees from consumers who enrolled in the IM program for their primary mortgage. During the same period, more than 100,000 consumers enrolled in the IM program for their primary mortgage.

21.     According to Nationwide, approximately 10,000 California residents are enrolled in the IM program.

**Advertising and Telemarketing for the Interest Minimizer Program**

22.     Nationwide primarily advertises the IM program by sending direct mail solicitations to consumers who have recently purchased homes or refinanced their mortgage loans. For each mortgage, Nationwide obtains the consumer's name, the address of the

4

Complaint

property, the amount of the mortgage, and the name of the mortgage originator from data sources that compile publicly available real estate information. In many of Nationwide's direct mail solicitations, Nationwide includes the amount of the consumer's mortgage and the name of the consumer's mortgage originator.

23.     Between January 2012 and July 2014, Nationwide sent more than 33.5 million mailers to consumers across the United States, including 5.2 million to consumers in California. It sends mailers both under its own name and under the name of LPA.

24.     Nationwide also advertises via several websites, including interestminimizer.com, which feature numerous videos of Lipsky explaining Nationwide's IM program.

25.     In September 2014, a paid infomercial advertising Nationwide's IM program, featuring Lipsky, was aired on Lifetime television across the United States. This infomercial also appears on Nationwide's website.

26.     Nationwide's marketing, including mailers sent under LPA's name, directs consumers to call Nationwide's call center to learn more about the program. Consumers who call Nationwide's call center speak to a Nationwide sales representative who uses a telemarketing sales script. Nationwide directs its sales representatives to follow the script word for word.

27.     In mailers, sales scripts, and other marketing materials Nationwide distributes to consumers, and in mailers LPA distributes to consumers, Nationwide and LPA represent to consumers that Nationwide is a consumer advocate that is acting in their interest.

**Defendants' Representations About Consumer Savings**

28.     In mailers, sales scripts, and other marketing materials Nationwide distributes to consumers, and in mailers LPA distributes to consumers, Nationwide and LPA misrepresent the savings consumers will purportedly achieve under the IM program.

29.     In mailers, sales scripts, and other marketing materials Nationwide distributes to consumers, and in mailers LPA distributes to consumers, Nationwide and LPA guarantee that consumers will save money. For example, many mailers state: "Am I guaranteed to save money? Yes! We provide a 100% SAVINGS GUARANTEE."

Complaint

30.     Some Nationwide and LPA mailers, using the consumer's actual loan amount and a sample interest rate, claim consumers will achieve "Monthly Interest Savings" and total "Interest Savings" of specific amounts.

31.     In reality, consumers will not begin to save the "Monthly Interest Savings" amount upon enrollment. Rather, the "Monthly Interest Savings" Nationwide and LPA promise are an average over the life of the loan, assuming the consumer stays in the program until the mortgage is paid off.

32.     Other Nationwide communications to consumers expressly or impliedly represent that consumers will achieve immediate interest savings by enrolling in the IM program. For example, the company sends contract documents to consumers with cover emails containing statements like "soon you will be . . . saving thousands of dollars in unnecessary payments."

33.     In reality, consumers who enroll will not "soon" be saving thousands of dollars. For the first several years of consumers' enrollment in the IM program, typical consumers pay more in fees to Nationwide than they save through the program, and they will not save the "monthly" amounts promised by Nationwide until they are nearly halfway through their loan term. Most of the promised savings will not be realized until the last years of the loan.

34.     According to Nationwide, in 2013, the median consumer using the IM program for a thirty-year fixed-rate mortgage had a mortgage loan of $160,204 and an interest rate of 4.125%. A biweekly consumer in the IM program with those loan terms will not save enough to recoup the fees she has paid Nationwide until she is nine years into the program. By that point, she will have paid more than $1,200 in fees to Nationwide. A biweekly consumer in the IM program with those loan terms will not realize "Monthly Interest Savings" of the type advertised by Nationwide until she has been enrolled in the program for approximately 14 years. She will not realize half of the total savings Defendants promise until she has been enrolled for more than 20 years.

Complaint

35.     A substantial number of consumers will not stay in the program long enough to achieve any savings. Only 25% of the consumers enrolled in the IM program on December 31, 2014, had been enrolled for longer than four years.

36.     In mailers, sales scripts, and other marketing materials Nationwide distributes to consumers, and in mailers LPA distributes to consumers, Nationwide and LPA misrepresent the aggregate amount Nationwide's customers have saved. For example, in Nationwide's Lifetime infomercial aired in 2014, Lipsky claimed, "last year alone we helped our customers eliminate over $161 million in interest charges."

37.     Nationwide's customers did not save $161 million in interest charges in 2013.

**Defendants' Representations That Consumers Will Achieve Savings Without Paying More**

38.     In mailers and other marketing materials Nationwide distributes to consumers, and in mailers LPA distributes to consumers, Nationwide and LPA falsely claim that consumers enrolled in the IM program will achieve savings without paying more.

39.     For example, one Nationwide mailer claims that "you do not increase your monthly payment" and that savings are realized "without increasing the amount of your monthly payment." In one video on Nationwide's website, Lipsky states, "you're not increasing your payment. You're just switching to a smaller biweekly or weekly amount."

40.     In fact, consumers enrolled in the IM program increase their monthly payment by paying processing fees for each debit to Nationwide and by making additional biweekly payments that Nationwide either collects as a setup fee or remits to the consumer's mortgage lender or servicer.

**Defendants' Representations That Consumers Cannot Achieve Similar Savings Without the IM Program**

41.     Nationwide falsely represents that consumers cannot achieve the same savings without the IM program, by telling consumers that their mortgage lenders or servicers will not accept biweekly payments directly from consumers and that they will fail if they attempt to make additional principal payments on their own.

7

Complaint

42.     In telemarketing calls, when consumers ask Nationwide's sales representatives if they can pay biweekly to their servicers on their own, Nationwide's sales scripts require the representative to respond, "No, lenders require mortgages to be remitted monthly and will not accept a biweekly payment."

43.     For some consumers, this representation is false; some mortgage lenders and servicers accept biweekly payments directly from consumers.

44.     All consumers can also achieve the same interest savings promised by the IM program on their own, simply by making an extra principal payment, in the amount of their monthly mortgage payment, annually to their mortgage lender or servicer.

45.     In mailers, sales scripts, and other marketing materials Nationwide distributes to consumers, and in mailers LPA distributes to consumers, Nationwide and LPA tell consumers that they will fail to make extra principal payments on their own, based on a survey purportedly finding that former Nationwide consumers who tried to make extra payments on their own had "a 99% failure rate."

46.     The actual results of this survey, which was conducted by Nationwide's customer service department, do not support the assertion that former Nationwide consumers who tried to make extra payments on their own had a 99% failure rate.

**Defendants' Representations and Omissions About the Cost of the IM Program**

47.     In mailers and other marketing materials Nationwide distributes to consumers, and in mailers LPA distributes to consumers, Nationwide and LPA falsely claim that consumers' extra payments every year "are directed 100% to the principal of the loan."

48.     This statement is false, because Nationwide keeps consumers' first extra payment (up to $995) as the setup fee. Nationwide does not direct this payment to the principal of the loan.

49.     Nationwide's and LPA's mailers generally do not mention a setup fee. Nationwide does not disclose the existence of the setup fee on the portions of Nationwide's website that explain how the program works or in the Lifetime infomercial aired in September 2014 and posted on Nationwide's website.

Complaint

50.     When consumers ask Nationwide's sales representatives how much the IM program costs, some of Nationwide's scripts direct the sales representative to redirect the consumer. Other scripts instruct sales representatives to mention the setup fee only if consumers "persist to ask about fees."

51.     Nationwide's telemarketing sales scripts do not directly state the dollar amount of the setup fee.

### Defendants' Representation of Affiliation with Mortgage Servicers or Lenders

52.     In mailers Nationwide and LPA distribute to consumers, and during phone calls consumers make to Nationwide's call center, Nationwide and LPA expressly or impliedly misrepresent that Nationwide is affiliated with consumers' mortgage lenders or servicers.

53.     Nationwide is not affiliated with any mortgage lender or servicer.

54.     When consumers who call Nationwide's call center ask if Nationwide is affiliated with their mortgage lenders or servicers, Nationwide's sales scripts misrepresent Nationwide's affiliation with consumers' mortgage lenders or servicers. For example, in one script, when consumers ask, "Do you work with/affiliated with my lender?" sales representatives were instructed, "Do NOT say 'No'" – when the accurate answer is "No."

55.     When consumers who call Nationwide's call center ask if Nationwide is affiliated with their mortgage lenders or servicers, Nationwide's sales scripts direct its sales representatives to tell consumers that Nationwide has a "working relationship" with their mortgage lenders or servicers.

56.     In fact, this "working relationship" consists solely of Nationwide's submitting consumers' payments to their mortgage lenders and servicers, without any agreement with or involvement by the mortgage lenders or servicers.

### COUNT I

### (Against Nationwide and Lipsky)

### Abusive Acts or Practices in Violation the CFPA

57.     The allegations in paragraphs 1-56 are incorporated here by reference.

Complaint

58.     Nationwide and Lipsky guarantee to consumers that they will save money if they enroll in the IM program.

59.     During the first several years in which consumers are enrolled in the IM program, consumers will pay more in fees to Nationwide than they will save through the program.

60.     Nationwide and Lipsky know that a substantial number of consumers will leave the IM program prior to saving any money.

61.     Consumers are unlikely to understand that during the first several years of enrollment in the IM program, they will pay more in fees to Nationwide than they will save.

62.     In numerous instances, in connection with offering or providing consumer financial products or services, Nationwide and Lipsky have taken unreasonable advantage of consumers' lack of understanding of the material risks, costs, or conditions of the IM program.

63.     Nationwide and Lipsky's acts and practices are abusive under the CFPA. 12 U.S.C. § 5531(d)(2)(A). Because Nationwide and Lipsky are both "covered persons," their conduct is unlawful under Sections 1031(a) and 1036(a)(1) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1).

## COUNT II

### (Against All Defendants)

### Deceptive Acts or Practices in Violation of the CFPA

64.     The allegations in paragraphs 1-63 are incorporated here by reference.

65.     In numerous instances, in connection with offering or providing consumer financial products or services, Defendants have misrepresented, directly or by implication:

> a.   the amount that consumers will save and when they will achieve such savings through the IM program;
>
> b.   that consumers will realize savings without increasing the amount they pay each month;
>
> c.   that consumers cannot achieve the same savings without the IM program;
>
> d.   the amount and existence of the IM program's setup fee; and
>
> e.   that Nationwide is affiliated with consumers' mortgage servicers or lenders.

10

Complaint

66.     Each of the representations set forth in paragraph 65 were, and are, false or misleading. Defendants' acts and practices are deceptive under the CFPA. Because each Defendant is a "covered person," their conduct is unlawful under Sections 1031(a) and 1036(a)(1) of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1).

## COUNT III

### (Against Nationwide and Lipsky)

### Deceptive Telemarketing Acts or Practices in Violation of the TSR

67.     The allegations in paragraphs 1-66 are incorporated here by reference.

68.     It is a deceptive act or practice under the TSR for any seller or telemarketer to:

    a.   before a consumer consents to pay for goods and services offered, fail to disclose truthfully and in a clear and conspicuous manner the total cost to purchase the goods or services that are the subject of the sales offer, 16 C.F.R. § 310.3(a)(1)(i);

    b.   misrepresent, directly or by implication, the total cost to purchase the goods and services that are the subject of the sales offer, 16 C.F.R. § 310.3(a)(2)(i);

    c.   misrepresent, directly or by implication, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer, 16 C.F.R. § 310.3(a)(2)(iii);

    d.   misrepresent, directly or by implication, a seller or telemarketer's affiliation with, or endorsement or sponsorship by, any person, 16 C.F.R. § 310.3(a)(2)(vii); or

    e.   make a false or misleading statement to induce any person to pay for goods or services. 16 C.F.R. § 310.3(a)(4).

69.     Nationwide is a "seller" or "telemarketer" as defined by the TSR, 16 C.F.R. § 310.2(aa), (cc), because, in connection with telemarketing, it initiates or receives telephone calls to or from customers, and in connection with a telemarketing transaction, it provides,

Complaint

offers to provide, or arranges for others to provide goods or services to customers in exchange for consideration.

70. Lipsky is a "seller" as defined by the TSR, 16 C.F.R. § 310.2(aa), because, in connection with a telemarketing transaction, he arranges for Nationwide to provide goods or services to customers in exchange for consideration.

71. In numerous instances, Nationwide has:

    a. before a consumer consents to pay for the IM program, failed to disclose truthfully and in a clear and conspicuous manner the total cost of enrolling in the IM program;

    b. misrepresented, directly or by implication, the total cost of enrolling in the IM program;

    c. misrepresented, directly or by implication, material aspects of the performance, efficacy, nature, or central characteristics of the IM program, including the amount that consumers will save, when they will achieve such savings, and that consumers will achieve savings without paying more each month;

    d. misrepresented, directly or by implication, that Nationwide is affiliated with consumers' mortgage servicers or lenders; and

    e. made false or misleading statements to induce consumers to pay for the IM program.

72. Therefore, Nationwide and Lipsky have engaged in deceptive telemarketing acts and practices in violation of the TSR. 16 C.F.R. § 310.3(a)(1)(i); (a)(2)(i); (a)(2)(iii); (a)(2)(vii); (a)(4).

## COUNT IV

### (Against Nationwide and Lipsky)

### Deceptive Telemarketing Acts or Practices in Violation of the CFPA

73. The allegations in paragraphs 1-72 are incorporated here by reference.

Complaint

74.     15 U.S.C. § 6102(c)(2) provides that a violation of the TSR that is committed by a person subject to the CFPA shall be treated as a violation of a rule under Section 1031 of the CFPA, 12 U.S.C. § 5531, regarding unfair, deceptive, or abusive acts or practices.

75.     Because Nationwide and Lipsky violated the TSR and are "covered persons" under the CFPA, they also violated Section 1031 of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a).

## **DEMAND FOR RELIEF**

WHEREFORE, the Bureau requests that the Court:

a.      Permanently enjoin Defendants from committing future violations of the CFPA, 12 U.S.C. §§ 5531, 5536, and the TSR, 16 C.F.R. § 310.3;

b.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CFPA and TSR, including, but not limited to, refund of fees paid, restitution, disgorgement or compensation for unjust enrichment, and payment of damages;

c.      Impose civil money penalties against Defendants;

d.      Award Plaintiff the costs of bringing this action; and

e.      Award other and additional relief as the Court may determine to be just and proper.


Dated:  May 11, 2015                          Respectfully submitted,

                                              ANTHONY ALEXIS
                                              Enforcement Director

                                              DEBORAH MORRIS
                                              Deputy Enforcement Director

                                              MICHAEL G. SALEMI
                                              Assistant Litigation Deputy


                                              _____

                                              Melanie Hirsch
                                              melanie.hirsch@cfpb.gov
                                              202-435-7944

_____

Complaint

13

Edward Keefe
edward.keefe@cfpb.gov
202-435-9198
*Enforcement Attorneys*

Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

14

Complaint