ANTHONY ALEXIS (DC Bar #384545)
DEBORAH MORRIS (Admitted to the NY Bar)
MICHAEL G. SALEMI (IL Bar #6279741)
MELANIE HIRSCH (DC Bar #989310)
EDWARD KEEFE (DC Bar #490713)
PATRICK GUSHUE (PA Bar #306966)
JONATHAN URBAN (CO Bar #44190)
Melanie.Hirsch@cfpb.gov
1700 G Street NW
Washington, DC 20552
Phone: 202-435-7944
Fax: 202-435-7080

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

NATIONWIDE BIWEEKLY ADMINISTRATION, INC., LOAN PAYMENT ADMINISTRATION LLC, AND DANIEL S. LIPSKY,

Defendants.

---------------------------------------------

NATIONWIDE BIWEEKLY ADMINISTRATION, INC.,

Counter-claimant,

v.

CONSUMER FINANCIAL PROTECTION BUREAU,

Counter-defendant.

Case No. 3:15-cv-02106-RS

**NOTICE OF MOTION AND MOTION TO DISMISS COUNTERCLAIMS AND TO STRIKE PORTIONS OF THIRD AMENDED ANSWER**

Hearing Date: August 4, 2016
1:30 p.m.
Judge: Hon. Richard Seeborg
Courtroom: Courtroom 3, 17th Floor
450 Golden Gate Ave.
San Francisco, CA 94102

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

NOTICE OF MOTION TO DISMISS COUNTERCLAIMS AND TO STRIKE PORTIONS OF THIRD AMENDED ANSWER .......... 1

MEMORANDUM OF POINTS AND AUTHORITIES .......... 1

STATEMENT OF ISSUES TO BE DECIDED .......... 1

INTRODUCTION .......... 1

BACKGROUND .......... 3

A. The Bureau's Complaint Against Defendants .......... 3

B. Subsequent Proceedings .......... 4

C. Nationwide's Amended Counterclaims and Affirmative Defense Nine .......... 5

STANDARD OF REVIEW .......... 7

ARGUMENT .......... 9

I. NATIONWIDE'S AMENDED COUNTERCLAIMS SHOULD BE DISMISSED. .......... 9

A. Nationwide's Amended Counterclaims Still Do Not Plead Any Facts About How the Bureau "Coerced" Nationwide's Banks. .......... 9

B. The Court Lacks Subject Matter Jurisdiction over the Counterclaims .......... 11

1. Nationwide does not have standing to bring counterclaims against the Bureau .......... 11

2. Because there has been no waiver of the Bureau's sovereign immunity, the Court lacks power to review Nationwide's APA counterclaims. .......... 13

C. Nationwide's Counterclaims Fail as a Matter of Law .......... 16

1. Nationwide's constitutional counterclaims fail to allege protected rights or Bureau infringement of those rights. .......... 16

2. Nationwide's APA counterclaims are without merit .......... 20

II. THE COURT SHOULD STRIKE SEVERAL PORTIONS OF THE TAA. .......... 22

A. Defense Nine Violates the Court's Order and Constitutes an Insufficient, Immaterial, and Impertinent Defense. .......... 22

B. The Court Should Strike Paragraph 36 from the TAA. .......... 25

CONCLUSION .......... 25

## TABLE OF AUTHORITIES

**Cases** Page(s)

*Ajetunmobi v. Clarion Mortg. Capital, Inc.*, 595 F. App'x 680 (9th Cir. 2014) .......... 16

*Allen v. Wright*, 468 U.S. 737 (1984) .......... 12

*Armstrong v. Manzo*, 380 U.S. 545 (1965) .......... 23

*Army Corps of Eng'rs v. Hawkes*, --- U.S. ----, 136 S. Ct. 1807 (2016) .......... 15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 8, 10, 11

*Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) .......... 18

*Barnes v. AT&T Pension Benefit Plan – Nonbargained Program*, 718 F. Supp. 2d 1167 (N.D. Cal. 2010) .......... 8, 24

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) .......... 19

*Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989) .......... 17

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 8, 10, 11

*Bennett v. Spear*, 520 U.S. 154 (1997) .......... 15

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) .......... 16, 17

*Booth v. United States*, 2007 WL 2462158 (E.D. Cal. Aug. 29, 2007) .......... 25

*Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist*, 149 F.3d 971 (9th Cir. 1998) .......... 19

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980) .......... 16

*City of Renton v. Playtime Theatres, Inc.*,
475 U.S. 41 (1986) .......... 18

*Clapper v. Amnesty Int'l USA*,
--- U.S. ----, 133 S. Ct. 1138 (2013) .......... 12

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. FDIC*,
132 F. Supp. 3d 98 (D.D.C. 2015) .......... 12, 13, 15, 20, 21

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
527 U.S. 666 (1999) .......... 19

*Delson v. The Barron Egg Shop of Montclair*, No. C12-06454 RS,
(N.D. Cal. Apr. 22, 2013) .......... 8, 9

*Dex Media W., Inc. v. City of Seattle*,
696 F.3d 952 (9th Cir. 2012) .......... 17

*Dunn & Black, P.S. v. United States*,
492 F.3d 1084 (9th Cir. 2007) .......... 8

*E.J. Friedman Co. v. United States*,
6 F.3d 1355 (9th Cir. 1993) .......... 8, 14

*F.T.C. v. Warner Commc'ns, Inc.*,
742 F.2d 1156 (9th Cir. 1984) .......... 24

*George v. United States*,
901 F. Supp. 2d 1179 (N.D. Cal. 2012) .......... 21

*Goldberg v. Kelly*,
397 U.S. 254 (1970) .......... 19

*Groten v. Cal.*,
251 F.3d 844 (9th Cir. 2001) .......... 19

*Guzman v. Shewry*,
552 F.3d 941 (9th Cir. 2008) .......... 20

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 14

*Jachetta v. United States*,
653 F.3d 898 (9th Cir. 2011) .......... 13

*Johnson v. Riverside Healthcare Sys., LP*,
534 F.3d 1116 (9th Cir. 2008) .......... 8

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........................................................ 11, 12

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011)........................................................11

*Modesto Irrigation Dist. v. Gutierrez*,
619 F.3d 1024 (9th Cir. 2010)........................................................14, 21

*Moore v. Johnson*,
582 F.2d 1228 (9th Cir. 1978)........................................................ 19

*Nat'l Council of Resistance of Iran v. Dep't of State*,
251 F.3d 192 (D.C. Cir. 2001) ........................................................20

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
366 F.3d 930 (D.C. Cir. 2004)........................................................ 12

*O'Bannon v. Town Court Nursing Ctr.*,
447 U.S. 773 (1980) ........................................................20

*Outdoor Media Grp., Inc. v. City of Beaumont*,
702 F. Supp. 2d 1147 (C.D. Cal. 2010), *aff'd*, 464 F. app'x 611 (9th Cir. 2011) ........................ 18

*Paul v. Davis*,
424 U.S. 693 (1976) ........................................................ 19

*People of State of Cal. ex rel. Younger v. Andrus*,
608 F.2d 1247 (9th Cir. 1979)........................................................8

*Portman v. Cnty. of Santa Clara*,
995 F.2d 898 (9th Cir. 1993) ........................................................ 18

*Raditch v. United States*,
929 F.2d 478 (9th Cir. 1991)........................................................ 19

*Rattlesnake Coal. v. Envtl. Prot. Agency*,
509 F.3d 1095 (9th Cir. 2007)........................................................ 8, 14

*Rizzo v. Dawson*,
778 F.2d 527 (9th Cir. 1985)........................................................ 16

*Rosenfeld v. JPMorgan Chase Bank, N.A.*,
732 F. Supp. 2d 952 (N.D. Cal. 2010)........................................................ 16

*S.E.C. v. Cuban*,
798 F. Supp. 2d 783 (N.D. Tex. 2011)........................................................24, 25

*S.E.C. v. KPMG, LLP*,
2003 WL 21976733 (S.D.N.Y. Aug. 20, 2003)........................................................25

*S.E.C. v. Nat'l Student Mktg. Corp.*,
538 F.2d 404 (D.C. Cir. 1976) ..... 24

*S.E.C. v. Rivlin*,
1999 WL 1455758 (D.D.C. Dec. 20, 1999) ..... 25

*S.E.C. v. Toomey*,
866 F. Supp. 719 (S.D.N.Y. 1992) ..... 24

*Sealy, Inc. v. Easy Living, Inc.*,
743 F.2d 1378 (9th Cir. 1984) ..... 12

*Simon v. E. Ky. Welfare Rights Org.*,
426 U.S. 26 (1976) ..... 13

*Skidmore v. Swift*,
323 U.S. 134 (1944) ..... 22

*Spicer Accounting, Inc. v. United States*,
918 F.2d 90 (9th Cir. 1990) ..... 23

*Stickrath v. Globalstar, Inc.*,
2008 WL 2050990 (N.D. Cal. May 13, 2008) ..... 17

*Stock West, Inc. v. Confederated Tribes of the Colville Reservation*,
873 F.2d 1221 (9th Cir. 1989) ..... 8

*TRW, Inc. v. F.T.C.*,
647 F.2d 942 (9th Cir. 1981) ..... 23, 24

*United States v. Agnew*,
423 F.2d 513 (9th Cir. 1970) ..... 13

*United States v. Fernandez*,
231 F.3d 1240 (9th Cir. 2000) ..... 24

*United States v. Mead Corp.*,
533 U.S. 218 (2001) ..... 21, 22

*United States v. Mitchell*,
463 U.S. 206 (1983) ..... 13

*United States v. Philip Morris Inc.*,
304 F. Supp. 2d 60 (D.D.C. 2004) ..... 18

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) ..... 16

*W. Reserve Oil & Gas Co. v. New*,
765 F.2d 1428 (9th Cir. 1985) .... 19

*Wash. Envtl. Council v. Bellon*,
732 F.3d 1131 (9th Cir. 2013) .... 13

*Wellman v. Dickinson*,
79 F.R.D. 341 (S.D.N.Y. 1978) .... 24

*WMX Techs., Inc. v. Miller*,
197 F.3d 367 (9th Cir. 1999) .... 19

**Statutes**

5 U.S.C. § 551(13) .... 14, 15

5 U.S.C. § 701(b)(2) .... 15

5 U.S.C. § 702 .... 13

5 U.S.C. § 704 .... 14

5 U.S.C. § 706(2)(A) .... 7, 21

5 U.S.C. § 706(2)(C) .... 7, 21

12 U.S.C. § 1818 .... 5

12 U.S.C. § 5515(b)(1)(A) .... 14

12 U.S.C. § 5515(b)(1)(C) .... 14, 21

12 U.S.C. § 5515(e)(G) .... 5

12 U.S.C. § 5564 .... 5

12 U.S.C. § 5531 .... 3

12 U.S.C. § 5536 .... 3

**Rules**

Fed. R. Civ. P. 5.2(a)(4) .... 6

Fed. R. Civ. P. 12(b)(1) .... 1, 7, 11

Fed. R. Civ. P. 12(b)(6) .... 1, 8, 9, 11

Fed. R. Civ. P. 12(f) .... 1, 8

Fed. R. Civ. P. 13(d) .......... 13

**Regulations**

12 C.F.R. § 1070.45(a)(4) .......... 6

Telemarketing Sales Rule, 16 C.F.R. part 310 .......... 3

Disclosure of Records and Information, 78 Fed. Reg. 11,484 (Feb. 15, 2013) .......... 6

**Other Authorities**

U.S. Const. amend. V .......... 18

U.S. Const. art. III .......... 11

## NOTICE OF MOTION TO DISMISS COUNTERCLAIMS AND TO STRIKE PORTIONS OF THIRD AMENDED ANSWER

Please take notice that on August 4, 2016, at 1:30 p.m., or as soon thereafter as counsel may be heard, Plaintiff Consumer Financial Protection Bureau ("Bureau") will move this Court, pursuant to Civ. L.R. 7-2 and Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 12(f), to strike portions of the Third Amended Answer ("TAA"), Dkt. No. 82, submitted by Defendants Nationwide Biweekly Administration, Inc. ("Nationwide"), Loan Payment Administration LLC, and Daniel S. Lipsky (collectively, "Defendants"), and to dismiss Nationwide's counterclaims. Pursuant to Civ. L.R. 7-1(b), the Bureau requests that this matter be determined without oral argument or by telephone conference call.

The Court should dismiss the counterclaims asserted in the TAA for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. The Court should also strike Defense Nine as legally insufficient, immaterial, and impertinent, and Paragraph 36 as filed in violation of the scope of Defendants' leave to amend.

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF ISSUES TO BE DECIDED

Has Nationwide failed to state a claim when, despite instruction from the Court, it fails to allege sufficient factual matter to state a plausible claim, and the allegations, even if plausible, fail to state a cognizable claim that the Bureau infringed Nationwide's constitutionally protected rights or violated the Administrative Procedure Act?

Does the Court have jurisdiction over Nationwide's counterclaims where the alleged harm was caused by independent third parties and cannot be remedied by the requested relief, and where the Bureau's sovereign immunity has not been waived?

To streamline resolution of this action and avoid unnecessary and costly discovery, should the Court strike an affirmative defense that remains legally insufficient, immaterial, or impertinent, and a paragraph filed in violation of the scope of Defendants' leave to amend?

### INTRODUCTION

The Bureau sued Defendants Nationwide, Loan Payment Administration LLC, and Daniel S. Lipsky for engaging in abusive and deceptive acts and practices related to their

marketing and administration of a program that purported to guarantee that consumers would save money on their mortgages. Nationwide's own allegations describe what happened immediately after the suit was filed: within hours, banks that held funds on behalf of Nationwide's customers contacted Nationwide to express concerns about whether their business relationships could continue. Counterclaim ("CC") ¶ 65, Dkt. No. 82.[1] The banks ultimately decided to terminate Nationwide's accounts. *Id.* ¶ 73. Notwithstanding the banks' evident concern about the Bureau's lawsuit, Nationwide contends that the banks made their decision not because of the lawsuit but because of the Bureau's purported use of "back-room pressure" tactics to coerce the banks to close Nationwide's accounts, with the supposed intent of putting Nationwide out of business, *see id.* ¶ 10 – in other words, that the Bureau allegedly targeted Nationwide via its banks. These supposed tactics allegedly violated the Fifth and First Amendments and the Administrative Procedure Act ("APA"). Defendants also allege, in their ninth affirmative defense, that the Bureau violated their due process rights and the APA by suing Defendants without providing advance notice. TAA ¶¶ 93-97.

The Court should reject Nationwide's counterclaims and Defendants' Defense Nine. In ruling on the Bureau's previous motions to dismiss the counterclaims and strike several defenses, this Court instructed Defendants that, should they wish to amend to add further factual allegations, they should "consider carefully whether [they] ha[ve] a good faith basis to advance any further factual allegations in support of the counterclaims or the affirmative defense. That leave to amend has been granted does not mean it necessarily should be exercised." Order, Dkt. No. 80, at 10-11. Despite this clear instruction, Nationwide still has not identified a single specific action that the Bureau took with respect to Nationwide's banks for the purpose of shutting down Nationwide. Instead, it provides an array of irrelevant, extraneous information. With respect to Defense Nine, it similarly provides only a litany of irrelevant allegations about Defendants' supposed prior compliance with state regulations, rather than providing the factual support that this Court required.

[1] "CC" refers to the separately numbered allegations in Nationwide's counterclaims, which begin on page 14 of the Third Amended Answer to Complaint and Counterclaim.

Without factual allegations demonstrating how the Bureau – and not independent third parties – harmed it, Nationwide cannot meet its burden of demonstrating standing, and the Court accordingly lacks subject matter jurisdiction over the counterclaims. The Court further lacks jurisdiction over the APA counterclaims; because the agency activities at issue are committed to agency discretion by law and cannot be considered "final" or "agency action," the Bureau's sovereign immunity has not been waived.

Furthermore, even if Nationwide could overcome these hurdles, each of its counterclaims would be subject to dismissal for failure to state a claim for which relief can be granted. Its First and Fifth Amendment counterclaims fundamentally fail to identify how the Bureau itself infringed Nationwide's constitutionally protected speech, liberty, or property rights. And its APA counterclaims, which allege that the Bureau's interpretation of the term "risk to consumers" is arbitrary, capricious, and in excess of the Bureau's statutory authority, fail to consider that Congress granted the Bureau authority to interpret this term or that the Bureau's interpretation is entitled to deference.

## BACKGROUND

### A. The Bureau's Complaint Against Defendants

The Bureau brought this lawsuit on May 11, 2015, alleging deceptive and abusive acts and practices in violation of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531, 5536, and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. part 310. The Complaint seeks, *inter alia*, permanent injunctive relief, consumer restitution, and civil money penalties.

According to the allegations contained in the Bureau's complaint, Nationwide offered an "Interest Minimizer" program through which homeowners usually made biweekly, rather than monthly, payments on their mortgage loans. Complaint ("Compl.") ¶ 9, Dkt. No. 1. Consumers who enrolled in the biweekly program divided their monthly mortgage payment in half and remitted that payment to Nationwide every two weeks. *Id*. Nationwide held consumers' funds in trust accounts with banks before forwarding payments to consumers' mortgage servicers each month. *See id*. Because there are 52 weeks in a year, Nationwide's consumers remitted 26 biweekly payments – the equivalent of 13 monthly payments – to Nationwide each year. *Id*.

¶ 10. Nationwide generally directed that extra monthly payment, comprising two extra biweekly payments, toward the loan principal, with one exception. In the first year of the consumer's enrollment, Nationwide kept the first extra biweekly payment, up to $995, as a setup fee. *Id.* ¶¶ 12-13.

The Bureau's complaint alleges that Nationwide's advertising and telemarketing sales scripts included numerous material misrepresentations and omissions. For example, Nationwide concealed the amount and existence of the program's substantial setup fee. *Id.* ¶¶ 47-51. Further, Nationwide purported to guarantee that consumers would save money, *id.* ¶ 29, even though it knew that for the first several years consumers were enrolled in the program, the opposite was true: they would pay more to Nationwide in fees than they realized in interest savings. *Id.* ¶ 33. Additionally, Nationwide falsely represented that the only way consumers could achieve this kind of interest savings was through Nationwide's program. *Id.* ¶¶ 41-46. Finally, Nationwide expressly or impliedly misrepresented that it had an affiliation with consumers' mortgage lenders or servicers. *Id.* ¶¶ 52-56.

### B. Subsequent Proceedings

Defendants first filed an answer, raising thirty affirmative defenses, on July 13, 2015. Dkt. No. 34. After Bureau counsel requested that Defendants withdraw several of these defenses, Defendants filed a First Amended Answer that included twenty-four affirmative defenses. Dkt. No. 43. The Bureau then filed a motion to strike many of the affirmative defenses in the First Amended Answer. Dkt. Nos. 48, 57. On February 2, 2016, Defendants filed a Second Amended Answer to Complaint and Counterclaim ("SAA"), Dkt. No. 67, which, for the first time, asserted counterclaims brought by Nationwide, as well as new affirmative defenses. The Bureau moved to strike several affirmative defenses and to strike or dismiss the counterclaims. Dkt. Nos. 70, 71.

On May 23, 2016, this Court (1) dismissed the counterclaims with leave to amend; (2) struck without leave to amend Defenses Seven and Eight, which pertained to the actions of the Ohio Attorney General in a previous action against Defendants; and (3) struck Defense Ten – premised on the Bureau's alleged deprivation of Defendants' due property rights and violation

of the APA for failure to follow its Notice and Opportunity to Respond and Advise ("NORA") process – with leave to amend. Order, at 10-11. Defendants filed their Third Amended Answer to Complaint and Counterclaim on June 13, 2016. Dkt. No. 82.

**C. Nationwide's Amended Counterclaims and Affirmative Defense Nine**

According to its counterclaims, Nationwide's alleged harm arises from the fact that the banks where Nationwide held consumer trust accounts – without which it claims it cannot operate its biweekly program – terminated their relationships with Nationwide in the fall of 2015. *See* CC ¶¶ 83-85. Nationwide has been unable to initiate relationships with new banks. *Id.* ¶ 84. As a result, Nationwide had to suspend its biweekly program. *Id.* ¶ 86.

Nationwide alleges that, within hours of the Bureau's announcement of its lawsuit, its banks contacted it with concerns about continuing their banking relationships. *Id.* ¶ 65. It further suggests a temporal connection between the identification of the banks in a public filing made in the course of this litigation and the banks' ultimate decisions to terminate their relationships with Nationwide. *Id.* ¶¶ 68, 73. Nevertheless, Nationwide's counterclaims depend on a different premise: that the Bureau "engaged in a campaign to drive" Nationwide out of business "by exerting back-room pressure on banks," CC ¶ 10, including by "communicat[ing] privately to banks that they will face adverse regulatory action, such as harsh and prolonged examinations and reduced examination ratings" if they continued to do business with Nationwide. *Id.* ¶ 22. In an attempt to support these assertions, Nationwide alleges an assortment of unrelated facts:

- The United States Department of Justice ("DOJ") and other federal agencies, including the Federal Deposit Insurance Corporation ("FDIC") engaged in something called "Operation Choke Point," which was based on the concept of "reputational risk" in the context of banking agencies' authority to regulate bank safety and soundness, *see id.* ¶¶ 11-22, 27-39, 55-56;[2]

[2] In contrast to the Federal banking agencies, who have authority to prevent banks from operating in an unsafe or unsound manner, 12 U.S.C. § 1818, the Bureau's enforcement authority is limited to enforcing compliance with Federal consumer financial laws, 12 U.S.C. § 5564. *See also* 12 U.S.C. § 5515(e)(G) ("Nothing in this section [concerning the Bureau's supervisory authority over large depository institutions] shall modify or limit . . . the authority

- Internal DOJ memoranda mentioned meeting with the Bureau "to discuss payday lending" and possibly "pursue a joint investigation" in that area, *see id.* ¶¶ 31, 51, without noting whether such investigation actually occurred;
- The Bureau has a supervision program for very large depository institutions that monitors "risk to consumers," and this program coordinates with the Bureau's enforcement office when enforcement action is warranted, *see id.* ¶¶ 41-48;
- The Bureau sued a payment processor unrelated to Nationwide or this litigation for facilitating fraud, *see id.* ¶¶ 52-53, and settled an unrelated matter with another company that provided a biweekly mortgage payment program, *see id.* ¶ 62;
- The House Financial Services Committee questioned the Director of the Bureau with respect to "Operation Choke Point," *see id.* ¶¶ 23-24, 54, 57;
- After the Bureau issued a press release about its lawsuit against Defendants on May 11, 2015, Nationwide's banks immediately contacted Nationwide with concerns, *see id.* ¶¶ 64-65;
- The Bureau filed a document including the names of Nationwide's banks on June 2, 2015, *see id.* ¶¶ 67-72;[3]
- Nationwide's banks indicated their intent to close Nationwide's accounts by July 8, 2015, and the banks closed the accounts by November 2015, *see id.* ¶¶ 73-75;
- The Bureau declined to interfere in the banks' decision, *see id.* ¶ 76; and
- Nationwide's banks had not previously terminated its accounts despite previous legal actions involving Nationwide, *see id.* ¶¶ 80-82.[4]

---

of a prudential regulator to interpret or take enforcement action under any other provision of Federal law for safety and soundness purposes."); *cf.* CC ¶ 49 (Bureau director explained that "Operation Choke Point" is premised on "prudential regulation, safety and soundness, and sort of risk – operational risk, legal risk, reputational risk").

[3] While Nationwide intimates that the Bureau behaved improperly in filing this document in support of its opposition to Defendants' motion to transfer venue, it has never argued that, when it produced the document to the Bureau, the document was designated a trade secret or privileged or confidential commercial or financial information. As such, the Bureau was entitled to include it in public court filings. 12 C.F.R. § 1070.45(a)(4). In promulgating this rule, the Bureau declined to require its counsel to seek a protective order or *in camera* review prior to such disclosure. 78 Fed. Reg. 11,484, 11,498 (Feb. 15, 2013). The Bureau also properly redacted account numbers pursuant to Fed. R. Civ. P. 5.2(a)(4).

Nationwide asserts that the Bureau's actions resulted in the loss of its banking relationships, in violation of its constitutional rights and the APA. Nationwide contends that it has been deprived of "its right to conduct its business and inform people about the biweekly mortgage interest savings program methodology . . . in violation of the Free Speech Protections of the First Amendment of the Constitution." *Id.* ¶ 96. It further alleges Fifth Amendment due process violations, in that the Bureau has "stigmatized [it] and inflicted reputational harm upon it, which has effectively prevented Nationwide from pursuing its lawful, chosen line of business" and "depriv[ed] [it] of its access to banking services," resulting in harm to its "business, in which it has an important property right." *Id.* ¶¶ 102-103. With respect to the APA, Nationwide contends that the definition of "risk to consumers" in the Bureau's Supervision and Examination Manual ("Exam Manual") and the Bureau's supposed involvement in "Operation Chokepoint" are agency actions that both exceed the Bureau's statutory authority and are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* ¶¶ 106-116 (citing 5 U.S.C. § 706(2)(A), (C)).[5]

Defendants' TAA includes Defense Nine, which restates Defense Ten from the SAA. As before, Defendants assert that (1) the Bureau failed to provide notice as to what behavior complies with the law; and (2) the Bureau lacked a rational basis for declining to provide advance notice of its enforcement action via the NORA process. It includes new facts about Nationwide's history with a number of state regulators, including the Ohio Attorney General, TAA ¶¶ 85-92, but no new facts about the Bureau.

## STANDARD OF REVIEW

On a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), the plaintiff (or here, the counter-claimant) must prove that the court has jurisdiction.

[4] These allegations do not mention that, one week after the Bureau filed its lawsuit, Defendants were sued in state court by the California Department of Business Oversight and the District Attorneys of Monterey, Marin, and Alameda Counties. *See* Compl., *People v. Nationwide Biweekly Admin., Inc.*, No. RG15770490 (Super. Ct. of Alameda Cty., Cal. May 15, 2015). This suit alleged that Defendants "have collected no less than ten million dollars ($10 million) in total fees from California consumers." *Id.* ¶ 4.

[5] While Nationwide structures these claims as subparts of its Fifth Amendment claim, they appear to arise under the APA, not the Constitution.

*See Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989). Federal courts are presumed to be "without jurisdiction unless the contrary affirmatively appears." *People of State of Cal. ex rel. Younger v. Andrus*, 608 F.2d 1247, 1249 (9th Cir. 1979) (per curiam) (citation omitted). Dismissal for lack of subject matter jurisdiction is appropriate if a party fails to demonstrate standing. *Id.* Courts should also dismiss actions against a federal agency for lack of subject matter jurisdiction if a party fails to "establish[] that its action falls within an unequivocally expressed waiver of sovereign immunity by Congress," *Dunn & Black, P.S. v. United States*, 492 F.3d 1084, 1088 (9th Cir. 2007), which can occur when an action is committed to agency discretion by law, *E.J. Friedman Co. v. United States*, 6 F.3d 1355, 1359-60 (9th Cir. 1993), or if no final agency action has occurred. *Rattlesnake Coal. v. Envtl. Prot. Agency*, 509 F.3d 1095, 1104 (9th Cir. 2007).

A dismissal under Fed. R. Civ. P. 12(b)(6) may be based on the "absence of sufficient facts alleged under a cognizable legal theory" or on the "lack of a cognizable legal theory." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008). As stated by the Supreme Court in *Ashcroft v. Iqbal*, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To state a plausible claim, a party must plead more "than a sheer possibility that a defendant has acted unlawfully" or "facts that are 'merely consistent with' a defendant's liability." *Id.* (quoting *Twombly*, 550 U.S. at 556-57). Even if a claim includes sufficient facts, however, it must still be dismissed if it fails to plead a cognizable legal claim. Fed. R. Civ. P. 12(b)(6).

Under Fed. R. Civ. P. 12(f), the Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." A majority of federal courts have held that the heightened pleading standard articulated in *Twombly* and *Iqbal* equally applies to determining the sufficiency of affirmative defenses. *See, e.g., Barnes v. AT&T Pension Benefit Plan – Nonbargained Program*, 718 F. Supp. 2d 1167, 1172 (N.D. Cal. 2010); *Delson v. The Barron Egg Shop of Montclair*, No. C12–06454 RS, slip op. at 2 (N.D. Cal. Apr. 22, 2013). A matter is "immaterial" if it lacks any essential or important relationship to the

claim for relief, and it is "impertinent" if it does not pertain to and is not necessary for the issues in question. *Delson*, slip op. at 3 (citation omitted).

## ARGUMENT

## I. NATIONWIDE'S AMENDED COUNTERCLAIMS SHOULD BE DISMISSED.

Nationwide's amended counterclaims should be dismissed because, contrary to this Court's direct instruction, Nationwide still has not pleaded a single fact supporting its contention that the Bureau coerced Nationwide's banks into closing its accounts. As such, the complaint continues to fail under Fed. R. Civ. P. 12(b)(6) and *Iqbal*. Furthermore, even if Nationwide had pleaded sufficient facts to comply with the Court's instruction and state a claim, Nationwide still would not be able to demonstrate that the Court has subject matter jurisdiction to hear its counterclaims. Finally, should Nationwide manage to surpass these obstacles, each of its counterclaims nevertheless fails as a matter of law.

### A. Nationwide's Amended Counterclaims Still Do Not Plead Any Facts About How the Bureau Allegedly "Coerced" Nationwide's Banks.

In its May 23, 2016 order granting the Bureau's motion to dismiss the previous incarnation of Nationwide's counterclaims, this Court instructed Nationwide "to consider carefully whether it has a good faith basis to advance any further factual allegations in support of the counterclaims or the affirmative defense. That leave to amend has been granted does not mean it necessarily should be exercised." Order, at 10-11. It made this statement following the Bureau's demonstration that Nationwide's counterclaims were largely cut and pasted from a different complaint, brought by a different plaintiff against different federal agencies; that the face of the allegations contradicted any assertion that the Bureau coerced Nationwide's banks; and that the counterclaims contained no factual allegations about the Bureau's actions with respect to Nationwide's banks except those made "on information and belief." *See id.* at 2-3, 8.

Despite the Court's clear instruction and the ballooning of the counterclaims from 47 to 121 paragraphs, Nationwide's amended counterclaims continue to lack the necessary facts to state a plausible claim that the Bureau targeted Nationwide via its banks. Indeed, Nationwide does not make a single factual allegation supporting its continued assertions that the Bureau "engaged in a campaign to drive" Nationwide out of business "by exerting back-room pressure

on banks," CC ¶ 10, and "communicated privately to banks that they will face adverse regulatory action, such as harsh and prolonged examinations and reduced examination ratings" if they continued to do business with Nationwide. *Id.* ¶ 22.

Rather than allege facts showing how the Bureau purportedly targeted it via its banks, Nationwide pleads a plethora of irrelevant facts. But quantity of allegations cannot substitute for quality. Unlike the complaint in *Community Financial Services Association of America, Ltd. v. FDIC*, No. 14-cv-953 (GK) (D.D.C. June 5, 2014) ("CFSA Compl."), Nationwide's counterclaims contain no allegations that, for example, the Bureau issued guidance documents warning banks against doing business with companies like Nationwide, *see* CFSA Compl. ¶¶ 43-47, or that Nationwide's specific banks reported that they were closing its accounts because of regulatory concerns. *See id.* ¶¶ 65-70.[6] Not only does Nationwide fail to plead facts about the Bureau's actions, but it continues to plead itself out of court by alleging that *the Bureau's lawsuit*, not any purported backroom pressure, caused the banks to decide to close the accounts: "[w]ithin hours of the CFPB's press release" announcing its action against Defendants, Nationwide's banks "expressed concerns . . . and reservations" about continuing to work with Nationwide. CC ¶ 65. The banks ultimately closed Nationwide's accounts in the fall of 2015. *Id.* ¶ 73.

Nationwide's amended counterclaims therefore fail to "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). Nationwide itself provides an "obvious alternative explanation" for the banks' closure of its accounts, *id.* at 682, that has nothing to do with any purported "back-room pressure." All told, even under a generous reading of Nationwide's allegations, a court could not infer even "a sheer possibility that [the Bureau] has acted unlawfully." *Id.* It follows that Nationwide's counterclaims based on supposed coercion do not come close to crossing "the line between possibility and plausibility of 'entitlement to relief.'"

[6] Indeed, Nationwide essentially concedes that it has no relevant facts by noting that the alleged "facts and circumstances surrounding the termination of Nationwide's banking relationships *are indicative of* CFPB's use of Operation Choke Point-style tactics to directly or indirectly choke off a targeted business's access to financial services without due process." CC ¶ 77 (emphasis added).

*Id.* (citing *Twombly*, 550 U.S. at 557). The counterclaims should therefore be dismissed for failure to state a claim for which relief can be granted. Fed. R. Civ. P. 12(b)(6).

**B. The Court Lacks Subject Matter Jurisdiction over the Counterclaims.**

Without facts showing how the Bureau's alleged use of unspecified "pressure tactics" – as opposed to the banks' independent reaction to the Bureau's lawsuit – caused Nationwide's alleged harm, Nationwide cannot meet its burden of demonstrating Article III standing. As a result, this Court lacks subject matter jurisdiction over the counterclaims. This Court further lacks subject matter jurisdiction over the APA counterclaims; because the alleged agency activities at issue are committed to agency discretion and no final agency action has occurred, the Bureau's sovereign immunity has not been waived. The Court should accordingly dismiss the counterclaims under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.

**1. Nationwide does not have standing to bring its counterclaims against the Bureau.**

Before a court can consider the merits of an action, it must consider the "threshold question" of whether the party asserting the claim has standing. *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011). To establish standing sufficient for the "case" or "controversy" requirement of Article III, a party must allege (1) that it has suffered an injury in fact; (2) a "causal connection between the injury and the conduct complained of," such that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) that it is "likely," not "merely speculative," that a favorable decision will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Furthermore, standing to sue the government is "substantially more difficult to establish" when a party "is not himself the object of the government action or inaction he challenges," because "[t]he existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict." *Id.* at 562 (quotation marks omitted); *see also Clapper v. Amnesty Int'l USA*, --- U.S. ----, 133 S. Ct. 1138, 1150 (2013) (Supreme Court is "reluctant to

endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment”). The standing requirements apply with equal force to counterclaim plaintiffs. *See Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1384 (9th Cir. 1984).

Here, Nationwide fails the causation and redressability prongs of the standing inquiry. Nationwide’s allegations hinge on the banks’ decisions to close its accounts, which prevented Nationwide from operating its biweekly program. *See* CC ¶¶ 83-85. Nationwide’s claimed injury was thus caused by the independent, discretionary actions of third parties; the banks exercised their independent judgment following the Bureau’s lawsuit, *see id.* ¶ 65, and decided to sever their relationships with Nationwide. Accordingly, *Defenders of Wildlife* dictates that “much more is needed” to demonstrate causation sufficient for standing, even at the pleading stage. *See Nat’l Wrestling Coaches Ass’n v. Dep’t of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004). But Nationwide does not allege how specific Bureau actions – including its definition of “risk to consumers” in its Exam Manual – played *any* role in the banks’ decisions, let alone show that the Bureau’s actions were “a substantial factor motivating the decisions of the third parties that were the direct source of [its] injuries.” *See Cmty. Fin. Servs. Ass’n of Am. v. FDIC*, 132 F. Supp. 3d 98, 109 (D.D.C. 2015) (citing *Nat’l Wrestling Coaches*, 366 F.3d at 940-41). In *CFSA*, in contrast, the district court found that the plaintiffs sufficiently demonstrated causation by alleging facts showing how the defendant agencies targeted the plaintiffs via their banks. *Id.* at 111-15.

Furthermore, any suggestion that the requested relief will cause the banks – who are not parties to this litigation – to enter into new contracts with Nationwide is entirely speculative. *See Defenders of Wildlife*, 504 U.S. at 571 (environmental groups lacked standing to challenge regulation where “redress of the only injury in fact respondents complain of requires action” by entities not party to the suit); *Allen v. Wright*, 468 U.S. 737, 758 (1984), *abrogated on other grounds by Lexmark Int’l, Inc. v. Static Control Components, Inc.*, --- U.S. ----, 134 S. Ct. 1377 (2014) (parents lacked standing to challenge IRS tax exemption policy on racially discriminatory private schools because it was “entirely speculative” that modifying tax exemption would cause schools to change their behavior); *Simon v. E. Ky. Welfare Rights*

*Org.*, 426 U.S. 26, 43 (1976) (plaintiffs lacked standing to challenge IRS ruling encouraging hospitals to provide fewer services to indigent persons because alleged injury was caused by hospitals; it was "just as plausible that the hospitals . . . would elect to forego favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services"). Nor could retraction of Bureau documents or guidance remedy Nationwide's harm, because Nationwide has not alleged that its harm was caused by any such Bureau documents or guidance, including the Bureau's definition of "risk to consumers" in its Supervision and Examination Manual. *See CFSA*, 132 F. Supp. 3d at 111 (complaint adequately alleged redressability via retraction of documents where it identified specific agency documents whose issuance caused plaintiffs' harm). Nationwide has therefore not met its burden of alleging "a substantial likelihood that the injury will be redressed by a favorable judicial decision." *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1146 (9th Cir. 2013).

**2. Because there has been no waiver of the Bureau's sovereign immunity, the Court lacks power to review Nationwide's APA counterclaims.**

The Court further lacks subject matter jurisdiction over the APA counterclaims because the Bureau's sovereign immunity has not been waived. It is a foundational legal principle that "the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). The government's waiver of sovereign immunity "must be unequivocally expressed in statutory text." *Jachetta v. United States*, 653 F.3d 898, 903 (9th Cir. 2011) (citing *Lane v. Pena*, 518 U.S. 187, 192 (1996)). The APA provides a limited waiver of an agency's sovereign immunity solely with respect to an action "seeking relief other than money damages," 5 U.S.C. § 702,[7] but

[7] Because Section 702 limits its waiver of sovereign immunity to actions "seeking relief other than money damages," it bars Nationwide's requests for damages in Paragraphs 99 and 105 of the counterclaims. Fed. R. Civ. P. 13 also does not waive the Bureau's immunity. Fed. R. Civ. P. 13(d) (rule "do[es] not expand the right to assert a counterclaim . . . against the United States or a United States officer or agency"); *United States v. Agnew*, 423 F.2d 513, 514 (9th Cir. 1970) (per curiam) ("[t]he filing of a suit in the name of the United States does not amount to a waiver of sovereign immunity subjecting the United States" to a counterclaim).

this waiver does not apply to Nationwide's APA counterclaims concerning the definition of "risk to consumers" in the Bureau's Exam Manual, for two reasons.[8]

First, before a party may seek review of federal agency activity under the APA, "a party must first clear the hurdle of [Section] 701(a)," which provides that the APA's chapter on judicial review – including the provision waiving sovereign immunity – applies "except to the extent that (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985) (citing 5 U.S.C. § 701(a)); *E.J. Friedman*, 6 F.3d at 1359-60 (the APA does not waive sovereign immunity to challenge actions committed to agency discretion by law). If a statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," the statute "can be taken to have committed the decisionmaking to the agency's judgment absolutely." *Chaney*, 470 U.S. at 830.

Here, Congress committed the definition of "risk to consumers" to the Bureau's discretion when it granted the Bureau exclusive authority to examine financial institutions with assets over $10 billion to assess compliance with Federal consumer financial laws and "detec[t] and asses[s] associated *risks to consumers* and to markets for consumer financial products and services," 12 U.S.C. § 5515(b)(1)(A),(C) (emphasis added). The CFPA does not define "risk to consumers" or provide a standard against which to judge the Bureau's discretion. When Congress uses an ambiguous term "and then declin[es] to define it, Congress intend[s] to provide agencies with discretion" in how to define the term. *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1033 (9th Cir. 2010).

Second, "the APA applies to waive sovereign immunity only after final agency action" has occurred, *Rattlesnake Coalition*, 509 F.3d at 1104-05 (citing 5 U.S.C. § 704), and the Exam Manual is neither "final" nor an "agency action" at all. To begin, the APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the

[8] Because Nationwide has not explained how the Bureau purportedly participated in "Operation Choke Point" or used "pressure tactics" against it, *see infra* Part I.A, it is impossible to separately examine whether this alleged conduct is committed to agency discretion or constitutes a "final" "agency action."

equivalent or denial thereof, or failure to act," 5 U.S.C. §§ 551(13), 701(b)(2); none of these definitions applies to the Exam Manual. Notably, the Exam Manual includes a disclaimer that it is intended purely to "provid[e] internal guidance to supervisory staff of the CFPB. It does not bind the CFPB and does not create any rights, benefits, or defenses, substantive or procedural, that are enforceable by any party in any matter. While every effort has been made to ensure accuracy, examination procedures should not be relied on as a legal reference." Exam Manual at 1, *available at* http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf. The Exam Manual's section on "risk to consumers" further notes that "risk assessments are not used to reach conclusions about whether an entity has violated a particular law or regulation." *Id.* at 21.

Additionally, for an agency action to be "final," it must meet two conditions: (1) it "mark[s] the consummation of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature," and (2) "the action must be one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations and quotation marks omitted). The Supreme Court recently concluded that an agency action marked the consummation of the agency's decisionmaking when it was made "after extensive factfinding" and "is typically not revisited." *Army Corps of Eng'rs v. Hawkes*, --- U.S. ----, 136 S. Ct. 1807, 1813-14 (2016). On the second prong, that action had "legal consequences" because it bound the government and created a safe harbor from liability. *Id.* at 1814. The Bureau's Exam Manual meets neither of these prongs; the document is explicit that it serves as internal guidance only, does not bind the Bureau, and is subject to revision. As such, no legal consequences can flow from its interpretation of "risk to consumers." Notably, in *CFSA*, the court held that while the agencies' formal guidance documents met the first prong because they were not "tentative or interlocutory," they failed the second prong because they were explicitly advisory and did not impose any obligations or prohibitions. 132 F. Supp. 3d at 119-20.

### C. Nationwide's Counterclaims Fail as a Matter of Law.

Even if Nationwide could demonstrate both that it pleaded specific facts about any alleged Bureau actions with respect to Nationwide's banks and that this Court has subject matter jurisdiction, each counterclaim would nevertheless fail as a matter of law.[9]

#### 1. Nationwide's constitutional counterclaims fail to allege protected rights or Bureau infringement of those rights.

Neither of Nationwide's constitutional counterclaims allege critical components of such claims: that the government violated a constitutionally protected right. Nationwide's First Amendment counterclaim continues to omit any allegation that the Bureau infringed upon its protected speech. And while Nationwide's Fifth Amendment counterclaim now alleges that it has suffered reputational harm and not merely harm to its business, it still fails to properly allege either the deprivation of a protected right or that the Bureau infringed upon that right.

##### a. Nationwide does not allege that the Bureau infringed upon speech protected by the First Amendment.

To state a claim under the First Amendment, a party must allege both that it engaged in activity protected by the First Amendment and that the government impermissibly infringed on its right to engage in that activity. *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985). Nationwide does not plausibly allege either of these elements.

First, the Supreme Court has reiterated that "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980). Governments may regulate commercial speech even where it "is not provably false, or even wholly false, but only deceptive and misleading." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771-72 (1976). When determining whether speech is commercial, courts consider whether the speech is an advertisement, the speech refers to a specific product, and the speaker has an economic motivation. *See Bolger v. Youngs*

[9] Nationwide is therefore not entitled to any relief, and Count III of Nationwide's counterclaims, titled "Declaratory Relief and Preliminary/Permanent Injunctions," cannot pass muster as a standalone claim; "[d]eclaratory and injunctive relief are remedies, not causes of action." *Ajetunmobi v. Clarion Mortg. Capital, Inc.*, 595 F. App'x 680, 684 (9th Cir. 2014); *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 975 (N.D. Cal. 2010) (same).

*Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983). Commercial speech may still receive full First Amendment protection, however, if "commercial aspects of the speech are inextricably intertwined with otherwise fully protected speech, such that the publication sheds its commercial character." *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 958 (9th Cir. 2012).

Here, Nationwide identifies its purportedly protected speech as its marketing, CC ¶¶ 91-94, which is indisputably commercial speech: it is advertising, for Nationwide's product, for which Nationwide has an economic motive. *See Bolger*, 463 U.S. at 66-67. Nationwide appears to contend that its advertising is nevertheless entitled to full First Amendment protection because it both "educate[s]" consumers about "the biweekly mortgage interest savings program methodology in general, and market[s] Nationwide's own such program." CC ¶ 93. This supposed educational function of Nationwide's advertising, however, does not grant it full First Amendment protection. As the Supreme Court has concluded, the inclusion of educational information – in that case, about "how to be financially responsible and how to run an efficient home" – in a sales pitch "no more convert[s the] presentations into educational speech, than opening sales presentations with a prayer or a Pledge of Allegiance would convert them into religious or political speech." *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 474-75 (1989). The same is true about any supoposedly educational material in Nationwide's advertising.

Furthermore, the Bureau has alleged that Nationwide's commercial speech is false, deceptive, and misleading, Compl. ¶¶ 64-75, which renders it not entitled to constitutional protection. Nationwide's contention that its speech is accurate and protected merely disagrees with the Bureau's characterization of its advertising. That dispute is properly evaluated via the adjudication of the Bureau's lawsuit and Defendants' affirmative defenses, not as a counterclaim. *See Stickrath v. Globalstar, Inc.*, No. C07-1941 TEH, 2008 WL 2050990, at *3 (N.D. Cal. May 13, 2008) ("The label 'counterclaim' has no magic. What is really an answer or defense to a suit does not become an independent piece of litigation because of its label.") (quoting *Tenneco Inc. v. Saxony Bar & Tube, Inc.*, 776 F.2d 1375, 1379 (7th Cir. 1985)).

Second, even if Nationwide could allege that its advertising is constitutionally protected, it fails to state a claim for a First Amendment violation because it does not plead any government restriction on that advertising other than the Bureau's request for an injunction in its prayer for relief. CC ¶ 94. But the Bureau has not obtained any injunctive relief prohibiting Nationwide from advertising, and even if it had, injunctive relief is an appropriate remedy for speech held to be misleading. *See United States v. Philip Morris Inc.*, 304 F. Supp. 2d 60, 71 (D.D.C. 2004) ("If the Government successfully establishes that the Defendants disseminated their advertising in furtherance of an overall scheme to defraud, the First Amendment will not present an obstacle to appropriate injunctive and equitable relief to remedy the fraud."). Nationwide's only other allegations concerning its speech reflect the loss of its "ability to do business," CC ¶ 95, not its ability to advertise or otherwise speak. It does not allege, for example, that it can no longer advertise or speak because the Bureau shut down its websites or confiscated its direct mailers. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 54 (1986) (upholding zoning ordinance limiting locations for adult theaters where some locations remained available for theaters to engage in speech); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) (finding First Amendment harm where sheriff "threaten[ed] legal sanctions . . . for facilitating future speech"). It therefore alleges only economic harm, which is not sufficient "to prevail on a First Amendment claim of constitutional harm." *Outdoor Media Grp., Inc. v. City of Beaumont*, 702 F. Supp. 2d 1147, 1162 (C.D. Cal. 2010), *aff'd*, 464 F. App'x 611 (9th Cir. 2011) (citing cases).

**b. Nationwide does not identify a constitutionally protected liberty or property interest that it has been deprived of by the Bureau.**

To state a claim for a violation of procedural due process, a party must allege "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process." *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). Nationwide fails to identify either a constitutionally protected interest or any deprivation by the government.

The Fifth Amendment prohibits government deprivation of "life, liberty, or property, without due process of law," U.S. Const. amend. V, but "the range of interests protected by procedural due process is not infinite." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 (1972).[10] As the Supreme Court has explained, a constitutionally protected property interest arises when a person has "more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577. That entitlement must be based on "the acts of the sovereign, state or federal, manifested in legislation, rules, or customs." *Moore v. Johnson*, 582 F.2d 1228, 1233 (9th Cir. 1978).[11] With respect to liberty interests, the Constitution does not protect "reputation alone," because that would amount to no more than a state-law defamation claim. *WMX Techs., Inc. v. Miller*, 197 F.3d 367, 376 (9th Cir. 1999) (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)). Instead, a due process claim based on stigma requires a "stigma-plus" allegation that the government action harming reputation also "deprived the plaintiff of a protected liberty or property interest or a status recognized by the state." *Id.* at 376 (citing *Paul*, 424 U.S. at 712).

Here, Nationwide has not identified any constitutionally protected property or liberty interest. The only property interest mentioned at all is Nationwide's asserted "property right" in its "business," CC ¶ 103, but this purely economic interest is not a constitutionally protected property right. *See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) ("[B]usiness in the sense of *the activity of doing business*, or the activity *of making a profit* is not property in the ordinary sense.") (emphasis in original); *W. Reserve Oil & Gas Co. v. New*, 765 F.2d 1428, 1432 (9th Cir. 1985) (rejecting that "the right to continue the operation of a business is a cognizable property interest"). Nor does Nationwide sufficiently allege a claim based on "stigma-plus"; while it alleges stigma and reputational harm, CC ¶ 102,

[10] While *Roth* concerned the Fourteenth Amendment, the same principles apply under the Fifth Amendment. *Raditch v. United States*, 929 F.2d 478, 481 (9th Cir. 1991).

[11] Courts have identified constitutionally protected property interests in, for example, continuing to receive government benefits, *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970), obtaining a government license where the criteria for the license are non-discretionary, *Groten v. Cal.*, 251 F.3d 844, 850 (9th Cir. 2001), and receiving a salary guaranteed by law or contract. *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist*, 149 F.3d 971, 982 (9th Cir. 1998).

it has not alleged a cognizable "plus" in its contentions that it has been prevented from "pursuing its lawful, chosen line of business" or that it has been deprived of "access to banking services." *Id.* ¶¶ 102-103. Violation of the right to choose a line of business requires "a *complete prohibition* on the right to engage in a calling, and not a sort of brief interruption." *Guzman v. Shewry*, 552 F.3d 941, 954 (9th Cir. 2008) (emphasis in original) (citing *Conn v. Gabbert*, 526 U.S. 286, 292 (1999)). Here, Nationwide avers its intent to restart its business. CC ¶ 88. The Bureau has also been unable to locate authority that applies the proper *Roth* "legitimate claim of entitlement" standard in concluding that the right to hold a bank account – as opposed to the right to the contents of an account – is a protected property interest.[12]

Even if Nationwide had alleged the existence of a constitutionally protected right, its due process claim would still fail because it does not plead that the Bureau deprived it of that right. The law is clear that "the due process provision of the Fifth Amendment does not apply to the indirect adverse effects of governmental action." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 789 (1980) (citing cases). Put another way, the fact that governmental action leads to substantial harm "does not turn the [action] into a governmental decision to impose that harm." *Id.* at 789. Nationwide alleges no more than an indirect adverse effect of governmental action, which does not suffice to state a due process claim. In contrast, the district court in *CFSA* held that the plaintiffs had sufficiently stated a due process claim because their allegations included facts showing how the defendant agencies targeted the plaintiffs via their banks, rendering the impact neither "indirect nor incidental." 132 F. Supp. 3d at 122.

**2. Nationwide's APA counterclaims are without merit.**

Even assuming that Nationwide's APA counterclaims are suitable for this Court's review, those counterclaims – contending that the definition of "risk to consumers" in the

[12] In *CFSA*, the court did not address *Roth* in considering the status of the right to hold a bank account. Instead, it noted that "many people" would consider holding bank accounts to be an "important" right. 132 F. Supp. 3d at 124 (citing *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 204 (D.C. Cir. 2001)). In doing so, it directly quoted a case that, in actuality, concluded that due process was required before the government designated the plaintiff a foreign terrorist organization and deprived it of an array of rights, including the right to the contents of a bank account. *Nat'l Council of Resistance of Iran*, 251 F.3d at 204.

Bureau's Exam Manual is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations," CC ¶¶ 106-116 (citing 5 U.S.C. § 706(2)(A), (C)) – also fail to state a claim for which relief can be granted.[13] Congress gave the Bureau authority to supervise very large banks for the purpose of "detecting and assessing associated *risks to consumers* and to markets for consumer financial products and services." 12 U.S.C. § 5514(b)(1)(C) (emphasis added). Congress did not, however, define the term "risk to consumers," leading to the conclusion that Congress gave the Bureau discretion to define it. *Modesto Irrigation Dist.*, 619 F.3d at 1033.[14]

Additionally, because the Exam Manual is an internal, non-binding guidance document, its interpretation of "risk to consumers" is entitled to "some deference . . . given the specialized experience and broader investigations and information available to the agency, and given the value of uniformity in its administration and judicial understandings of what a national law requires." *United States v. Mead Corp.*, 533 U.S. 218, 234-35 (2001); *cf. George v. United States*, 901 F. Supp. 2d 1179, 1183 (N.D. Cal. 2012) (in assessing whether agency action is arbitrary and capricious, courts consider "whether the agency articulated a rational connection between the facts found and the choice made. A reviewing court may not overturn the action as long as the agency decision was based on a consideration of factors and there is no clear error of judgment. . . . [D]eference is due when the decision concerns factual disputes implicating substantial agency expertise") (internal citations and quotation marks omitted). Here, as in *Mead*, the regulatory scheme is "highly detailed" such that the Bureau has "the benefit of specialized experience," *id.* at 235: the Exam Manual's more than 900 pages cover examination procedures for thirteen different statutory or regulatory regimes. Therefore, the Exam Manual

---

[13] Because Nationwide has not explained how the Bureau purportedly participated in "Operation Choke Point" or used "pressure tactics" against it, *see infra* Part I.A, it is impossible to separately examine whether this alleged conduct violated the APA.

[14] In contrast, in the CFSA Complaint's APA allegations, the FDIC was alleged to have improperly defined the term "reputational risk," which does not appear in the relevant statute. *See* CFSA Compl. ¶¶ 95-108. Because the court in that matter found that the agency activities at issue did not constitute "final agency action," it dismissed the complaint's APA claims without reaching whether this definition or the agencies' other alleged "Operation Choke Point" activities violated the APA. 132 F. Supp. 3d at 118-21.

should be given respect "proportional to its power to persuade." *Id.* (citing *Skidmore v. Swift*, 323 U.S. 134, 140 (1944)). Under *Skidmore*, an agency's interpretation entitlement to deference is based "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140.

The Exam Manual's interpretation of "risk to consumers" merits deference. It carefully explains how examiners are to assess risks to consumers at a given institution, including factors to be considered and how the assessment is used to set examination priorities. It is based on the Bureau's expertise in Federal consumer financial protection laws, and it is consistent with the Bureau's authority to require compliance with those laws. *See* Exam Manual at 6-9. Accordingly, if the Court reaches the issue, it should find that the Bureau's Exam Manual is not arbitrary or capricious or in excess of statutory authority.

## II. THE COURT SHOULD STRIKE SEVERAL PORTIONS OF THE TAA.

When this Court struck the SAA's Defense Ten, it granted leave to amend "only to add additional factual underpinnings to support the legal theory currently set out in the defense . . . not to add other or different defenses," while cautioning Defendants "[t]hat leave to amend has been granted does not mean it necessarily should be exercised." Order, at 9-11. Nevertheless, Defendants have not set forth the required factual underpinnings of the defense, and they also improperly modified other portions of the TAA.

### A. Defense Nine Violates the Court's Order and Constitutes an Insufficient, Immaterial, and Impertinent Defense.

Defense Nine in the TAA, like the SAA's stricken Defense Ten, contends that the Bureau failed to provide notice as to what behavior complies with the law and also lacked a rational basis for declining to provide Defendants with advance notice of its enforcement action. TAA ¶¶ 85-97. This defense should again be struck; it is insufficient, immaterial, redundant, and impertinent, because it does not provide a defense to any of the Bureau's claims or have any bearing on the subject matter of the litigation. Its inclusion would also prejudice the Bureau, burden the Court, and lead to unnecessary and costly discovery.

Both of Defendants' arguments in Defense Nine remain legally insufficient. As to Defendants' first argument – that they were not on notice of what conduct violates the CFPA or the TSR – the only new facts Defendants include are a litany of irrelevant allegations involving Nationwide's history with a number of state regulators. TAA ¶¶ 85-94. In essence, Nationwide appears to argue – again – that its history of "compliance" with state regulators enforcing different laws should somehow bar the Bureau from enforcing federal consumer financial law in this case or, at very least, provide some defense because the "marketing materials at issue . . . are substantively the same as the marketing materials that flowed from the resolution of the [Ohio State Court case]." TAA ¶ 92. But the Court already considered and rejected this argument, noting that "Nationwide has proffered no factual or legal basis on which a federal agency may be equitably precluded from pursuing these claims based *on any prior litigation by a state*, regardless of whether a former state official now holds federal office." Order, at 10 (emphasis added). That same reasoning applies here. *See Spicer Accounting, Inc. v. United States*, 918 F.2d 90, 94 (9th Cir. 1990) (United States "was not a party, nor in privity with the State of Idaho, in the prior state administrative action" and therefore could relitigate issue previously determined in state action).

Defendants similarly fail to provide the requisite factual support for their second argument, that the Bureau violated Defendants' due process rights and the APA by declining to notify them that it was planning to file suit or provide them an opportunity to respond in advance of this lawsuit. *Compare* SAA ¶¶ 88, 89, 91 *with* TAA ¶¶ 96, 95, 97. Defendants cannot plausibly allege that they will be deprived of a fair opportunity to be heard in this Court. *See Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) ("A fundamental requirement of due process is 'the opportunity to be heard.'") (citation omitted). As the Bureau has previously explained, Dkt. Nos. 70, 78, its decision not to engage in the explicitly discretionary, pre-complaint NORA process does not constitute a deprivation of due process or a violation of the APA. In analogous situations, courts have held that defendants are not constitutionally entitled to pre-suit notification that an agency is considering litigation or an opportunity to respond prior to litigation. *See TRW, Inc. v. F.T.C.*, 647 F.2d 942, 952 (9th Cir. 1981) ("The Commission's prior

practice [of allowing pre-complaint presentations to Commissioners] was not a 'rule' to which the Commission is constitutionally compelled to adhere."); *S.E.C. v. Nat'l Student Mktg. Corp.*, 538 F.2d 404, 407 (D.C. Cir. 1976) (finding no constitutional or statutory procedural infirmity in SEC decision not to follow its discretionary pre-suit notification process; requiring SEC to follow process would seriously burden the SEC's enforcement procedure); *Wellman v. Dickinson*, 79 F.R.D. 341, 353 (S.D.N.Y. 1978) (concluding that pre-suit process is not constitutionally compelled; there is no substantive adjudication of rights until after suit is filed and defendant has an opportunity to present claims at a full trial on the merits).

Defense Nine is also subject to strike because it will prejudice the Bureau, burden the Court, and lead to unnecessary and costly discovery into issues that do not provide a defense to the Bureau's claims and that have nothing to do with the issues in this case. *See Barnes*, 718 F. Supp. 2d at 1173 (finding discovery and litigation of legally unsustainable affirmative defenses inherently prejudicial); *S.E.C. v. Toomey*, 866 F. Supp. 719, 722 (S.D.N.Y. 1992) (accepting increased time and litigation expense as sufficient to establish prejudice for purposes of motion to strike). Instead, Defendants apparently plan to use Defense Nine to seek discovery into the Bureau's internal investigative, decision-making, and deliberative processes. *See* Dkt. Nos. 44 (Joint Management Statement and [Proposed] Order) at 6, and 53 (Joint Further Case Management Statement and [Proposed] Order) at 6 (both indicating that Defendants will seek discovery into "the Bureau's investigation of this matter"). This information, however, is privileged. *See United States v. Fernandez*, 231 F.3d 1240, 1245-47 (9th Cir. 2000) (district court abused discretion in requiring production of internal agency memoranda protected by deliberative process and work product privileges); *F.T.C. v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984) ("[The deliberative process] privilege permits the government to withhold documents that reflect advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated."). Defense Nine thus has no purpose other than to turn this litigation into an "intrusive dispute" by inviting inevitable discovery battles about how the Bureau conducted the investigation; it is inherently prejudicial because of the "delay and increased litigation expense [that] are virtually

certain to follow." *See S.E.C. v. Cuban*, 798 F. Supp. 2d 783, 794-95 (N.D. Tex. 2011); *see also S.E.C. v. Rivlin*, No. 99–1455 (RCL), 1999 WL 1455758 (D.D.C. Dec. 20, 1999). Defendants should not be permitted to tie up Bureau staff and resources with a purported defense that is insufficient as a matter of law and would prejudice the Bureau. *See S.E.C. v. KPMG, LLP*, No. 03 Civ. 671 (DLC), 2003 WL 21976733, at *3 (S.D.N.Y. Aug. 20, 2003) (striking affirmative defenses as prejudicial because "defendants have already given notice that they will seek to discover the internal workings of SEC investigations . . . to support these defenses").

### B. The Court Should Strike Paragraph 36 from the TAA.

The Court should also strike Paragraph 36 from the TAA, which Defendants have surreptitiously revised from the SAA, in contravention of the Court's Order, which only permitted amendments to the affirmative defense and the counterclaims. Paragraph 36 of the SAA read, in relevant part: "Defendants admit Daniel S. Lipsky estimated in 2014 that Nationwide's program in 2013 helped customers *save* approximately $161 million *in interest charges over the life of their loans*." SAA ¶ 36 (emphasis added).[15] In contrast, Paragraph 36 of the TAA now reads, in relevant part: "Defendants admit Daniel S. Lipsky estimated in 2014 that Nationwide's program in 2013 helped customers *achieve a savings of* approximately $161 million *off the total projected interest charges of their loans*." TAA ¶ 36 (emphasis added). Because Defendants amended Paragraph 36 in violation of the Court's Order and without the Bureau's consent, the amendment is a nullity and without legal effect. *See Booth v. United States*, No. CIV F 07-486 AWI WMW, 2007 WL 2462158, at *1 (E.D. Cal. Aug. 29, 2007) (citations omitted). Accordingly, the Court should strike Paragraph 36 of the TAA and substitute Paragraph 36 of the SAA.

## CONCLUSION

For the foregoing reasons, the Bureau respectfully requests that the Court dismiss Nationwide's counterclaims, strike Defense Nine and Paragraph 36 of the TAA, and grant any additional relief the Court deems just and proper.

Dated: July 5, 2016 Respectfully submitted,

[15] Defendants' Answer and Amended Answer, Dkt. Nos. 34, 43, use identical language.

MARY MCLEOD
General Counsel

JOHN R. COLEMAN
Assistant General Counsel

ANTHONY ALEXIS
Enforcement Director

DEBORAH MORRIS
Deputy Enforcement Director

MICHAEL G. SALEMI
Assistant Litigation Deputy

/s/ Melanie Hirsch
Melanie Hirsch
melanie.hirsch@cfpb.gov
202-435-7944
Edward Keefe
edward.keefe@cfpb.gov
202-435-9198
Patrick Gushue
patrick.gushue@cfpb.gov
202-435-9671
Jonathan Urban
jonathan.urban@cfpb.gov
202-435-7371
*Enforcement Attorneys*

Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552