SEAN E. PONIST (SBN 204712)
sponist@ponistlaw.com
GEORGIA Z. SCHNEIDER (SBN 251358)
gschneider@ponistlaw.com
**LAW OFFICES OF SEAN PONIST, P.C.**
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 798-2222
Fax: (888) 350-5442

JOHN D. SMITH (admitted *pro hac vice*)
**JOHN D. SMITH CO., LPA**
jsmith@johndsmith.com
140 N. Main Street, Suite B
Springboro, Ohio 45066
Telephone: (937) 748-2522
Fax: (937) 748-2712

***Attorneys for Defendants Nationwide Biweekly Administration, Inc., Loan Payment Administration, LLC, and Daniel S. Lipsky And Counterclaimant Nationwide Biweekly Administration, Inc.***

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

vs.

NATIONWIDE BIWEEKLY ADMINISTRATION, INC., LOAN PAYMENT ADMINISTRATION LLC, and DANIEL S. LIPSKY,

Defendants.

NATIONWIDE BIWEEKLY ADMINISTRATION, INC.,

Counter-Claimant,

vs.

CONSUMER FINANCIAL PROTECTION BUREAU,

Counter-Defendant.

Case No. 3:15-cv-02106-RS

**OPPOSITION TO PLAINTIFF'S MOTION DISMISS COUNTERCLAIMS AND TO STRIKE PORTIONS OF THIRD AMENDED ANSWER**

Hearing Date: August 11, 2016
1:30 p.m.
Judge: Hon. Richard Seeborg
Courtroom: Courtroom 3, 17th floor
450 Golden Gate, Avenue
San Francisco, CA 94102

# TABLE OF CONTENTS

**Page(s)**

MEMORANDUM OF POINTS AND AUTHORITIES ....................1

I. NATIONWIDE HAS SUFFICIENTLY PLED ITS AMENDED COUNTERCLAIM ....................3

A. The Only Plausible Explanation For Four Banks Unilaterally Terminating Nationwide's Critical Banking Services Is CFPB's Use of Extrajudicial Operation Choke Point Tactics ....................4

1. CFPB's Involvement In Operation Choke Point Is Well Documented ....................5

2. CFPB's Unique Relationship With The Banking Industry Has Ideally Positioned It To Improperly Utilize Extrajudicial Tactics....................6

3. CFPB Used Extrajudicial Tactics To Blacklist Nationwide And "Choke Off" Nationwide's Critical Banking Services....................7

4. The Manner In Which Each Of The Four Banks Terminated Nationwide's Services Is Further Evidence Of CFPB's Use Of Tactics....................8

5. There Are No More Probable "Obvious Alternative Explanations" for the Termination Of Nationwide's Banking Relationships....................9

a. Banks Have Known About Other Civil, Governmental, Regulatory Actions Against Nationwide, But Never Sought To Terminate Relationships With Nationwide ....................9

b. CFPB Has Utilized Operation Choke Point Tactics To "Choke Off" Financial Services for Individuals and Entities Related to Nationwide That Are Not Parties To This Lawsuit ....................10

6. If Necessary, Nationwide is prepared to Offer Additional, Recently Discovered Facts....................10

a. Additional Facts re Extrajudicial Action Affecting Personal Accounts and Affiliated Nonparty Accounts....................11

b. Additional Recently Learned Facts That Banks Terminated Services Because of Fear of Retaliation from CFPB ....................11

B. Nationwide Has Met Its' Burden Of Demonstrating Article III Standing....................12

1. Nationwide Has Sufficiently Alleged Causation ....................13

2. Nationwide Has Sufficiently Alleged Redressability ....................13

3. There Exists No Law Committing CFPB's Use Of Operation Choke Point And Other Extrajudicial Tactics To "Agency Discretion" ....................15

4. CFPB's Use Of Operation Choke Point Tactics To Drive Nationwide Out Of Business Constitutes "Final Agency Action" Reviewable By This Court .......16

**<u>TABLE OF CONTENTS</u>: (continued)** **<u>Page(s)</u>**


C. Nationwide Has Sufficiently Pled the Causes of Action in its Counterclaim....................17

1. Nationwide Has Properly Alleged Infringement of Protected Speech ..................17

2. Nationwide Has Properly Alleged Deprivation of a Constitutionally Protected Liberty Interest..........................................................................19

3. Nationwide Has Properly Alleged A Claim For Relief Under the APA ...............21

II. THE COURT SHOULD NOT STRIKE DEFENSE NINE OR PARAGRAPH 36 FROM THE THIRD AMENDED ANSWER...........................................................................22

A. Defense Nine Should Not Be Stricken...................................................................23

B. Paragraph 36 Should Not Be Stricken ...................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*44 Liquormart v. R.I.*, 517 U.S. 484 (1996) .......... 17

*ABB Turbo Systems AG v. Turbousa, Inc.*, 774 F.3d 979 (Fed. Cir. 2014) .......... 4

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 3, 4

*Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) .......... 19

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) .......... 17

*Barnes v. AT&T Pension Benefit Plan*, 718 F.Supp.2d 1167 (N.D. Cal. 2010) .......... 22

*Bennett v. Spear*, 520 U.S. 154 (1997) .......... 16

*Bigelow v. Virginia*, 412 U.S. 809 (1975) .......... 17

*Cardigan Mountain School v. New Hampshire Ins. Co.*, 787 F.3d 82 (1st Cir. 2014) .......... 4, 5

*Cervantez v. Sullivan*, 719 F.Supp. 899 (E.D. Cal. 1989) .......... 3

*Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115 (9th Cir. 2010) .......... 12

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Fed. Deposit Ins. Corp.*, 132 F.Supp.3d 98 (D.D.C. 2015) .......... 14, 20

*Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33 (1st Cir. 2013) .......... 9

*G & G Fire Sprinklers, Inc. v. Bradshaw*, 156 F.3d 893 (9th Cir. 1998) .......... 20

*Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246 (9th Cir.1997) .......... 3

*Heckler v. Chaney*, 470 U.S. 821 (1985) .......... 15

*Humphries v. City. of L.A.*, 554 F.3d 1170 (9th Cir. 2009) .......... 19

*Hynix Semiconductor Inc. v. Rambus, Inc.*, Nos. CV-00-20905 RMW, 2007 WL406845, (N.D. Cal. Nov. 15, 2007) .......... 22

*In re R.M.J.*, 455 U.S. 191 (1982) .......... 17

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377 (2014) .......... 13

*Love v. United States*, 915 F.2d 1242 (9th Cir. 1989). .......... 4

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .......... 12, 13

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .......... 19

*N.Y.C. Emples. Ret. Sys. v. Berry*, 667 F.Supp.2d 1121 (N.D. Cal. 2009) .......... 23, 25

**TABLE OF AUTHORITIES: (continued)** **Page(s)**

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109 (2nd Cir. 2013) ........ 9

*Oregon Natural Desert Ass'n v. U.S. Forest Service*, 465 F.3d 977 (9th Cir. 2006) ........ 16

*Orion Tire Corp. v. Goodyear Tire & Rubber Co., Inc.*, 268 F.3d 1133 (9th Cir. 2001) ........ 10

*OSU Student Alliance v. Ray*, 699 F.3d 1053 (9th Cir. 2012) ........ 4

*Reniger v. Hyundai Motor Am.*, 122 F. Supp. 3d 888 (N.D. Cal. 2015) ........ 12, 13

*Robertson v. Sea Pines Real Estate Cos., Inc.*, 679 F.3d 278 (4th Cir. 2012) ........ 4

*Rothman v. Jackson*, 49 Cal.App.4th 1134 (1996) ........ 8

*Solis v. Zenith Capital, LLC*, No. 08-4854, 2009 WL1324051 (N.D. Cal. May 8, 2009) ........ 23

*Stanbury Law Firm v. I.R.S.*, 221 F.3d 1059 (8th Cir. 2000) ........ 22

*Stickrath v. Globalstar, Inc.*, No. C07-1941 TEH, 2008 WL 2050990 (N.D. Cal. May 13, 2008) ........ 18

*Trifax Corp. v. District of Columbia*, 314 F.3d 641 (D.C. Cir. 2003) ........ 20

*U.S. AMC Entertainment, Inc.*, 549 F.3d 760 (9th Cir. 2008) ........ 23

*United States v. Philip Morris Inc.*, 304 F.Supp.2d 60 (D.D.C. 2004) ........ 18

*Walnut Properties, Inc. v. City of Whittier*, 861 F.2d 1102 (9th Cir. 1988) ........ 18

*Watson Carpet & Floor Covering, Inc. v. Mohawk Industries, Inc.*, 648 F.3d 452 (6th Cir. 2011) ........ 9

*White v. Hansen*, No. C 05-784 SBA, 2005 WL1806367 (N.D. Cal. July 28, 2005) ........ 22

*Whitney v. Guys, Inc.*, 700 F.3d 1118 (8th Cir. 2012) ........ 4

*Wisconsin v. Constantineau*, 400 U.S. 433 (1971) ........ 19

*Wyler Summit P'ship v, Turner Broad. Sys.*, 135 F.3d 658 (9th Cir. 1998) ........ 3

*Wyshak v. City Nat'l Bank*, 607 F.2d 824 (9th Cir. 1979) ........ 22

**Rules**

DOJ R. 1-7.500 ........ 8

DOJ R. 1-7.520 ........ 8

# **MEMORANDUM OF POINTS AND AUTHORITIES**

## **STATEMENT OF ISSUES TO BE DECIDED**

Has the CFPB overcome the strong presumption against dismissing an action for failing to state a claim where Nationwide has alleged 74 additional paragraphs demonstrating that the only plausible explanation for the bank terminations is CFPB's use of extrajudicial tactics to exert pressure on the banks and where its counterclaim alleges facts supporting all required elements of its claims, which are entitled to a presumption of truth?

Has CFPB demonstrated that Nationwide has not alleged Article III standing where Nationwide's counterclaim contains specific allegations that Nationwide suffered deprivation of its constitutional rights as a direct result of extrajudicial actions by CFPB, and seeks monetary and injunctive relief to redress those injuries?

Has CFPB stated an adequate basis for a Rule 12(f) motion to strike Nationwide's ninth affirmative defense where the defense is legally sufficient and CFPB cannot demonstrate any prejudice?

## **INTRODUCTION**

In its Motion to Dismiss, CFPB largely regurgitates its same arguments while largely ignoring the new facts alleged. It can only be assumed that CFPB hopes that the Court will similarly ignore the extensive evidence linking CFPB to Operation Choke Point and move quickly past the plausibility argument. The Court, however, was clear during the May 23, 2016 hearing that plausibility was the **only** issue on which it had granted CFPB's motion to dismiss with leave to amend. Despite CFPB's desire to do so, these facts cannot be ignored.

In response to the Court's directive, Nationwide has amended its counterclaims adding 74 additional paragraphs, which demonstrate CFPB's involvement in Operation Choke Point and use of extrajudicial tactics in this case. Specifically, Nationwide has alleged facts sufficient to demonstrate that:

- CFPB was involved in Operation Choke Point from its inception;
- CFPB has utilized Operation Choke Point tactics against other biweekly companies;
- CFPB supervised all four banks that terminated services for Nationwide and because of its unique relationships with the banks and virtually unregulated status, it is in the ideal position to implement Operation Choke Point;
- Each bank termination occurred at the same time and in the same manner, consistent with Operation Choke Point;
- Each termination occurred approximately 30 days after CFPB **unnecessarily** published the names

of Nationwide's banking partners in a public court filing;

- Nationwide has been sued by other governmental organizations with nearly identical allegations and has **not** lost any banking relationships; and
- Mr. Lipsky's personal bank and investment accounts, having nothing do with this litigation, have also been terminated, thus eliminating the possibility that the mere existence of this lawsuit is an "obvious alternative explanation" for the terminations.

In addition, Nationwide has recently discovered a recorded call between a Nationwide employee and two representatives from US Bank which further demonstrates that US Bank's termination of Nationwide's account was a result of US Banks' fear of reprisal from CFPB if it did not terminate its relationship and **not** simply a result of CFPB filing this lawsuit as CFPB suggests. In fact, US Bank indicated that, but for fear of reprisal from CFPB, it would have wanted to maintain its relationship with Nationwide. Accordingly, not only is it plausible that CFPB's use of Operation Choke Point and other extrajudicial tactics was the cause for the bank terminations, it is, in fact, the **only** plausible explanation.

Finally, Nationwide has alleged facts sufficient to meet its burden of demonstrating Article III standing and facts sufficient to allege plausible claims for relief for violation of Nationwide's First Amendment rights, violation of Nationwide's Fifth Amendment Due Process rights, and for declaratory and injunctive relief. Similarly, there is no basis to strike Defense Nine or paragraph 36 of the Third Amended Answer ("TAA"). Thus, CFPB's motion has no merit and should be denied in its entirety.

## BACKGROUND

The Defendants in this action, including Nationwide, filed an Answer on July 13, 2015, and thereafter, on August 10, 2015, filed a First Amended Answer. Dkt. Nos. 34 and 43. CFPB filed a motion to strike a number of the affirmative defenses asserted in the First Amended Answer. Dkt. Nos. 48 and 57. As a result of a transition of lead counsel, Defendants sought, and obtained, CFPB's consent to amend their pleading pursuant to Rule 15 of the Federal Rules of Civil Procedure. Dkt. No. 65. On February 2, 2016, Defendants filed their Second Amended Answer withdrawing 12 affirmative defenses and asserting compulsory counterclaims based on events that happened after the filing of the first amended answer. Dkt. No. 67.

Thereafter, CFPB filed a motion to dismiss and motion to strike the Second Amended Answer, which was heard by this Court on May 12, 2016. The Court granted CFPB's motions in part with leave

to amend. Dkt. No. 80. The Court indicated during the hearing and in its order that plausibility was the **only** issue on which he was granting CFPB's motion to dismiss:

> As to the motion to dismiss, the argument, as I understand it, is that the plaintiffs are saying the counterclaims are deficient for lack of standing, sovereign immunity, failure to state a claim. **I don't think at this juncture they would be subject to dismissal on the first two grounds, and I am saying just on the current state of the pleadings, but I do think the claims fail to state a plausible claim**.

May 23, 2016 Hearing, R.T. 2:23-3:8 (emphasis added); Dkt. No. 80.

Thus, in response to the Court's directive, Nationwide amended its counterclaims adding 74 additional paragraphs, which demonstrate CFPB's involvement in Operation Choke Point and use of these extrajudicial tactics in this case. In addition, Nationwide amended its Due Process affirmative defense in accordance with the Court's order to "add additional factual underpinnings to support the legal theory currently set out in the defense." Dkt. No. 80, 9:20-23.

## ARGUMENT

### I. NATIONWIDE HAS SUFFICIENTLY PLED ITS AMENDED COUNTERCLAIM

"To survive a motion to dismiss [under Federal Rule of Civil Procedure 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the **reasonable inference** that the defendant is liable for the misconduct alleged." *Id.* (Emphasis added.) In considering a Rule 12(b)(6) motion to dismiss, "all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." *Wyler Summit P'ship v, Turner Broad. Sys.*, 135 F.3d 658, 661 (9th Cir. 1998) (citation omitted). There is a strong presumption against dismissing an action for failure to state a claim. See *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (citation omitted).

Similarly, when faced with a facial challenge to subject matter jurisdiction, as in the instant case, the non-movant "is entitled to safeguards similar to those applicable when a Rule 12(b)(6) motion is made." *Cervantez v. Sullivan,* 719 F.Supp. 899, 903 (E.D. Cal. 1989), rev'd on other grounds, 963 F.2d 229 (9th Cir. 1992). The factual allegations of the complaint are presumed to be true, and the motion is granted only if the non-movant fails to allege an element necessary for subject matter jurisdiction. *Id.*

Moreover, the allegations of the complaint must be construed in the light most favorable to the non-movant. *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989).

As pled and demonstrated herein, Nationwide has alleged sufficient facts to state a claim for relief that is plausible on its face and facts sufficient to allege subject matter jurisdiction.

### A. The <u>Only</u> Plausible Explanation For Four Banks Unilaterally Terminating Nationwide's Critical Banking Services Is CFPB's Use of Extrajudicial Operation Choke Point Tactics

Nationwide's amended counterclaims not only allege facts sufficient to demonstrate that CFPB was involved in Operation Choke Point but, in fact, demonstrate that the **<u>most</u>** plausible explanation for the termination of Nationwide's banking services is CFPB's use of these extrajudicial tactics to "choke off" Nationwide's critical banking services. This, of course, is more than is required at the pleading stage. See *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1078 (9th Cir. 2012) ("But where the claim is plausible – meaning something more than 'a sheer possibility,' but less than a probability – the plaintiff's failure to prove the case on the pleadings does not warrant dismissal"); *Robertson v. Sea Pines Real Estate Cos., Inc.*, 679 F.3d 278, 291 (4th Cir. 2012) (same); *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (same).

CFPB, however, appears to ignore the alleged facts and plausibility pleading standard, devoting less than two pages of its 25-page motion to address this critical issue of plausibility. Rather, CFPB disingenuously suggests that simply because Nationwide's counterclaim does not contain allegations that "the Bureau issued guidance documents warning banks against doing business with companies like Nationwide," or that "Nationwide's specific banks reported that they were closing its accounts because of regulatory concerns," Nationwide's counterclaim must be dismissed. Mot., 10:7-11. That, however, is **<u>not</u>** the standard on a motion to dismiss. Rather, Nationwide must only plead facts sufficient to "allow[ ] the court to draw the **<u>reasonable inference</u>** that [CFPB] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (emphasis added).

Further, contrary to CFPB's suggestion, there is **<u>no</u>** requirement that you plead only "direct" facts. Circumstantial facts are sufficient, particularly where, as here, the actual facts are largely in the hands of CFPB. See *Cardigan Mountain School v. New Hampshire Ins. Co.*, 787 F.3d 82, 88 (1st Cir. 2014); *ABB Turbo Systems AG v. Turbousa, Inc.*, 774 F.3d 979, 988 (Fed. Cir. 2014) (noting "the importance of a

'context specific' application of Rule 8 [and *Twombly/Iqbal*], and the particular need to apply the plausibility standard with a recognition that direct evidence of some facts – such as guilty knowledge, in some cases – may be distinctively in the defendant's possession, requiring that the threshold standard of plausibility be applied to more circumstantial evidence.") Accordingly, "the factual allegations need only be enough to nudge the claim 'across the line from conceivable to plausible,' thus 'rais[ing] a reasonable expectation that discovery will reveal evidence of'" the direct facts in support of the allegations. *Cardigan Mountain School*, 787 F.3d at 88 citing *Twombly*, 550 U.S. at 556, 570.

**1. CFPB's Involvement In Operation Choke Point Is Well Documented**

While CFPB may have turned a blind-eye to the new allegations in its Motion, its involvement in Operation Choke Point is well documented as set forth in Nationwide's amended counterclaim ("CC"). In November of 2012, an internal Department of Justice ("DOJ") memorandum proposed Operation Choke Point and **explicitly identified CFPB as a partner in the operation**. CC, ¶¶27, 50. The goal of Operation Choke Point from its inception was to extrajudicially pressure banks to terminate banking services of certain individuals and businesses the government deemed "problematic," or whom the government alleged were engaging in fraud, without any judicial involvement. CC, ¶29. To accomplish this goal, Operation Choke Point's participants were to use focused pressure on the bank's "sensitiv[ity] to the risk of civil/criminal liability and regulatory action." *Id.*

Not only has CFPB been involved in Operation Choke Point, **CFPB was a founding partner of Operation Choke Point**. CC, ¶¶ 30, 50, 51. In an April 17, 2013 Operation Choke Point status report, Michael S. Blume, the Director of DOJ's Consumer Protection Branch, reported having "offered to work with CFPB to identify appropriate targets and to pursue a joint investigation." *Id.* Thereafter, Director Blume verified: "**CFPB's Director of Enforcement has approved [DOJ's] proposal for a joint approach**." CC, ¶33.

On September 9, 2013, Director Blume circulated another memo entitled, "Operation Choke Point: Six Month Status Report." In this memo Director Blume again recited the purported purpose of Operation Choke Point and noted how subtle actions by the federal government have purportedly caused:

> [A] dramatic shift in the banking industry with respect to third-party payment processor risk assessment and risk tolerance, as will be described further below. Segments of the banking industry that had been doing business with third party

> payment processors have chosen to exit or severely curtail that business, thereby making it harder - and in some cases, impossible - for untold numbers of merchants … to run their … operations.

CC, ¶37. The memo further stated in part:

> All signs indicate that Operation Choke Point is having an unprecedented effect on banks doing business with illicit third-party payment processors…
>
> Most importantly, we have learned directly from many sources that banks that have received our subpoenas, **<u>and others aware of our efforts</u>**, are scrutinizing their-relationships with high risk third-party payment processors.

CC, ¶38 (emphasis added). Thus, through the limited use of Operation Choke Point tactics on certain banks and in certain situations, the entire banking industry has been put on high-alert that association with any disfavored business can lead to retaliatory action against it by the federal government. *Id*.

The memo went on to describe how banks were at risk "because they could be held responsible for the bogus or fraudulently procured charges to consumer bank accounts." CC, ¶39. Notably, the **<u>CFPB was the first and only branch of the federal government to actually employ this strategy against financial institutions and payment processors who would not capitulate</u>**, naming them as co-defendants in a lawsuit along with the disfavored business. CC, ¶¶39, 52. Thus, CFPB's feigned ignorance of its participation in Operation Choke Point and its use of other extrajudicial tactics is disingenuous and misleading.

### 2. CFPB's Unique Relationship With The Banking Industry Has Ideally Positioned It To Improperly Utilize Extrajudicial Tactics

In July 2011, CFPB began the operation of a supervision program for very large banks, including each of Nationwide's four former banking partners. CC, ¶41. To conduct bank examinations, CFPB created a supervision section and hired bank examiners to staff it. CC, ¶42. The bank supervision section's job has been to learn if the bank's products or services violate any consumer protection laws. *Id*. CFPB also created an enforcement section which is staffed with attorneys whose job it is to "implement appropriate enforcement actions to address violations of law that harm consumers." *Id*. Importantly, however, these two sections both reported to the Associate Director for Supervision, Enforcement, and Fair Lending. CC, ¶43. Thus, from 2011 to 2013, attorneys from the enforcement section were regularly sent to bank examinations with the bank examiners from the bank supervision section – a practice which received "intense criticism from banks, industry lawyers and trade groups who

said the presence of enforcement attorneys at routine examinations crated a hostile regulatory environment." *Id*.

Despite recommendations from the Inspector General and the Ombudsman that this practice be changed, CFPB still has allowed examiners to "coordinate and work closely with CFPB's Enforcement staff to implement appropriate enforcement actions to address violations of law that harm consumers." CC, ¶44. Moreover, CFPB implemented "year-round supervision" of the banks. Thus, banks (including Nationwide's former banking partners) now operate under CFPB's constant supervision and threat that the slightest perceived misconduct, or association therewith, will result in stricter audits and/or enforcement actions. CC, ¶45.

Further, CFPB's Supervision and Examination Manual ("CFPB Manual") describes how CFPB's Bank Supervision section is to conduct examinations of large banks under its supervision. CC, ¶46. Importantly, the CFPB Manual sets forth policies and procedures for the Bank Supervisions division to use in assessing certain kinds of alleged "risk." *Id*. One such policy and procedure is the preparation of a "Risk Assessment," which the CFPB Manual indicates is meant to evaluate "the extent of risk to consumers arising from the activities of a supervised entity or particular lines of business within it and to identify the sources of that risk." *Id*. Notably, it is CFPB's policy and procedure to consider not just actually unfair, deceptive, or abusive practices, but also potentially unfair, deceptive, or abusive practices and the definition of "risk to consumers" is so broad that it concludes not only alleged risk from a bank's activities, but also alleged risk from a bank customer's activities. CC, ¶47. Thus, CFPB's Manual provides a platform for the veiled use of Operation Choke Point and other extrajudicial tactics designed to persuade banks to cease doing business with certain individuals or entities or risk CFPB altering their "risk profile" and supervision plan. CC, ¶48.

**3. CFPB Used Extrajudicial Tactics To Blacklist Nationwide And "Choke Off" Nationwide's Critical Banking Services**

As demonstrated in Nationwide's amended counterclaim, CFPB has targeted Nationwide and other biweekly programs through its use of Operation Choke Point. CC, ¶¶61-63. In fact, before targeting Nationwide, CFPB targeted Paymap, Inc., which like Nationwide had a biweekly program called "Equity Accelerator," which it described as being "designed to help consumers pay off their

mortgages more quickly." CC, ¶62. Further, although CFPB appears to recognize the advantages of biweekly payments, on its website, CFPB encourages consumers to carry out biweekly payment plans "on [their] own" rather than paying for such services through companies such as Nationwide. CC, ¶63.

Not only did CFPB target Nationwide, it actively sought to blacklist Nationwide and send a clear message to Nationwide's banking partners that they cease doing business with Nationwide or risk heightened scrutiny from CFPB. For example, at the same time CFPB filed this lawsuit against Nationwide on May 11, 2015, CFPB issued a press release entitled, "CFPB Files Suit Against Nationwide Biweekly for Luring Consumers with False Promises of Mortgage Savings." In the press release, CFPB asserted, **not** alleged, that Nationwide and Mr. Lipsky "took advantage of consumers with false promises of savings on their mortgage." CC, ¶64. This press release went well-beyond what is acceptable for a federal government agency in a press release, and well-beyond what would be shielded by any litigation privilege.[1] Shortly thereafter, within hours, Nationwide's banking partners expressed concerns to Nationwide and reservations about maintaining further their banking relationship. CC, ¶65.

Moreover, on June 2, 2015, CFPB unnecessarily named all four of Nationwide's banking partners in a public court filing, thereby linking those banks with false allegations of violations of federal law. CC, ¶71. This, again, sent a clear message to each of Nationwide's banks to cease business with Nationwide or risk heightened scrutiny and/or action by the CFPB—a tactic seen in Operation Choke Point to pressure, coerce, and intimidate banks into "choking off" a disfavored customer's access to financial services. CC, ¶72.

#### 4. The Manner In Which Each Of The Four Banks Terminated Nationwide's Services Is Further Evidence Of CFPB's Use Of Tactics

A little more than thirty days after CFPB unnecessarily published the names of Nationwide's

[1] Department of Justice rules mandate that in a civil case, "Department personnel may release … identification material [name etc.] regarding defendants, the concerned government agency or program, a short statement of the claim, and the government's interest." DOJ R. 1-7.520. The rules specifically prohibit "[a]ny opinion as to the defendant's guilt," and "any statement or information that [the Department] knows or reasonably should know will have a substantial likelihood of materially prejudicing the adjudicative proceeding." DOJ R. 1-7.500 and 1-7.550. See also *Rothman v. Jackson*, 49 Cal.App.4th 1134, 1149 (1996) ("[T]he litigation privilege should not be extended to 'litigating in the press.' Such an extension would not serve the purposes of the privilege; indeed it would serve no purpose but to provide immunity to those who would inflict upon our system of justice the damage which litigating in the press generally causes: poisoning of jury pools and bringing disrepute upon both the judiciary and the bar.")

banks, all four banks sent nearly identical letters to Nationwide terminating its banking services. CC, ¶73. Thereafter one bank terminated all critical services in September 2015 and other other three banks terminated all critical services in November 2015. *Id*. Importantly, each of Nationwide's banks acted in precisely the same way by sending form letters indicating that services would be terminated, but failing to provide any reason for such terminations, **a practice which is an extensively documented hallmark of Operation Choke Point**. CC, ¶74. Moreover, this practice of refusing to provide a reason in writing for the termination of banking services is also consistent with a CFPB compliance bulletin, which instructs all supervised financial institutions (such as Nationwide's banks) not to disclose any "[c]ommunications between the CFPB and the supervised financial institution related to the CFPB's examination of the institution or other supervisory activities" or any other "information created by the CFPB in the exercise of its supervisory authority." CC, ¶74.

In addition, each of Nationwide's banks also acted at virtually the same time – **a fact that is consistent with the involvement or influence of CFPB**, which has supervisory authority over each of the four banks. CC, ¶75. Notably, CFPB fails to address either of these facts in its Motion.

**5. There Are No More Probable "Obvious Alternative Explanations" for the Termination Of Nationwide's Banking Relationships**

Where the factual allegations plead in the complaint allow the court to draw a "reasonable inference" that the defendant is liable for the alleged misconduct, the pleading will survive **even if** there may be alternative explanations that are more plausible or even probable "unless at least one of those competing inferences rises to the level of an 'obvious alternative explanation.'" *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC,* 709 F.3d 109, 121 (2nd Cir. 2013) (citations omitted); *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013) ("It is not for the court to decide, at the pleading stage, which inferences are more plausible than other competing inferences."); *Watson Carpet & Floor Covering, Inc. v. Mohawk Industries, Inc.*, 648 F.3d 452, 458 (6th Cir. 2011) (same).

**a. Banks Have Known About Other Civil, Governmental, Regulatory Actions Against Nationwide, But Never Sought To Terminate Relationships With Nationwide**

Here, CFPB absurdly asserts that the mere existence of the Bureau's lawsuit is an "obvious

alternative explanation" for the banks' closure of Nationwide's accounts. Mot., 10:12-22. However, contrary to CFPB's unsupported assertion, Nationwide has pled facts sufficient to show that the bank terminations were **not** merely a result of the existence of the present litigation. As alleged, it is unreasonable to assume, as CFPB suggests, that banks are somehow "squeamish over the prospect of litigation as they [themselves] are constantly embroiled in legal battles." CC, ¶82, n.6. Therefore, the **only** plausible explanation advanced for the simultaneous termination of Nationwide's critical banking services by four banks supervised by CFPB is CFPB's use of Operation Choke Point and other extrajudicial tactics.

As set forth in Nationwide's amended counterclaims, Nationwide, like many of businesses, has been a party to civil lawsuits and government and regulatory actions before the commencement of the CFPB's lawsuit against it. CC, ¶80. Nationwide disclosed these prior actions to its banking partners without any consequence or termination of banking services. *Id*. Notably, the issues involved in these prior cases were substantially similar to those involved in the present CFPB action. CC, ¶¶81, 82. Nonetheless, despite awareness of the foregoing matters, **none** of the banks sought to terminate their relationship with Nationwide. *Id*.

**b. CFPB Has Utilized Operation Choke Point Tactics To "Choke Off" Financial Services for Individuals and Entities Related to Nationwide That Are Not Parties To This Lawsuit**

Moreover, CFPB's use of Operation Choke Point tactics has extended beyond Nationwide and has reached entities that are not even parties to this litigation, further demonstrating that the mere existence of the current litigation is **not** the cause for the bank terminations. Financial services have been inaccessible or terminated for both Mr. Lipsky, **personall**y, and other companies owned by him. CC, ¶66. The termination of **personal accounts** and the **accounts of affiliated nonpartie**s clearly indicates responses to extrajudicial action and not just responses to judicial action.

**6. If Necessary, Nationwide is prepared to Offer Additional, Recently Discovered Facts**

Should the Court require additional facts at the pleading stage, leave to amend should be granted. *Orion Tire Corp. v. Goodyear Tire & Rubber Co., Inc.*, 268 F.3d 1133, 1137 (2001) ("But complaints may not be dismissed with prejudice unless the allegations of the complaint make clear that plaintiff

cannot state a claim … Where counsel is able to posit possible amendments that would be consistent with the operative complaint and could also possibly state a claim for relief, the complaint should not be dismissed on its face with prejudice." (Citations omitted.))

**a. Additional Facts re Extrajudicial Action Affecting Personal Accounts and Affiliated Nonparty Accounts**

On July 13, 2015, for instance, all Mr. Lipsky's **personal accounts** at a CFPB-supervised bank were closed without explanation. Schneider Decl., ¶ 8. In late 2015, Mr. Lipsky, in his **personal capacity**, was denied an airline credit card through that same CFPB-supervised bank. In November of 2015, a different CFPB-supervised bank terminated the mortgage loan for Nationwide's office building, which was held by a company owned by Mr. Lipsky, but **not** a party of this lawsuit. *Id*. By February of 2016, the CFPB-supervised bank demanded payment in full, despite having received all mortgage payments on time for years. *Id*. Mr. Lipsky sought to refinance the mortgage but was declined. *Id*. Further, in May of 2016, all of Mr. Lipsky's **personal investment accounts** at a CFPB-supervised institution were closed without explanation. CC, ¶66. Finally, on June 14, 2016, following filing of the TAA, a company owned by Mr. Lipsky, but again **not** a party to this lawsuit, had its credit card services terminated without explanation, and has been unable to obtain new credit card services. *Id*.[2]

This series of events demonstrates that, contrary to CFPB's absurd suggestion, the bank terminations are **not** solely the result of CFPB filing the present lawsuit, but rather, are the result of CFPB's use of extrajudicial tactics designed to pressure and coerce banks to terminate services for Nationwide, Mr. Lipsky, and any company with any relation to Mr. Lipsky.

**b. Additional Recently Learned Facts That Banks Terminated Services Because of Fear of Retaliation from CFPB**

Additionally, through its continued investigation regarding the bank terminations, counsel for Nationwide has recently learned that on June 15, 2015, an employee of Nationwide spoke with two

[2]Counsel for Nationwide has met and conferred with CFPB regarding amending its counterclaim to include these newly discovered additional facts, and specifically to include the facts regarding the termination of services which occurred after Nationwide filed its amended counterclaims. CFPB has indicated that it will not agree to such a stipulation, nor will it agree to take the present motion off calendar to allow Nationwide to file a motion for leave to amend. Rather, CFPB indicated that Nationwide should include these facts in its opposition. Schneider Decl., ¶ 9 Accordingly, Nationwide requests that should the Court be inclined to grant CFPB's motion, that leave to amend be granted such that Nationwide can plead these additional facts that exclude the possibility that the mere existence of this lawsuit is an "obvious alternative explanation" for the bank terminations.

representatives of US Bank regarding the termination of Nationwide's account. Schneider Decl., ¶10, Ex. 1. The US Bank representatives told this employee that they would have to terminate their relationship with Nationwide because US Bank was very concerned about "risk." *Id*. Specifically, the representatives noted that the CFPB "has long arms," "unlimited resources," and is not even regulated by the federal government so it can do "whatever it wants." *Id*. They also noted that "just between the three of us," US Bank has had a lot of bad experiences with the CFPB and whenever they see the CFPB, they "turn around and run the other way – once bitten, twice shy." *Id*. Further, the representatives specifically noted that Nationwide had always been a good customer and they "felt sick" about terminating the account, emphasizing that this was <u>**not**</u> a reflection on Nationwide. *Id*.

This call demonstrates, <u>as Nationwide has alleged in its amended counterclaims</u>, that the "banks terminated their relationship with Nationwide as a result of the CFPB employing a variety of "Operation Choke Point" back-room pressure tactics to persuade the banks to terminate Nationwide's critical services, effectively "choking off" Nationwide's banking services and/or CFPB's prior use and/or threatened use of "Operation Choke Point" tactics against banks, effectively "scaring off" its banking partners, and depriving Nationwide of the ability to conduct its business." CC, ¶77. Thus, the mere existence of this lawsuit, independent of CFPB's extrajudicial actions and pressure tactics, is not an "obvious alternative explanation."

### B. Nationwide Has Met Its' Burden Of Demonstrating Article III Standing

On a Rule 12(b)(1) motion to dismiss, the party asserting jurisdiction bears the burden of proving the existence of Article III standing. *Reniger v. Hyundai Motor Am.*, 122 F. Supp. 3d 888, 891 (N.D. Cal. 2015), citing *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121-1122 (9th Cir. 2010). However, at this early stage in the litigation, Nationwide's burden to demonstrate the existence of the elements of standing is a relatively light one. The Supreme Court has described it as follows:

> Since [the standing elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. <u>At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim</u>.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (emphasis added) (internal citations omitted).

Thus, where, as here, Nationwide has alleged that "[a]s a direct result of CFPB's actions, Nationwide has suffered and, absent relief from this Court, will continue to suffer damages for lost revenue, harm to its business and goodwill, and infringement and deprivation of its constitutional rights," Nationwide has met its burden and sufficiently alleged standing. See CC, ¶105.

**1. Nationwide Has Sufficiently Alleged Causation**

As demonstrated above, Nationwide has pled facts sufficient to demonstrate that CFPB's use of extrajudicial tactics is the most likely cause of Nationwide's banking relationships being terminated rather than "the banks' independent reaction to the Bureau's lawsuit," as suggested by CFPB.[3] See Section (I)(A), *supra*. Accordingly, Nationwide has pled a "causal connection between the injury and the conduct complained of" that is "fairly traceable to the challenged action of [CFPB], and not the result of the independent action of [the banks]." See *Lujan*, 504 U.S. at 560. That is all that is required at the pleading stage.

Further, contrary to CFPB's assertion, Nationwide is **not** required to allege that its injuries were solely or exclusively caused by CFPB's action, without the involvement of any third parties or intervening events as "[p]roximate causation is **not** a requirement of Article III standing, which requires **only** that the plaintiff's injury be fairly traceable to the defendant's conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1391, n.6 (2014) (emphasis added).

Here, as set forth above, Nationwide has alleged facts sufficient for the Court to make the reasonable inference that CFPB was involved in Operation Choke Point and CFPB has utilized Operation Choke Point tactics in this case to pressure and coerce the banks to terminate their relationships with Nationwide. See Section(I)(A), *supra*. Accordingly, Nationwide has sufficiently alleged conduct by the CFPB that is "fairly traceable" to its loss of banking relationships and resulting harm.

**2. Nationwide Has Sufficiently Alleged Redressability**

Nationwide has also sufficiently alleged that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Reniger*, 122 F.Supp.3d at 891. In its

---

[3]CFPB erroneously contends, without basis or support, that Nationwide's injury was purportedly "caused by the independent, discretionary actions of third parties." Mot., 12:6-9. This is simply **not** true—the banks wanted to maintain their relationship with Nationwide, but felt compelled to terminate the relationships based on CFPB's improper, extrajudicial tactics. See e.g., Exhibit 1 to Schneider Declaration.

counterclaim, Nationwide seeks injunctive relief enjoining CFPB from directly or indirectly "pressuring, coercing, intimidating, or threatening" banks, from "seeking to deprive Nationwide of its access to banking services" and from "its ability to pursue its chosen line of lawful business without due process of law," and, from relying on the definition of "risk to consumers" to "directly or indirectly pressure, coerce, intimidate, or threaten any financial institution to terminate or refuse to provide banking services to Nationwide." CC, Prayer for Relief, ¶7(a)-(c). Importantly, Nationwide also seeks an order "[r]equiring CFPB to immediately transmit a copy of the Court's order granting the requested declaratory and injunctive relief to all banks that have terminated critical services to Nationwide." CC, Prayer for Relief, ¶7(d). Thus, through a combination of prohibitory and mandatory injunctive relief, Nationwide seeks to re-establish its lost banking relationships by requiring CFPB to transmit a copy of the Court's order, thus indicating that the banks will not suffer heightened scrutiny and/or regulatory or enforcement action from CFPB for doing business with Nationwide, and also prohibit future interruptions of banking services as a result of Operation Choke Point tactics.

The United States District Court for the District of Columbia recently addressed a similar issue in *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Fed. Deposit Ins. Corp.*, 132 F.Supp.3d 98 (D.D.C. 2015). In that case, the plaintiff claimed that the FDIC, like the CFPB in the instant case, had engaged in "back-room pressure tactics" as part of "Operation Choke Point" to force banks to terminate their relationships with the plaintiff. The FDIC claimed, in a motion to dismiss, that the plaintiff had failed to establish the redressability prong of Article III standing, as there was no guarantee that the banks would restore their relationships with the plaintiff if the requested relief was granted. The court, however, held that, "[i]f Plaintiffs are able to prove that injunctive relief would result in a substantial likelihood that banks will restore relationships or not terminate relationships in the future, they have sufficiently established [redressability]." *Id.* at 114. The court further noted that, assuming the truth of the plaintiffs' allegations that the defendants' actions had pressured banks into terminating their relationships with the plaintiff, "it is reasonable to conclude that a Court order…enjoining Defendants would redress Plaintiffs' injuries," as "in the absence of such pressure, some banks may well choose to reestablish relationships with Plaintiffs," and "the absence of such pressure is also likely to prevent additional banks from terminating relationships with Plaintiffs in the future." *Id.* at 115. Similarly, in the instant case, if the court assumes

the truth of the allegations in Nationwide's complaint (as it must on a motion to dismiss), that extrajudicial, Operation Choke Point tactics by the CFPB caused banks to terminate their relationships with Nationwide, it is reasonable to conclude that a court order enjoining the CFPB from further such actions and requiring CFPB to transmit a copy of the Court's order to the banks that have already terminated their relationships with Nationwide would redress Nationwide's injuries.

Accordingly, Nationwide has adequately alleged causation and redressability and CFPB's motion to dismiss on this ground should be denied.

**3. There Exists No Law Committing CFPB's Use Of Operation Choke Point And Other Extrajudicial Tactics To "Agency Discretion"**

CFPB asserts that Nationwide's APA counterclaims are barred by the doctrine of sovereign immunity because its "agency actions" challenged in this proceeding were "committed to agency discretion by law" as that phrase is used in 5 U.S.C. §701(a), and are therefore not subject to the APA's waiver of sovereign immunity. Mot., 14:3-21. However, §701(a) creates "**a very narrow exception**.... applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (emphasis added) (internal quotations omitted). For example, in *Heckler*, the Supreme Court interpreted §701(a) to mean that review cannot be had under the APA *if* a statute commits agency action to agency discretion and *if* "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." 470 U.S. at 830; *see also* 5 U.S.C. § 701(a)(2); *County of Esmeralda v. United States*, 925 F.2d 1216, 1218 (9th Cir. 1991).

In its Motion, CFPB improperly focuses only on the definition of "risk to consumers" in the CFPB's manual and dismisses all of Nationwide's other allegations regarding CFPB's use of Operation Choke Point and other extrajudicial tactics in a one sentence footnote. Mot., 14, n.8. Much like CFPB's willful blindness of all of Nationwide's allegations establishing plausibility, here too CFPB attempts to sweep these facts under the rug hoping that the Court will too. However, **these facts cannot be ignored**. As set forth above, Nationwide has sufficiently alleged that it is not only plausible that Nationwide's bank terminations were a result of CFPB's use of improper extrajudicial tactics, but rather it is the **only plausible explanation** for Nationwide simultaneously losing all of its long term, well-established

banking partners.

CFPB has not cited any statute, nor does one exist, that gives CFPB unfettered discretion to "engage in a campaign to drive biweekly businesses, like Nationwide, and other third-party payment processors out of business by exerting back-room pressure on banks and other regulated financial institutions to terminate their relationships with Nationwide and other such businesses." CC, ¶10. Similarly, despite the discretion that Congress may or may not have intended to provide CFPB regarding the definition of "risk to consumers," there is no statute allowing CFPB to use this discretion as a platform for the veiled use of Operation Choke Point and other improper extrajudicial tactics. CC, ¶¶46-49. Accordingly, Section 701(a) of the APA does not preclude judicial review.

#### 4. CFPB's Use Of Operation Choke Point Tactics To Drive Nationwide Out Of Business Constitutes "Final Agency Action" Reviewable By This Court

Although CFPB again attempts to improperly limit the analysis of this issue to the Bureau's Exam Manual and the definition of "risk to consumers" (Mot., 14:22-15:26.), the issue is **<u>not</u>** that narrow and the Court must look at all the alleged conduct, including CFPB's use of Operation Choke Point and other extrajudicial tactics to "choke off" Nationwide's banking services and drive Nationwide out of business. The Supreme Court has held that two conditions must be satisfied for an agency action to be final:

> First, the action must mark the consummation of the agency's decision making process-it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

*Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotations omitted). The Ninth Circuit has interpreted the *Bennett* analysis "to provide several avenues for meeting the … finality requirement," including that an agency action may be final if it has a "**<u>direct and immediate … effect on the day-to-day business of the subject party</u>**." *Oregon Natural Desert Ass'n v. U.S. Forest Service*, 465 F.3d 977, 986-987 (9th Cir. 2006) (emphasis added) (internal quotations and citations omitted). Where, as alleged here, CFPB's improper extrajudicial actions have deprived Nationwide of its right to hold a bank account and its right to conduct its business, CFPB's actions necessarily have an effect on the "day-to-day business" of Nationwide, and are thus final and subject to review under the APA. In fact, the very point of the counterclaim is that CFPB took final action without process.

**C. Nationwide Has Sufficiently Pled the Causes of Action in its Counterclaim**

**1. Nationwide Has Properly Alleged Infringement of Protected Speech**

CFPB argues that Nationwide has failed to allege that the Bureau infringed upon speech protected by the First Amendment because "the Bureau has alleged that Nationwide's commercial speech is false, deceptive, and misleading … which renders it not entitled to constitutional protection." Mot., 17:20-22. CFPB's argument, however, misses the mark. The issue is **not** whether CFPB may enjoin Nationwide from disseminating materials and information regarding its Interest Minimizer program **after** final adjudication of this lawsuit. Rather, the issue before the Court is whether Nationwide has sufficiently alleged infringement of its First Amendment Rights where Nationwide has alleged that **prior to adjudication of this lawsuit**, "CFPB has employed and continues to employ a variety of 'Operation Choke Point' back-room pressure tactics to persuade, pressure, coerce and/or intimidate banks to terminate their relationships with Nationwide" to "restrain Nationwide's marketing practices" and "otherwise restrict Nationwide's speech and dissemination of **accurate information**." CC, ¶¶94, 95 (emphasis added).

Thus, presuming all factual allegations of the complaint to be true, as is required on a motion to dismiss, Nationwide's marketing materials constitute "[t]ruthful advertising related to lawful activities," which is "entitled to the protection of the First Amendment" as alleged in the counterclaim. *In re R.M.J.*, 455 U.S. 191, 203 (1982).[4] In turn, CFPB's actions against Nationwide constitute "a scheme of … censorship effectuated by **extralegal** sanctions" and an informal system of prior restraint. See *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 72 (1963). The fact that the question of the truth or falsehood of the claims made in Nationwide's marketing materials is also at issue in CFPB's affirmative claims does **not** preclude Nationwide from asserting a counterclaim requiring resolution of that factual dispute and the unpublished case cited by CFPB does not hold otherwise. In *Stickrath v. Globalstar, Inc.*, No. C07-1941

[4] It is not necessary to address CFPB's arguments regarding whether Nationwide's speech is purely commercial speech or whether it constitutes mixed use, as alleged, because under either scenario, Nationwide has sufficiently alleged infringement of protected speech. See *44 Liquormart v. R.I.*, 517 U.S. 484, 503-504 (1996) ("even a communication that does no more than propose a commercial transaction is entitled to the coverage of the First Amendment"); *Bigelow v. Virginia*, 412 U.S. 809, 826 (1975) ("Regardless of the particular label asserted by the State – whether it calls speech 'commercial' or 'commercial advertising' or 'solicitation' – a court may not escape the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation.")

TEH, 2008 WL 2050990, at (N.D.Cal. May 13, 2008), the defendant asserted purported counterclaims that were the "mirror image" of the relief sought by the plaintiff and another that was redundant of its affirmative defenses. *Id*. at *2. Here, in contrast, Nationwide's counterclaim is not redundant of plaintiffs' claims nor of its affirmative defenses, as each requires proof of elements that the other does not. For example, Nationwide's affirmative defense asserts that CFPB's <u>complaint</u> seeks relief that infringes on Nationwide's First Amendment rights (TAA, ¶82), whereas Nationwide's First Amendment counterclaim asserts, *inter alia*, that CFPB's <u>extrajudicial</u> actions have infringed on Nationwide's free speech. CC, ¶¶90-99. In addition, the counterclaim seeks "declaratory and injunctive relief, damages and attorneys' fees and costs" (CC, ¶99) which are neither sought in nor available in the affirmative defense.

Further, contrary to CFPB's assertion, Nationwide has pled "government restriction on … advertising other than the Bureau's request for an injunction in its prayer for relief." Mot., 18:1-4. In fact, Nationwide specifically alleges that:

> CFPB has employed and continues to employ a variety of "Operation Choke Point" back-room pressure tactics to persuade, pressure, coerce, and/or intimidate banks to terminate their relationships with Nationwide as a backdoor means of restraining Nationwide's marketing practices and Nationwide's ability to reach individuals and inform them of the biweekly mortgage interest savings program methodology, thereby restraining Nationwide's free speech—i.e., by shutting down Nationwide's ability to do business, CFPB has effectively, preemptively shut down Nationwide's speech.

CC, ¶ 95. Thus, Nationwide has alleged that CFPB has infringed Nationwide's speech **<u>prior</u>** to any establishment of wrongdoing or adjudication of CFPB's claims, and CFPB's reliance on *United States v. Philip Morris Inc.*, 304 F.Supp.2d 60 (D.D.C. 2004) is misplaced. ("If the Government [first] successfully establishes that the Defendants disseminated their advertising in furtherance of an overall scheme to defraud, [then] the First Amendment will not present an obstacle to appropriate injunctive and equitable relief to remedy the fraud.")

Finally, CFPB argues that its action caused only an economic loss, which is not sufficient to prevail on a First Amendment claim. Mot., 18:17-20. The Ninth Circuit, however, has distinguished between regulations which merely place an economic burden on a business' ability to exercise free speech and regulations which effectively deny the business a reasonable opportunity to operate at all. In *Walnut Properties, Inc. v. City of Whittier*, 861 F.2d 1102 (9th Cir. 1988), the court held that a zoning ordinance which would force the county's only existing adult theater "to close at its present location with

no definite prospect of a place to relocate" was an impermissible violation of the theater's free speech rights, as the ordinance "left open insufficient alternative avenues of communication." *Id*. at 1110-1112. Similarly, in *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), where the operator of a classified advertising website alleged that the county sheriff imposed an informal prior restraint on speech by sending letters to credit card companies requesting that they stop processing payments to the website, the Seventh Circuit dismissed a similar argument noting that the termination of the credit card companies did result in irreparable harm to Backpage despite the fact they could still continue to run the ads for free because "no company can expect to continue to operate without a source of revenue." *Id*. at 238.

Here, like in *Walnut Properties* and *Backpage*, CFPB's extrajudicial actions directed at Nationwide have imposed burdens far exceeding those necessary to achieve any legitimate purpose, and have not only left Nationwide with insufficient alternative avenues for communication, but have effectively denied the company the ability to operate in any way. CC, ¶¶83-87. Therefore, Nationwide has properly stated a claim for infringement of its First Amendment rights.

**2. Nationwide Has Properly Alleged Deprivation of Constitutionally a Protected Liberty Interest**

The Supreme Court has held that "[t]he 'right to be heard before being condemned to suffer grievous loss of any kind . . . is a principle basic to our society.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Specifically, "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). Thus, where government conduct "creates both a stigma and a tangible burden on an individual's ability to obtain a right or status recognized by state law, an individual's liberty interest has been violated." *Humphries v. City. of L.A.*, 554 F.3d 1170, 1188 (9th Cir. 2009).

Here, there can be no question that Nationwide has alleged that CFPB's conduct, including, *inter alia*, its use of extrajudicial tactics to apply pressure to Nationwide's banking partners, its "black listing" of Nationwide via its press release, and its "outing" of Nationwide's banking partners in a public court filing, has stigmatized Nationwide. CC, ¶¶61-79. Moreover, there can be no question that Nationwide has alleged that this stigma has had a "tangible burden" on Nationwide's ability to pursue its chosen line

of business and hold a bank account (CC, ¶¶83-89) – both rights which are entitled to constitutional protection.[5] See *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003) (explaining that "government stigmatization that broadly precludes individuals or corporations from a chosen trade or business deprives them of liberty in violation of the Due Process Clause."); see also *Community Financial Services Association of America, Ltd., supra*, 132 F.Supp.3d at 124 (finding that the payday lenders had "sufficiently alleged that their liberty interests are implicated by [the FDIC's] alleged actions and that the alleged stigma has deprived them of their rights to bank accounts and their chosen line of business, so as to state a claim for violation of constitutional due process").

Moreover, CFPB incorrectly claims that Nationwide has failed to plead that the Bureau, and not an independent party such as the banks, deprived it of any constitutionally protected right. (Mot., 20:10-20.) However, Nationwide's amended counterclaim plainly alleges that:

> All of these facts and circumstances surrounding the termination of Nationwide's banking relationships are indicative of CFPB's use of Operation Choke Point-style tactics to directly or indirectly choke off a targeted business's access to financial services without Due Process through pressure, coercion, and intimidation of the targeted business's banking relationships. **<u>These banks terminated their relationship with Nationwide as a result of the CFPB employing a variety of "Operation Choke Point" back-room pressure tactics</u>** to persuade the banks to terminate Nationwide's critical services, effectively "choking off" Nationwide's banking services and/or CFPB's prior use and/or threatened use of "Operation Choke Point" tactics against banks, **<u>effectively "scaring off" its banking partners, and depriving Nationwide of the ability to conduct its business</u>**.

(CC, ¶ 77.) Accordingly, nothing about the adverse effects on Nationwide in the instant case was "indirect."

Finally, for purposes of a Due Process claim, where the claimant is the "target of the state's action," there is "no 'indirect' governmental action despite the presence of [others] in the chain of causation." *G & G Fire Sprinklers, Inc. v. Bradshaw*, 156 F.3d 893, 903 (9th Cir. 1998) *vacated on other grounds*, 526 U.S. 1061(1999) and *opinion reinstated*, 204 F.3d 941 (9th Cir. 2000). Moreover, the Supreme Court has noted:

> We of course need not and do not hold that a person may never have a right to a

[5] Additionally, contrary to CFPB's assertion, the right to conduct one's chosen trade or business is a constitutionally protected property right. See *Truax v. Corrigan*, 257 U.S. 312, 327 (1921)("Plaintiffs' business is a property right…."); *Merced Dredging Co. v. Merced Cty.*, 67 F. Supp. 598, 604 (S.D. Cal. 1946)("[P]laintiff's business is a property right, and as such is entitled to protection"); *Angelopoulos v. Bottorff*, 76 Cal. App. 621, 626, 245 P. 447, 449 (Cal. Ct. App. 1926)(same).

> hearing before his interests may be indirectly affected by government action. **<u>Conceivably, for example, if the Government were acting against one person for the purpose of punishing or restraining another, the indirectly affected individual might have a constitutional right to some sort of hearing</u>**.

*O'Bannon v. Town Court Nursing* Center, 447 U.S. 773, 789 at n. 22 (1980) (emphasis added). Thus, even accepting CFPB's contention that its communication of threats to the banks in order to persuade them to terminate their relationships with Nationwide constituted "indirect action," such action would fall within the category expressly left open by the *O'Bannon* Court—action taken by the government against one party for the purpose of punishing or restraining another. In either case, Nationwide has properly alleged a Due Process claim against CFPB.

**3. Nationwide's Has Properly Alleged A Claim For Relief Under the APA**

In its counterclaim, Nationwide alleges that:

> CFPB's use of the concept of "risk to consumers," reputation risk, other vague regulatory terminology, and/or the Risk Assessment formulation process **<u>to directly and indirectly target and choke off Nationwide's access to banking services</u>** is … in excess of its statutory authority under the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5481 et seq.
>
> CFPB's direct and indirect efforts – **<u>through Operation Choke Point or a similar operation or activity – to target and choke off access to banking services to the biweekly mortgage payment industry and other industries</u>** which use 'telemarketing, mail, and other mass market' forms of solicitation is also in excess of its statutory authority under the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5481 et seq.
>
> The Manual provides no objective criteria for reliably ascertaining when "potential[ly]" unfair, deceptive, or abusive practices have occurred (**<u>which would ensure that the examination process cannot become a pretext for the advancement of illegitimate objectives</u>**). In these respects, CFPB's actions are arbitrary, capricious, and an abuse of discretion.
>
> CFPB's use of the concept of "risk to consumers," reputation risk, other vague regulatory terminology, and/or the Risk Assessment formulation process **<u>to directly and indirectly target and choke off Nationwide's (and other targets of Operation Choke Point or a similar operation or activity) access to banking services</u>** was and is arbitrary, capricious, and an abuse of discretion

CC, ¶¶106-116 (emphasis added). Notably, however, CFPB fails to address each of these allegations and instead focuses only on the facts that Congress did not define "risk to consumers" when delegating CFPB the authority to supervise banks and that the Exam Manual is a non-binding guidance document.

As set forth above in sections (I)(B)(3) and (4), the Bureau **<u>cannot</u>** simply ignore all of Nationwide's allegations regarding extrajudicial, improper tactics in moving to dismiss these

counterclaims. Regardless of whether Congress gave CFPB the authority to supervise large banks and define "risk to consumers," Congress did **not** give CFPB the authority to arbitrarily and capriciously employ a series of extrajudicial tactics to destroy Nationwide's business. Nor does it matter whether the exam manual is a "non-binding guidance document," as the nature of the document does not, of course, allow CFPB to use its review process as a means to exert pressure on the banks it supervises to discontinue doing business with certain companies or risk heightened scrutiny or sanctions.

Accordingly, Nationwide has sufficiently pled a claim for relief under the APA, and CFPB's motion should be denied.

## II. THE COURT SHOULD NOT STRIKE DEFENSE NINE OR PARAGRAPH 36 FROM THE THIRD AMENDED ANSWER

Motions to strike "are viewed with disfavor and are infrequently granted." *Stanbury Law Firm v. I.R.S.*, 221 F.3d 1059, 1063 (8th Cir. 2000) (internal quotations and citations omitted). Courts disfavor such motions as they are often used as a dilatory or harassing tactic. See e.g. *Hynix Semiconductor Inc. v. Rambus, Inc.*, Nos. CV-00-20905 RMW, 2007 WL406845, at *2 (N.D. Cal. Nov. 15, 2007) ("This court's case law amply demonstrates this disfavor, repeatedly admonishing litigants that motions to strike are 'generally not granted unless it is clear that the matter to be stricken could have **no possible bearing on the subject matter of the litigation**.'" (Emphasis added) (Citation omitted).) As such, "[a]ny doubt concerning the import of the allegations to be stricken weighs in favor of denying the motion to strike." *White v. Hansen*, No. C 05-784 SBA, 2005 WL1806367, at *14 (N.D. Cal. July 28, 2005) citing *In re 2TheMart.com, Inc. Sec. Litig.*, 114 F.Supp.2d 955, 965 (C.D. Cal. 2000). Moreover, even if a party is successful on a motion to strike, "leave to amend should be freely given when doing so would not cause prejudice to the opposing party." *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 826 (9th Cir. 1979).

In order to sufficiently plead an affirmative defense, a defendant need only set forth a "short and plain" statement that gives the opposing party fair notice of the defense. *Barnes v. AT&T Pension Benefit Plan*, 718 F.Supp.2d 1167, 1171 (N.D. Cal. 2010). "[O]nce an affirmative defense has been properly pled, a motion to strike which alleges the legal insufficiency of [that] defense will not be granted unless it appears to a certainty that plaintiff would succeed despite any state of the facts which could be proved in support of the defense." *Id.* at 1170. Accordingly, to prevail, plaintiff "must

convince the court that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the defense succeed." *Solis v. Zenith Capital, LLC*, No. 08-4854, 2009 WL1324051, at *2 (N.D. Cal. May 8, 2009).

Such motions are granted only "if the matter has no logical connection to the controversy at issue and may prejudice one or more of the parties to the suit. Where the moving party cannot adequately demonstrate such prejudice, courts frequently deny motions to strike even though the offending matter literally [was] within one or more of the categories set forth in Rule 12(f)." *N.Y.C. Emples. Ret. Sys. v. Berry*, 667 F.Supp.2d 1121, 1128 (N.D. Cal. 2009) (citation omitted) (alterations in original).

### A. Defense Nine Should Not Be Stricken

In another attempt to evade the issues, CFPB misstates Nationwide's position and, in so doing, its argument, again, misses the mark. Contrary to CFPB's argument, Nationwide's position it is not that its "history of 'compliance' with state regulators enforcing different laws should somehow bar the Bureau from enforcing federal consumer financial law" as misleadingly suggested by CFPB (Mot. at 4-9), but rather that: (1) The regulations promulgated under the Consumer Fraud Protection Act are substantially similar as state and federal consumer protection laws already in effect which had regulated Nationwide's activities (i.e., while they are, of course, styled differently, the essence of the laws is the same); (2) Nationwide has been in compliance with consumer protection laws for over a decade and, in fact, never learned that it was purportedly out-of-compliance with federal law until CFPB suddenly filed suit; and, (3) If there is to be a shift in the way a party or industry is regulated, as here, federal law requires notice of the change in the application of the law and an opportunity for the party or industry to comply with the new regulatory approach but here, however, no such notice was provided.

There is, of course, fundamental to the right to Due Process, that the government provide citizens with **sufficient notice** of what behavior complies with the law. As set forth by the Ninth Circuit in *U.S. AMC Entertainment, Inc.*, 549 F.3d 760 (9th Cir. 2008):

> Liberty depends on no less: '[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give persons of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Put more colloquially, '[t]hose regulated by an administrative agency are entitled to know the rules by which the game will be played.'

*U.S. AMC Entertainment, Inc.*, 549 F.3d 760, 768 (9th Cir. 2008) quoting *Grayned v. City of Rockford*,

408 U.S. 104, 108 (1972). As alleged in Nationwide's TAA, CFPB's complaint contravenes these fundamental principles of fairness and notice, in violation of Nationwide's due process rights.

As set forth in Defense Nine, Nationwide applied for and was licensed in forty-one States. Prior to licensing, each of these States required Nationwide to submit for approval detailed information regarding the Interest Minimizer program and any additional information requested by the State. CC, ¶86. Each application process took several months. *Id.* Moreover, following the granting of the license, the states would send its examiners to Nationwide's offices for on-site or off-site regulatory examinations. CC, ¶87. Accordingly, Nationwide's state regulators have reviewed Nationwide's marketing materials on an ongoing basis and have never refused to grant Nationwide a license or revoke a license based on their extensive reviews of the Interest Minimizer Program. CC, ¶88.

Moreover, in 2008, Nationwide's marketing letters and sales scripts were the subject of an enforcement action that was ultimately settled in 2010 by then-Ohio Attorney General Richard Cordray (the current Director of the CFPB.) CC, ¶89. The Ohio Attorney General's office and Nationwide spent close to two years negotiating a settlement through mediation and Nationwide's direct mail marketing letters and sales scripts (the **<u>same</u>** letters and scripts CFPB now claims to be false or misleading) were reviewed in detail and specific changes were made at the request of the Ohio Attorney General. CC, ¶¶90-92.

Thus, based on fact that Nationwide's marketing letters and scripts had undergone extensive review by more than forty states, including a two-year review by the Ohio Attorney General's Office, Nationwide had absolutely **<u>no</u>** reason to believe that its marketing materials violated any deception or unfairness standards. In fact, Nationwide received numerous assurances to the contrary. CFPB also failed, without reason, to follow its customary Notice and Opportunity to Respond and Advise (NORA) process and failed to provide Nationwide with an opportunity to respond to the Bureau's allegations in advance of filing this lawsuit. CC, ¶96. Accordingly, Nationwide was completely blindsided by CFPB filing this surprise lawsuit and the subsequent bank terminations that resulted due to CFPB's blacklisting of Nationwide. CC, ¶94. Although CFPB now disingenuously asserts that there has been no due process violation because Defendants will have a "fair opportunity to be heard in this Court" (Mot. 23:21-23), CFPB knows this is not the case, and in fact has made sure this will not be the case by choking off

Nationwide's banking services, thereby effectively shutting the company down **prior** to being heard in this Court.

Additionally, CFPB will **not** be prejudiced if Nationwide is permitted to maintain this defense. CFPB points to Defendants' assertion that they will seek discovery into "the Bureau's investigation of this matter" as purported evidence that Defense Nine will lead to improper discovery. Mot., 24:9-25:7. The Court, however, has already indicated, and the Bureau agreed, that discovery into the Bureau's decision making in this case would be permitted:

> THE COURT: Don't you think they are going to be able to get into the decisional process that the agency made relative to them as opposed to others?
>
> I can see your argument would be that generalized discovery into the decision making process of the agency is probably beyond the pale, but the decision process that went into the – their claims, the claims you've now brought against them, isn't that going to be open season regardless of the existence of the 10th affirmative defense?
>
> MR. GUSHUE: Presumably it would, your Honor …

R.T., 21:11-20. Moreover, if any of the discovery sought by Defendants in this case is subject to any protection or privilege, as the Bureau asserts, the Bureau can make that objection at that time. The fact that Defendants may potentially seek discovery into an area that may be privileged does not, of course, otherwise invalidate a properly pled affirmative defense. Accordingly, CFPB has not, and cannot, demonstrate any prejudice and Defense Nine should not be stricken. See *N.Y.C. Emples. Ret. Sys*, 667 F.Supp.2d at 1128 ("Where the moving party cannot adequately demonstrate such prejudice, courts frequently deny motions to strike even though the offending matter literally [was] within one or more of the categories set forth in Rule 12(f)." (Citation omitted) (alterations in original)).

### B. Paragraph 36 Should Not Be Stricken

Finally, at the hearing, CFPB indicated an unwarranted concern that Defendants would use an opportunity to amend to add new, additional affirmative defenses or counterclaims. R.T., 10:24-11:7. Consistent with CFPB's concerns and the subsequent order of the Court, Defendants have not done so in the TAA. Rather, Defendants simply made a semantical clarification to paragraph 36 which has no material effect on its response, i.e., Defendants are still admitting the same part of paragraph 36 and denying the same part of paragraph 36 with only a handful of words changed. The change is immaterial to the response and the litigation and CFPB's petty grievance is unwarranted.

## **CONCLUSION**

It begs the question, if CFPB did not wish to exert extrajudicial pressure on Nationwide's banking partners, then why did it reject Nationwide's repeated requests to provide its partners with assurances that it would not punish them simply for continuing their relationship with Nationwide (CC, ¶76)? Similarly, why does CFPB fight so hard against a claim which merely seeks to prevent it from using improper, extrajudicial tactics? The unavoidable reality is that CFPB has discreetly and improperly engaged in extrajudicial heavy-handed tactics and wants the unfettered "right" to continue to do so. Nationwide should have the opportunity to protect itself from such tactics and, accordingly requests that Court deny CFPB's motion to dismiss and strike in its entirety.

Dated: July 26, 2016

LAW OFFICES OF SEAN PONIST, P.C.

By: /s/ Georgia Z. Schneider
Georgia Z. Schneider

***Attorneys for Defendants Nationwide Biweekly Administration, Inc., Loan Payment Administration, LLC, and Daniel Lipsky and Counterclaimant Nationwide Biweekly Administration, Inc.***