ANTHONY ALEXIS (DC Bar #384545)
DEBORAH MORRIS (Admitted to the NY Bar)
MICHAEL G. SALEMI (IL Bar #6279741)
PATRICK GUSHUE (PA Bar #306966)
JONATHAN URBAN (CO Bar #44190)
STEPHEN JACQUES (DC Bar # 464413)
THOMAS MCCRAY-WORRALL (Admitted to the MD Bar)
Patrick.Gushue@cfpb.gov
1700 G Street NW
Washington, DC 20552
Phone: 202-435-9671
Fax: 202-435-7329
Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

NATIONWIDE BIWEEKLY ADMINISTRATION, INC., LOAN PAYMENT ADMINISTRATION LLC, AND DANIEL S. LIPSKY,

Defendants.

---------------------------------------------

NATIONWIDE BIWEEKLY ADMINISTRATION, INC.,

Counter-claimant,

v.

CONSUMER FINANCIAL PROTECTION BUREAU,

Counter-defendant.

Case No. 3:15-cv-02106-RS

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS II – IV OF PLAINTIFF'S COMPLAINT**

| | |
|---|---|
| Hearing Date: | February 9, 2017<br>1:30 p.m. |
| Judge: | Hon. Richard Seeborg |
| Courtroom: | Courtroom 3, 17th Floor<br>450 Golden Gate Ave.<br>San Francisco, CA 94102 |

# TABLE OF CONTENTS

**INTRODUCTION** ... 1

**STATEMENT OF MATERIAL FACTS** ... 2

1. The Parties ... 2
2. Defendants' Direct-Mail Marketing and Advertising Operations ... 4
3. Defendants' Telemarketing Operations ... 5
4. Misrepresentations to Consumers through Defendants' Advertising and Telemarketing Operation . 6

a. Defendants hide a setup fee of up to $995 from consumers ... 6

i. Defendants' advertisements and other marketing materials do not disclose the existence or amount of the setup fee ... 7

ii. Defendants' sales scripts and related guidance obscure the existence and amount of the setup fee ... 7

iii. Defendants conceal the setup fee in their contracts, online enrollment form, and related documents ... 9

iv. Consumer testimony confirms consumer confusion over the amount and existence of the setup fee ... 10

b. Defendants falsely claim that consumers achieve savings without paying more through the IM program ... 10

c. Defendants falsely guarantee interest savings and misrepresent the results of the IM program 11

d. Defendants falsely claim that consumers cannot achieve interest savings on their own without the IM program ... 13

e. Defendants misrepresent an affiliation with the consumer's lender or servicer ... 14

**ARGUMENT** ..... 16

1. Defendants Are Sellers or Telemarketers Under the TSR and Covered Persons Under the CFPA .. 16

2. Defendants Violated the CFPA By Engaging in Deceptive Acts or Practices (Count II) ..... 17

a. Defendants Misrepresent the Amount and Existence of the Setup Fee in Violation of the CFPA ..... 17

b. Defendants Make Express Misrepresentations about Other Aspects of the IM Program in Violation of the CFPA ..... 19

c. Defendants Misrepresent an Affiliation with the Consumer's Lender in Violation of the CFPA ..... 20

3. Nationwide and Lipsky Violated Various Provisions of the TSR and, Therefore, the CFPA (Counts III and IV) ..... 21

4. Individual Liability of Daniel S. Lipsky ..... 22

5. Relief Requested ..... 23

a. The Bureau Is Entitled to an Order of Restitution and Disgorgement ..... 23

b. The Court Should Impose Civil Money Penalties Against All Defendants ..... 25

**CONCLUSION** ..... 25

## TABLE OF AUTHORITIES

**Cases**

*Bailey Employment System, Inc. v. Hahn*,
545 F.Supp. 62, 70 (D. Conn. 1982) *aff'd* 723 F.2d 895 (2d Cir. 1983) .............................................. 20

*Consumer Fin. Prot. Bureau v. CashCall, Inc.*,
2016 WL 4820635, at *10 (C.D. Cal. Aug. 31, 2016)............................................................... 17

*Consumer Fin. Prot. Bureau v. Gordon*,
819 F.3d 1179, 1192 (9th Cir. 2016) ........................................................................... 17, 22, 24

*FTC v. Affiliate Strategies, Inc.*,
849 F. Supp. 2d 1085, 1105 (D. Kan. 2011)............................................................................. 17

*FTC v. Amy Travel Serv., Inc.*,
875 F.2d 564, 573 (7th Cir. 1989) ........................................................................................ 22, 24

*FTC v. Arlington Press, Inc.*,
1999 WL 33574020, at *12 (C.D. Cal. Jan. 11, 1999............................................................... 21

*FTC v. Commerce Planet, Inc.*,
815 F.3d 593, 603 (9th Cir. 2016); ............................................................................................ 24

*FTC v. Commerce Planet, Inc.*,
878 F. Supp. 2d 1048, 1088 (C.D. Cal. 2012) ........................................................................... 23

*FTC v. EDebitPay, LLC*,
695 F.3d 938, 944 (9th Cir. 2012) ............................................................................................ 17

*FTC v. Febre*,
128 F.3d 530, 535 (7th Cir. 1997). ............................................................................................ 24

*FTC v. Figgie Int'l*,
994 F.2d 595, 603–04 (9th Cir. 1993) .................................................................... 19, 20, 24

*FTC v. Gill*,
265 F.3d 944 at 958 (2001)....................................................................................................... 23

*FTC v. Gill*,
71 F.Supp.2d 1030, 1044 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001)........................... 18, 20

*FTC v. Good Ebusiness, LLC*, 2016 WL 3704489, at *7 (C.D. Cal. July 12, 2016) ... 24

*FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1102 (9th Cir. 2014) ... 22

*FTC v. Health Formulas, LLC*, 2015 WL 2130504, at *12 (D. Nev. May 6, 2015) ... 18

*FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008) ... 19

*FTC v. Mortg. Relief Advocates LLC*, 2015 WL 11257575, at *2 (C.D. Cal. July 1, 2015) ... 19

*FTC v. Munoz*, 17 Fed.Appx. 624, 626–27 (9th Cir. 2001) ... 22

*FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994) ... 17, 19

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170-71 (9th Cir. 1997) ... 22

*FTC v. Southwest Sunsites, Inc.*, 105 FTC 7, 149, *aff'd*, 785 F.2d 1431 (9th Cir. 1986) ... 17

*FTC v. Stefanchik*, 559 F.3d 924, 930 (9th Cir. 2009) ... 17, 19, 22, 23, 24

*FTC v.Cyberspace.Com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006). ... 17, 18, 19

*In re Cliffdale Associates, Inc.*, 103 FTC 110, 165 (1984) ... 17, 20

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 245 (1994) ... 25

*Novartis Corp. v. FTC*, 223 F.3d 783, 786 (D.C. Cir. 2000) ... 18

*Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496–97 (1st Cir. 1989) ... 20

*Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) ... 18

*S.E.C. v. Platforms Wireless Int'l Corp.*,
617 F.3d 1072, 1096 (9th Cir. 2010). .......... 25
*Simeon Management Corp. v. FTC*, 579 F.2d 1137, 1146 n. 11 (9th Cir. 1978) .......... 19
*Standard Educators, Inc. v. FTC*,
475 F.2d 401, 403 (D.C. Cir. 1973) .......... 22
*Tull v. United States*,
481 U.S. 412 (1987) .......... 25

**Statutes**

12 U.S.C. § 5481(15)(A)(iv) .......... 17
12 U.S.C. § 5481(25)(B) .......... 17
12 U.S.C. § 5481(25)(C) .......... 17
12 U.S.C. § 5481(26)(A)(i) .......... 17
12 U.S.C. § 5481(26)(B). .......... 17
12 U.S.C. § 5481(6)(A) .......... 17
12 U.S.C. § 5536(a)(1)(B). .......... 17
12 U.S.C. § 5564 .......... 3
12 U.S.C. § 5565(c)(1) .......... 26
12 U.S.C. § 5565(c)(2) .......... 26
12 U.S.C. § 5565(c)(2)(A). .......... 26
12 U.S.C. §§ 5565(a)(1) and (2) .......... 24
15 U.S.C. § 6105(d) .......... 1

**Rules**

Fed. R. Civ. P. 56(a). .......... 16

**Regulations**

16 C.F.R. § 310.2(dd) ........ 17
16 C.F.R. § 310.2(ff),........ 17
16 C.F.R. § 310.2(gg) ........ 17
16 C.F.R. § 310.3(a)(1)(i) ........ 22
16 C.F.R. § 310.3(a)(4)........ 22
16 C.F.R. §§ 310.3(a)(2)(i), (iii), and (vii ........ 22
Designated Transfer Date, 75 FR 57252-02, 57253 (Sept. 20, 2010) ........ 25

## NOTICE OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Please take notice that on February 9, 2017, at 1:30 p.m., or as soon thereafter as counsel may be heard, Plaintiff Consumer Financial Protection Bureau (Bureau) will move this Court, pursuant to Civ. L.R. 7-2 and Fed. R. Civ. P. 56 for partial summary judgment on Counts II, III, and IV against Defendants Nationwide Biweekly Administration, Inc. (Nationwide), Loan Payment Administration LLC (LPA), and Daniel S. Lipsky (Lipsky) for violations of Sections 1031(a) and 1036(a)(1) of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a)(1), and the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6105(d), and its implementing regulation, the Telemarketing Sales Rule (TSR), 16 C.F.R. §§ 310.1-9 (2010).

Based on the record, which consists of Bureau Exhibits 1 through 161, the Court should grant partial summary judgment in favor of the Bureau on Counts II, III, and IV.

## INTRODUCTION

The uncontroverted evidence establishes that Defendants engaged in deceptive practices in connection with the advertising and sale of its Interest Minimizer Program – a financial product or service unaffiliated with the consumer's lender that purports to reduce the amount of interest paid and term for mortgage loans by transmitting funds to the lender on the consumer's behalf. Defendants send millions of direct-mail marketing letters and use a telemarketing operation to target – and mislead – new homeowners and consumers who have recently refinanced mortgage loans with false promises of unrealistic interest savings purportedly achieved through the program, while concealing hundreds of dollars collected as a setup fee, deceptively stating that enrollees will not increase the amount they pay per month to participate, and inaccurately telling consumers that they cannot realize any supposed benefits of paying down the principal more quickly on their own or without Nationwide. Based on the undisputed record, there is no genuine issue as to material fact, and the Bureau is entitled to summary judgment against all Defendants for violations of the CFPA and TSR as a matter of law. The Bureau is also entitled to an award of monetary relief and civil money penalties.

The Bureau commenced this action against Defendants Nationwide, LPA, and Lipsky for engaging in abusive and deceptive acts or practices in violation of the CFPA and TSR, in connection

with the marketing and administration of a program known as the "Interest Minimizer" (IM program). Defendants use an extensive direct-mail marketing and telemarketing operation to entice consumers to call Nationwide and learn about the IM program, which purports to guarantee that consumers will pay off their mortgage loans faster and achieve substantial interest savings by making biweekly, rather than monthly, payments on the loans – ultimately resulting in an extra monthly payment toward the principal, except during year one of the program. Approximately six months after enrollment, Defendants collect from consumers a substantial – and hidden – setup fee of up to $995. Since 2011, over [redacted] consumers have enrolled in the IM program.

Throughout the sales process, Defendants obscure central features of the IM program and make false statements about how the program works, what it costs, and whether consumers can achieve similar savings on their own. Although Defendants purport to be consumer advocates, in reality, Defendants confuse consumers with vague and evasive responses to straightforward questions and distract consumers, leaving them with the mistaken impression that participation costs only a couple extra dollars every other week, that Nationwide is affiliated with their lender, and that they cannot achieve savings on their own. In fact, as demonstrated below, many consumers would never have signed up had they been made aware of the considerable cost to pay for a service that many can do on their own or for free through their servicers. Defendants' deceptive practices prevent consumers from adequately understanding the program's cost, the amount they will save, and the many years it will take to recoup the significant and undisclosed fees paid into the IM program. This conduct has resulted in at least $[redacted] in consumer harm.

## STATEMENT OF MATERIAL FACTS

### 1. The Parties

Plaintiff Consumer Financial Protection Bureau is an independent agency responsible for enforcing the CFPA and the TSR, 12 U.S.C. §§ 5491, 5565, 15 U.S.C. § 6105(d). It may bring civil actions against persons violating these laws to "seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law." 12 U.S.C. § 5564.

Defendant Nationwide offers the IM program to consumers across the country. Ex. 2, Rog. 3 attached to Gushue Declaration, attached hereto as Exhibit A.[1] Nationwide contracts with consumers to debit one-half of a mortgage payment every two weeks, holds the consumer's funds in a suspense account until the mortgage due date, and then transmits the amount due to the mortgage servicer on a monthly basis for application toward the loan principal. Ex. 2, Rog. 14; Third Amended Answer (TAA), Dkt. 82 ¶¶ 6, 9-13. This process results in the equivalent of a 13th monthly payment on the loan principal and thus purports to reduce the balance at a faster rate than the standard monthly repayment schedule. Ex. 2, Rog. 14; Ex. 7, 104:15-19.[2]

Defendant LPA is a wholly-owned subsidiary of Nationwide that provides marketing services to Nationwide. TAA ¶ 7; Ex. 2, Rog. 3; Ex. 12, 242:15-243:16. Both Nationwide and LPA advertise the IM program through an extensive direct-mail marketing operation nationwide. Ex. 2, Rog. 3; Ex. 12, 242:15-243:16. Lipsky sends out mailers under various names, including Nationwide, LPA, Loan Payoff Processor, and Synergistic Payment Processing to give consumers the impression that the entities are competing against one another and to gain more market share in the biweekly product space. Ex. 12, 248:1-249:8; Ex. 4, 83:12-84:8; Ex. 7, 102:18-103:2; *see, e.g.*, Exs. 92, 102, 104, 111.

Defendant Lipsky is Nationwide's founder, president, sole officer, and owner and has managerial responsibility for all marketing and advertising decisions for Nationwide and LPA. TAA ¶ 8. Lipsky has been Nationwide's President since 2002 and its only executive officer (sole Director, Secretary, and Treasurer) since 2011. Ex. 4, 13:21-23; Ex. 7, 18:25-19:1; Ex. 2, Rog. 1 & 3. Lipsky created, revised, and/or approved all mailers, scripts, question-and-answer (Q&A) documents, talk-offs, talking points, written instructions/guidance for Nationwide's employees, contracts, and terms of service for the IM

[1] Subsequent references to exhibit numbers refer to the corresponding exhibit attached to the Gushue Declaration.

[2] Nationwide offers consumers several options of debiting their accounts on weekly, biweekly, or semi-monthly basis. TAA ¶¶ 9-19. Regardless of the frequency of the debiting, Nationwide generally charges all consumers the same amount (half of a monthly mortgage payment up to $995) in order to participate in the IM program. *Id*. For purposes of this motion, the Bureau will only refer to the biweekly option; however, the same arguments generally apply to any of Defendants' periodic payment programs.

program. Ex. 1, No. 4; Ex. 6, 55:6-16. Beyond that, Lipsky played a key role in designing and creating the training program for the sales department (Ex. 5, 31:7-13; Ex. 4, 240:1-13) and approving sales goals and personnel decisions for the enrollment department (Ex. 8, 70:9-24; Ex. 13, 244:24-246:7). From 2011 to 2015, Lipsky received over $[redacted] in shareholder distributions. Ex. 53 ¶¶ 14-15. He also receives an annual salary between $100,000 and $200,000 from Nationwide. Ex. 12, 595:3-5.

### 2. <u>Defendants' Direct-Mail Marketing and Advertising Operations</u>

Defendants use an extensive direct-mail marketing effort to advertise the IM program. As part of this process, Lipsky purchases the names, addresses, and loan information (closing date, loan amount, and lender name) from two data sources to target new homeowners and consumers who have recently refinanced. Ex. 7, 91:10-25; Ex. 4, 36:18-37:19. The mailers – many of which contain backsides (Exs. 112, 113) – typically include the name of the consumer's lender (visible through the front window of the envelope) and the consumer's loan amount, a sample interest rate to calculate estimated savings – often presented graphically in a table – that Nationwide claims consumers will achieve through the IM program, as well as additional information about how the IM program works. Ex. 12, 516:16-517:4; Ex. 11, 194:2-17; Ex. 4, 89:9-11; *see, e.g.*, Exs. 85-116 (mailers and envelopes).

Lipsky is primarily in charge of the design and layout of the mailers and envelopes (Ex. 12, 515:22-516:7, 619:9-14), decides which letters to send for a particular mailing campaign (Ex. 13, 97:13-98:1), tests consumer reactions to mailers (Ex. 7, 121:1-18), and tracks consumer response rates (Ex. 4, 89:21-90:19; Ex. 12, 261:4-262:19; Ex. 7, 87:24-88:11). Lipsky has sole final approval over any changes to mailers and envelopes. Ex. 4, 25:4-24; Ex. 1, No. 4.

In addition to mailers, Defendants maintain an online and multimedia presence in which Lipsky is heavily involved. Ex. 14, 371:22-372:7, 441:11-14; Ex. 12, 443:21-444:3. Lipsky is a company spokesman and has appeared in videos posted on Nationwide's websites. TAA ¶ 24; Ex. 12, 423:15-424:14; 458:22-459:4; Ex. 4, 30:17-25; Ex. 7, 243:16-23. Lipsky was involved in writing and approved the script for a paid advertisement in which he appeared ("The Balancing Act") that aired in September 2014 on the Lifetime network and is found on Defendants' website. TAA ¶ 25; Ex. 12, 545:12-547:4; Ex. 4, 31:1-24; Ex. 52 ¶¶ 4(a), (b).

**3. Defendants' Telemarketing Operations**

Defendants' mailers identify the consumer's lender and loan amount, and warn consumers on the envelope (Exs. 114-116) that loan payment information is enclosed. *See, e.g.*, Ex. 115 ("Mortgage Payment Information Enclosed"). Inside, Defendants stress the urgency and a deadline to call a toll-free number. *See, e*.g., Ex. 91. Defendants require enrollment specialists to follow scripts and Q&A documents (Exs. 54-75) word-for-word throughout the entire interaction with the consumer.[3] Ex. 7, 129:20-130:3; 135:1-6; Ex. 4, 43:8-12; Ex. 13, 98:22-99:5; 266:3-7.[4] Although enrollment specialists can add to the script, they are directed not to omit anything from it. Ex. 8, 64:11-17; Ex. 14, 40:14-19.[5] On average, Nationwide received approximately 10,000 to 20,000 calls per month from consumers across the country. Ex. 14, 390:23-391:3. During telemarketing calls, Defendants email consumers a savings analysis document that the enrollment specialist generates using details of the consumer's actual loan. Exs. 136-140; Ex. 12, 375:2-23, 402:5-11; Ex. 14, 57:4-14.[6] If the consumer wants to enroll, the enrollment specialist reads a script and directs her how to complete the "e-sign" process. Ex. 121 (online enrollment form); *see, e.g.*, Ex. 63, at 26-29 (walking consumer through enrollment process).[7] After the consumer signs electronically, Defendants generally send the consumer the executed contract, which includes a two-page Biweekly Program Agreement, and receipt. Ex. 2, Rog. No. 7; *see, e.g.*, Ex. 117 (sample contract).

---

[3] Over the years, although the script – which Lipsky developed from scratch (Ex. 12, 76:2-25) – has undergone revisions, it has essentially remained the same. *See* Exs. 54-75 (scripts, Q&As, rebuttals).

[4] Defendants script verbatim responses to a variety of common questions from consumers, such as "What are your fees?", "Are you affiliated with my lender?", "Can I do this if I'm behind on payments?", and "Are you my lender?" Ex. 6, 97:7-14; Ex. 5, 90:2-8; Ex. 13, 34:16-25.

[5] Scripts, as well as mailers and contracts, contain information and markings indicating the dates when each document was in use. Ex. 1, No. 4; Ex. 9, 52:6-23.

[6] Lipsky also controls the content of the savings analysis template. Ex. 12, 380:6-14.

[7] When applicable, the Bureau uses pinpoint citations with reference to the last two Bates numbers to indicate relevant pages for documents cited throughout the motion.

**4. <u>Misrepresentations to Consumers through Defendants' Advertising and Telemarketing Operation</u>**

**a. <u>Defendants hide a setup fee of up to $995 from consumers</u>**

Defendants misrepresent the cost of the IM program and hide the substantial one-time setup fee – up to $995 – from consumers. Prior to 2010, Nationwide charged all consumers a flat fee of $245 to participate in the IM program. Ex. 4, 60:20-62:20; Ex. 7, 52:11-19. Under that payment arrangement, enrollment specialists were required to disclose the exact amount of the fee over the phone and consumers had to present a credit or debit card or check by phone to authorize the charge. Ex. 9, 17:18-18:20; Ex. 7, 54:22-55:2; Ex. 41 ¶ 6; Ex. 42 ¶ 3; Ex. 49 ¶ 4.

Lipsky changed the fee structure in 2010. Ex. 7, 53:8-54:5; Ex. 12, 340:7-342:13; Ex. 4, 60:4-19. Instead of the consumer paying a setup fee of $245 over the phone, Defendants began taking one of the consumer's biweekly mortgage payments as a so-called "deferred setup fee," generally equivalent to "one biweekly debit" or half a mortgage payment for consumers with a 30-year mortgage. Ex. 4, 57:24-59:8.[8] Although Defendants contend the consumer owes the setup fee upon signing the contract (Ex. 7, 161:13-162:3), Defendants collect the setup fee by keeping the first "extra" biweekly payment (approximately the 13th debit, typically several months after enrollment). Ex. 12, 340:7-342:13.[9] Defendants then direct subsequent debits to the principal. Ex. 4, 57:24-59:8; TAA ¶ 13.[10] From 2011 to 2015, Defendants collected approximately $[redacted] in setup fees from over [redacted] consumers. Ex. 53 ¶¶ 6-8, 12-13.

---

[8] Defendants also charge periodic debiting fees of $1.95 and $3.50 per debit for its weekly and biweekly/semi-monthly programs, respectively. TAA ¶¶ 14-19. Lipsky was in charge of setting all price points for the IM program and did not cap the setup fee at $995 until the end of 2011. Ex. 4, 19:5-11; Ex. 7, 57:10-23; Ex. 82. Thus, for about a year, some consumers paid a deferred fee up to $1,995.

[9] Unless the consumer pays more than what is required by the lender, Defendants always collect the setup fee before making any additional principal payments to the consumer's lender or servicer. Ex. 12, 603:16-20.

[10] After Defendants switched to the deferred setup fee structure, enrollments in the IM program increased. Ex. 6, 123:2-9.

i. **<u>Defendants' advertisements and other marketing materials do not disclose the existence or amount of the setup fee</u>**

None of Defendants' mailers or related marketing materials indicates the amount of the fees – or that Defendants even charge a setup fee – to participate in the IM program. Exs. 84-113.[11] Some mailers state – multiple times in distinctive text – that there is no upfront fee. *See* Ex. 100 ([redacted]); Ex. 101 ([redacted]). Others state that the consumer's "extra funds" are "directed 100%" to the principal of the loan without disclosing that, in fact, a consumer must first pay Defendants a significant setup fee. Exs. 112, 113 (backside of mailers). Defendants' website, online videos, and infomercial similarly do not mention any fees and instead state that consumers pay the same amount they "pay now" to participate in the IM program. Ex. 129; Ex. 125, at 0:20 ("extra funds are directed 100% to the principal of the loan"); Ex. 127, at 0:12 ("you're paying the exact same amount you're paying now…"); Ex. 52 ¶ 4(a), (b). The savings analysis emailed to consumers (Exs. 136-140) likewise does not state the amount of the setup fee.

**ii. <u>Defendants' sales scripts and related guidance obscure the existence and amount of the setup fee</u>**

Defendants' scripts also hide the amount and existence of the setup fee. The enrollment specialist is required to read the following, which is the only time the setup fee is referred to in the script:

> Now there are 26 biweekly debits annually, which create 2 extra biweekly debits every year that are applied directly to your principal resulting in you saving over $(<u>Interest Savings</u>). So you will have a total of (biweekly loan term x 2) extra biweekly debits throughout the course of your loan. The one-time setup fee for the biweekly program is just one biweekly debit and is completely deferred (half a biweekly debit for mortgages with a term less than 20 years). We simply keep the first extra debit that occurs within the first 6 months and then the remaining ((biweekly loan term x 2) -1) extra debits will go 100% toward the principal of your loan saving you the $ ____ in interest charges![12]

Enrollment specialists generally do not give the exact amount of the setup fee when asked about fees. Ex. 6, 108:15-109:18; Ex. 4, 159:11-25; Ex. 63, at 32. Instead, Defendants direct employees

---

[11] Although some mailers note in fine print that projected savings are "net of all fees," the mailers generally contain no other reference to fees.

[12] Ex. 62, at 63. The setup fee portion of the script remained substantively unchanged between 2011 to 2015. Exs. 54-64.

to give the exact amount of the small debiting fees, *i.e.*, $3.50 per debit. *See* Exs. 54-64. If a consumer affirmatively asks about a setup fee, the scripts require enrollment specialists to redirect the conversation and read a section of the script in which no dollar amount is mentioned. *See, e.g.*, Ex. 59, at 18; Ex. 70, at 25 ("If you have run the analysis already, read setup fee section of script"). This is true even after the enrollment specialist has run a savings analysis and thus knows the exact amount of the fee. Ex. 66, at 38; *see also* Ex. 56, at 00 ("if they persist to ask about fees"). Nevertheless, if a consumer asks about the fees, Defendants provide several different ways to explain it – none of which provides the dollar amount itself. *See, e.g.*, Ex. 54, at 60; Ex. 6, 55:17-25 ("we had like four different ways to that you could explain the fee to somebody"). Indeed, until recently, it was generally against company policy to state an exact dollar amount of the setup fee unless the consumer asks about fees several times. Ex. 6, 111:23-112:14; Ex. 4, 159:11-25; Ex. 47 ¶ 12; Ex. 46 ¶ 6.[13]

When consumers ask how Defendants make money, Defendants direct enrollment specialists to respond by only mentioning the small debiting fees, rather than the more substantial setup fee (*see, e.g.*, Ex. 131, at 30), despite the fact that those debiting fees cover bank transaction costs and expenses. Ex. 10, 46:6-20; Ex. 71, at 62 ("The Debit Fee covers the costs associated with debiting your account, processing your payments to your Lender, maintenance of your account, and updating account information"). [redacted]. Ex. 53 ¶¶ 9-13.

Some of Defendants' former enrollment specialists felt uncomfortable with the lack of disclosures in the script and found the setup fee verbiage to be confusing and vague. Ex. 45 ¶ 5; Ex. 41 ¶ 7. Enrollment specialists observed that the majority of consumers appeared not to understand the fees

---

[13] Defendants' training materials reveal that the consumer must ask about the fees several times before being given the exact dollar amount. Ex. 77, at 06. Even though enrollment specialists are permitted to give the amount if specifically asked by the consumer, Nationwide discouraged enrollment specialists from doing so during training sessions. Ex. 47 ¶ 12; Ex. 48 ¶ 10; Ex. 44 ¶¶ 5-6.

and remarked that it was rare if a consumer appeared to notice the setup fee during the enrollment call. Ex. 42 ¶¶ 6, 7; Ex. 49 ¶¶ 9, 11; Ex. 44 ¶ 11. One former enrollment specialist believed Defendants designed the scripts to confuse consumers and to be intentionally unclear. Ex. 45 ¶ 5. Other enrollment specialists observed colleagues speeding through the setup fee portion of the script and muting or muffling the phone during the discussion of the setup fee. Ex. 40 ¶¶ 11, 13; Ex. 41 ¶ 9; Ex. 44 ¶ 13; Ex. 45 ¶14; Ex. 46 ¶ 9; Ex. 47 ¶ 11. In the experience of one former Nationwide customer care representative, many consumers who called to cancel the IM program learned for the first time on the cancellation call that Defendants had charged a setup fee. Ex. 42 ¶¶ 6-9; Ex. 25, ¶ 4. Defendants do not send monthly account statements but only debit notification e-mails. *See, e.g.*, Ex. 66, at 45. Thus, many consumers do not even become aware of the setup fee until they cancel their enrollment or reconcile mortgage payments made in the IM program. Ex. 33 ¶ 6; Ex. 27 ¶ 7; Ex. 19 ¶¶ 6, 7; Ex. 31 ¶ 6; Ex. 37 ¶ 6; Ex. 30 ¶ 9; Ex. 20 ¶ 7; Ex. 21 ¶ 7; Ex. 35 ¶ 7; Ex. 17 ¶ 9. If a consumer appeared to understand there was a setup fee despite the inadequate disclosure, Defendants directed enrollment specialists to downplay it with rebuttal phrases such as, "you won't feel the fee," "you won't notice it," and the fee "is not out of pocket expense to enroll…[it] happens naturally" and is "built into the program." Ex. 40 ¶¶ 14, 15; Ex. 46 ¶ 10; Ex. 47 ¶ 13; Ex. 49 ¶ 10.[14]

#### iii. <u>Defendants conceal the setup fee in their contracts, online enrollment form, and related documents</u>

Finally, Defendants obscure the existence and amount of the setup fee in their contracts and related documentation.[15] Unlike Defendants' pre-2010 contract for the "upfront" pricing scheme which clearly stated the dollar amount of the setup fee ($245) in a separately-numbered paragraph, the contracts and online enrollment form do not directly state the dollar amount of the deferred setup fee,

---

[14] Some enrollment representatives expressed concerns to management and others at Nationwide over consumer confusion about the setup fee section of the script. Ex. 39 ¶ 5; Ex. 40 ¶ 9; Ex. 46 ¶ 7. Nevertheless, the script remained largely unchanged. Exs. 54-74.

[15] As explained *supra*, the setup fee, however, is not "deferred" since it is due upon execution of the contract. The consumer has only seven days to cancel before owing the setup fee. Exs. 117, 119-121.

but instead refer to the non-refundable setup fee as a "biweekly debit" in an unnumbered paragraph that the consumer "currently" owes to Defendants. *Compare* Ex. 118 *with* Ex. 119; *see also* Ex. 42 ¶¶ 3-4. Notably, the fee disclosure language in Defendants' contract is in a smaller font than the rest of the contract language. *Id.* When walking consumers through the e-sign process, enrollment specialists direct consumers to click the "I Agree" box "once everything is filled out correctly" (*e.g.*, bank account information) without first drawing the consumer's attention to the fact that one of the check boxes involves a substantial fee. Ex. 59, at 16; Ex. 4, 161-162. The receipts Defendants email to consumers confirming the transaction disclose only that a "**$3.50** fee is included in each debit" and generally do not mention that the consumer has been charged or owes a substantial enrollment fee. *See, e.g.*, Ex. 117, at 79.[16] Lastly, Defendants do not send any additional notifications or receipts that it collected the large enrollment fee – other than a generic debiting notification. *See, e.g.*, Ex. 76, at 29.

**iv. <u>Consumer testimony confirms consumer confusion over the amount and existence of the setup fee</u>**

Many consumers were not aware of or did not understand the setup fee of several hundred dollars and never would have enrolled had they known about the large setup fee. *See* Ex. 15-38. Other consumers confirmed that – when specifically asking about the fees associated with the IM program – enrollment representatives only mentioned the small debiting fee for each biweekly debit. *Id.* Of approximately 216 complaints filed with the Better Business Bureau and State Attorneys General since 2012, at least 76 consumers complained that they were not aware or did not know of the setup fee. Ex. 51 ¶¶ 4-7, 10-13.

**b. <u>Defendants falsely claim that consumers achieve savings without paying more through the IM program</u>**

Defendants expressly promise that consumers will achieve savings through the IM program without increasing their monthly payment. For example, Defendants' ads and mailers promise that

[16] On October 19, 2015, Nationwide initiated a new requirement to include the dollar amount on enrollment contracts Ex. 83.

consumers can shorten loan terms "without increasing the amount of [] the monthly payment" (*see, e.g.*, Exs. 88, 102, 103) and that they "**do not increase** [their] **monthly payment**" by using the IM program (*see, e.g.*, Exs. 85, 86, 104, 106, 107), but instead that the consumer's "monthly payment is decreased to a much smaller biweekly debit amount (1/2 a monthly payment)[.]" (Exs. 112, 113). *See also* Ex. 123, at 1:11 ("your monthly payment is decreased…"); Ex. 84 ("No Increase in Your Monthly Payment"). At the same time, Defendants' videos state that consumers "pay[] the exact same amount [they] pay now" and "do not increase" their monthly payment. Ex. 127, at 0:14. Defendants similarly train enrollment specialists to remind consumers that they are "not increasing [their] monthly payment, but instead switching to a smaller biweekly or weekly payment." Ex. 79; Ex. 123, at 3:00 ("remember you're not increasing your payment…"), 4:45 ("there's no increase in your monthly payment"); Ex. 127, at 0:58 ("remember, you're not increasing your payment. You're just switching to a smaller biweekly amount…"). If a consumer hesitates about enrolling, Defendants direct enrollment specialists to respond that "the biweekly program is not increasing your monthly payment." Ex. 75, at 19.

All of these express claims are false. Consumers enrolled in the IM program actually pay substantially more per month because (1) Defendants charge and collect a setup fee of up to $995 and debiting fees each time a debit occurs ($91 per year), and (2) consumers make a 13th mortgage payment each year on the IM program. In fact, during the first year of enrollment alone, the median consumer's mortgage payment will increase an average of $72.28 per month, or 9.3%, when compared to making a monthly mortgage payment without the IM program. Ex. 161-A ¶¶ 44-48.

**c. Defendants falsely guarantee interest savings and misrepresent the results of the IM program**

Defendants expressly guarantee immediate savings and benefits by enrolling and misrepresent actual results for enrolled consumers. For example, Defendants' mailers and related correspondence guarantee immediate savings (Ex. 139: "**you're going to save a lot of money!**") – and often present these figures in a table reflecting purported "Interest Savings," and "Monthly Interest Savings" achieved through the IM program. *See, e.g.*, Ex. 93. Defendants' mailers similarly urge consumers to act quickly claiming that consumers are losing "thousands of dollars every year" (Ex. 126, at 0:20 "for most of us,

(we're losing) thousands of dollars every year (to interest payments)") in interest charges and that – by enrolling in the IM program – consumers will "soon" save thousands of dollars in interest. Ex. 122. Enrollment specialists likewise tout "immediate" benefits (*see e.g.*, Ex. 57, at 82) and a "100% savings guarantee" while telling consumers that the interest savings benefit after year one of enrollment will be $1,500 and $5,000 in year two (Ex. 64, at 04), their loan term will go "down," they "will eliminate" specific amount of months off the term, and they "will save" a specific amount of money. *See, e.g.*, Ex. 60, at 13. Defendants repeatedly guarantee savings and advertise that Nationwide has helped its "customers eliminate over $161 million in interest in 2013." Ex. 68, at 13; Ex. 52 ¶ 4(b), at 4:31 ("In last year alone, we helped our customers eliminate over $161 million in interest charges"). These express statements are false for several reasons.

First, the savings Defendants guarantee are contingent on consumers participating in the IM program until paying off the loan. As demonstrated by the Bureau's expert, the benefits are not "immediate" because it takes several years to achieve any savings after accounting for the substantial fees and the nature of loan amortization. . Ex. 161-A ¶¶ 39-43. It will take 23.9 years for the median consumer to achieve the touted saving, and the average consumer enrolled in the IM program will not see net savings until month 108. *Id.*[17] Of the 123,716 active customers enrolled on December 31, 2014, only about 25% had been enrolled for longer than four years. Ex. 134. Barring unusual circumstances, this means at least 75% of enrollees have not participated long enough to get out of the hole created by the fees. The average consumer stays in a mortgage for only 4.5 years. Ex. 161-A ¶ 32. Thus, based on this figure, few if any of Defendants' consumers have been enrolled long enough to achieve any savings.

Second, Defendants' statements about interest savings "achieved" are false because Defendants do not actually track such figures or know how many consumers have paid off their mortgages while on the IM program. Ex. 12, 588:15-589:11; Ex. 4, 222:6-224:25. The "$161 million" *saved* figure is also

[17] The IM program does not provide true economic value until the start of the tenth year – which is twice as long as the average period in which a consumer holds a mortgage. Ex. 161-A ¶¶ 39-43.

based upon an inaccurate methodology since it represents hypothetical savings based on the total interest that would be saved over the life of the loan. Ex. 161-A ¶¶ 49-51; Ex. 135; Ex. 4, 108:13-24, 220:10-21.

**d. Defendants falsely claim that consumers cannot achieve interest savings on their own without the IM program**

Defendants claim that (1) most lenders will not accept biweekly payments unless set up through Nationwide, and that lenders will not let consumers pay biweekly by themselves, and (2) consumers will fail if they attempt to make extra principal payments on their own without enrolling in the IM program. These statements are false.

When consumers ask if they can pay biweekly on their own, the enrollment specialist is required to respond, "No, lenders require mortgages to be remitted monthly and will not accept a biweekly payment. Most lenders require biweekly programs to be set up through a third party administrator, like us." *See*, *e.g.*, Ex. 59, at 19; Ex. 61, at 49; Ex. 72, at 42; Ex. 74, at 37; *see also* Ex. 65, at 74 ("[Lenders] are not applying 100% of the extra debits towards your principal."). These statements are repeated on Defendants' website ("Does my lender offer this program?" and "NBA Works for You, Not the Lender!") in which consumers again are told that "[o]nly a small percentage of lenders actually offer a bi-weekly mortgage program to their customers...The few lenders who do offer a bi-weekly program require you to set it up through an administrator like us." Ex. 124, at 0:15; Ex. 128; Ex. 130.[18] Enrollment specialists are also required to tell consumers that "lenders that do offer (a biweekly program) are actually not administrating the biweekly program themselves." Exs. 78, 80, 81. However, these statements are false for many consumers whose lenders do not require them to use Defendants and instead offer similar programs at little or no cost. Exs. 154-160; Ex. 133.[19]

---

[18] Although enrollment specialists have access to an internal Nationwide document containing competitors' programs (Ex. 133), Defendants do not disclose to consumers whether the consumer's lender offers a similar program, even though many lenders – based on Defendants' own list – offer a biweekly option at little or no cost. Ex. 133.

[19] For example, if a consumer had Wells Fargo or Bank of America as her lender, the consumer would not only be able to set up biweekly payments on her own, but she would also save considerably more money because there are no fees. Ex. 161-A, Exhibit C-1 (showing month-by-month cumulative IM Program fees); Ex. 158; Ex. 159; Ex. 53 ¶¶ 16, 17.

Defendants similarly claim that 99% of people who try to make biweekly payments on their own fail to do so. *See*, *e.g.*, Ex. 112; Ex. 66, at 44; Ex. 52 ¶ 4(c). Defendants allegedly conducted a survey to support this claim, however they cannot locate or retrieve the purported data underlying this "statistic" (Ex. 3, RPD No. 2), and instead have data showing that this claim is false. Ex. 141; Ex. 142, at 35.[20]

**e. <u>Defendants misrepresent an affiliation with the consumer's lender or servicer</u>**

Defendants misrepresent an affiliation with the consumer's mortgage lender or servicer when, in reality, no such relationship exists.

First, Defendants send mailers in envelopes emblazoned with the consumer's lender through the front window – *e.g.* "Regarding your loan with Wells Fargo" – and include prominent red text stating "Mortgage Payment Information Enclosed" (Ex. 115) or "Mortgage Information Enclosed (Accelerated Reduction in your Principal Balance)" (Ex. 116), or "Payment Information Enclosed" (Ex. 114). Inside, the mailers contain numerous suggestions that Defendants are affiliated with the consumer's mortgage lender by listing the name of the mortgage lender, the amount of the consumer's loan, and official-sounding "record IDs" and "reference IDs" that Defendants actually use to monitor consumer responses. *See* Exs. 85-111 (mailers). Many mailers also bear prominent statements that the consumer now has a "choice as to <u>how you would like to pay</u> [the] mortgage," that she is "now able to set up a biweekly payment for [her] new mortgage loan," and that her "current status" is "pending"– while warning the consumer that if she "decline[s]" or "waive[s] the biweekly option, [she] will be asked to confirm that [she] understand[s] that [she] is voluntarily waiving the interest savings and loan term reduction[.]" Exs. 90, 91, 105, 109. At the same time, the mailers bear markings, such as "[redacted]" (Ex. 100), "2[ND] ATTEMPT" (Ex. 95),

---

[20] In 2014, Defendants brought in a consultant to assess their sales operation. Ex. 11, 29:11-13; 33:12-35:4. That consultant wanted to ensure the accuracy of various marketing statistics used by Nationwide and – with Lipsky's approval – arranged for a third party to test the "99%" claim and validate its accuracy. *Id.* 76:25-78:11; 126:23-128:22. But the results of that survey did not support the "99%" claim (Ex. 142, at 35), and the consultant advised Lipsky that Nationwide should not be making the "99%" claim. Ex. 11, 129:3-9. Nevertheless, Defendants continue to make the unsupported "99%" claim even as recently as October 20, 2016. Ex. 50 ¶ 4.

"Confidential Document" (Ex. 98), "[redacted]" (Ex. 110), "Document Date" (Ex. 96) and "[redacted]" (Ex. 108), in addition to various subject lines, such "**Subject:** Optional Payment Change" (Exs. 88, 89, 94) and statements that "the biweekly program is administered to your lender" – all of which strongly connote an affiliation or relationship with the lender.

Even though the mailers commonly include a disclaimer at the bottom of the page stating that Nationwide is not affiliated with the consumer's lender, enrollment specialists use carefully scripted and ambiguous responses to straightforward questions further obscuring the lack of affiliation between the servicer and Nationwide, and are instructed "not to say 'NO'" when consumers ask "are you my lender" or "are you affiliated with my lender" (*see, e.g.*, Ex. 60, at 11; Ex. 59, at 18 ("Do NOT say "No"); Ex. 57, at 92; Ex. 67, at 97 ("We administer the Program to your lender…")) regardless of the consumer's lender. Some scripts also do not contain introductory language to identify Nationwide, but instead instruct employees to answer the phone by simply indicating that the consumer has reached "the enrollment department" (Ex. 55, at 62; Ex. 54, at 57), thus perpetuating the impression of an affiliation with the consumer's mortgage servicer.

Enrollment specialists were in fact trained to avoid directly answering questions about lender affiliation and to respond not by saying "no," but rather by explaining what Nationwide is and does. Ex. 45 ¶ 8; Ex. 40 ¶¶ 5-6. Former employees estimated that between 33% and 70% of consumers expressed confusion as to Nationwide's affiliation over the phone. Ex. 49 ¶ 7; Ex. 46 ¶ 4; Ex. 41 ¶ 5; Ex. 43 ¶ 7. One former employee recalled that consumers asked about Nationwide's affiliation on nearly every call and that consumers would hang up if they actually realized that Nationwide was not their lender. Ex. 44 ¶ 17. Finally, the record shows consumers were misled by Defendants' representations. Ex. 15 ¶¶ 3, 5; Ex. 16 ¶ 3; Ex. 19 ¶¶ 2, 4; Ex. 20 ¶ 3; Ex. 22 ¶¶ 2, 5; Ex. 23 ¶ 3; Ex. 24 ¶ 2; Ex. 28 ¶¶ 2-3; Ex. 31 ¶¶ 2, 5; Ex. 35, ¶ 2; Ex. 36 ¶ 4; Ex. 51 ¶¶ 8, 14.

**ARGUMENT**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[21] Here, the pleadings, discovery, and declarations demonstrate that there is no genuine issue as to any material facts and that the Bureau is entitled to judgment on Counts II through IV.

**1. Defendants Are Sellers or Telemarketers Under the TSR and Covered Persons Under the CFPA**

As set forth in Sections 1-3, *supra*, the uncontroverted evidence demonstrates that Defendants offer a financial product or service to transmit residential mortgage payments on the consumer's behalf to mortgage lenders and servicers. Therefore, Nationwide and LPA are "covered persons" and Lipsky is a "related person" subject to the CFPA's bar on deceptive and abusive acts or practices.[22] Lipsky and Nationwide are also "sellers" or "telemarketers" as defined in the TSR.[23]

---

[21] Fed. R. Civ. P. 56(a).

[22] A "covered person" is "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A). A "financial product or service" includes "transmitting or exchanging funds, or otherwise acting as a custodian of funds or any financial instrument for use by or on behalf of a consumer." *Id.* § 5481(15)(A)(iv). LPA is both a covered person and a "service provider" under the CFPA. A "service provider" is "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that participates in designing, operating, or maintaining the consumer financial product or service." *Id.* § 5481(26)(A)(i). A "service provider" is deemed a "covered person to the extent that such person engages in the offering or provision of its own consumer financial product or service" under 12 U.S.C. § 5481(26)(B). Lipsky is also a "related person" under the CFPA, which means "(i) any director, officer, or employee charged with managerial responsibility for, or controlling shareholder of, or agent for, such covered person; (ii) any shareholder, consultant, joint venture partner, or other person, as determined by the Bureau (by rule or on a case-by-case basis) who materially participates in the conduct of the affairs of such covered person[.]" *Id.* § 5481(25)(C). A "related person...shall be deemed to mean a covered person for all purposes of any provision of Federal consumer financial law," including the CFPA and TSR. *Id.* § 5481(25)(B).

[23] The TSR, 16 C.F.R. § 310.2(dd), defines "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." Section 310.2(ff), defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." Section 310.2(gg), defines "telemarketing" as "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more

**2. <u>Defendants Violated the CFPA By Engaging in Deceptive Acts or Practices (Count II)</u>**

Under the CFPA, it is unlawful for any covered person or service provider to engage in any deceptive act or practice.[24] An act or practice is "deceptive" if: (1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material.[25] To determine whether a representation, omission, or practice is likely to mislead, the Court may consider the overall net impression the representation creates.[26] A representation, omission, or practice "is material if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product."[27] Express claims or deliberately-made implied claims used to induce the purchase of a particular product or service are presumed to be material.[28] For the following reasons, the Bureau is entitled to judgment on Count II.

**a. <u>Defendants Misrepresent the Amount and Existence of the Setup Fee in Violation of the CFPA</u>**

As explained more fully in Section 4(a), *supra*, Defendants mislead consumers at every stage of

---

telephones and which involves more than one interstate telephone call." *See FTC v. Stefanchik*, 559 F.3d 924, 930 (9th Cir. 2009) (individual who had authority to review and approve marketing materials and scripts and made decision what to sell through program deemed "seller" under TSR).

[24] 12 U.S.C. § 5536(a)(1)(B).

[25] *Stefanchik*, 559 F.3d at 928 (applying elements of deception claim under the Federal Trade Commission Act to claim under the TSR); *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016) (applying FTC Act standard to CFPA). This is a question that the Court may decide on summary judgment. *See FTC v.Cyberspace.Com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006).

[26] *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *10 (C.D. Cal. Aug. 31, 2016) (quotations and citations omitted); *see also Cyberspace.Com LLC*, 453 F.3d at 1200 ("A solicitation may be likely to mislead by virtue of the net impression it creates ….").

[27] *Cyberspace.Com LLC*, 453 F.3d at 1201, *quoting In re Cliffdale Associates, Inc.*, 103 FTC 110, 165 (1984) ("A misleading impression created by a solicitation is material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product."); *FTC v. Southwest Sunsites, Inc.*, 105 FTC 7, 149, *aff'd*, 785 F.2d 1431 (9th Cir. 1986) (If consumers are likely to have chosen differently but for the deception, then a misrepresentation is material); *FTC v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012) (finding that representations about the nature of the benefit were material).

[28] *See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994) (express claims presumed material); *FTC v. Affiliate Strategies, Inc.*, 849 F. Supp. 2d 1085, 1105 (D. Kan. 2011) (express representations that are shown to be false are presumed material).

the enrollment process and conceal the existence and amount of the setup fee. Defendants induce the initial contact through deception by never disclosing the setup fee in mailers, advertisements/videos, its websites, or other marketing materials.[29] The deception continues with enrollment specialists who are required to read verbatim from misleading scripts rather than provide the actual amount of the setup fee, even when the consumer asks for clarification about the cost. Instead, Defendants employ vague and confusing language by referring to so-called "biweekly debits," which – consumers are deceptively told – "are applied 100% to the principal of the loan" without informing the consumer that the first "extra" biweekly debit is collected as a setup fee. If consumers hesitate about enrolling, Defendants instruct enrollment specialists to use misleading rebuttals in response to questions about the setup fee, which is similarly buried in the contract and not even disclosed in the receipt.[30] Defendants do not even alert consumers that they are collecting the setup fee, which generally occurs six months after enrollment.

There is a presumption of materiality as to claims about the cost of the IM program.[31] These multiple misrepresentations concerning the existence and amount of the setup fee are material because consumers likely would have chosen differently had they been made aware that it costs several hundreds of dollars to participate in the IM program. That is especially true here, as evidenced by the record

---

[29] *See Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) (The FTC Act is "violated if [the seller] induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract.") (citation omitted).

[30] Even though Defendants may contend that the setup fee is disclosed in the script ("one biweekly debit") and in the contract (in noticeably smaller font without a dollar amount of the fee), such fine-print disclaimers do not dispel the mailers, scripts, and marketing materials that overwhelmingly suggest no setup fee to enroll. *See Cyberspace.Com, LLC*, 453 F.3d at 1200 (summarizing case law from other circuits in which fine-print disclaimers are insufficient to overcome evidence of deceptive messaging); *FTC v. Gill*, 71 F.Supp.2d 1030, 1044 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001) (finding disclaimers in contracts signed by consumers insufficient to create dispute of material fact "because each representation must stand on its own merit, even if other representations contain accurate, non-deceptive information[.]") (citation omitted); *FTC v. Health Formulas, LLC*, 2015 WL 2130504, at *12 (D. Nev. May 6, 2015) ("Even if customers read and fully understand the fine print, they are not given the full cost of the product or told how much they will be billed, as there is no price listed next to the dollar sign in the fine print.").

[31] *See Novartis Corp. v. FTC*, 223 F.3d 783, 786 (D.C. Cir. 2000) (citation omitted).

containing 24 declarations from consumers who would not have enrolled in the IM program had they known Nationwide charged a substantial enrollment fee (Exs. 15-38), in addition to many more who complained via other channels (Ex. 51). While such proof is not necessary to prove deception, it is highly probative to show that Defendants' practices were likely to deceive consumers acting reasonably under the circumstances.[32] Taken together, Defendants' deceptive practices are misleading as a matter of law because they leave the consumers with the common sense net impression that Defendants do not collect or charge a setup fee.

**b. <u>Defendants Make Express Misrepresentations about Other Aspects of the IM Program in Violation of the CFPA</u>**

As set forth in Sections 4(b)-(d) *supra*, Defendants make several express claims about other aspects of the IM program, including that (1) consumers save money "without increasing" their monthly mortgage payment, (2) consumers are "guaranteed" to achieve "immediate" interest savings and benefits and that Defendants have "saved" a specific amount for consumers, and (3) consumers cannot achieve savings on their own. These express claims are false and thus presumed to be material.[33]

Although Defendants do not track actual interest savings of the IM program, they nevertheless falsely advertise that consumers are "guaranteed" to save money and tout a false amount of interest "saved" for their customers despite the facts that the vast majority of their own customers have not been enrolled long enough to achieve any net savings after fees.[34] As demonstrated by the Bureau's expert

---

[32] *Cyberspace.Com LLC*, 453 F.3d at 1201 (proof of deception, while not necessary, is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstance); *Simeon Management Corp. v. FTC*, 579 F.2d 1137, 1146 n. 11 (9th Cir. 1978) ("Consumer testimony, although sometimes helpful, is not essential" to determine whether ads have the capacity to deceive or mislead).

[33] *See Pantron I Corp.*, 33 F.3d at 1095-96 (express claims presumed material); *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008) (citation omitted) (express representations that are shown to be false are presumed material). Courts have declined to require reasonable consumers to doubt the veracity of express, objective product claims. *FTC v. Mortg. Relief Advocates LLC*, 2015 WL 11257575, at *2 (C.D. Cal. July 1, 2015) (citation omitted).

[34] *See Stefanchik*, 559 F.3d at 928 (noting that a material omission may violate § 5 of FTC Act; claims held to be deceptive "where very few people made money using the Stefanchik [real estate] Program as promised in the advertising materials and telemarketing pitches"); *FTC v. Figgie Int'l*, 994 F.2d 595, 603–04 (9th Cir. 1993) (misrepresentation about benefit product offered concerned "the single most

who analyzed the underlying model of the IM program, it takes many years to achieve any net savings and consumers therefore are not guaranteed to save any money on the IM program. Defendants also consistently misinform consumers that they do not pay more on the IM program (when, in fact, they do) and that they cannot achieve savings on their own and must instead use Nationwide to reap the purported benefits, even though consumers can achieve the same benefits on their own or many can do so for free directly with their lenders.

**c. <u>Defendants Misrepresent an Affiliation with the Consumer's Lender in Violation of the CFPA</u>**

As set forth in Section 4(e), *supra*, Defendants also make implied claims that Nationwide is affiliated with the consumer's lender or servicer in order to induce the consumer to enroll.[35] The misrepresentation begins when the consumer receives a deceptive mailer that contains the consumer's loan amount and lender name, as well as other markings, warnings, and other urgent language, that strongly suggest Nationwide is somehow related or affiliated with the consumer's lender or servicer.[36] Because of the deceptive messaging in the mailers, many consumers call Defendants and immediately inquire as to the relationship with the lender. Rather than providing a straightforward response,

---

useful piece of information" consumers could receive, and misrepresentation was material); *Bailey Employment System, Inc. v. Hahn*, 545 F.Supp. 62, 70 (D. Conn. 1982) *aff'd* 723 F.2d 895 (2d Cir. 1983) (holding projected earnings claims were deceptive where such claims did not "bear a reasonable relationship to the average amounts earned in the past by a majority of existing franchisees."); *Cliffdale Associates, Inc*., 103 FTC at 175 n. 4 (An omission of fact may be deceptive under Section 5 when "information necessary to prevent a practice, claim, representation, or reasonable expectation or belief from being misleading is not disclosed.").

[35] The Court can decide implied deception claims on summary judgment. *See Gill*, 71 F. Supp. 2d at 1043. Even if some of the statements are impliedly misleading, and not expressly so, this is a distinction without a difference. *Id.*, *citing Figgie Int'l, Inc.*, 994 F.2d at 604.

[36] It is inapposite that mailers may have contained a fine-print disclaimer because each representation must stand on its own merit, even if other representations contain accurate, non-deceptive information. *See Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496–97 (1st Cir. 1989) ("Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings.").

Defendants' scripts direct enrollment specialists not to say "no" to direct questions such as "are you my lender," which further compounds the deceptive messaging, thus creating the net impression that Nationwide is affiliated or has a relationship with the lender. Finally, the record contains highly probative evidence that consumers were in fact deceived by Defendants' practices. Ex. 15 ¶¶ 3, 5; Ex. 16 ¶ 3; Ex. 19 ¶¶ 2, 4; Ex. 20 ¶ 3; Ex. 22 ¶¶ 2, 5; Ex. 23 ¶ 3; Ex. 24 ¶ 2; Ex. 28 ¶¶ 2-3; Ex. 31 ¶¶ 2, 5; Ex. 35, ¶ 2; Ex. 36 ¶ 4; Ex. 51 ¶¶ 8, 14.

### 3. <u>Nationwide and Lipsky Violated Various Provisions of the TSR and, Therefore, the CFPA (Counts III and IV)</u>

Before a customer consents to pay for goods or services, a telemarketer or seller must disclose "truthfully" and "in a clear and conspicuous manner" facts, including "the total costs to purchase . . . goods or services that are the subject of the sales offer."[37] In addition, the TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, "the total costs to purchase . . . goods or services," "[a]ny material aspect of the performance, efficacy, nature or central characteristics" of the goods or services, or the seller or telemarketer's "affiliation with...any person."[38] Finally, the TSR prohibits sellers or telemarketers from making "a false or misleading statement to induce any person to pay for goods or services."[39]

As detailed in Section 4(a), *supra*, Defendants' telemarketing scripts, Q&A documents, and other guidance do not clearly and conspicuously disclose the setup fee for the IM program. Even when consumers specifically ask about the fees, enrollment specialists are discouraged from disclosing a specific amount to the consumer and instead are required to further obfuscate the fee by reading verbatim from a portion of the script that contains several cryptic references to "biweekly debits" and fails to state the actual amount.[40] Defendants' scripts similarly falsely state that consumers must use

---

[37] 16 C.F.R. § 310.3(a)(1)(i).
[38] 16 C.F.R. §§ 310.3(a)(2)(i), (iii), and (vii).
[39] 16 C.F.R. § 310.3(a)(4).
[40] *FTC v. Arlington Press, Inc.*, 1999 WL 33574020, at *12 (C.D. Cal. Jan. 11, 1999) (finding FTC likely to prevail in preliminary injunction context in case involving a cryptic reference to the total amount of the sale because it was never stated in a clear and conspicuous manner).

Nationwide to safeguard their money and achieve the promised savings and that Nationwide has an affiliation or relationship with the consumer's lender. Moreover, as explained in Sections 4(b)-(d), *supra*, Defendants' multiple false and misleading statements in telemarketing scripts obscure central features of the IM program, deceptively overstate the amount and timing of such savings, and misstate the benefits of enrolling in the IM program in order to induce the consumer to enroll.[41] Accordingly, the Bureau is entitled to judgment on Counts III and IV.

**4. Individual Liability of Daniel S. Lipsky**

Under 12 U.S.C. § 5536(a)(1)(B), it is unlawful for any covered person to engage in any deceptive act or practice. Some courts have applied the standard for individual liability under the FTC Act to claims of individual liability under the CFPA. The Ninth Circuit has done so in one case, stating that an individual may be liable for corporate violations if (1) he participated directly in the deceptive acts or had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth.[42]

As established above, Lipsky engaged in the deceptive acts or practices. He is Nationwide's founder, president, sole officer, and sole owner and – as such – has exercised unfettered authority to execute key decisions regarding the IM program and maintains extensive oversight of critical aspects of

---

[41] *See Stefanchik*, 559 F.3d at 929–30 (analyzing TSR violation under same analysis of FTC Act); *FTC v. Munoz*, 17 Fed.Appx. 624, 626–27 (9th Cir. 2001).

[42] *Gordon*, 819 F.3d at 1193 (holding an individual liable under the CFPA where, among other things, the individual "had final decision-making authority for all marketing used by the operation" and "reviewed the scripts and any marketing material used by the operation, and he edited and modified those items"); *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1102 (9th Cir. 2014) ("[t]he extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability.") (citation omitted); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170-71 (9th Cir. 1997) (individual's status as corporate officer and authority to sign documents on behalf of corporate defendant sufficient to demonstrate the requisite control for finding individual liable); *Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973) (A corporate officer is presumed to be in control of a small, closely held corporation); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989) (assuming the duties of a corporate officer is probative of an individual's participation or authority).

Nationwide's advertising and telemarketing operations. He directs and oversees all aspects of the operations, including drafting, editing, and approving the content and layout of sales scripts, direct-mail marketing letters, contracts, and other marketing materials that contained the deceptive statements that violated the CFPA and TSR. In this regard, he acts as the gatekeeper for every word, representation, and claim that appears in Nationwide's marketing materials, sales scripts, and videos. As demonstrated above, Lipsky participates extensively and directly in the deceptive acts and has the exclusive authority to control them. Even if some level of knowledge is required to hold an individual liable under the CFPA, Lipsky would meet that standard because he is aware of the misrepresentations. Lipsky reviews consumer complaints (many of which concern the same deceptive claims in this case), edits and approves Nationwide's formal responses to consumer complaints received on behalf of third parties, and authorizes consumer refunds. Ex. 8, 31:7-22; Ex. 4, 204:16-205:10; Ex. 9, 107:2-4; Ex. 132 ("Final review and approval [of response to customer complaints] will be completed by [Lipsky]…."). In fact, only very rarely were refunds ever issued without Lipsky's approval. Ex. 9, 91:25-92:23. Moreover, Lipsky and Nationwide, which have been subject to prior lawsuits and administrative action involving similar allegations of consumer deception, have knowledge of, or at the very least, are recklessly indifferent to the truth or falsity of their misrepresentations, which were pervasive. *See* Ex. 143-153.

**5. <u>Relief Requested</u>**

The CFPA authorizes the Court to order any appropriate equitable relief, including, *inter alia*, disgorgement, restitution, limits on the activities or functions of the person, and civil money penalties.[43]

**a. <u>The Bureau Is Entitled to an Order of Restitution and Disgorgement</u>**

The Bureau seeks monetary relief in the form of setup fees paid by consumers to enroll in the IM program, less refunds.[44] The Bureau need not prove that every consumer actually relied upon the

---

[43] 12 U.S.C. §§ 5565(a)(1) and (2); *see also FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1088 (C.D. Cal. 2012) ("Restitution may be measured by the 'full amount lost by consumers rather than limiting damages to defendant's profits.'"), *quoting Stefanchik*, 559 F.3d at 931.

[44] The proper measure of such recovery is the full amount that consumers paid as a result of the unlawful conduct. *See FTC v. Gill*, 265 F.3d 944 at 958 (2001).

misrepresentations to prevail.[45] It is sufficient to show that misrepresentations were widely disseminated and caused actual consumer injury.[46] As set forth above, the Bureau has met the requirements for an award of restitution because Defendants made several material misrepresentations about the IM program, and consumers purchased the IM program.[47] Once the Bureau satisfies its burden on these elements, it must show that its calculations reasonably approximate the amount of customers' net losses, and then the burden shifts to Defendants to show that those figures were inaccurate.[48]

Here, the Bureau's forensic analyst reviewed financial records from Defendants and third party accountants.[49] He determined that from July 21, 2011 to December 31, 2015, Defendants received $[redacted] in total revenue from deferred setup fees paid by approximately [redacted] consumers who were enrolled in the IM program during that timeframe.[50] Ex. 53 ¶¶ 6-8, 12-13. Accordingly, the Bureau is entitled to a judgment of restitution from Defendants jointly and severally in the amount of $[redacted].[51] The Court also should enter an order of disgorgement in the amount of $[redacted]

---

[45] *Stefanchik*, 559 F.3d at 929 n.12, *quoting FTC v. Amy Travel Serv., Inc.*, 875 F.2d at 572; *see Figgie Int'l, Inc.*, 994 F.2d at 605 (citation omitted).

[46] *See Figgie*, 994 F.2d at 605-606.

[47] To the extent Defendants introduce evidence that some consumers may have been satisfied with their purchase, this would not create a genuine issue of material fact because such fact, even if true, would not constitute a defense to a deception claim. *Stefanchik*, 559 F.3d at 929 n.12.

[48] *See FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 603 (9th Cir. 2016); *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997).

[49] *See FTC v. Good Ebusiness, LLC*, 2016 WL 3704489, at *7 (C.D. Cal. July 12, 2016) (awarding judgment of monetary relief based upon declaration of FTC's forensic accountant).

[50] Effective July 21, 2011, the CFPA transferred authority over several existing consumer laws from other agencies to the Bureau. *See* Designated Transfer Date, 75 FR 57252-02, 57253 (Sept. 20, 2010) ("[C]ertain authorities will transfer from other agencies to the CFPB, and the CFPB will be able to exercise certain additional, new authorities under the Act and other laws."). Although Defendants' violations began on or about January 1, 2011, the Bureau seeks restitution only for setup fees collected from the transfer date (July 21, 2011) to present. The Bureau is not seeking restitution for the periodic debiting fees assessed for the same period.

[51] *See Gordon*, 819 F.3d at 1196 (affirming decision to hold individual and company jointly and severally liable for full amount of sales because, *inter alia*, individual had control over and approved deceptive marketing materials); *Commerce Planet, Inc.*, 815 F.3d at 600.

against Lipsky for the shareholder distributions he received from 2011 to 2015 for his involvement in the scheme.[52] Ex. 53 ¶¶ 14-15.

**b. <u>The Court Should Impose Civil Money Penalties Against All Defendants</u>**

Any person that violates "any provision of Federal consumer financial law shall forfeit and pay a civil penalty."[53] The CFPA provides for three tiers of civil money penalties, calibrated by scienter.[54] Each tier sets a maximum penalty for each violation. The first tier provides for penalties not to exceed $5,000 for any violation for each day during which such violation continues, regardless of the person's scienter.[55] Based on the undisputed record, Defendants' violations of the CFPA occurred from at least July 21, 2011[56] to November 23, 2015 (Counterclaim, Dkt. 82 ¶ 83) – a total of 1,586 days.[57] Therefore, for the purposes of summary judgment, the Bureau requests that the Court impose a civil monetary penalty against each Defendant in the amount of $7,930,000.

**<u>CONCLUSION</u>**

For the reasons stated above, the Court should grant partial summary judgment in favor of the Bureau.

Date: December 8, 2016.

ANTHONY ALEXIS
Enforcement Director

DEBORAH MORRIS
Deputy Enforcement Director

---

[52] District courts have broad powers to order disgorgement, which is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable. *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010).
[53] 12 U.S.C. § 5565(c)(1); *Tull v. United States*, 481 U.S. 412 (1987) (courts determine the amount of civil money penalties to be imposed).
[54] 12 U.S.C. § 5565(c)(2).
[55] *Id*. at (c)(2)(A). Subsections (c)(2)(B) and (C) provide for second- and third-tier penalties up to $25,000 and $1,000,000 for each violation, respectively, based on degrees of the subject's scienter.
[56] The Bureau is seeking civil money penalties only for conduct occurring on or after July 21, 2011, the effective date of the statute. 12 U.S.C. § 5491 note. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 245 (1994) (as a general principle, "a court must apply the law in effect at the time it renders its decision.").
[57] One option to calculate civil money penalties – and the method the Bureau proposes here – is to add the number of days that the violative conduct occurred.

MICHAEL G. SALEMI
Assistant Litigation Deputy

*<u>/s/ Patrick Gushue</u>*
Patrick Gushue
patrick.gushue@cfpb.gov
202-435-9671
Jonathan Urban
jonathan.urban@cfpb.gov
202-435-7371
Stephen Jacques
Stephen.jacques@cfpb.gov
202-435-7368
*Enforcement Attorneys*

Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served on December 8, 2016, via ECF upon counsel of record in this action:

John D. Smith
140 North Main Street, Suite B
Springboro, Ohio 45066

Sean Ponist
Georgia Schneider
Law Office of Sean Ponist, P.C.
100 Pine Street, Suite 1250
San Francisco, CA 94111

Allyson Baker
Venable LLP
575 7th Street, NW
Washington, DC 20004

Christopher Stock
119 East Court Street
Suite 530
Cincinnati, OH 45202

*/s/ Patrick Gushue*
Patrick Gushue
patrick.gushue@cfpb.gov
202-435-9671
*Enforcement Attorney*

Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552