1  SEAN E. PONIST (SBN 204712)
   sponist@ponistlaw.com
2  GEORGIA Z. SCHNEIDER (SBN 251358)
   gschneider@ponistlaw.com
3  **LAW OFFICES OF SEAN PONIST, P.C.**
   100 Pine Street, Suite 1250
4  San Francisco, California 94111
   Telephone:  (415) 798-2222
5  Fax:  (888) 350-5442

6  JOHN D. SMITH (admitted *pro hac vice*)
   **JOHN D. SMITH CO., LPA**
7  jsmith@johndsmith.com
   140 N. Main Street, Suite B
8  Springboro, Ohio 45066
   Telephone: (937) 748-2522
9  Fax: (937) 748-2712

10 *Attorneys for Defendants Nationwide Biweekly*
   *Administration, Inc., Loan Payment Administration, LLC, and*
11 *Daniel S. Lipsky and Counterclaimant Nationwide Biweekly*
   *Administration, Inc.*

12            **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
13

14 CONSUMER FINANCIAL PROTECTION     | CASE NO. 3:15-cv-02106-RS
   BUREAU,
15
                        Plaintiff,
16
       vs.                                **DEFENDANTS' MEMORANDUM OF POINTS**
17                                        **AND AUTHORITIES IN OPPOSITION TO**
   NATIONWIDE BIWEEKLY                   **PLAINTIFF'S MOTION FOR PARTIAL**
18 ADMINISTRATION, INC., LOAN            **SUMMARY JUDGMENT**
   PAYMENT ADMINISTRATION LLC, and
19 DANIEL S. LIPSKY,

20                      Defendants.
   _____
21 NATIONWIDE BIWEEKLY
   ADMINISTRATION, INC.,
22                                        Hearing Date: February 9, 2017 at 9:00 a.m.
                      Counter-claimant,   Judge:        Hon. Richard Seeborg
23                                        Courtroom:    Courtroom 3, 17th Floor
       vs.                                              450 Golden Gate Ave.
24
   CONSUMER FINANCIAL PROTECTION                        San Francisco, CA 94102
25 BUREAU,

26 Counter-defendant.

27

28

                    DEFENDANT'S OPP. to PLAINTIFF'S MSJ
   3:15-CV-02106-RS

TABLE OF CONTENTS

SUMMARY OF ARGUMENT...……………………………………………………………..1

STATEMENT OF RELEVANT FACT………………………...………………………………..3

STANDARD OF REVIEW...…………………………………………………………………5

STANDARD OF REVIEW – SPECIFIC TO THE BUREAU……………………………………6

LAW AND ARGUMENT…………………………………………………………………8

I.    THERE IS A GENUINE DISPUTE OF FACT AS TO EVERY POSITION
      IN THE BUREAU'S  MOTION §4 THAT PRECLUDES SUMMARY JUDGMENT….8

      A.  THE DEFERRED SETUP FEE CHARGED TO THE CONSUMER FOR
          NBA'S SERVICES WAS CLEARLY STATED AND UNDERSTOOD
          BY CONSUMERS………………………………………………………………8

      B.  SAVINGS PROMISED TO THE CONSUMER ARE ABSOLUTELY TRUE……..14

          1.   NBA'S INTEREST MINIMIZER PRODUCT DID
               NOT INCREASE A CUSTOMER'S MONTHLY
               LOAN PAYMENT ……………………………………………………14

          2.   CONSUMERS ARE GUARANTEED TO ACHIEVE IMMEDIATE
               SAVINGS AND BENEFITS………………………………….....................16

          3.   NBA EXPLICITLY STATES CONSUMERS CAN ACHIEVE
               INTEREST SAVINGS ON THEIR  OWN……………………………….18

      C.  NBA DOES NOT REPRESENT THAT IT IS AFFILIATED WITH THE
          CONSUMERS' MORTGAGE LENDER AND IN FACT DISCLAIMS
          SUCH AN AFFILIATION ……………………………………………….........20

      D.  THE NEGLIGIBLE NUMBER OF CONSUMER COMPLAINTS BASED
          UPON NBA'S MARKETING MATERIALS ESTABLISHES THAT NBA'S
          MARKETING MATERIALS DID NOT DECEIVE THE CONSUMER …………..23

      E.  THE BUREAU HAS NOT SHOWN THAT A REASONABLE JURY
          COULD NOT FIND IN FAVOR OF NBA ON ISSUES OF METERIALITY…......23

      F.  IN THE EVENT SUMMARY JUDGMENT IS GRANTED, A DISPUTE OF
          FACT REMAINS AS TO DAMAGES SOUGHT BY THE BUREAU……………..24

CONCLUSION……………………………………………………………………...25

CERTIFICATE OF SERVICE…………………………………………………………26

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986) …………………………………….6

*Braxton-Secret v. A.H. Robbins Co.,*769 F2d 528, 531 (9th Cir. 1985) ……………………….6

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) …………………………………………….6, 7

*Consumer Fin. Prot. Bureau v. Irvine Webworks, Inc.,* No. SA-CV-JVS 2016 WL 1056662
(C.D. Cal Feb 5, 2016) …………………………………………………………………….…..7, 20

*Easter v. Am. W. Fin.,* 281 F.3d 948, 957 (9th Cir. 2004) …………………………………….5

*F.T.C. v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006) …………………………….…7

*F.T.C. v. Gill*, 71 Supp.2d 1030 (C.D. Cal. 1999) …………………………………………….7

*Harkins Amusement Enter., Inc. v. Gen Cinema Corp.,* 850 F.2d 477, 485 (9th Cir. 1988) ………..5

*Matushita Elec. Indus. Co. v. Zenith Radio Co.,* 475 U.S. 574, 588 (1986) ………………………6

*Odle v. Heckler,*707 F.2d 439, 440 (1983) ………………………………………………….6

*Scott v. Harris*, 550 U.S. 372, 378 (2007) ……………………………………………………..6

*Starships Services, Ltd v. Epix, Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999) ……………………7

*FTC v. Stefanchik*, 559 F.3d  924 (9th Cir. 2009) ……………………………………………23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendants Nationwide Biweekly, Inc. ("Nationwide"), Loan Payment Administration, LLC ("LPA"), and Daniel S. Lipsky ("Mr. Lipsky") (collectively, "NBA") submit the following opposition to the Motion for Summary Judgment filed by Plaintiff Consumer Financial Protection Bureau (the "Bureau" or "Plaintiff").

## SUMMARY OF ARGUMENT

NBA's Interest Minimizer Program did not mislead consumers in any respect. The Bureau's Summary Judgment Motion ("Mot." or "Motion") is in contradiction to the records the Bureau has produced and ignores its own evidence that demonstrates NBA did not deceive consumers. Taken as a whole, all of the information produced, in both NBA's Response and the Bureau's Motion and Exhibits, illustrates that there are genuine issues of material fact on each and every issue raised by the Plaintiff's Motion.

First, The Bureau's Motion argues that there is no dispute that NBA engaged in deceiving its customers in three basic respects: (1) consumers were misled into believing that NBA was affiliated with their lender; (2) consumers were misled into believing that there was no deferred set fee to be paid for its service; and (3) that NBA misled its consumers into believing they would save money on the biweekly program. These claims, however ignore the simple facts of this matter: (1) there are numerous disclaimers on the marketing material and what the consumers were told in the telephone interaction that clearly establish NBA was not affiliated with the consumer's lender; (2) there is a plethora of evidence that the consumers were told multiple times of the deferred setup fee; and (3) the Bureau's statistical analysis is flat out wrong in addressing the impact of the extra principal payment on an interest bearing loan. As all three of the above points will be established, there clearly exists genuine issues of material fact such that the Bureau's Motion should be denied in its entirety.

Second, the Bureau's Motion heavily relies on a minimal number of consumer complaints and declarations of former employees of NBA. The Bureau asks the Court to assume that the former are all

making accurate allegations when, in fact, evidence exists that the consumers who did complain were not accurate, had other reasons for complaining, and, most importantly, their number was so statistically insignificant that it actually proves that consumers were adequately advised as opposed to establishing that customers were actually confused. Further, the declarations of a select group of former employees is based on speculation and "what they believe" without foundation for their competency in most respects. More important, their declarations contravene deposition testimony and other evidence on the record. Thus, genuine issues of material fact exist and the Motion should be denied.

Third, under the Interest Minimizer Program, the reduction in interest expense begins as soon as the first payment is made to the principal. Consumers are able to achieve "immediate" interest savings and benefits without increasing their monthly mortgage payment. The extra payment immediately reduces the interest liability of the borrower. Candidly, the evidence will be undisputed that the interest savings representations by NBA are absolutely true and the calculations of the Bureau in this regard are "voodoo economics."  In any event, there is a genuine issue of material fact with regard to this issue and summary judgment must be denied.

Fourth, NBA customers achieve savings without increasing the monthly payment required by the lender. The monthly payment required by the lender does not change. NBA's standard mailer discloses that results in 26 biweekly debits annually, "which equal[s] 13 monthly payments." The purpose of the program is to make a thirteenth payment. The Bureau's Motion misstates this thirteenth payment as an increase in the monthly loan payment.

Fifth, NBA's marketing material clearly states the consumer is able to achieve savings through the Interest Minimizer program but is unlikely to do so on their own. Its script accurately states that (1) a lender requires mortgage payments to be remitted monthly, not biweekly and (2) most lenders require biweekly programs for mortgages to be set up through a third-party administrator.

Sixth, NBA marketing materials did not misrepresent the setup fee charged to Interest Minimizer Program consumers. Each sales script required sales enrollment specialists to notify each purchaser of

DEFENDANT'S OPP. to PLAINTIFF'S MSJ

2

the one-time deferred setup fee. The contract then reiterated the presence and condition of each customer's deferred setup fees.

Seventh, NBA does not misrepresent an affiliation with the consumer's mortgage lender. Marketing materials identify that NBA is not affiliated with lenders. Likewise, the script makes clear that NBA is not partnered with any lender. The contract further indicates that the lender is a separate entity with no connection to NBA.

## STATEMENT OF RELEVANT FACT

Defendant agrees with the statement of Material Fact in Plaintiff's Motion in the following respects: (1) the categorization of the parties and (2) NBA was a marketing business.

Mr. Lipsky is the founder and President of Nationwide. Lipsky Decl., at ¶2.  Nationwide was once one of the country's largest and most recognized administrators for biweekly loan repayment programs known for Nationwide's Biweekly Interest Savings Program ("Interest Minimizer Program"). It began in 2002 and for more than a decade enabled Nationwide's customers to achieve interest savings and reduce their debt much faster by allowing Nationwide to debit smaller, biweekly amounts which were then remitted to their servicer/lender on a monthly basis as required by their lenders towards each customer's mortgage. Lipsky Decl., at ¶3.

Nationwide is located in Xenia, Ohio. Doc. No. 1.  As it grew through the years since its inception, it took on more and more customers and, consequently, more and more employees. Customer enrollment in the program was a three-step process. Lipsky Decl., at ¶20.  First, consumers were generally exposed to NBA's product by direct mail. *Id.*  Interested customers were encouraged to place a phone call to an NBA enrollment specialist. *Id.* at ¶ 13.  During phone calls, NBA enrollment specialists were required to follow a script. *Id.* at ¶ 14.  The enrollment specialist could add to the script but they were directed not to omit anything from it.  Doc. No. 14-9; 64:11-17.  All phone interaction with customers was recorded and maintained. Lipsky Decl., at ¶29.   The calls were then reviewed by a quality assurance specialist on a regular basis. *Id.* The quality assurance specialist reviewed calls to

DEFENDANT'S OPP. to PLAINTIFF'S MSJ

ensure enrollment specialists followed the script. *Id*. Enrollment specialists who did not follow the script or who were found to not appropriately service the customer were disciplined. *Id*. at ¶30. The intent at all times of NBA was to fully inform its customers as to all material aspects of its relationship with the customers so that they could make an informed decision about whether to purchase the service and/or continue the service already purchased. *Id*. at ¶33. At its height, NBA was licensed in 41 states. *See*, e.g., Doc. No. 130-14 to 120. Each state had their own rules and regulations with which NBA had to comply and NBA was subject to audits by various states on an ongoing basis. *See id.* [1]

In 2008, the Ohio Attorney General's Office ("OAG") filed a lawsuit against NBA. Doc. No. 130-11, at ¶4. In 2010, the OAG, by and through former Ohio Attorney General Richard Cordray ("Director Cordray"), entered into an Agreed Entry regarding the propriety of the Interest Minimizer Program and the proper marketing and sale of the same under the Ohio Consumer Sales Practices Act and Home Solicitation Sales Act. Doc. No. 130-11.

The marketing letters, sales scripts (for enrollment specialists) and contracts with customer are substantially the same as the ones agreed to in the Agreed Entry. Doc. No. 130-11; See also, Lipsky Decl., at ¶7. The sole difference is that NBA transitioned to a deferred setup fee instead of an upfront fee as preferred by Director Cordray in his role as Ohio Attorney General. Lipsky Decl., at ¶8. Equally, and perhaps more importantly, the Interest Minimizer Program and its representations as to interest savings were substantially the same then as they are in this litigation. Lipsky Decl., at ¶9. Nevertheless, the instant litigation brought by Director Cordray, as the current Director of the Bureau, attacks the same product (Interest Minimizer Program) and its guarantee of interest savings as false although the same product is no different than it was when approved by Mr. Cordray as Ohio's Attorney General in February of 2010. Lipsky Decl. at ¶¶7-11.

---

[1] Doc. No. 130-14 to Doc. No. 130-20 illustrate the different and varying rules and regulations of the individual states to which NBA not only had to comply but agreeably did so. The issues involved the state's differing requirements for what type of license was required to rules and regulations regarding use of the lender's name in its materials. These exhibits illustrate NBA's adherence and willingness to comply so long as it received notice of what was required unlike the Plaintiff's actions herein.

During the litigation with Mr. Cordray on behalf of the State of Ohio, criticism was leveled at NBA's collection of an upfront fee for its services. Lipsky Decl., at ¶8; See also, Doc. No. 124-5.  In fact, between 2008 and 2010, it was found that customers also preferred a deferred fee as opposed to paying up front for the Interest Minimizer Program. Doc. No. 124-5; pp. 254-255. In response to customer preference and Director Cordray, the company in 2011 began explaining the deferred setup fee method to customers. Lipsky Decl., at ¶8; Doc. No. 124-5; pp. 255-256.   Accordingly, the sales enrollment specialist scripts were changed to reflect the deferred setup fee. *See* Lipsky Decl., at ¶8. Enrollment specialists were required, and the scripts used by them were designed, to be a step by step process to ensure the customer was aware of both the biweekly debit amount required and the deferred set up fee. Lipsky Decl., at ¶¶21-22. The deferred set up fee is not hidden, obscured, or designed to be misleading in any respect.  Lipsky Decl., at ¶27.  In fact, the deferred setup fee is clearly stated and reiterated in the contract form. *Id.* at ¶34. A customer must sign the contract before being able to enroll in the Interest Minimizer Program. *Id.*

It was NBA policy, as set by Mr. Lipsky, to discipline any enrollment specialist who failed to follow the script. *Id.* at ¶30. It was also NBA policy that if a sales enrollment specialist failed to adequately explain the setup fee in accordance with the script, NBA would refund or waive the deferred setup fee depending on other circumstances. *Id.*, at ¶32; Doc. No. 125-2; 111:12-111:15.

## STANDARD OF REVIEW

"In order to withstand summary judgment, an issue of material fact need not be conclusively resolved; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Harkins Amusement Ent., Inc. v. Gen. Cinema Corp.*, 850 F.2d 477, 485 (9th Cir. 1988). "Summary judgment cannot be granted where contrary inferences may be drawn from evidence as to material issues." *Easter v. Am. W. Fin.*, 281 F.3d 948, 957 (9th Cir. 2004). "The inquiry involved in a ruling on a Motion for Summary Judgment…implicates the substantive evidentiary standard of proof that would

DEFENDANT'S OPP. to PLAINTIFF'S MSJ

apply at trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). On summary judgment, the court draws all reasonable and factual inferences in favor of the non-movant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). When the moving party has the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact would find other than for the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When the operative facts are substantially undisputed, and the heart of controversy is the legal effect of such facts, such a question effectively becomes a question of law that can, quite properly, be decided on summary judgment." *See Odle v. Heckler*, 707 F.2d 439, 440 (1983). "However, summary judgment should not be granted where contradictory inferences may be drawn from undisputed facts." *See Braxton-Secret v. A.H. Robbins Co.*, 769 F.2d 528, 531 (9th Cir. 1985). In such a case, the non-moving party must show the inferences it suggests are reasonable in light of competing issues. *See Matushita Elec. Indus. Co. v. Zenith Radio Co.*, 475 U.S. 574, 588 (1986).

## STANDARD OF REVIEW – SPECIFIC TO THE BUREAU

Important in this legal analysis is the distinction to be made between allegations of statements made by the Bureau that are objectively false vis-a-vis statements made by NBA in connection with this product that the Bureau contends are misleadingly ambiguous.  There are three fundamental categories of allegations made by the Bureau:

1.)   Allegations that the deferred setup fee is hidden, obscure, not disclosed, etc.;
2.)   Representations of the Defendant that consumers can achieve savings and the general results of the IM Program;
3.)   Representations of an affiliation with the consumer's lender or servicer[2]

The first and third of these allegations are, in substance, the allegation that NBA's statements are misleadingly ambiguous and only the allegations of the second are that the NBA's statements are objectively false.  With regard to statements that the Bureau contends are misleadingly ambiguous, the standard for deciding a motion for summary judgment is set forth in *Consumer Fin. Prot. Bureau v.*

---

[2] These allegations may also be referred to as "Statement of Issues" to be decided as required by L.R. 7-4.

*Irvine WebWorks, Inc.* No. SA-CV-141967-JVS 2016 WL 1056662, at *9 (C.D. Cal. Feb. 5, 2016). Given the limited precedent addressing the Bureau's attempts at summary judgment, the framework applied in the *IrvineWebWorks* decision should apply here. The Court stated:

> The Bureau has not pointed to any statement made by the Defendants that are **objectively false, only statements it contends are misleadingly ambiguous.** There is a triable issue of fact as to whether any particular statement by the Defendants, or all of the statements and other acts together, imply an affiliation with the [DOE]." *Id.* at *9. (emphasis added).

The Bureau's theories require a weighing of evidence similar to a "likelihood of confusion" analysis[3] ordinarily not suitable for summary judgment. *See id* (citing *Starships Services, Ltd. v. Epix, Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999) ("Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena"). [4] The Court in *IrvineWebWorks* ultimately held—"[T]he undisputed facts in this case merely invite an inference in favor of the Bureau; they do not compel that result." *Id.* The Court's reference to (1) "likelihood of confusion" analysis and (2) the bolded text cited above establish summary judgment is only proper if the Bureau can prove a statement made by NBA was objectively false. Stated otherwise, a finding that a statement is "misleadingly ambiguous" is insufficient for summary judgment as that issue is properly tried to the factfinder.

Here, the Bureau's Motion does not demonstrate any statement made by NBA as objectively false with regard to either the issue of affiliation with the consumer's lender or with regard to the deferred setup fee. Regardless, NBA's Memoranda in Opposition demonstrates consumer were neither misled nor deceived. With regard to the Bureau's allegation that the Defendants' statements of guaranteed interest savings, it will be established that there is not only a genuine issue of material fact in respect to said statements but also that the Bureau's position is flat out statistically and formulaically

---

[3] Strikingly, the Bureau's Motion at 4(a)(iv) appears to rely on this "likelihood of confusion" standard for summary judgment when it suggests customer confusion is sufficient for summary judgment. *See* Bureau's Motion at 10.
[4] *See id* at *9, ¶1 for full discussion differentiating *F.T.C. v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006) ("*Cyberspace.com* is a deceptive trade practice case "very different from the Bureau's theory of this case [*IrvineWebWorks*] and *F.T.C. v. Gill*, 71 Supp.2d 1030 (C.D. Cal. 1999) (finding the *Gill* Court found the defendants therein made false statement") from this case.

wrong.

## LAW AND ARGUMENT

I.   **THERE IS A GENUINE DISPUTE OF FACT AS TO EVERY POSITION IN THE BUREAU'S MOTION §4 THAT PRECLUDES SUMMARY JUDGMENT**

A.   **THE DEFERRED SETUP FEE CHARGED TO THE CONSUMER FOR NBA'S SERVICES WAS CLEARLY STATED AND UNDERSTOOD BY CONSUMERS.**

Revealingly, the Bureau' own arguments show it cannot decide on what the true facts are with regard to its own complaint about the deferred set up fee.  A quick glance at its Motion's table of contents of reveals that in successive arguments, the Bureau argues: (1) "the setup fee is not disclosed"; (2) the setup fee is "obscured" (how can it be obscured if it is not revealed as previously stated); (3) the setup fee is concealed (how can it be concealed if it is not disclosed in the first argument). The obvious inconsistencies in the Bureau's own argument is evidence of the "pick and choose" efforts of the Bureau intentionally ignoring all the facts and circumstances of the entire contact relationship between the consumer and NBA—at least a three-step process.

Consumers were generally exposed to NBA's product by direct mail. [5] Since the fee is tied to the amount of the consumer's mortgage monthly payment, a general marketing letter would never be able to refer to what the fee would be.  Thus, an allegation that the marketing materials do not disclose a fee are quite absurd.  Second, if interested after receiving NBA's marketing letter, the consumers were encouraged to place a phone call to an NBA enrollment specialist.  When speaking with a consumer, NBA enrollment specialists were required, at a minimum, to follow a script. [6]  The script stated the deferred setup fee. *See*, e.g., Doc. No. 127-7 to Doc. No. 127-12.  Third, if the entire telephone interaction with the consumer was satisfactory to the consumer, then a contract was provided by email in which the amount of the fee was conspicuously stated. *See* Doc. No. 129-7 to 129-12.

---

[5] Lipsky Decl., at ¶__.

[6] They were permitted to add to the script if it would help educate and explain things to the consumer but were always required to inform the consumer of the minimum information in the script. *See* Doc. No. 124-7; 95:9-95:13.

Thus, the deferred set up fee was disclosed to the consumer in the sales script, enrollment contract, online enrollment form, and related documents.[7] *See* Doc. No. 127-2 to 127-11; *see also* Doc. No. 129-7 to 129-12. This is illustrated more specifically below.

First, consumers may not purchase the Interest Minimizer Program without speaking to an NBA enrollment specialist. The purpose of NBA's marketing letters is to make consumers aware of the Interest Minimizer Program—it was not a selling tool. Lipsky Decl., at ¶14.  The envelope and letter request interested customers to contact NBA to discuss NBA's Interest Minimizer Program. *See* Doc. No. 128-5 to Doc. No. 129-6. Aside from listing comparisons, customer benefits, and NBA promotions, the only instruction listed is for the consumer to contact NBA. *See* Doc. No. 128-5 to Doc. No. 129-6. Some letters state "NO UPFRONT FEE."[8]  Doc. No. 128-20. Given that NBA does not collect the setup fee until approximately the thirteenth debit (or six months after enrollment), this statement is true. *See* Bureau's Motion at 6; *see also* Doc. No. 124-5, 57:24-59:8.

Second, NBA provides the existence and amount of the setup fee during phone calls with the customer. *See* Doc. No. 127-2 to 127-11. The costs associated with NBA's program are customized for each person and are explained fully during the enrollment call. Lipsky Decl., at ¶26. For example, if a customer has a monthly mortgage payment of $1,000, NBA would propose a biweekly debit of $500 to match the customer's payday (plus a $3.50 debit fee). The amount of the biweekly debit varies depending on a customer's mortgage. NBA then credits a deferred setup fee of approximately one biweekly debit, or $500.

NBA's sales enrollment script—read together as intended by NBA—is a step-by-step process designed to ensure the consumer is aware of both the amount of the biweekly debit and the deferred setup fee. Lipsky Decl., at ¶22. The script requires the enrollment specialist to first state, "Based upon the figures you've given me, your biweekly debit will be $(payment)!" *See*, e.g., Doc. No. 127-4.  The

---

[7] NBA transitioned to the deferred fee as a result of an investigation by the Ohio Attorney General's Office ("OAG") and former Ohio Attorney General Richard Cordray. Doc. No. 124-5; 254:5- 255:8. Mr. Lipsky testified that the OAG preferred a "delayed or deferred setup fee." *Id.*

[8] The text "NO UPFRONT FEE" certainly suggests that the fee would be collected at a future time.

DEFENDANT'S OPP. to PLAINTIFF'S MSJ

3:15-CV-02106-RS

9

customer is then advised, as demonstrated by the Bureau's Exhibits:

> "**There is a one-time setup fee equal to just one biweekly debit** (half for 15 year loan) that we defer for you. **It is simply taken from the first extra debit that occurs in about 6 months**..." *See*, e.g., Doc. No. 127-5.

In other words, a customer is told the actual biweekly debit amount, and then informed the setup fee will be the cost of one such biweekly debit. The Bureau cannot allege the deferred setup fee is hidden when (1) the customer is informed of the biweekly debit, and (2) explicitly told his deferred setup fee will be one biweekly debit.[9]

Third, the contract establishes the customer is aware and fully understands the biweekly debit fee. The contract's main page clearly states the exact amount of the customer's biweekly debit account. *See*, e.g., Doc. No. 129-7. Underneath the stated amount, there is a section named "SETUP FEE." *See*, e.g., Doc. No. 129-7:



That section describes and authorizes one biweekly debit amount to go to pay the deferred setup. Doc. No. 129-7 to Doc. 129-12. It precisely states— "By signing below, I acknowledge that I agree to a non-refundable setup fee equivalent to one bi-weekly debit." *See*, e.g., Doc. No. 129-7 to 129-12. The placement of the biweekly debit amount next to "SETUP FEE" explicitly makes clear to each customer the amount of the individual setup fee. Smith Decl., at Exhibit D at 4.1.

Further, Section 8 of the contract refers to the presence of fees: "All funds that are collected

---

[9] The script demonstrates NBA made clear each deferred setup fee was one biweekly debit. If the Bureau's record demonstrates a customer is notified of (1) the biweekly debit and (2) that the deferred setup fee is the equivalent to one biweekly debit, then the Bureau cannot allege on summary judgment that NBA hid the deferred setup fee.

from the Designated Account pursuant to this Agreement - **other than those which cover fees and charges** that Client has agreed to pay under this Agreement - will be solely for the purpose of making payments on the Loan on Client's behalf." Doc. No. 129-7 to 129-10 (emphasis added). Section 13 of the contract also states: "Upon termination by Client, NBA will . . . promptly refund to Client any funds which have been previously collected for the Designated Account under this Agreement – **other than those which cover fees and charges** that Client has agreed to pay under this Agreement – and not paid on the Loan." Doc. No.  129-7 to Doc. No. 129-10 (emphasis added). The Bureau thus cannot allege a reasonable trier of fact would find either the contract or script misleading when (1) the contract's main page explicitly provides the biweekly debit and defines the "setup fee" right underneath and (2) additional sections in the contract address the existence of fees, and the scripts clearly set forth the existence of the setup fee.

The Bureau's argument, recognizing that the deferred set up fee is discussed and revealed multiple times with the customer, collapses into only the anecdotal consumer declarations attached to its Motion.[10]  It should be noted that the burden of proof is on the Bureau to show that a reasonable consumer would be deceived by the entire context of the presentation of the deferred set up fee to the consumer as described above.  The Bureau fails to provide survey to carry this burden of proof. Therefore, it resorts to the anecdotal customer complaints that it has attached to its Motion.

These declarations, although legally deficient [11] illustrate that they do not stand entirely for the propositions upon which they are asserted by the Bureau.  For example, Andreya Prattman, (Doc. No. 15-7. ¶7) indicates "at that point I was told what the program cost."  After two years in the program, she expected a refund and was unhappy that she did not get one. Many of the consumer declarations are based upon the fact that their services were suspended in November 2015, the subject of the Counterclaim herein when NBA had its ACH services terminated by all of its banks due to the

---

[10] Under separate cover, NBA is submitting Declaration of Sherry Ann Scott ISO NBA's Opp. re: Customer Declarations ("Scott Decl. re Customer Decl."). *See* Dkt No. (forthcoming).
[11] Legal deficiencies are discussed in the objections to evidence.

DEFENDANT'S OPP. to PLAINTIFF'S MSJ

influence, intimidation, and actions of the Bureau.  *See*, e.g., Doc. No. 125-12; 125-13; Doc. No. 125-14; Doc. No. 125-20.  These inconsistencies in the anecdotal declarations filed are pointed out for purposes of this Motion. NBA respectfully retains its right to retain evidentiary objections.

Furthermore, NBA has, upon receipt of the consumer declarations, [12] conducted a review of the business records and recordings of its contacts with all of the consumer declarants. All disputes of facts with regard to said declarations are contained in the Scott Decl. re Customer Decl. [13]  In summary, to the extent that the information was available, the records that exist establish that the named consumers: (1) were told and informed of the deferred set up fee [14]and acknowledged same; (2) only complained after their suspension of services in November of 2015 as a result of this litigation and many had complaints resolved; and (3) in the case of Ms. Nicollette Colly, actually stating, "she was not misled and that Nationwide did not do anything wrong during multiple calls with the Nationwide supervisory team." Doc. No. 126-4.

The declarations of former employees are also not without dispute.[15]  An examination of the personnel and disciplinary files kept in the ordinary course of business on each of them showed that in most instances the declarant had to be counseled, reprimanded or disciplined with regard to their failure to appropriately and clearly designate the deferred fee to the customer. Declaration Sherry Ann Scott ISO NBA Opp. re Former Employee Declarations ("Decl. Scott re Employee Decl."). *See* Dkt No. (forthcoming).

Moreover, Jenna Solis, the head of Customer Complaint Services provided by NBA, testified that any time a complaint was received that involved a setup fee issue she reviewed the recordings of the enrollment specialist's conversations with the consumer and found that the fee was normally and

---

[12] None of these Declarations were provided in discovery nor were any of the factual statements contained therein provided in discovery although informally requested by counsel.

[13] NBA will also be filing leave of court to file audio recordings of consumer phone calls.

[14] The attachment sets forth the consumers whose recorded calls were actually produced in discovery and in at least five of these instances the recordings are in the possession of Plaintiff and, regrettably, Plaintiff submits to this Court Declarations that are to the opposite of what Plaintiff knows.

[15] NBA objects to all former employee declarations on grounds on hearsay, speculation, lack of personal knowledge, and foundation. *See* Doc. No. 126-1 to Doc. No. 126-19.

DEFENDANT'S OPP. to PLAINTIFF'S MSJ

1
2
3
4
5
6
7
8
9
10
11

usually clearly stated. *See* Doc. No. 128-23; *see also* Doc. No. 128-5.   "In my experience, an overwhelming majority, while they said there were not told about a fee, were in fact, told about a fee". Smith Decl. at Exhibit A; 107:16-107:18; *See also* Smith Decl., at Exhibit A, Sub-Exhibit 8 of JMS deposition. Exhibit 8 was a complaint identified in the Bureau's deposition of Ms. Solis wherein the complaint alleged the customer was not told about the deferred set up fee but review of the actual recording not only indicated that he was told, but that he also acknowledged being told by saying "OK." *See* Smith Decl. at Exhibit A, Sub-Exhibit 9 of JMS deposition. In Exhibit 9, the situation replayed itself with another customer. Moreover, if, in the handling of the complaint process, it was discovered that the enrollment specialist did not follow the script, did not reveal the fee, then the fee was typically refunded or waived and the enrollment specialist was disciplined. Lipsky Decl., at ¶32.

12
13
14
15
16
17

Lastly, the testimony of Paul Courtemanche ("Mr. Courtemanche") confirms NBA did not hide the setup fee. [16] He was hired by NBA "to work with the sales management group and sales leader to provide best practices and general management tools and establish sales, performance metrics." *Id*. He had direct involvement in the script and marketing material. *See*, e.g., Doc. No. 125-11; 80:3-80:12; 177:5- 177-15. At his deposition, Mr. Courtermanche testified NBA never hid the deferred setup fee:

18
19
20
21

> Q: Did you ever find anything you felt was unfair to the customer?
> A: No
> Q: Did you find that the deferred setup fee was clearly stated to the customer?
> A: Yep.
> Q: Did you find anything in the scripts that you felt really misled the consumer about the deferred setup fee?
> A: No. *See* Doc. No. 125-11; 255:13-256:19.

22
23
24
25
26

Moreover, not only did Mr. Courtemanche find nothing unfair to the consumer with regard to the deferred fee, but he also did a retroactive review of customer complaints and that did not lead him to believe that there was deception, unfairness, and misleading of customers with regard to it. Doc. No. 125-2; 262-263. Interestingly, Mr. Courtemanche, with all of his years of experience, found that the

27
28

---

[16] Mr. Courtemanche is the former NBA Vice President of Operations. Doc. No. 125-11; 31:1-33:19. He is a brand and marketing professional. *See* Doc. No. 125-11; 12-29. He holds a Bachelor of Commerce and Masters in Business Administration from McGill University in Montreal, Canada. *See id*.

existence of customer complaints does not mean that they are valid. *Id* at 259. Thus, Mr. Courtemanche with an entire career in sales and marketing and customer interactions and relations, clearly states an opposing view to those anecdotal customers (who had other reasons to complain) and creates a genuine issue of material fact on this issue. NBA clearly stated the deferred setup fee and did not mislead consumers about the deferred setup fee. Accordingly, there "is nothing that is objectively false that is written or stated by NBA and the entire process is not misleadingly ambiguous".

**B.  SAVINGS PROMISED TO THE CONSUMER ARE ABSOLUTELY TRUE**

There is neither one complaint nor any reasonable rational person that can argue that NBA customers did not understand they would make a thirteenth mortgage payment each and every year as a method of saving interest and accelerating the pay down of their mortgage.  This is the fundamental premise of the program and no one misunderstood it, except for the Bureau's contorted attempt in this case to confuse the Court.  The consumers were not misled and/or confused about this concept and neither will be the Court.

**1.  NBA'S INTEREST MINIMIZER PRODUCT DID NOT INCREASE
A CUSTOMER'S MONTHLY LOAN PAYMENT**

The Bureau's Motion attempts to blur the distinction between the Interest Minimizer Program and the customer's monthly loan payment. The Interest Minimizer Program is designed to assist customers make an additional thirteenth monthly payment to principal, thus accelerating an individual's mortgage amortization. Lipsky Decl., at ¶35. Under this Program, the monthly loan payments remain the same and the Interest Minimizer Program ensures customers make a thirteenth loan payment. Lipsky Decl., at ¶¶35-37. For this service, the customer pays a $3.50 debit fee and a one-time deferred setup fee. Lipsky Decl., at ¶37.

NBA's statement that Interest Minimizer Program customers "do not increase [their] monthly payment" is true.  The monthly payment paid by the customer to the lender does not change. Scott Decl., at ¶¶35-37. The payment of the deferred setup fee is for the Interest Minimizer Program product

and all it entails, not an additional payment to the lender. The purpose of the Interest Minimizer Program is to make an additional thirteenth payment (two biweekly debits) to accelerate the mortgage amortization. Lipsky Decl., at ¶35. [17] This is clearly stated to consumers numerous times:

> "Nationwide Biweekly Administration provides the biweekly savings program for borrowers who have loan from over 5,000 lenders nationwide…This automated process results in 26 biweekly debits annually, which equals 13 monthly payments." *See*, e.g., Doc. No. 128-13; Doc. No. 128-4; Doc. No. 128-14; Doc. No. 128-5; Doc. No. 129-28; Doc. No. 129-1.

It is common knowledge that a loan requires a homeowner to make 12 monthly payments to the lender. Smith Decl., at Exhibit C. A reasonable consumer would therefore understand both (1) there are 12 monthly payments, meaning the thirteenth payment is an extra payment applied to the principal of the loan; and (2) under the Interest Minimizer Program, the purpose of this additional payment is to accelerate the mortgage amortization. Accordingly, the Interest Minimizer Program added an additional thirteenth payment—it did not increase the actual monthly loan payment.

The Bureau's own evidence contradicts its claim. Its exhibits demonstrate NBA customers were aware of the thirteenth payment and transaction fee. *See*, e.g., Doc. No. 125-18 (Dec. of Humberto Arredondo ("Mr. Arredondo") acknowledging the Interest Minimizer Program entailed, "one extra payment going to principal every year" and that "[t]he sales representative told me that the fee was $3.50 for each semi-monthly debit"). Mr. Arredondo's Declaration establishes he knew his monthly loan payment would remain the same, and the purpose of the Interest Minimizer Program was to make an automatic additional thirteenth payment to principal. *See* Doc. No. 125-18.

The deferred setup fee is also separate from the monthly loan payment. The setup fee is one-time payment made by a customer to enroll in NBA Interest Minimizer Program. Lipsky Decl., at ¶ 24. The benefits of the program include (1) assistance in making a thirteenth loan payment; (2) independent audits of a customer's loan; and (3) lifetime enrollment in program, meaning

---

[17] The term "biweekly" implies to the reasonable consumer that a biweekly debit will be debited from the customer's account 26 times during a year, obviously more than a typical monthly payment plan.

transferability of the program to other lenders when the loan and lender changes. Lipsky Decl., at ¶ 24. The Bureau thus cannot assert the deferred setup fee is included in the monthly loan payment.

Ultimately in this context, the customer makes two separate payments: (1) the Interest Minimizer Program's $3.50 debit fee and the one-time deferred setup fee and (2) the monthly loan payment. While the customer does make an additional payment towards principal per year under the Interest Minimizer Program, the customer's monthly loan payment remains the same. Essentially, the Plaintiffs argument that because the customer must pay the disclosed fees for the services, it is the obligation of NBA to "net" the fees off of the monthly payment and calculate all of that for the customer.   This would presuppose that the customer doesn't understand that they are paying a fee ($3.50 debit fee and a one-time deferred set up fee) for the services.   The argument is duplicitous.  At a minimum, there is a triable issue of fact as to the Bureau's contorted claim.

**2.   CONSUMERS ARE GUARANTEED TO ACHIEVE IMMEDIATE SAVINGS AND BENEFITS.**

Under the Interest Minimizer Program, the reduction in interest expense and the total payment liability begin when the first extra payment is made to the principal. Smith Decl., Exhibit E Rosen Report at 6. The extra payment **immediately reduces** the interest liability of the borrower as is reported on CFPB disclosure form 25(b). *Id*. (emphasis added). NBA's Expert Dr. Harvey Rosen ("Dr. Rosen") demonstrates a customer's immediate savings because of the extra biweekly debit. Smith Decl., at Exhibit E, Appendix C.  Dr. Rosen's findings establish that "even if in the first year of the loan, one extra debit is made and the participant does not continue in the program, they will still have the achieved interest savings and reduction in the total payment liability, over the course of the loan." Exhibit E at 7. In fact, one extra debit will save a consumer over $1,241 over the course of the average loan. *Id*. The calculation performed by Dr. Rosen demonstrates Interest Minimizer Program customers reap immediate savings and benefits, meaning as the soon as the first payment is made, the customer's original loan projection is immediately reduced by $1,241. Thus, the statements of NBA that a

1  customer will achieve immediate savings are in fact true.

2          Next, the Bureau argues that the interest savings that NBA guarantees are "contingent upon

3  consumers participating in the IM Program until paying off the loan".  This claim is also refuted by Dr.

4  Rosen and common sense.  First, Dr. Rosen's Report establishes that when an extra principal payment

5  is made, the savings are "immediate." Smith Decl., at Exhibit E.  Second, the Plaintiffs position

6  attempts to confuse and mislead with regard to the difference of how long a customer may stay in the

7  Interest Minimizer Program (for life) with the term of the first loan that the customer brings to the

8  program.  Simply put, when one enrolls in the program and pays the deferred set up fee a later

9  refinance of that original loan, a sale of their home and the obtaining of a new mortgage still entitles

10 the customer to remain in the program without paying an additional set up fee.  *See* Doc. No. 125-3;

11 410-415. [18]  Thus, as Dr. Rosen points out, the savings are immediate upon the first principal payment

12 to be made and it matters not that a customer may refinance the original loan, sell the home, and get

13 another loan.  NBA continues to provide its services to the customer and, therefore, Plaintiffs position

14 holds no water.

15

16          Finally, The Bureau argues that the "161 million" saved in interest by NBA's customers (in

17 marketing materials) is based upon an inaccurate methodology.  The Bureau claims that such a number

18 represents "hypothetical savings."  What the Bureau fails to understand is that the mortgages that

19 consumers have when they enroll in the Interest Minimizer Program are anything but hypothetical,

20 they are in fact real.[19]  The customer has a contractual obligation with the lender to pay their loan in

21 accordance with its terms by amortizing the loan at the agreed upon interest rate over the amortization

22 period.  This is anything but hypothetical.  Essentially, the Bureau is returning to the false premise that

23 customers will pay off their loan in a shorter period than the amortization period and, therefore, "don't

24

25

26 [18] Likewise, Plaintiffs statement that interest savings "achieved" are false because Defendants do not actually track such figures is also false because NBA can do that (Doc. No. 124-8, pp. 63-64) however, such information was not necessary to the calculation performed by Hoon Nam referred to below.

27 [19] NBA objects to the declaration of Mansour Heidari (Doc. No. 127-1) on grounds of mischaracterization, lack of personal knowledge, lacks foundation, vague and ambiguous, and irrelevant because its calculation are mathematically and statiscally incorrect.

28

DEFENDANT'S OPP. to PLAINTIFF'S MSJ

save any money." This entire premise is refuted by Dr. Rosen in his report and in the arguments made above. Repeating it does not make it any better for the Bureau with regard to the amount of interest that consumers are saving by enrolling in the program.  Finally, NBA's statement that its customers saved $161 Million Dollars was not only true it was actually calculated by Hoon Nam, the Finance Manager at NBA. *See* Doc. No. 124-8; 249-250.  The interest savings that the customer has achieved off the original projected interest charges of the loan at loan closing, which that figure is far below what it actually was.  It was actually much higher.  Mr. Nam had done a very thorough analysis of the number of customers and what the average customer was with different types of loans and came up with the conservative figure mentioned above. *Id.*  There is nothing objectively false in these regards nor ambiguously misleading. Therefore, summary judgment on these claims is not proper.

### 3. **NBA EXPLICITLY STATES CONSUMERS CAN ACHIEVE INTEREST SAVINGS ON THEIR OWN.**

First, NBA mailers state in the "Q/A" section that the consumer "may achieve savings on [the consumer's] own, but most people find it difficult to send in more than the regular payment every month." [20] *See*, e.g., Doc. No. 128-20; Doc. No. 129-2; Doc. No.129-3; Doc. 134-2; Doc. No. 134-3; Doc. No. 134-9; Doc. No. 134-10; *see also* Doc. No. 127-13; Doc. No. 127-14; Doc. No. 127-15; Doc. No. 127-25. In other words, NBA states the consumer may achieve the same savings without its Interest Minimizer Program, but are unlikely to do so. There is nothing false in this statement.

It is true that years ago, an in-house survey was conducted by NBA that showed that 99% of the people who tried to make a biweekly payment on their own failed to do so after three years outside of the program. Doc. No. 124-8; 124:12-127:1 At the recommendation of Mr. Courtemanche, years later, an effort was made to update the data in 2015. *See id* at 127:1-127:15. This outside study done Nielsen Research concluded that 88% of the people who tried to make biweekly payments on their own. Lipsky Decl., at ¶4. In this case, NBA made a conscious business decision to update its survey.

---

[20] "**Q: Can I achieve the same result without a biweekly program?**"

Doc. No. 124-8. The fact a more recent study yields a different metric than the original study does not mean the original study is false.

Further, the two studies are not exactly the same that were done. *See* Doc. No. 124-8; 124:12-129:12. The studies were done years apart.  And most importantly, it is absurd to suggest that there is a material difference between a 99% failure rate and a 88% failure rate on this issue.  This is not a false statement in any regard whatsoever.  Unfortunately, before marketing materials could be changed, the company was put out of business by this instant litigation. Lipsky Decl. at ¶4.

The Bureau's Motion rests its argument on a narrow portion of the sales enrollment script. Nothing in that portion of the script is false. A mortgage may only be remitted monthly. Lipsky Decl., at ¶36.  It may not be paid on a biweekly basis. Lipsky Decl., at ¶36. Accordingly, NBA's statement "lenders require mortgages to be remitted monthly and will not accept a biweekly payment" is true. Further, NBA's script does not claim that **all** lender biweekly programs have to be set up through a third party administrator. *See,* e.g., Doc. No. 127-7. It states that **most** lenders do. *Id*. The Bureau's Motion cites six declarations to suggest lender biweekly payment programs do not require third party administrators. Doc. No. 130-14 to Doc. No. 130-20. NBA was remitting payments with 5,000 lenders and servicers. Lipsky Decl., at ¶38. [21] Moreover, bank declarations in Doc. No. 130-14 to 130-20 do not establish that NBA's claim that most lenders either use a third-party administrator or do not have a similar program is substantially true. In reviewing the declarations, what one finds is that only Bank of America, N.A. has had a program during the time frames alleged in the Complaint. Doc. No. 130-19. Quicken had one since 2012. Doc. No. 130-14. Of the two that may be within said time, two banks out of over 5,000 NBA remitted payment to does not make the statement that "most lenders do not offer the service" untrue.

Finally, and most important, none of those declarations address the other benefits offered by NBA

---

[21] The declarations cited in the Bureau's Motion Doc. No. 130-14 to Doc. No. 130-20 do not specify time frame (meaning the banks' programs may not have been offered during 2011 to 2015) or offer an independent audit service like NBA did, or allow transfer of the program to a substituted, refinanced, or new loan.

DEFENDANT'S OPP. to PLAINTIFF'S MSJ

to the customer.  First, if you pay off any of the loans of the institutions of the Declarants, the customer/consumer is "finished." So if the customer refinances their loan with Quicken to a different lender (there are over 5,000 more) that does not offer the program, they have no further services whereas with NBA they have a lifetime service. Lipsky Decl., at ¶24.  Further still, none of the competitors in the bank declarations offer the audit services on an annual basis like NBA offers and a lifetime enrollment in the program.

The long and short here is that the product and services are different and NBA's claims that most of the lenders do not offer the same services is accurate in all material respects.  The bottom line here is that once again, NBA's statements are true.  Summary judgment must be denied.

## C. NBA DOES NOT REPRESENT THAT IT IS AFFILIATED WITH THE CONSUMERS' MORTGAGE LENDER AND IN FACT DISCLAIMS SUCH AN AFFILIATION

NBA did not misrepresent its affiliation with any lender because none of three forms of communication with the consumer—direct mail, phone calls with consumers, and contracts—make any such misrepresentation. *See IrvineWebWorks, Inc.*, 2016 WL 1056662, at *1 (Denying summary judgment for Bureau's allegation that Defendants created the false impression that Defendants were affiliated with, endorsed by, or sponsored by the Department of Education ("DOE")). The Court in *IrvineWebWorks* held even if there is sufficient evidence for a factual finding that Defendants misrepresented an affiliation with DOE, such a finding is a task for the jury, not the Court. In sum, the *Irvine Webworks* holding suggests summary judgment is only proper when the Bureau can demonstrate an outright falsehood. *See id*.

In this case, no such falsehood exists. There are three forms of contact between NBA and the consumer. The consumer is notified not once, not twice, but three times that NBA is not affiliated with their lender. Viewing the evidence as a whole, the Bureau cannot claim it is entitled to an order of summary judgment on the basis that NBA mislead consumers as to lender affiliation.

NBA does not represent itself as having a legal affiliation with a consumer's lender or services.

DEFENDANT'S OPP. to PLAINTIFF'S MSJ

3:15-CV-02106-RS

First, the envelopes contain the return address of the sender in the upper left hand corner of the envelopes. Lipsky Decl., at ¶15. The envelopes identify the sender as either "Nationwide Biweekly Administration" or "Loan Payment Administration." Lipsky Decl., at ¶15; *see also,* e.g., Doc. No. 129-6. None of these envelopes provide the name of a lender in the upper left hand corner where the return address appears on the envelope. *Id*. Each envelope had in "eye-catching" color and font, "Payment Schedule Change Offer," "Mortgage Payment Information Enclosed," "Payment Information Enclosed," or something similar. Lipsky Decl., at ¶16. Most envelopes had the Lender's name showing through the addressee window. Lipsky Decl., at ¶17. Most envelopes clearly showed the return address of the sender to be "Loan Payment Administration," or "Nationwide Biweekly Administration." Scott Decl., at ¶17. Further, when the envelope had the lender's name had the name through the see through window, all envelopes stated to the right of the see through window: "Loan Payment Administration is not affiliated with lender" or "Nationwide Biweekly Administration is not affiliated with lender." *See* Doc. No. 129-4 to Doc. No. 129-6; Lipsky Dec., at ¶17. From the envelope, it is reasonable that the consumer infers NBA is not affiliated with the consumer's lender because the outside of the direct mail envelope states NBA is not affiliated with the lender. [22]

Inside the envelope, the letter does not indicate it is from the consumer's lender. [23] Lipsky Decl., at ¶18; Smith Decl., at Exhibit B at ¶47.  In fact, most letters contained specific language— offset from the rest of the material on the page to make it more noticeable—that stated NBA is not affiliated with the consumer's lender. Doc. No. 128-5 to 128-19; *see e.g.,* Doc. No. 128-9 "Loan Payment Administration is *not affiliated, connected, or associated with*, *sponsored or approved* by the lender listed above. Information concerning your loan was obtained from public record. References to lenders name is made strictly for loan identification purposes only." [24] All NBA letters had a backside

---

[22] The Bureau cannot allege NBA committed a material omission of fact, when its initial mailer (or first contact with consumer) openly and clearly states NBA is not affiliated with the consumer's lender.

[23] NBA is attaching two expert reports on marketing materials—Dr. Chigaouris and Dr. Motley who both conclude the NBA did not misrepresent lender affiliation.

[24] The method was specifically approved by Director Cordray when he was Ohio Attorney General. Doc. No. 130-11.

1
2
3
4

page that provides frequently asked questions and accompanying answers. *See*, e.g., Doc. No. 128-20. One of the questions addresses the question as to the lender affiliation. *Id*. The answer clearly indicates that NBA is not affiliated with a lender. *Id*. [25] Accordingly, there is at a triable issue of fact as to whether the letter misled consumers.

5
6
7
8
9
10
11
12

Second, the phone call with the enrollment specialist does not suggest NBA misrepresented its affiliation with the consumer's lender. [26] Enrollment specialists are trained to follow and state every line in each script. Lipsky Decl., at ¶21. There is no language present in the script material that indicates NBA is associated with the consumer's lender. Smith Decl., Exhibit B at ¶60. To the contrary, script material establishes NBA is not affiliated with consumer's lender. *Id*. If the consumer asked an enrollment specialist if NBA "was" or "affiliated with" the consumer's lender, the enrollment specialist was required to respond:

13
14

> "We're Nationwide Biweekly Administration, the nation's largest and most recognized biweekly administrator. We administer the program to (your lender) as well as 5,000 other lenders across the country…"

15
16
17
18

> "We administer thousands of payments to (your lender) and have a working relationship with them through our Interest Minimizer Program. However, we have chosen NOT to partner with them so that they cannot dictate to us how much we can help you save. We work for you the customer, not the lender." (emphasis added) *See*, e.g., Doc No. 127-2 to Doc. No. 127-12. [27]

19
20
21
22

Third, the Bureau's Motion does not address any alleged misrepresentation in the contract material. *See* Doc. No. 124. Nowhere in the contract is language present that suggests NBA is associated with the consumer's lender. Smith Decl., at Exhibit B at ¶60; *See also* Doc. No. 129-7 to Doc. No. 129-12.

23
24
25

There is undisputed evidence that (1) both envelope and letter within in NBA's marketing material both separately stated that NBA was not affiliated with a lender; and (2) in the event a

26
27
28

---

[25] "Q: **Does my Lender or loan change?** No. The bi-weekly program is administered to your current lender. There is no change in your interest rate or the terms of your loan."
[26] Even if the consumer wanted to enroll online after receiving the direct mailer, the consumer was still required to have a phone call with an NBA enrollment specialist. Lipsky Decl., at ¶19.
[27] Plaintiff complains that some scripts instruct the specialist to "don't say no". The same script requires the above answer which is far more educating to the consumer on the relationship between NBA and the consumer's lender.

1

2

3

consumer asked about NBA's affiliation with a lender, the enrollment specialist was required to state, "We work for the customer, not the lender." *See*, e.g., Doc. No. 127-12. From the established facts, a rationale trier of fact would find NBA did not misrepresent its affiliation with the customer's lender.

4

5

### D.  THE NEGLIBLE NUMBER OF CONSUMER COMPLAINTS BASED ON NBA'S MARKETING MATERIALS ESTABLISHES THAT NBA'S MARKETING MATERIALS DID NOT DECEIVE THE CONSUMER.

6

7

8

9

From 2011 to 2015, NBA sent over 50,000,000 direct mail letters. Lipsky Decl., at ¶20. During that time, 166,379 customer accounts were activated with Nationwide. *Id*. Only around 308 complaints were ever filed with government agencies. *Id*.

10

11

12

13

14

15

16

17

18

19

Here, mailers, scripts, and contracts relating to the Interest Minimizer Program are on the record. Given the statistically insignificant number of total complaints (308) when compared to the total number of mailers sent (greater than 50,000,00) (this would relate to marketing letters) or comparing the insignificant number of roughly 300 complaints to the activated customers in the amount of 166,379 (which is .00185) means that less than two persons out of 10,000 customers complained.  Considering that all complaints did not deal with the allegations of the Plaintiff in this case, the number grows smaller yet.  The inescapable inference is that NBA customers, on almost the entire whole, fully understood, were not deceived, and were satisfied with NBA's Interest Minimizer Program and all representations and fees associated therewith.

20

21

### E.  THE BUREAU HAS NOT SHOWN THAT A REASONABLE JURY COULD NOT FIND IN FAVOR OF NBA ON ISSUES OF MATERIALITY

22

23

24

25

26

27

28

For every statement CFPB alleges is "deceptive," CFPB must show the statement was "material." A representation, omission, or practice "is material if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *FTC v. Stefanchik*, 559 F.3d  924 (9th Cir. 2009). Simply labeling statements as "false," as CFPB does repeatedly throughout its brief, does not make a statement false. Accordingly, CFPB's characterization of Nationwide's claims as false do not suffice to establish materiality. And, regardless, for every claim

DEFENDANT'S OPP. to PLAINTIFF'S MSJ

1
2
3

of falsity made by CFPB, Nationwide has presented evidence that a reasonable jury would find to be credible and accurate. Accordingly, summary judgment is inappropriate for the Plaintiff has not offered any evidence of materiality with regard to its allegations of deceptive acts.

4
5

### F.  IN THE EVENT SUMMARY JUDGMENT IS GRANTED, A DISPUTE OF FACT REMAINS AS TO DAMAGES SOUGHT BY THE BUREAU

6
7
8
9
10
11
12
13
14
15
16
17

The Bureau seeks restitution in the total amount of gross revenues of Defendant, NBA, for the time period covered in the Complaint in the amount of $73,955,169.00. [28]  In addition to the gross revenue of NBA, the Bureau requests that Defendant, Dan Lipsky, "disgorge" all distributions made to himself during the same time period.  This is the prime example of the old "double dip."  First, it is obvious that the gross revenue of NBA includes that which was distributed, at a later time, to Defendant Dan Lipsky.  Plaintiff wants the same dollars twice.  Second, the request for the gross revenue of NBA ignores the fact that NBA had operating expenses which were just, appropriate, and reasonable under the circumstances.  To order all of the wages and benefits paid to employees during the time period of the Complaint is to request that monies be created "out of thin air".  Third, and more important, the Bureau makes no attempt to create any "nexus" (materiality) between the individual allegations it has made and the amounts of restitution and fines requested.

18
19
20
21
22
23
24
25
26
27

For example, it has already been shown that there is no objectively false statements made by NBA in this matter.  Thus, there is a genuine issue of material fact, at the least, as to whether any statement by NBA or any allegedly confusing or unintentional misleading statement [29] was the actual cause for a consumer to sign up for the Interest Minimizer Program. Plaintiff merely makes the broad sweeping statements that "it is right about its allegations" and "therefore, it is entitled to a remedy that is greater than the entire gross revenue of the company.  All of this notwithstanding, at the time that the Complaint was filed in this matter, NBA had over 135,000 "satisfied" customers who were being serviced happily.  Finally, and just as important, Defendant Lipsky has had to reinvest substantial

28

---

[28] There are genuine issues of material fact as to whether the Bureau's "analyst" methodology of calculating same is accurate but for the sake of this portion of the argument an assumption is made with regard to said number.
[29] With which Defendants continue to adamantly deny.

DEFENDANT'S OPP. to PLAINTIFF'S MSJ

amounts of money from the distributions to him as a result of the servicing banks terminating all of the ACH services to NBA in November of 2015.  As the Court is aware from the pending Counterclaim, Response, and numerous supporting documents, the Bureau has a causal connection to the termination of the Defendant's ACH services and the resulting unavoidable suspension of services to the over 135,000 satisfied NBA customers.  Whether the Court allows the Counterclaim to survive or not is irrelevant to the point at hand.  The Bureau is proximately related to (1) the loss of revenue to NBA and (2) the resulting necessity to invest previously earned profit by Defendant Lipsky back into the company to keep alive efforts to revive the services to the existing satisfied customers.  Therefore, there is genuine issue of material fact as to what, if any, restitution, damages, or fines should be assessed.

## **CONCLUSION**

For the reasons stated, the Court should deny the Bureau's partial motion for summary judgment.

Dated: January 5, 2017

**JOHN D. SMITH CO., LPA**

*/s/ John Smith*
John D. Smith
Jsmith@johndsmith.com
(937) 748-2522

***Attorney for Defendants Nationwide Biweekly Administration, Inc., Loan Payment Administration, LLC, and Daniel S. Lipsky***

1

2

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on January 5, 2017 via

ECF upon counsel of record in this action:

Stephen Jacques
Thomas Mccray-Worrall
Patrick Gushue
Patrick.Gushue@cfpb.gov
202-425-9671
*Enforcement Attorney*
Jonathan Urban
jonathan.urban@cfpb.gov
202-435-7371
*Enforcement Attorney*

Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552


**JOHN D. SMITH CO., LPA**

*/s/ John Smith*
John D. Smith


***Attorney for Defendants
Nationwide Biweekly
Administration, Inc., Loan
Payment Administration,
LLC, and Daniel S. Lipsky***