SEAN E. PONIST (SBN 204712)
sponist@ponistlaw.com
GEORGIA Z. SCHNEIDER (SBN 251358)
gschneider@ponistlaw.com
**PONIST LAW GROUP PC**
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 798-2222
Fax: (888) 350-5442

JOHN D. SMITH (admitted *pro hac vice*)
**JOHN D. SMITH CO., LPA**
jsmith@johndsmith.com
140 N. Main Street, Suite B
Springboro, Ohio 45066
Telephone: (937) 748-2522
Fax: (937) 748-2712

***Attorneys for Defendants Nationwide Biweekly Administration, Inc., Loan Payment Administration, LLC, and Daniel S. Lipsky And Counterclaimant Nationwide Biweekly Administration, Inc.***

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>vs.<br><br>NATIONWIDE BIWEEKLY ADMINISTRATION, INC., LOAN PAYMENT ADMINISTRATION LLC, and DANIEL S. LIPSKY,<br><br>Defendants. | Case No. 3:15-cv-02106-RS<br><br>**REDACTED OPPOSITION TO COUNTER-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIMS**<br><br>Hearing Date: February 9, 2017, 1:30 p.m.<br><br>Judge: Hon. Richard Seeborg<br><br>Courtroom: Courtroom 3, 17th floor, 450 Golden Gate, Avenue, San Francisco, CA 94102 |
| NATIONWIDE BIWEEKLY ADMINISTRATION, INC.,<br><br>Counter-Claimant,<br><br>vs.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Counter-Defendant. | Defendants re-submit this redacted version of Dkt. No. 166, redacting pp. 10:25-11:7. Defendants have not added any new facts, law or arguments to this redacted brief. As none of the now redacted facts and/or arguments were addressed by CFPB in its reply, no further briefing is required and the parties remain prepared to proceed with the hearing on February 9, 2017. |

# TABLE OF CONTENTS


**Page(s)**

MEMORANDUM OF POINTS AND AUTHORITIES ....1

I. INTRODUCTION ....1

II. ISSUES PRESENTED ....3

III. STATEMENT OF FACTS ....4

A. NATIONWIDE'S BIWEEKLY INTEREST SAVINGS PROGRAM ....4

B. CFPB'S INVOLVEMENT IN OPERATION CHOKE POINT IS WELL-DOCUMENTED ....4

1. CFPB Is A Founding Partner Of Operation Choke Point ....4

2. CFPB's Unique Relationship With The Banking Industry Has Ideally Positioned CFPB To Implement Operation Choke Point And Other Extrajudicial Tactics ....6

3. CFPB Sent Clear Message to Banks Regarding the Activities of ACH Customers ....8

C. CFPB'S USE OF OPERATION CHOKE POINT TACTICS IN THIS CASE ....9

1. CFPB Utilized Operation Choke Point and Other Extrajudicial Tactics to "Choke Off" Nationwide's Critical Banking Services ....9

a. CFPB's Press Release ....9

b. CFPB Publicly Named Nationwide's Banking Partners ....10

c. CFPB Refused to Take Action to Prevent or Reverse the Bank Terminations ....10

2. CFPB Utilized Operation Choke Point and Other Extrajudicial Tactics to "Choke Off" Financial Services for Accounts and Dealings Wholly Unrelated to This Litigation ....12

D. US BANK EMPLOYEES ADMIT THAT US BANK TERMINATED SERVICES BECAUSE OF FEAR OF RETALIATION FROM CFPB ....13

1. June 15, 2015 Call With US Bank Representatives ....13

2. Deposition of Former US Bank Employee Alaim Kamden ....13

E. BANKS HAVE KNOWN ABOUT OTHER CIVIL, GOVERNMENTAL, REGULATORY ACTIONS AGAINST NATIONWIDE BEFORE, BUT NEVER SOUGHT TO TERMINATE RELATIONSHIPS WITH NATIONWIDE ....14

**TABLE OF CONTENTS: (continued)** **Page(s)**


F. IT IS THE OPINION OF NATIONWIDE'S BANKING AND MORTGAGE LENDING EXPERT THAT EXTRAJUDICIAL ACTIONS TAKEN BY CFPB, ABOVE AND BEYOND FILING THIS LAWSUIT, CAUSED THE BANKS TO TERMINATE THEIR RELATIONSHIPS WITH NATIONWIDE.................................15

IV. LEGAL ARGUMENT.........................................................................................................17

A. STANDARD OF REVIEW .............................................................................17

B. CFPB'S PURPORTED "MATERIAL FACTS" ARE IRRELEVANT AND CONTROVERTED BY THE EVIDENCE SUBMITTED HEREWITH .........................18

1. Nationwide Has Obtained Ample Evidence In Support Of Its Counterclaims, Which CFPB Has Failed To Disprove .......................................18

2. While Irrelevant, Contrary to CFPB's Statement of "Material Fact," Nationwide Has Obtained Deposition Testimony In Support of Its Counterclaim...............................................................................................19

3. While Irrelevant, Contrary to CFPB's Statement of "Material Fact," Nationwide Has Identified Witnesses And Documents In Support Its Counterclaims ..............................................................................................20

4. While Irrelevant, Contrary To CFPB's Statement of "Material Fact," The Banks Have Produced Documents In The Unrelated *Krogstad* Case, However, Discovery In An Unrelated Case Is Irrelevant For Purposes of CFPB's Motion ..............................................................................................20

C. The Court Has Already Determined That, As A Matter Of Law, Nationwide Has Sufficiently Alleged the Claims Set Forth in Counterclaims............................................21

1. Nationwide Has Standing To Assert Its Counterclaims .......................................22

2. CFPB's Use Of Extrajudicial Tactics Infringed Nationwide's Protected Speech.........................................................................................................23

3. CFPB's Use Of Extrajudicial Tactics Deprived Nationwide of a Constitutionally Protected Liberty Interest..........................................................24

4. CFPB's Use Of Extrajudicial Tactics Violated the APA......................................25

V. CONCLUSION...................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-160 (1970) ....................19, 21

*Angelopoulos v. Bottorff*, 76 Cal. App. 621, 626, 245 P. 447, 449 (Cal. Ct. App. 1926)....................25

*Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015)....................24

*Bigelow v. Virginia*, 412 U.S. 809, 826 (1975)....................23

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ....................17, 18, 21

*City of Mt. Pleasant, Iowa v. Associated Elec. Co-op, Inc.*, 838 F.2d 268, 273 (8th Cir. 1988) ....................19

*Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1029-1030 (9th Cir. 2006) ....................17

*Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003)....................17

*Humphries v. City. of L.A.*, 554 F.3d 1170, 1188 (9th Cir. 2009) ....................24

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) ....................22

*Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)....................24

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ....................17

*Merced Dredging Co. v. Merced Cty.*, 67 F. Supp. 598, 604 (S.D. Cal. 1946) ....................25

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999)....................17

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) ....................17, 19

*Russ v. International Paper Co., 943 F.2d 589, 592* (5th Cir. 1991) ....................19

*T.W. Elec. Service Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987) ....................17

*Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991)....................17

*Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003) ....................24

*Truax v. Corrigan*, 257 U.S. 312, 327 (1921)....................24

*Walnut Properties, Inc. v. City of Whittier*, 861 F.2d 1102 (9th Cir. 1988) ....................23

*Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) ....................24

**TABLE OF AUTHORITIES: (continued)** **Page(s)**

**Statutes**

12 U.S.C. §§ 5481 ........................................................ 25

5 U.S.C. § 706(2)(B) ........................................................ 25

Fed. R. Civ. P. 56(c) ........................................................ 17

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

For more than a decade, Nationwide was a thriving company licensed and regulated by over forty states. Nationwide was awarded an "A" rating from the Better Business Bureau and had established and maintained banking relationships and accounts with four of the largest banks in the country (after each bank conducted significant due diligence). Yet, despite Nationwide's exemplary standing, in 2015, Nationwide's essential banking services were unilaterally terminated by each of these four banks without explanation. Tellingly, Nationwide's banking partners did **not** identify this lawsuit as the reason for the termination of services. Rather, the banks refused to give any explanation whatsoever as to why they were terminating Nationwide's banking services—a hallmark characteristic of the use of the Consumer Financial Protection Bureau's ("CFPB") extrajudicial tactics which has been coined "Operation Choke Point." In fact, only in a later conversation with one of Nationwide's prior banking partners did the banking partner admit it terminated its relationship out of fear of reprisal from CFPB if it did not do so.

Following the bank terminations, Nationwide made tremendous efforts to establish new banking relationships, but was unable to find a single bank to provide the essential services Nationwide requires to administer its Interest Minimizer program. Accordingly, Nationwide was forced to suspend the Interest Minimizer program for over 130,000 customers and lay off most of its employees, thereby putting the company's future viability at great risk. Following the bank terminations, Nationwide filed a Counterclaim against CFPB alleging violation of Nationwide's First Amendment rights, violation of Nationwide's Fifth Amendment rights, violations of the Administrative Procedure Act, and seeking declaratory and injunctive relief.

CFPB has filed a motion for summary judgment, erroneously arguing that Nationwide does not have any evidence to support its counterclaims. In support of its contention, CFPB offers the followingly purported "material facts":

(1) CFPB's own, self-serving and inadmissible discovery responses in which CFPB falsely claims to have no knowledge of Operation Choke Point (despite public records clearly indicating otherwise), and

(2) CFPB's own, unsupported and erroneous belief that Nationwide does not have any evidence

supporting its counterclaims (a conclusion that can only be reached by turning a blind-eye to the mountain of evidence in support of the counterclaim).

Each of the foregoing facts, like CFPB's motion, is without merit. As set forth at length herein, Nationwide has obtained ample evidence in support of its counterclaims and in support of the material fact that CFPB employed extrajudicial tactics to pressure and persuade Nationwide's banking partners to terminate Nationwide's banking services, thereby violating Nationwide's First Amendment and Fifth Amendment Due Process rights as well as the APA. Specifically, Nationwide has obtained the following evidence supporting CFPB's use of Operation Choke Point and other extrajudicial tactics:

- CFPB was involved in Operation Choke Point from its inception;
- CFPB has utilized Operation Choke Point tactics against other biweekly companies;
- CFPB supervised all four banks that terminated services for Nationwide and because of its unique relationships with the banks and virtually unregulated status, it is in the ideal position to implement Operation Choke Point;
- Each bank termination occurred at the same time and in the same manner, consistent with Operation Choke Point;
- Each termination occurred approximately 30 days after CFPB **<u>unnecessarily</u>** published the names of Nationwide's banking partners in a public court filing;
- Nationwide has been sued by other governmental organizations with nearly identical allegations and has **<u>not</u>** lost any banking relationships;
- Mr. Lipsky's personal bank and investment accounts, having nothing do with this litigation, have also been terminated, thus eliminating the possibility that mere existence of this lawsuit was the reason for the terminations;
- Representatives from US Bank, have admitted that US Bank's termination of Nationwide's account was a result of US Banks' fear of reprisal from CFPB if it did not terminate its relationship. In fact, US Bank indicated that, but for fear of reprisal from CFPB, it would have wanted to maintain its relationship with Nationwide;
- It is the opinion of Nationwide's expert with 35 years of banking and regulatory experience, that CFPB's extrajudicial actions caused the banks to sever their relationship with Nationwide.

Tellingly, **<u>CFPB does not address any of these facts in its motion, nor does it offer any evidence contradicting these facts</u>**. Likewise, **<u>just as CFPB had turned a blind eye to extensive evidence linking it to Operation Choke Point in its unsuccessful attempts to have Nationwide's counterclaims dismissed at the pleading stage, CFPB *again* ignores all of this evidence and *again* hopes that the Court will do the same</u>**. Here, however, unlike the pleading stage, CFPB cannot simply argue that Nationwide's counterclaims fail as a matter of law. Rather, CFPB has the initial burden of production and the ultimate burden of persuading the Court that there is no genuine issue as to any

material fact and that it is entitled to judgment as a matter of law. CFPB has failed to meet this burden.

CFPB fails to address, let alone controvert, any of Nationwide's evidence. As this Court has already denied CFPB's attempts to dismiss the counterclaim at the pleading stage, CFPB's complete failure to address the evidence, and willful blindness thereto, is fatal at this stage. Accordingly, as demonstrated herein, CFPB has failed to meet its initial burden of production and has failed to demonstrate that there is no genuine issue of material. As such, CFPB is **not** entitled to summary judgment.

## II. ISSUES PRESENTED

In deciding CFPB's motion for summary judgment, the following issues are presented:

1. Whether CFPB has met its burden of proof and established that no genuine issue of material fact exists where, *inter alia*, documents from the public record of which this Court may take judicial notice demonstrate CFPB's involvement in and use of Operation Choke Point, declarations set forth specific evidence regarding CFPB's use of Operation Choke Point tactics to influence Nationwide's banks and the banks of entities that are not parties to this lawsuit to terminate services, a recorded phone call between US Bank employees and Nationwide in which US Bank employees admit that they were terminating Nationwide's account based on fear of reprisal from CFPB, the deposition testimony of one of these US Bank employees confirming US Bank's reasons for terminating Nationwide's services, and Nationwide's banking expert concludes that in his opinion the extrajudicial actions of CFPB caused Nationwide's banking partners to terminate their relationships with Nationwide.

2. Whether CFPB has met its burden of proof and established that no genuine issue of material fact exists where, *inter alia*, the "material facts" set forth by CFPB are largely irrelevant, disputed and/or inadmissible.

3. Whether CFPB has met its burden of proof and established that no genuine issue of material fact exists where, *inter alia*, the Court previously determined that Nationwide had sufficiently set forth the allegations in its counterclaims, where Nationwide has subsequently substantiated the allegations with admissible evidence and where CFPB has simply chosen to ignore, *again*, the evidence.

## III. STATEMENT OF FACTS

### A. NATIONWIDE'S BIWEEKLY INTEREST SAVINGS PROGRAM

Nationwide was once one of the country's largest and most recognized administrators for biweekly loan repayment programs. Decl. of Daniel S. Lipsky ("Lipsky Decl.") ¶ 1. Nationwide's biweekly interest savings program ("Interest Minimizer Program") began in 2002, and for more than a decade enabled Nationwide's customers to achieve interest savings and reduce their debt much faster by allowing Nationwide to debit smaller biweekly payments which were then remitted monthly, as required by their lenders, toward their mortgages. *Id*. In order to provide this valuable service for consumers, Nationwide partnered with banks that held the customer's biweekly payments in trust prior to Nationwide remitting payment to the customer's lenders once per month as require by the lender. Lipsky Decl. ¶ 2.

For many years, Nationwide worked with TD Bank (and its predecessors) for Automated Clearing House ("ACH") services. *Id*. In the spring of 2013, in response to an increase of enrollments in the Interest Minimizer Program, Nationwide added additional banking partners to accommodate the higher volume of ACH transactions. *Id*. After performing extensive reviews of Nationwide's business, three additional banks—BMO Harris Bank, Bank of America, and US Bank—agreed to perform ACH services for Nationwide. *Id*. By early 2015, Nationwide grew its Interest Minimizer Program to approximately 130,000 customers, making it the largest independent biweekly interest savings program in the United States. *Id.* at ¶ 3.

### B. CFPB'S INVOLVEMENT IN OPERATION CHOKE POINT IS WELL-DOCUMENTED

#### 1. CFPB Is A Founding Partner Of Operation Choke Point

In November of 2012, an internal Department of Justice ("DOJ") memorandum ("2012 Memo") proposed "Operation Choke Point".[1] The goal of Operation Choke Point from its inception was to extrajudicially pressure banks to terminate banking services of certain individuals and businesses the

[1] Request for Judicial Notice ("RJN"), Ex. A, U.S. HOUSE OF REPRESENTATIVES, COMM. ON OVERSIGHT AND GOV'T REFORM, THE DEPARTMENT OF JUSTICE'S "OPERATION CHOKE POINT": ILLEGALLY CHOKING OFF LEGITIMATE BUSINESSES? (May. 29, 2014) ["DOJ OPERATION CHOKE POINT REPORT"], at page HOGR-3PPP000017 through HOGR-3PPP000017 of Appendix I to the Report.

government deemed "problematic," or whom the government alleged were engaging in fraud, **without any judicial involvement**. DOJ OPERATION CHOKE POINT REPORT, RJN, Ex. A, at page HOGR-3PPP000018 through HOGR-3PPP000019 of Appendix I to the Report. To accomplish this goal, Operation Choke Point's participants were to use focused pressure on the bank's "sensitiv[ity] to the risk of civil/criminal liability and regulatory action." *Id.* For example, participants could cause the desired termination of the "problematic" customer's banking services simply by "sending a letter to a senior bank executive" or by "serving a . . . subpoena." *Id.* The targets of Operation Choke Point are diverse including, but not limited to, "Internet, telemarketing, mail and other mass market" businesses. *Id.* at page HOGR-3PPP000017 of Appendix I to the Report.

Not only has CFPB been involved in Operation Choke Point, **CFPB was a founding partner of Operation Choke Point**. *Id.* at page HOGR-3PPP000019 of Appendix I to the Report. Indeed, in an April 17, 2013 Operation Choke Point status report, Michael S. Blume, the Director of DOJ's Consumer Protection Branch, reported having "offered to work with CFPB to identify appropriate targets and to pursue a joint investigation." *Id.* at page HOGR-3PPP000048 through HOGR-3PPP000050 of Appendix I to the Report. Thereafter, Director Blume verified: "CFPB's Director of Enforcement has approved [DOJ's] proposal for a joint approach." DOJ OPERATION CHOKE POINT REPORT, RJN, Ex. A, at page HOGR-3PPP000167 through HOGR-3PPP000169 of Appendix I to the Report.

Soon thereafter, legitimate businesses, like Nationwide, began losing banking services as a result of Operation Choke Point. *Id.* at page HOGR-3PPP000335 of Appendix I to the Report. Director Blume concluded, however, that when that occurs, targeted businesses should have to "convince" the bank they are "wholly legitimate." *Id.* Notably, the words "due process" do not appear in the status report. *Id.* at page HOGR-3PPP000329 through HOGR-3PPP000340 of Appendix I to the Report.

The extrajudicial tactics used in Operation Choke Point have led to multiple congressional reports, which document numerous government entities' role in Operation Choke Point, including CFPB.[2] The House of Representatives has passed legislation to stop Operation Choke Point-type

---

[2] *See*, RJN, Ex. B, U.S. HOUSE OF REPRESENTATIVES, COMM. ON OVERSIGHT AND GOV'T REFORM, FEDERAL DEPOSIT INSURANCE CORPORATION'S INVOLVEMENT IN "OPERATION CHOKE POINT" 1 (Dec. 8, 2014) ["FDIC OPERATION CHOKE POINT REPORT"]; and RJN, Ex. A, DOJ OPERATION CHOKE POINT REPORT.

operations and to make clear that pressuring banks to terminate disfavored customer accounts is a violation of law.[3] A House Committee has also asked CFPB's Director, Richard Cordray ("Director Cordray"), to disclaim CFPB's participation in Operation Choke Point, which, tellingly, has gone unanswered in the public record.[4]

Thus, CFPB's involvement in Operation Choke Point is undeniable, and the termination of Nationwide's banking services was the intended consequence of CFPB's use of Operation Choke Point tactics in this case. See Declaration of Brian H. Kelley ("Kelley Decl."), Ex. 2, p. 18, ¶ 34.

**2. CFPB's Unique Relationship With The Banking Industry Has Ideally Positioned CFPB To Implement Operation Choke Point And Other Extrajudicial Tactics**

In July of 2011, CFPB began the operation of a supervision program for very large banks, including each of Nationwide's four former banking partners.[5] To conduct bank examinations, CFPB created a supervision section ("Bank Supervision section") and hired bank examiners to staff it.[6] CFPB also hired supervisory staff who previously worked at the FDIC. *CFPB Supervisory Approach,* RJN, Ex. E. Separate from the Bank Supervision section, CFPB created an Enforcement section staffed with attorneys to carry out enforcement actions. *Id*. The Enforcement section, for example, has targeted the two largest biweekly interest savings programs in the country since 2013 – Nationwide and Paymap, Inc.[7] Through its Bank Supervision and Enforcement sections, CFPB can both conduct bank examinations and initiate enforcement actions. *CFPB Supervisory Approach,* RJN, Ex. F. Importantly, however, CFPB prohibits the banks it supervises from revealing nearly any information about CFPB's supervision activities, including any information regarding pressure, coercion, and intimidation from CFPB to cease conducting business with legitimate business such as Nationwide.[8]

---

[3] RJN, Ex. C, Financial Institution Customer Protection Act of 2016, H.R.766, 114th Cong. (2016).

[4] RJN, Ex. D, Letter from United States House of Representatives, Comm. on Fin. Servs., to Richard Cordray, Dir., Bureau of Consumer Fin. Prot. (Apr. 8, 2015) ["Cordray Letter"].

[5] RJN, Ex. E, *CFPB Depository Institutions* ["CFPB Depository Institutions"].

[6] RJN, Ex. F, *Consumer Financial Protection Bureau Outlines Bank Supervision Approach*, CFPB (July 12, 2011) ["*CFPB Supervisory Approach*"].

[7] RJN, Ex. G, Consent Order issued in *In the Matter of PAYMAP Inc.*, in Administrative Proceeding File No. 2015-CFPB-0017.

[8] RJN, Ex. H, CONSUMER FIN. PROT. BUREAU, CFPB COMPLIANCE BULL. NO. 2015-01, TREATMENT OF CONFIDENTIAL SUPERVISORY INFORMATION 1-3 (Jan. 2015) ["CFPB BULL."].

From 2011 to 2013, attorneys from the Enforcement section were regularly sent to bank examinations with the bank examiners from the Bank Supervision section—a practice which both the Inspector General for the Board of Governors of the Federal Reserve System and CFPB Ombudsman's Office recommended be changed.[9] Nevertheless, CFPB still specifically encourages both sections to communicate and coordinate with each other.[10] CFPB Director Richard Cordray has summarized this two-way communication process in the following way:

> Many of our most significant enforcement actions have occurred after the initial work was done by examination teams that identified violations and laid groundwork that was later taken up, developed, and completed by our enforcement teams. Other matters may have begun and proceeded as enforcement investigations, prompted by some source of information that gave rise to an inquiry leading to determinations of legal violations. Our supervisory personnel would have some visibility and input into that process as well.

Cordray Remarks, RJN, Ex. K.

Further, CFPB's Supervision and Examination Manual ("CFPB Manual") describes how CFPB's Bank Supervision section examines banks, including the policies and procedures used to assess certain kinds of "risk."[11] One such procedure is the preparation of a "Risk Assessment," which is meant to evaluate "the extent of **risk to consumers** arising from the activities of a supervised entity or particular lines of business within it and to identify the sources of that risk." CFPB MANUAL, RJN, Ex. L, at 21, (emphasis added). In the CFPB Manual, "risk to consumers" is broadly defined as any activity where there is "the potential for consumers to suffer economic loss or other legally-cognizable injury . . . from a violation of Federal consumer financial law." *Id.* Also, the Risk Assessment is "particularly" meant to consider "factors related . . . to the potential for unfair, deceptive or abusive practices, or discrimination." *Id.* Each bank's Risk Assessment can be changed at any time by CFPB. *Id.* Therefore, if CFPB's Bank Supervision section becomes aware of activity that creates even a **potential** for economic loss or which is

---

[9] RJN, Ex. I, BD. OF GOVERNORS OF THE FED. RESERVE SYS., OFFICE OF THE INSPECTOR GEN., THE CFPB SHOULD REASSESS ITS APPROACH TO INTEGRATING ENFORCEMENT ATTORNEYS INTO EXAMINATIONS AND ENHANCE ASSOCIATED SAFEGUARDS (Dec. 16, 2013); RJN. Ex. J, CFPB OMBUDSMAN'S OFFICE, FY2012 ANNUAL REPORT TO THE DIRECTOR 13-14 (Nov. 15, 2012).

[10] RJN, Ex. K, Prepared Remarks of CFPB Director Richard Cordray at the Federal Reserve Bank of Chicago, CFPB (May 9, 2014) [ "Cordray Remarks"].

[11] RJN, Ex. L, CONSUMER FIN. PROT. BUREAU, CFPB SUPERVISION AND EXAMINATION MANUAL (Oct. 2012) (emphasis added) ["CFPB MANUAL"].

**potentially** unfair, deceptive, or abusive, the Bank Supervision section can revise a bank's Risk Assessment, which can, in turn, cause CFPB to change the bank's entire "Supervision Plan" (CFPB's plan for monitoring and examining the bank), thereby increasing the regulatory burden on the bank. *Id.* at 18.

Despite requests from Congress and others, CFPB has **not** issued guidance regarding when, if ever, it is permissible for CFPB's Bank Supervision section to request a bank to terminate relationships with specific businesses. *See* Cordray Letter, RJN, Ex. D. Conversely, the FDIC has issued this type of guidance.[12]

### 3. CFPB Sent Clear Message to Banks Regarding the Activities of ACH Customers

About 6 months before this lawsuit was filed, Director Cordray gave a speech to the Automated Clearing House ("ACH") group, in which he issued a clear warning to banks:

> Today I want to talk to you about electronic payment networks in general. This includes the ACH system……While there are undoubtedly great benefits to the current system of electronic payment networks − financial transactions today would not be the same without them − ***at the Consumer Bureau we also have some concerns.***...Let me describe these issues in more detail as a means of sparking more consideration and discussion about them.
>
> First, we have concerns that electronic payment systems can be misused ***to victimize consumers unless banks and the system administrators work to police and enforce safeguards***
>
> ***When bad actors take advantage of*** *weaknesses in the automated payments system, consumers can find themselves paying for charges they never authorized* or later revoked
>
> * * *
>
> ***"Surely, the financial institutions that accept these unscrupulous lenders and their payment processors as clients*** *need to do a better job of* ***ensuring that they are honoring the protections afforded consumers*** under the Electronic Fund Transfer Act. But more fundamentally, consumers expect their own bank or credit union to be on their side. They trust them to hold on to their money, *and banks and credit unions need to be better about doing just that.* Unfortunately, ***all too often the institutions are not living up to consumers' expectations*** by failing to honor consumers' stop payment and revocation orders or even refusing to allow consumers to close their accounts to halt the abuse.

[12] *See* RJN, Ex. M, FED. DEPOSIT INS. CORP., OFFICE OF THE INSPECTOR GEN., THE FDIC'S ROLE IN OPERATION CHOKE POINT AND SUPERVISORY APPROACH TO INSTITUTIONS THAT CONDUCTED BUSINESS WITH MERCHANTS ASSOCIATED WITH HIGH-RISK ACTIVITIES 7, 31–33 (Sept. 2015) ["FDIC REPORT"].

> * * *
>
> "As we see it, ***banks*** *and administrators have important roles to play*, ***and they need to be vigorous and proactive*** both to preserve consumer trust in the payment system and to protect their customer relationships."[13]

(Emphasis added.) Essentially, Director Cordray warned the banks that CFPB would hold the banks responsible should any ACH customer, such as Nationwide, violate the law. Kelley Decl., Ex. 2, p. 16 ¶ 31.

### C. CFPB'S USE OF OPERATION CHOKE POINT TACTICS IN THIS CASE

#### 1. CFPB Utilized Operation Choke Point and Other Extrajudicial Tactics to "Choke Off" Nationwide's Critical Banking Services

##### a. CFPB's Press Release

In addition to the general message CFPB sent to banks regarding ACH customers, on May 11, 2015, CFPB sent a very clear message to Nationwide's banking partners that they should cease doing business with Nationwide or otherwise be held accountable. In its Press Release entitled "CFPB Files Suit Against Nationwide Biweekly for Luring Customers with False Promises of Mortgage Savings," Director Cordray made forward-looking statements that indicated that Nationwide had, in fact, violated the law – as if a trial had already been conducted and a verdict rendered. Directory Cordray stated:

> These companies [Nationwide and Loan Payment Administration, LLC] and their owner, Daniel Lipsky, **<u>took advantage</u>** of consumers with **<u>false promises</u>** of savings on their mortgage, Homeowners deserve accurate information in the financial marketplace. Today we are taking action to end these **<u>illegal and deceptive practices</u>**…."[14] (Emphasis added.)

Cordray's words, following his previous warning to banks regarding ACH customers, served as an indicator to the banks that CFPB had already found Nationwide to be in violation of the law. Kelley Decl., Ex. 2, pp. 16-17, ¶ 32. Further, it is the opinion of banking and regulatory expert, Brian H. Kelley, that the small note at the bottom of the press release that "The Bureau's complaint is not a finding that the defendants have actually violated the law," was of little consequence to Nationwide's banking partners as the press release made clear that Director Cordray had already determined, in his eyes, that

---

[13] RJN, Ex. N, Prepared Remarks of CFPB Director Richard Cordray at the Clearing House, November 20, 2014 (ACH Newsroom) [ "Cordray ACH Remarks"]

[14] RJN, Ex. O, *CFPB Files Suit Against Nationwide Biweekly for Luring Consumers with False Promises of Mortgage Savings*, CFPB (May 11, 2015) ["CFPB Press Release"].

Nationwide had violated the law. *Id.*

**b. CFPB Publicly Named Nationwide's Banking Partners**

In July of 2014, Nationwide provided CFPB with the names of its four banking partners in response to a Civil Investigative Demand ("CID") from CFPB's Enforcement section. Lipsky Decl. ¶ 5. Importantly, this information was **not** publicly available. *Id.* All four of Nationwide's banking partners were (and currently are) supervised by CFPB's Bank Supervision section. *CFPB Depository Institutions*, RJN, Ex. E; see also Kelley Decl., Ex. 2, p. 13, ¶ 29.

On June 2, 2015, CFPB publicly and unnecessarily named all four of Nationwide's banking partners in a public court filing, thereby linking those banks with false allegations of violations of federal law. (ECF No. 29 & 29-1). CFPB listed the names of Nationwide's banking partners in its filing to support two points, neither of which required CFPB to publicly identify the names of Nationwide's banking partners. (ECF No. 29, at 2.) Thereafter, from June 15 to July 8, 2015, all four of Nationwide's banking partners sent letters to Nationwide indicating that they would unilaterally terminate banking services, without providing any reason in the termination letters. Lipsky Decl. ¶ 7. This failure to provide a reason for termination is consistent with a CFPB compliance bulletin and a hallmark characteristic of Operation Choke Point. *See* CFPB BULL., RJN, EX. H.

Nationwide was able to negotiate some extensions for the terminations, and remained hopeful that the banks would reverse their decisions. However, by November 23, 2015, all of Nationwide's banking services were terminated. *Id.* at ¶ 8. Nationwide sought ACH services from multiple other banks, but was unable to establish new banking relationships. *Id.* Consequently, Nationwide was forced to suspend approximately 130,000 Interest Minimizer Program customers. *Id.* Nationwide was also forced to lay off about two-thirds of its employees. *Id.* Essentially, Nationwide was forced out of business.

**c. CFPB Refused to Take Action to Prevent or Reverse the Bank Terminations**

When presented the opportunity to allay Nationwide's banking partners concerns of reprisal from CFPB if they continued their relationship with Nationwide, CFPB balked and refused to do so. [redacted]

[redacted]

The banks, fearful of reprisal from CFPB if they did not heed CFPB's warnings and without any assurance from CFPB that it would not target the banks if they failed to terminate Nationwide's accounts, went ahead and terminated all of Nationwide's accounts, causing Nationwide to suspend all customer services. Lipsky Decl., ¶ 8; Declaration of Sherry Ann Scott ("Scott Decl."), ¶¶ 4-8. Counsel for Nationwide nonetheless continued thereafter to have CFPB provide a "comfort letter" to banks which would allow Nationwide to re-establish its banking relationships or procure new relationships. To this end, Nationwide's counsel recently wrote CFPB in the fall of last year, stating:

> [A]s the Bureau is aware, Defendants' business was effectively shut down in November 2015 when the banks terminated essential services to Nationwide. Thus, given the extremely limited resources of Defendants, it is unlikely that the company will remain solvent if the trial date is continued any further. **If the Burau is willing to reconsider its position regarding signing a letter to Nationwide's form banking partners indicating that there will be no adverse regulatory impact if they resume business with Nationwide, Defendants can reconsider their position on the trial date**. However, absent such agreement, Defendants cannot stipulate to any continuance of the trial date.

Declaration of Georgia Z. Schneider ("Schneider Decl."), ¶ 3, Ex. 2 (emphasis added). Again, CFPB refused to do so. *Id*.

CFPB's actions, of course, beg the question—if providing a "comfort letter" to Nationwide's banking partners would provide them much needed assurance to continue their relationship with Nationwide in light of CFPB's actions and statements and if doing so would put to rest the banks fear of reprisal from CFPB by way its directly and indirectly threatened extrajudicial tactics, why not simply provide the letter (unless CFPB did, in fact, wish to drive Nationwide out of business through such tactics and without any due process)?

### 2. CFPB Utilized Operation Choke Point and Other Extrajudicial Tactics to "Choke Off" Financial Services for Accounts and Dealings Wholly Unrelated to This Litigation

CFPB's use of Operation Choke Point tactics has extended beyond Nationwide and has reached **personal** accounts of Mr. Lipsky as well as **wholly unrelated** companies owned by him. Lipsky Decl., at ¶ 12. On July 13, 2015, all Mr. Lipsky's **personal** accounts at a CFPB-supervised bank were closed without explanation. *Id*. In late 2015, Mr. Lipsky was denied a **personal** airline credit card through that same CFPB-supervised bank, again with no explanation provided. *Id*. In November of 2015, a different CFPB-supervised bank terminated the mortgage loan for Nationwide's office building, which was held by a **wholly unrelated, separate** company owned by Mr. Lipsky, **not** a party to this lawsuit. *Id*. By February of 2016, this same CFPB-supervised bank called the loan and demanded payment in full, despite having received all mortgage payments on time for years. *Id*. Mr. Lipsky thereafter sought to refinance the mortgage but was declined. *Id*. The CFPB-supervised bank granted a one year forbearance agreement, which required payment of a fee. *Id*. Mr. Lipsky, however, has been declined a refinance of this loan from other CFPB-supervised banks despite multiple attempts to do so. *Id*. In May of 2016, all of Mr. Lipsky's **personal** investment accounts at a CFPB-supervised institution were closed without explanation. *Id*. Finally, on June 14, 2016, a **wholly unrelated, separate** company owned by Mr. Lipsky, but again **not** a party to this lawsuit, had its credit card services terminated without explanation by a Bank of America joint venture, and has been unable to obtain new credit card services. *Id*. Oddly, these CFPB-supervised financial institutions never gave any explanation for these terminations as typically done in such circumstances. *Id*.

This series of events, affecting accounts and dealings **wholly unrelated** to the litigation, demonstrates that, contrary to CFPB's suggestion, the bank terminations are **not** solely the result of CFPB filing the present lawsuit, but rather, are the result of CFPB's use of Operation Choke Point and other extrajudicial tactics designed to pressure and coerce banks to terminate services for Nationwide, Mr. Lipsky, and any company with any relation to Mr. Lipsky.

### D. US BANK EMPLOYEES ADMIT THAT US BANK TERMINATED SERVICES BECAUSE OF FEAR OF RETALIATION FROM CFPB

#### 1. June 15, 2015 Call With US Bank Representatives

On June 15, 2015, an employee of Nationwide spoke with two representatives of US Bank regarding the termination of Nationwide's account. Scott Decl., ¶ 12, Ex. 1. The US Bank representatives told this employee that they would have to terminate their relationship with Nationwide because US Bank was very concerned about "risk." *Id.*, at p. 4:8-16. Specifically, the representatives noted that the CFPB "has long arms," "unlimited resources," and is not even regulated by the federal government so it can do "whatever it wants." *Id.*, at p. 6:9-25. They also noted that "just between the three of us," US Bank has had a lot of bad experiences with the CFPB and whenever they see the CFPB, they "turn around and run the other way – once bitten, twice shy." *Id.*, pp. 6:9-7:7. Further, the representatives specifically noted that Nationwide had always been a good customer and they "felt sick" about terminating the account, emphasizing that this was **not** a reflection on Nationwide, but rather the result of CFPB's improper influence. *Id.*, at p. 7:9-23.

#### 2. Deposition of Former US Bank Employee Alaim Kamden

US Bank's reasons for terminating Nationwide's accounts were confirmed by Alaim Kamden who was deposed in this case on December 12, 2016. Specifically, Mr. Kamden testified that in early June 2015, he became aware of the CFPB's lawsuit against Nationwide. Schneider Decl., Ex. 1 [Kamden Depo.], p. 27:5-13. When he first received the e-mail notifying him of the lawsuit, he did not think much of it, however, he quickly learned that this was not your ordinary lawsuit, and importantly, CFPB was not your ordinary Plaintiff:

> A. First when I got the e-mail I was -- **my initial reaction was, well, this is another lawsuit like any other lawsuit that they have had that we are aware of**, and then Brian Kroeger came to me and said … [y]ou need to -- **this is one that we may have to exit this relationship.**
>
> …
>
> **[My colleague's] reaction was very similar to mine in that why, we know that this company gets sued all the time, what is so different about this particular one, so we were surprised**.

*Id*. at pp. 28:8-29:5 (emphasis added).

Thereafter, an internal US Bank conference call was scheduled to discuss Nationwide's account. This call included the Market President, Relationship Manager, Team Lead, Senior Portfoilio Manager, and the Senior Credit Manager, among others. *Id.* at pp. 32:16-33:15. During this call, Senior Vice President, Senior Portfolio Manager for CPS gave Mr. Kamden and Ms. Whitman "a crash course" as to why this lawsuit was different:

> Q. Okay. Relate to me the crash course that Mr. Young gave.
>
> A. Pretty much in a nutshell, I mean **he went through reasons why this one is different**. **Pretty much it boiled down to the CF -- the CFPB** …
>
> …
>
> A. Mr. Young proceeded to tell us why this lawsuit is different, in essence saying the **CFPB is very powerful, the CFPB, in using his words, were the CFPB had deep pockets, they -- they're virtually unregulated, they – I know at some point he mentioned something about a [800] hundred pound gorilla**.
>
> **So, in a nutshell, he was trying to make us understand that the CFPB is very powerful** and that we can -- this customer should take this lawsuit very seriously.
>
> Q. Okay. Anything else you can think of in that conversation?
>
> A. No. It was -- it was more -- **the decision was made at that time. That's what he said. Guys, we need to exit this relationship**.

*Id*. at pp. 36:7-16 and 38:14-39:3 (emphasis added).

### E. BANKS HAVE KNOWN ABOUT OTHER CIVIL, GOVERNMENTAL, REGULATORY ACTIONS AGAINST NATIONWIDE BEFORE, BUT NEVER SOUGHT TO TERMINATE RELATIONSHIPS WITH NATIONWIDE

As Mr. Kamden testified, Nationwide, like many businesses, has been a party to civil law suits and government and regulatory actions before the commencement of the CFPB's lawsuit against it. Scott Decl., ¶ 13. Prior actions involving Nationwide include:

- A 2014 action brought by Nationwide (as defined herein) against various District Offices and offices located in the State of California (USDC—N.D. Cal., Case No. 5:14-cv-04420) involving marketing and advertising issues;
- A 2014 action brought by Nationwide Biweekly Administration, Inc. against Jan Lynn Owen as Commissioner of the Department of Business Oversight for the State of California (USDC—N.D. Cal, Case No. 5:14-cv-05166) involving licensing issues;
- A 2014 action by Washington State Department of Financial Institutions against

Nationwide Biweekly Administration, Inc. and Daniel S. Lipsky (Washington State Case No. C-13-1195-14-CO01) involving licensing and consumer issues;

- A 2013 action brought by Quicken Loans Inc. against Nationwide Biweekly Administration, Inc. and Loan Payment Administration, LLC (USDC—E.D. Mich., Case No. 2:13-cv-13431-LPZ-MKM,) involving the foregoing defendants' marketing practices;
- A 2008 action by the State of Ohio, ex. rel. Richard Cordray against Nationwide Biweekly Administration (Ohio State Case No. 2008 CV 0678) involving marketing and consumer issues.

*Id*. Nationwide disclosed these prior actions to its banking partners without any consequence or termination of banking services. *Id*. at ¶ 14. Notably, the issues involved in these prior cases were substantially similar to those involved in the present CFPB action. *Id*. Nonetheless, despite awareness of the foregoing matters, none of the banks sought to terminate their relationships with Nationwide, thus further demonstrating that it was not the fact that a lawsuit was filed against Nationwide that caused the banks to terminate their relationship, but rather, the fear of reprisal from CFPB if they continued their relationship with Nationwide. See *Id*.

### F. IT IS THE OPINION OF NATIONWIDE'S BANKING AND MORTGAGE LENDING EXPERT THAT EXTRAJUDICIAL ACTIONS TAKEN BY CFPB, ABOVE AND BEYOND FILING THIS LAWSUIT, CAUSED THE BANKS TO TERMINATE THEIR RELATIONSHIPS WITH NATIONWIDE

Nationwide has retained expert Brian H. Kelley to review the actions of Nationwide, the CFPB and Nationwide's banking partners and provide an opinion regarding the termination of Nationwide's banking services. Mr. Kelley has more than 35 years experience in the banking and mortgage lending industry. Kelley Decl., Ex. 2, ¶ 5. He has held a broad range of positions at major banks, smaller regional banks and mortgage companies, including serving as a senior executive officer, relationship manager, loan officer, underwriter and voting member of various boards and executive loan committees. *Id*. In addition, he has served as the president, chief executive officer, and director of three regional business banks in Southern California, where he directed and oversaw a broad range of lending activities, including the implementation and oversight of loan policy and underwriting guidelines. *Id*.

Based on Mr. Kelley's extensive experience in the banking industry as well as his review of the

documents and pleadings in this case and documents available in the public record regarding Operation Choke Point and CFPB's involvement in Operation Choke Point, it is Mr. Kelley's opinion that CFPB's extrajudicial actions caused the banks to sever their relationships with Nationwide. Kelley Decl., Ex. 2, p. 12-20. Specifically, Mr. Kelley identifies the following actions and decisions of CFPB that caused Nationwide's long-term banking partners to simultaneously and without explanation terminate their relationships with Nationwide:

- Each bank was supervised by the CFPB and CFPB had substantial discretion in making determinations about whether the banks had findings of violations or whether a bank required heightened scrutiny. (Kelley Decl., Ex. 2, pp. 12-13, ¶¶ 27-29).
- CFPB refused to provide assurances to Nationwide's banks who had threatened to terminate Nationwide's account, although fully aware that its refusal to do so would result in the banks' terminating relationships with Nationwide out of fear of reprisal from CFPB. (*Id*., p. 14, ¶ 30).
- Prior to filing this lawsuit, CFPB, through Director Richard Cordray, had sent a clear message to banks providing ACH services that they would be responsible if an ACH customer violated the law. (*Id*., pp. 15-16, ¶ 31).
- CFPB's May 11, 2015 press release regarding this lawsuit was an extremely strong statement clearly indicating to banks providing services to Nationwide that CFPB has already found Nationwide to be in violation of the law. (*Id*. pp. 16-17, ¶ 32).
- CFPB's history with regard to Operation Choke Point is undeniable and the termination of Nationwide's bank accounts was exactly the thing Operation Choke Point was designed to accomplish. (*Id*., p. 18, ¶ 34).
- The telephone transcript of the call between representatives of US Bank and Nationwide as well as the deposition testimony of Alain Kamden describe the central role CFPB played in US Bank's termination of Nationwide's ACH services. (*Id*., pp. 18-19, ¶ 35).
- The fact that banks not only terminated services to Nationwide, but also services to Mr. Lipsky and affiliated entities that are not parties to the litigation demonstrates that the action was taken by the banks in response to the extrajudicial tactics employed by CFPB.

(*Id.*, p. 19, ¶ 37).

In sum, it is Mr. Kelley's opinion that outside of the court filing, CFPB took actions and made decisions that would be taken as a clear message by any bank from their regulator to terminate Nationwide's ACH accounts, and to do so prior to any trial or determination of liability. Kelley Decl., Ex. 2, pp. 19-20, ¶ 38.

## IV. LEGAL ARGUMENT

### A. STANDARD OF REVIEW

The party moving for summary judgment has both the initial burden of production and the ultimate burden of persuading the court that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Summary judgment is proper **only** where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any *material* fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis added). Because summary judgment is a "drastic device" cutting off a party's right to present its case to a jury, the moving party bears a "heavy burden" of establishing the absence of any triable issue of material fact. *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the nonmoving party. *See T.W. Elec. Service Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630-31 (9th Cir. 1987) (emphasis added) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *see also Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). Moreover, direct evidence is **not** required – circumstantial evidence alone may create a genuine issue of material fact sufficient to defeat a motion for summary judgment. See *Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1029-1030 (9th Cir. 2006); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).

### B. CFPB'S PURPORTED "MATERIAL FACTS" ARE IRRELEVANT AND CONTROVERTED BY THE EVIDENCE SUBMITTED HEREWITH

#### 1. Nationwide Has Obtained Ample Evidence In Support Of Its Counterclaims, Which CFPB Has Failed To Disprove

CFPB erroneously asserts as a "material fact" that Nationwide has not obtained any facts material to these counterclaims. This unsupported assertion, ignores the evidence including, *inter alia*, documents from the public record of which this Court may take judicial notice demonstrating CFPB's involvement in and use of Operation Choke Point (see Request for Judicial Notice, Exs. A- O), declarations setting forth specific evidence regarding CFPB's use of Operation Choke Point tactics to influence Nationwide's banks and the banks of entities that are not parties to this lawsuit to terminate services (see Lipsky Decl. and Scott Decl.), a recorded phone call between US Bank employees and Nationwide in which US Bank employees admit that they were terminating Nationwide's account based on fear of reprisal from CFPB (Scott Decl., Ex. 1), and the deposition testimony of one of these US Bank employees confirming US Bank's reasons for terminating Nationwide's accounts (Schneider Decl., Ex. 1). In addition, Nationwide disclosed the report of banking expert, Brian H. Kelley, in which Mr. Kelley concludes that in his opinion the extrajudicial actions of CFPB caused Nationwide's banking partners to terminate their relationships with Nationwide. Kelley Decl., Ex. 2, pp. 12-20.

Notably absent from CFPB's Motion is **<u>any evidence</u>** controverting these material facts. In fact, CFPB's principal evidentiary showing, i.e., to its own discovery responses, is improper and inadmissible. (It is axiomatic that one's own out-of-court statements are, of course, hearsay and inadmissible.) While CFPB cites the *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 decision in which discovery responses were admitted into evidence, the moving party had used the opposing party's responses, **<u>not</u>** their own responses. Here, to the contrary, CFPB cites to its own, self-serving hearsay discovery responses stating that it has no responsive information, but ignores the many other witnesses, including, *inter alia*, Daniel Lipsky, Sherry Ann Scott and Alain Kamden, all of whom CFPB has had the opportunity to depose. In addition, unlike the manufacturer in *Celotex*, CFPB has not propounded comprehensive discovery regarding Nationwide's counterclaim seeking, for example, the identification of all documents and witnesses supporting Nationwide's counterclaim. *Id*. at 320 ("Petitioner noted that respondent had failed to identify, in answering interrogatories specifically requesting such information, any witnesses who

could testify about the decedent's exposure to petitioner's asbestos products.")

Thus, while it is possible to move for summary judgment based on a lack of evidence, "[i]t is not enough to move for summary judgment … with a conclusory assertion that the [opposing party] has no evidence to prove his case." *Celotex Corp. v. Catrett*, *supra*, 477 US at 326 (J. White, concur. Opn.); see also *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1105. Rather, the moving party must identify specific issues on which it claims the opposing party has no supporting evidence and **demonstrate** the absence of such evidence. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op, Inc.*, 838 F.2d 268, 273 (8th Cir. 1988); *Russ v. International Paper Co., 943 F.2d 589, 592* (5th Cir. 1991).

### 2. While Irrelevant, Contrary to CFPB's Statement of "Material Fact," Nationwide Has Obtained Deposition Testimony In Support of Its Counterclaim

CFPB also erroneously asserts that "Nationwide has not yet taken any depositions regarding its counterclaims" when, in fact, on December 12, 2016, Nationwide took the deposition of former US Bank employee, Alain Kamden. Schneider Decl., Ex. 1. Moreover, as CFPB is aware, the deposition of TD Bank is scheduled for January 6, 2017 per agreement and Nationwide's counsel is in the process of scheduling the depositions of BMO Harris and Bank of America.

As set forth above, the deposition testimony of Mr. Kamden confirms that US Bank terminated Nationwide's account, not because Nationwide had been sued, but rather, because of US Bank's fear of reprisal should they continue their relationship with Nationwide. Schneider Decl., Ex.1 [Kamden Depo.] at pp. 36:7-16 and 38:14-39:3.

While the deposition took place after CFPB filed its motion, CFPB was nonetheless aware of the notice of this deposition as well as the other bank depositions before going forward and filing its motion. Further, CFPB had the transcript of the phone call between US Bank employees Alain Kamden and Susan Whitman since July 26, 2016 as it was attached to the Schneider Decl. filed in support of Defendants' Opposition to CFPB's Motion to Dismiss and Strike. ECF No. 93-1. CFPB, however, has made **no** effort to controvert Mr. Kamden or Ms. Whitman's account of why US Bank terminated Nationwide's account, and thus has failed to negate this evidence and failed to demonstrate an absence of a genuine issue of material fact. See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-160 (1970).

As the moving party, it is **CFPB's burden** to show the absence of any material fact. *Id*. at 157.

It cannot do so, of course, by sticking its head in the sand and ignoring material facts. As, CFPB has "fail[ed] to foreclose the possibility" that US Bank terminated its relationship with Nationwide due to fear of reprisal from CFPB, as indicated by Ms. Whitman and Mr. Kamden, CFPB has filed to meet this burden and summary judgment must be denied. *Id*.

**3. While Irrelevant, Contrary to CFPB's Statement of "Material Fact," Nationwide Has Identified Witnesses And Documents In Support Its Counterclaims**

As set forth above, CFPB has had the telephone transcript of US Bank employees Alain Kamden and Susan Whitman's conversation with Nationwide since July 26, 2016. In addition, Mr. Kamden is identified in Defendants' Second Supplemental Initial Disclosures and was deposed on December 12, 2016. Schneider Decl., Ex. 3. Additional witnesses identified by Defendants include, *inter alia*, Daniel Lipsky, Shery Ann Scott, Hoon Nam (all of whom have been deposed by CFPB), and TD Bank for which the 30(b)(6) deposition scheduled for January 6, 2017. *Id*.

Thus, Nationwide has identified sources of information in support of its counterclaims and CFPB's unsupported and controverted assertions to the contrary are without merit. Despite this identification, however, CFPB has failed to examine these sources of information. Likewise, CFPB has failed to propound written discovery to establish the purported absence of evidence in support of Nationwide's counterclaim as it now claims. CFPB's failure to do so, does **<u>not</u>**, of course, establish an absence of any supportive evidence or otherwise establish grounds for summary judgment.

**4. While Irrelevant, Contrary To CFPB's Statement of "Material Fact," The Banks Have Produced Documents In The Unrelated *Krogstad* Case, However, Discovery In An Unrelated Case Is Irrelevant For Purposes of CFPB's Motion**

In a further attempt to prove an "absence" of evidence, CFPB cites to pleadings in an *unrelated* putative class action filed against Nationwide and asserts that Nationwide has acknowledged that the banks in Krogstad have no documents or information regarding the information sought by Nationwide. Mot., p. 5, fn. 5. This, however, is **<u>not</u>** the case.

On June 13 and June 16, 2016, Defendants in *Krogstad v. Nationwide Biweekly Admin., Inc. and Loan Payment Admin., LLC*, Civil Case No. 2:16-cv-00465-APG-CWH (D. Nev. filed Mar. 3, 2016) (hereinafter the "*Krogstad* case") served subpoenas on TD Bank, BMO Harris Bank, Bank of America and US Bank. Declaration of Christopher D. Stock ("Stock Decl."), ¶¶ 1-3. The subpoenas sought,

among other items, any communications between the banks and the CFPB regarding Defendants, including but not limited to the termination of accounts. *Id*. at ¶ 4. In response to the subpoenas, Bank of America produced 1,033 pages of documents, BMO Harris produced 6,771 pages of documents and TD Bank produced 1,661 pages of documents. *Id*. at ¶ 5. All of these documents were produced pursuant to a protective order and marked "Confidential – Attorneys Eyes Only." *Id*. Further, on July 29, 2016, Defendants moved to compel production of documents from US Bank. Id. at ¶ 6. The motion was heard on December 21, 2016, and thereafter was granted. *Id*.

Accordingly, contrary to CFPB's assertion, the banks **have** produced documents in the *Krogstad* case. More importantly, however, even if the banks had not produced documents in this *unrelated* case, CFPB would still **not** have met its burden on summary judgment to either submit affirmative evidence disproving or negating Nationwide's counterclaims **or** demonstrating that Nationwide lacks sufficient evidence to support its counterclaims as documents produced in an unrelated case have no bearing on this case or CFPB's motion for summary judgment. See *Adickes v. S.H. Kress & Co., supra*, 398 U.S. at 158-160; *Celotex Corp. v. Catrett*, *supra*, 477 U.S. at 325.

### C. The Court Has Already Determined That, As A Matter Of Law, Nationwide Has Sufficiently Alleged the Claims Set Forth in Counterclaims

This Court has already previously denied CFPB's challenges to the Counterclaims, indicating that the allegations, if established, sufficiently supported the claims. Thus, in order to prevail at summary judgment, CFPB would have to either introduce new material facts wholly controverting and refuting the facts alleged or otherwise establish that none of the allegations could possibly be supported by evidence. CFPB, however, has done neither (and, notably, if it were able to have done the latter, its earlier challenges would have been upheld).

Rather than set forth any actual evidence from the record to defeat or negate Nationwide's counterclaims, CFPB largely regurgitates its arguments in support of its motion to dismiss, which the Court denied on December 13, 2016. ECF No. 139. In its Order denying CFPB's motion to dismiss, the Court stated:

> Nationwide has now presented factual allegations – and arguments regarding the inferences reasonably to be drawn from the averments – that a decision on the basis of the pleadings alone would not be appropriate.
>
> For the same reasons discussed in the prior order, CFPB's additional arguments

regarding jurisdiction, standing, and sovereign immunity all fail.

ECF No. 139, p. 2:17-21. Accordingly, to the extent the CFPB has renewed these same legal arguments without any facts or challenges to the evidence (but rather a willful blindness thereto), the Court must reach the same conclusion.

Further, as demonstrated at length herein, contrary to CFPB's unsupported assertion, **there is ample evidence connecting CFPB's extrajudicial actions to the termination of Nationwide's banking services**. Thus, as set forth in Nationwide's opposition to the dismissal of its counterclaims, which Nationwide incorporates herein (RJN, Ex. P, ECF No. 93), and as summarized below, CFPB is **not** entitled to summary judgment as to Nationwide's counterclaims as there exist genuine issues of material fact as to each claim.

### 1. Nationwide Has Standing To Assert Its Counterclaims

To establish standing, a plaintiff must have suffered an injury in fact, there must be a causal connection between that injury and the conduct complained of, and it must be likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Contrary to CFPB's assertion, the facts in the record are sufficient to establish that the CFPB has exerted extrajudicial pressures on Nationwide's banking partners and such extrajudicial pressures caused the banks to sever their relationships with Nationwide. As set forth herein, CFPB's involvement in and use of Operation Choke Point tactics is well-documented in the public record. Statement of Facts, *supra*, Section III(B). There is also ample evidence of CFPB's use of such tactics in this case. *Id*., Section III(C). These facts in conjunction with the recorded phone call and testimony of US Bank employees admitting that the reason US Bank terminated Nationwide's account was fear of reprisal from CFPB (*Id*., Section III(D)) provide for the reasonable inference that CFPB's use of Operation Choke Point tactics caused the banks to terminate their relationships with Nationwide.

In addition, the facts in the record also support a reasonable inference that the banks were looking for assurance from CFPB, as a condition to resuming business with Nationwide. But, CFPB refused to provide any assurance, preferring to allow its extrajudicial tactics to run their course. Additionally, the testimony of Mr. Kamden and the recorded phone call between Nationwide and Mr. Kamden and Ms. Whitman make clear that, but for the involvement of the CFPB, US Bank would have continued its

relationship with Nationwide. See Statement of Facts, *supra*, Section III(D). As each bank termination occurred at the same time and in the same manner, it is reasonable to assume that the other banks, once deposed, will indicate the same.

Accordingly, there exists genuine issues of material facts as to the issue of standing and CFPB is **not** entitled to summary judgment.

**2. CFPB's Use Of Extrajudicial Tactics Infringed Nationwide's Protected Speech**

"Truthful advertising related to lawful activities" is "entitled to the protection of the First Amendment." *In re R.M.J.*, 455 U.S. 191, 203 (1982). Moreover, "even a communication that does no more than propose a commercial transaction is entitled to the coverage of the First Amendment." *44 Liquormart v. R.I.*, 517 U.S. 484, 503-504 (1996); see also *Bigelow v. Virginia*, 412 U.S. 809, 826 (1975) ("Regardless of the particular label asserted by the State – whether it calls speech 'commercial' or 'commercial advertising' or 'solicitation' – a court may not escape the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation.")

As demonstrated above, through the use of extrajudicial Operation Choke Point tactics, CFPB has infringed Nationwide's speech **prior** to any establishment of wrongdoing or adjudication of CFPB's claims. See Statement of Facts, supra, Section III(C). As a result of CFPB's actions, Nationwide has essentially been put out of business and, in turn, its marketing activities, and dissemination of accurate information regarding its Interest Minimizer Program have been restricted **prior** to adjudication of this lawsuit. Lipsky Decl., ¶ 8; Scott Decl., ¶¶ 4-8.

In addition, the loss to Nationwide is more than just an economic loss, as the Company has effectively been shut down as a result of CFPB's extrajudicial conduct and its loss of banking relationships. *Id*. Thus, CFPB's extrajudicial actions directed at Nationwide have imposed burdens far exceeding those necessary to achieve any legitimate purpose, and have not only left Nationwide with insufficient alternative avenues for communication, but have effectively denied the company the ability to operate in any way. See *Walnut Properties, Inc. v. City of Whittier*, 861 F.2d 1102, 1110-1112 (9th Cir. 1988) (holding that a zoning ordinance which would force the county's only existing adult theater "to close at its present location with no definite prospect of a place to relocate" was an impermissible

violation of the theater's free speech rights, as the ordinance "left open insufficient alternative avenues of communication."); see also *Backpage.com, LLC v. Dart*, 807 F.3d 229, 238 (7th Cir. 2015) (holding that the termination of credit card services resulted in irreparable harm to Backpage despite the fact they could still continue to run the ads for free because "no company can expect to continue to operate without a source of revenue.")

Accordingly, there exists genuine issues of material facts as to Nationwide's First Amendment Counterclaim, and CFPB is **not** entitled to summary judgment.

**3. CFPB's Use Of Extrajudicial Tactics Deprived Nationwide of a Constitutionally Protected Liberty Interest**

The Supreme Court has held that "[t]he 'right to be heard before being condemned to suffer grievous loss of any kind . . . is a principle basic to our society.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Specifically, "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). Thus, where government conduct "creates both a stigma and a tangible burden on an individual's ability to obtain a right or status recognized by state law, an individual's liberty interest has been violated." *Humphries v. City. of L.A.*, 554 F.3d 1170, 1188 (9th Cir. 2009).

Here, there can be no question that CFPB's conduct, including, *inter alia*, its use of extrajudicial tactics to apply pressure to Nationwide's banking partners, its "black listing" of Nationwide via its press release, and its "outing" of Nationwide's banking partners in a public court filing, has stigmatized Nationwide. See Statement of Facts, *supra*, Section III(C). Moreover, there can be no question that this stigma has had a "tangible burden" on Nationwide's ability to pursue its chosen line of business and hold a bank account (Lipsky Decl., ¶ 8; Scott Decl., ¶¶ 4-8), both rights which are entitled to constitutional protection. See *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003) (explaining that "government stigmatization that broadly precludes individuals or corporations from a chosen trade or business deprives them of liberty in violation of the Due Process Clause"). Additionally, contrary to CFPB's assertion, the right to conduct one's chosen trade or business is a constitutionally protected property right. See *Truax v. Corrigan*, 257 U.S. 312, 327 (1921)("Plaintiffs' business is a property right…."); *Merced Dredging Co. v.*

*Merced Cty.*, 67 F. Supp. 598, 604 (S.D. Cal. 1946)(same); *Angelopoulos v. Bottorff*, 76 Cal. App. 621, 626, 245 P. 447, 449 (Cal. Ct. App. 1926) (same).

Accordingly, there exists genuine issues of material facts as to Nationwide's Due Process Counterclaim, and CFPB is **not** entitled to summary judgment.

### 4. CFPB's Use Of Extrajudicial Tactics Violated the APA

Finally, Under the APA the Court has authority to "hold unlawful and set aside agency action, findings, and conclusions" that are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). As set forth above, CFPB has employed extrajudicial tactics intended to "choke off" Nationwide's access to banking services and destroy Nationwide's business. See Statement of Facts, Section III, *supra*. These extrajudicial actions are in excess of CFPB's statutory authority under the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5481 et seq. As such, CFPB has acted in excess of its statutory authority in violation of the APA and Nationwide's due process rights.

Accordingly, there exists genuine issues of material facts as to Nationwide's APA Counterclaim and CFPB is **not** entitled to summary judgment.

## V. CONCLUSION

CFPB has failed to submit any affirmative evidence that disproves an essential element of Nationwide's counterclaims and has failed to demonstrate that Nationwide lacks sufficient evidence to support its counterclaims. Instead, CFPB has simply turned a blind-eye to the factual record. As such, CFPB has failed to meet both its initial burden of production and the ultimate burden of persuading the Court that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Thus, Nationwide respectfully requests that the Court deny CFPB's motion for summary judgment in its entirety.

Dated: February 1, 2017

**PONIST LAW GROUP, P.C**

By: /s/ Georgia Z. Schneider

Georgia Z. Schneider
***Attorneys for Counterclaimant Nationwide Biweekly Administration, Inc.***

**CERTIFICATE OF SERVICE**

On February 1, 2017, I filed the foregoing document with the Court's CM/ECF filing system, which will serve all parties and counsel of record in this case.

/s/ Georgia Z. Schneider

Georgia Z. Schneider