ANTHONY ALEXIS (DC Bar #384545)
DEBORAH MORRIS (Admitted to the NY Bar)
MICHAEL G. SALEMI (IL Bar # 6279741)
PATRICK GUSHUE (PA Bar #306966)
JONATHAN URBAN (CO Bar #44190)
STEPHEN JACQUES (DC Bar # 464413)
THOMAS MCCRAY-WORRALL (Admitted to the MD Bar)
ELIZABETH FRANCE (DC Bar # 999851)
Patrick.Gushue@cfpb.gov
1700 G Street NW
Washington, DC 20552
Phone: 202-435-7944
Fax: 202-435-7722
*Attorneys for Plaintiff*
*Consumer Financial Protection Bureau*

KIMON MANOLIUS (154971)          HELEN M. MAC MURRAY (admitted *pro hac vice*)
kmanolius@hansonbridgett.com     (OH Bar #0038782)
**HANSON BRIDGETT, LLC**         (PA Bar # 318247)
425 Market Street, 26th floor    (MO Bar # 63646)
San Francisco, CA  94105         (KS Bar # 26606)
Phone:  415-995-5841             (IL Bar # 6318586)
                                 (NE Bar # 25904)
                                 (TN Bar # 033783)
                                 (WI Bar # 1103121)
                                 (WV Bar # 13015)
                                 LISA A. MESSNER (OH Bar # 0074034) (admitted *pro hac vice*)
                                 hmacmurray@mslawgroup.com
                                 **MAC MURRAY & SHUSTER, LLP**
                                 6530 West Campus Oval, Suite 210
                                 New Albany, Ohio  43054
                                 Phone: 614-939-9955
                                 *Attorneys for Defendants and Counter-Claimant*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | Case No. 3:15-cv-02106-RS |
| Plaintiff, | **JOINT PRE-TRIAL STATEMENT REGARDING NATIONWIDE'S COUNTERCLAIMS** |
| v. | |
| NATIONWIDE BIWEEKLY ADMINISTRATION, INC., LOAN | Trial Date:    April 24, 2017     8:00 a.m. <br> Judge:    Hon. Richard Seeborg |

PAYMENT ADMINISTRATION
LLC, AND DANIEL S. LIPSKY,

                    Defendants.

--------------------------------------------

NATIONWIDE BIWEEKLY
ADMINISTRATION, INC.,

             Counter-claimant,

             v.

CONSUMER FINANCIAL
PROTECTION BUREAU,

             Counter-defendant.

Courtroom:      Courtroom 3, 17th Floor
                      450 Golden Gate Ave.
                      San Francisco, CA 94102

## **JOINT PRETRIAL STATEMENT**

### **Counterclaims**

1.    **Substance of the Action:**

  **A. Nationwide's Statement**

       The Bureau's actions against Counterclaimant extend beyond the filing of suit. With great power vested in it under the Dodd-Frank Act, the Bureau had an affirmative duty to treat Counterclaimant fairly. It did not do so.

       The Bureau engaged in an extrajudicial effort to terminate Nationwide Biweekly Administration, Inc.'s ("Nationwide" or "Counterclaimant") banking relationships and automated clearinghouse services ("ACH"). At the time suit was filed in May 2015, Director Cordray issued an unnecessary and materially prejudicial press release.  This press release (i) went beyond a short statement of the claims and the government's interest in filing the lawsuit, and instead (ii) presented to the public and banking community quoted statements by Director Cordray. The quoted statements indicated a personal belief that Counterclaimant had in fact violated the law, by saying that Nationwide "took advantage of consumers." One month later in June 2015, the Bureau filed a pleading naming all

four of Nationwide's banks causing all four banks to send notices of termination by July 2015. Nationwide requested the Bureau to intervene on its behalf to maintain its services for 135,000 customers. The Bureau refused, directly causing the suspension of all services for customers under Nationwide's ACH services. The Bureau now asks for damages from the suspension of services that it caused.

These actions, in conjunction with the Bureau's supervisory rules, directives, and communications over banks, materially prejudiced Nationwide, not only robbing Nationwide of its existing banking relationships, but also blackballing Nationwide from forming new banking relationships. Per the Bureau's orders, Nationwide and its 135,000 customers were excluded from the banking system.

**B. The Bureau's Statement**

Nationwide's claim that the Bureau engaged in an extrajudicial effort to terminate its banking relationships lacks factual support, logical coherence, and any legal basis. Nationwide identifies four features of this so-called extrajudicial effort. First, Nationwide points to a press release the Bureau issued on the day it filed its complaint in this case. As a factual matter, Nationwide cannot establish any causal connection between the issuance of the press release and the decision by its banks to terminate their relationships with Nationwide. Nationwide can point to no testimony or documentary evidence indicating that the banks were aware of this press release, let alone that it factored into any decision regarding their relationship with Nationwide. Nor can Nationwide establish that the press release constituted some sort of ill-defined extrajudicial conduct. It did not. The issuance of the press release, like the filing of the complaint itself, was well within the Bureau's authority.

Second, Nationwide claims that Bureau's mention of Nationwide's banking partners in a routine filing in this matter that did not violate any law or order of this Court also constituted "extrajudicial" conduct that led to the termination of its banking relationship. Once again, Nationwide cannot establish any causal connection between this filing and the banks' decision to terminate their relationships. As with the press release, Nationwide can point to no evidence indicating that the banks were aware of this filing or that it factored into their decision to terminate their relationship with Nationwide. Nationwide

3

also cannot establish that the filing in support of the Bureau's venue argument constituted extrajudicial conduct; in fact, it was a court filing, and a filing necessary to support the Bureau's argument that Defendants' business activities – including its banking activities – were more extensive in California than in any other state.

Third, Nationwide claims that the Bureau refused Nationwide's request that the Bureau intervene on Nationwide's behalf to maintain services for its customers (including by providing a so-called "comfort letter"), and that the Bureau's refusal caused the suspension of its banking services.  As a factual matter, Nationwide cannot prove that any refusal by the Bureau to "intervene" in this manner caused the suspension of Nationwide's banking services.  Moreover, Nationwide cannot establish that a so-called "comfort letter" would have prevented the loss of its banking services or, as a legal matter, that the Bureau had any obligation to provide such a letter.

Finally, Nationwide claims that the Bureau's actions and its supervisory conduct "prejudiced" Nationwide, "robb[ed]" it of its banking relationships, and "blackball[ed]" Nationwide from forming new banking relationships.  Once again, Nationwide cannot establish any specific conduct by the Bureau to support these allegations or any causal relationship between the Bureau's supervisory conduct and Nationwide's loss of its banking relationships, or alleged inability to form new banking relationships. Nor can Nationwide establish that its customers were excluded from the banking system.

Not only can Nationwide establish no facts to support its claims, but those claims fail as a matter of law.  As a threshold matter, Nationwide lacks the standing necessary to maintain this Court's jurisdiction, as it can establish neither the causation nor redressability prongs necessary for Article III standing.  Even if Nationwide could establish standing, this Court lacks power to review Nationwide's APA claims; Nationwide can identify no final agency action under the APA, and the government has not waived its sovereign immunity with respect to such claims.  Nationwide also cannot establish that the Bureau infringed on any First Amendment rights, as Nationwide cannot establish that the Bureau restricted its speech or that Nationwide's commercial speech was entitled to heightened First Amendment protections.  Similarly, for purposes of its Fifth Amendment claim Nationwide cannot establish that the Bureau deprived it of any constitutionally protected liberty interest, nor can it identify

4

any such interest.  Further, Nationwide cannot identify any legal authority for the proposition that a law enforcement agency's refusal to "intervene" on behalf of a defendant that the same law enforcement agency has accused of illegal behavior constitutes "extrajudicial" conduct by the agency, or that before filing an enforcement action a law enforcement agency has a duty to anticipate any negative consequences that the enforcement action might have for the defendant and its business relationships.

The Bureau raises the following defenses that remain to be decided, as raised in the Bureau's Answer to Nationwide's Counterclaims (Dkt. 151), and as addressed in the Bureau's Motion to Dismiss Counterclaims (Dkt. 86), and the Bureau's Motion for Summary Judgment on Counterclaims and Reply in Support thereof (Dkt. 123, 179):

1. Nationwide lacks Article III standing to bring its counterclaims.  Nationwide has not established a causal connection between its alleged injury and the conduct Nationwide alleges the Bureau engaged in, nor has Nationwide established that its alleged injuries will be redressed by a favorable decision.  Because Nationwide lacks standing to bring its counterclaims, this Court lacks subject matter jurisdiction.

2. The agency action at issue in Nationwide's counterclaims is committed to agency discretion by law, and the agency action at issue in Count III of Nationwide's counterclaims does not constitute final agency action under the APA.

3. Nationwide's claims are barred by sovereign immunity.  The government has not waived its sovereign immunity with respect to the conduct at issue in Nationwide's counterclaims, as such conduct does not constitute final agency action under the APA.

4. Nationwide's claims are barred to the extent that they arise from Nationwide's own fraudulent, illegal, or otherwise improper conduct, as alleged in the Bureau's affirmative claims.

5. Nationwide's claims are barred by the doctrine of unclean hands.  Nationwide did not act fairly and without deceit as to the circumstances giving rise to the injuries alleged in Nationwide's counterclaims, as alleged in the Bureau's affirmative claims.

6. Nationwide's claims are barred because its alleged injuries were caused by nonparties, and no Bureau conduct was the proximate cause of those injuries.  Nationwide's alleged injuries were

5

caused by the conduct of third-party banks, which acted independently in terminating their banking relationships with Nationwide.

7. Nationwide's claims fail as a matter of law.

**2.   Relief Prayed:**

**A. Nationwide's Statement**

Counterclaimant seeks the following:

A.   Declaratory Relief

1. A declaration that the Bureau's enforcement of the alleged consumer protection laws referenced in its Complaint is unconstitutional under the First Amendment to the U.S. Constitution.

2. A declaration that the Bureau's enforcement of the alleged consumer protection laws referenced in its Complaint is unconstitutional under the Due Process Protections of the Fifth Amendment to the U.S. Constitution.

3. A declaration that the Bureau's definition of "risk to consumers," reputation risk, or other vague terminology used in a supervisory capacity by the Bureau is contrary to constitutional right, is in excess of its statutory authority, and its arbitrary, capricious, and an abuse of discretion.

4. A declaration that the Bureau's inclusion in a supervised financial institution's "Risk Assessment" of not just actually unfair, deceptive, or abusive practices, but also "potential[ly] unfair, deceptive, or abusive practices is contrary to a constitutional right, is in excess of its statutory authority, and is arbitrary, capricious, and an abuse of discretion.

5. A declaration that, through its participation in Operation Choke Point (or a similar operation or activity), the Bureau's direct and indirect efforts to target and choke off Counterclaimant's access to banking services is contrary to constitutional right, is in excess of its statutory authority, and is arbitrary, capricious, and an abuse of discretion.

6. A declaration that, through its participation in Operation Choke Point (or a similar operation or activity), the Bureau's direct and indirect efforts to target and choke access to banking services to the biweekly mortgage payment industry and other industries which use "telemarketing, mail, and other mass market" forms of solicitation is contrary to constitutional right, is in excess of statutory

6

authority, and is arbitrary, capricious, and an abuse of discretion.

B.  Injunctive Relief

1.  Preliminarily and permanently enjoining the Bureau from directly or indirectly pressuring, coercing, intimidating, or threatening banks or other action intended to prevent banking services form being provided to Counterclaimant.

2.  Enjoining the Bureau's officers, employees, agents, those acting in concert with them, or others who have acted for or on behalf of them, from harming Counterclaimant's reputation; from seeking to deprive Counterclaimant of its access to banking services; and from seeking to deprive Counterclaimant of its ability to pursue its chosen line of lawful business without due process of law.

3.  Enjoining the Bureau's officers, employees, agents, those acting in concert with them, or others who have acted for or on behalf of them from relying on the definition of "risk to consumers," reputation risk, or other vague regulatory terminology and from taking any action whatsoever to directly or indirectly pressure, coerce, intimidate, or threaten any financial institution to terminate or effuse to provide banking services to Counterclaimant.

4.  Requiring the Bureau to immediately transmit a copy of the Court's order granting the requested declaratory and injunctive relief to all banks that have terminated critical services to Counterclaimant, as well as any other financial institution or others who have been directly or indirectly pressured, coerced, intimidated, or threatened by them to refuse banking services to Counterclaimant.

5.  Reasonable attorney fees and costs incurred herein as allowed by law; and

6.  All other and further relief as may be available and the Court deems just under the circumstances.

**B.  The Bureau's Statement**

Nationwide is not entitled to any relief.  Moreover, Nationwide has failed to show that the relief it requests is likely to redress its alleged injuries, depriving Nationwide of standing, and thus, this Court of jurisdiction.  Nationwide cannot show that any of its banking partners will resume their business relationships with Nationwide if the Court grants Nationwide's requested relief.  *See* Parts 1.B, 4.B, 9.B.

7

**3.** **Undisputed Facts:**

The parties agree that the undisputed facts at issue in the Bureau's affirmative case constitute undisputed facts for the purposes of Nationwide's counterclaims.  The parties further stipulate that:

1. The Bureau filed its affirmative claims in the present lawsuit on May 11, 2015.

2. The Bureau issued a press release regarding the present lawsuit on May 11, 2015.

3. The Bureau has issued a Supervision and Examination Manual, which is a guide for Bureau examiners to use in overseeing companies that provide consumer financial products or services. The manual describes how the Bureau supervises and examines these companies and gives Bureau examiners direction on how to assess compliance with federal consumer financial laws.

**4.** **Disputed Factual Issues:**

**A. Nationwide's Statement**

1. Whether the Bureau has supervisory capacity and influence over Nationwide's former banks that provided ACH services, directly or indirectly.

2. Whether the Bureau's press release of its lawsuit on May 11, 2015 went beyond the proper scope of a proper press release by its director.

3. Whether Nationwide's banks terminated its ACH services as a result of the Bureau's actions and/or influence.

4. Whether the Nationwide's ability to access the banking system to service its customers was effectively terminated by the actions and/or status of the Bureau.

5. Whether the monetary damages and/or restitution sought by the Bureau were proximately caused by the Bureau's own actions as opposed to any improper act of Nationwide.

6. Whether the Bureau refused to sign a comfort-type letter needed as a result of the bank terminations of Nationwide's ability to access ACH banking services.

7. Whether the Bureau did or should have anticipated at the time of filing the Complaint on May 11, 2015, the termination by the banks performing ACH banking services for Nationwide's customers.

Joint Pretrial Statement Regarding Nationwide's Counterclaims
Case No. 3:15-cv-02106-RS

8. Whether the Bureau did or should have taken actions to avoid harm to approximately 135,000 customers of Nationwide, its employees as well as to Defendants.

**B. The Bureau's Statement**

1. What caused Nationwide's banks to terminate their banking relationships with Nationwide.

2. Whether Nationwide was unable to establish new banking relationships following the termination of its banking relationships.

3. Whether the termination of Nationwide's existing banking relationships effectively cut it off from the banking system.

4. Whether the Bureau's conduct precluded Nationwide from pursuing its biweekly mortgage payment business.

5. Whether a favorable decision regarding Nationwide's counterclaim is likely to cause Nationwide's former banking partners to reestablish banking relationships with Nationwide.

6. Whether there exists a causal connection between the injury Nationwide alleges and conduct engaged in by the Bureau.

7. Whether Nationwide engaged in fraudulent, illegal, or otherwise improper conduct in connection with the conduct at issue in its counterclaims.

8. Whether Nationwide's alleged injuries were caused by nonparties, including Nationwide's former banking partners.

9. Whether the Bureau conduct alleged by Nationwide was the proximate cause of the injuries Nationwide alleges.

10. Whether the speech at issue in Nationwide's First Amendment claims constituted speech other than commercial speech.

11. Whether the speech at issue in Nationwide's First Amendment claims was false or misleading.

12. Whether Nationwide asserts anything other than an economic interest in its business for purposes of its Fifth Amendment claims.

13. Whether Nationwide failed to meet revenue targets set by U.S. Bank, N.A. ("U.S. Bank").

9

14. Whether the failure to meet revenue such targets set by U.S. Bank caused or contributed to the bank's decision to terminate its relationship with Nationwide.

15. Whether a consent order U.S. Bank entered into with the CFPB in September 2014 contributed to the bank's concern about the Bureau's enforcement action against Nationwide.

16. Whether Nationwide failed to meet revenue targets set by TD Bank.

17. Whether the failure to meet revenue targets set by TD Bank caused or contributed to TD Bank's decision to terminate its relationship with Nationwide.

18. Whether Nationwide's relationship with TD Bank had deteriorated prior to the filing of the Bureau's lawsuit.

19. Whether Nationwide's failed attempt to establish a joint marketing campaign with TD Bank contributed to the deterioration of Nationwide's relationship with TD Bank.

20. Whether the deterioration of Nationwide's relationship with TD Bank caused and/or contributed to the bank's decision to terminate its relationship with Nationwide

21. Whether Nationwide failed to maintain a cooperative working relationship with TD Bank prior to the termination of the bank's relationship with Nationwide.

22. Whether Nationwide's failure to maintain a cooperative working relationship with TD Bank caused and/or contributed to the bank's decision to terminate its relationship with Nationwide.

**5.      Agreed Statement:**

The parties have not come to an agreement on whether the action may be presented upon an agreed statement of facts; however, the parties have set forth undisputed facts and will continue working toward narrowing the factual issues.

**6.      Stipulations:**

The parties agree that stipulations agreed to by the parties in the Bureau's affirmative case will be considered stipulations for the purposes of Nationwide's counterclaims.

Joint Pretrial Statement Regarding Nationwide's Counterclaims
Case No. 3:15-cv-02106-RS

**7.**   **Witnesses to be Called:**[1]

**A. Nationwide's Statement**

1.  Alain Kamdem: Witness will testify that U.S. Bank, N.A. terminated relationship with Nationwide based on actions taken by the Bureau. Witness will appear either live or by deposition.

2.  Sonia Himmelberg: Witness will testify that T.D. Bank, N.A. terminated relationship with Nationwide based on actions taken by the Bureau. Witness will appear either live or by deposition.

3.  Daniel S. Lipksy: Witness will testify as to (1) the circumstances of termination of Counterclaimant's banking relationships; (2) efforts to have the Bureau assist in retaining banking relationships; and (3) efforts to establish new banking relationships.

4.  Sherry Ann Scott: Witness will testify as to (1) the circumstances of termination of Counterclaimant's banking relationships; (2) efforts to have the Bureau assist in retaining banking relationships; and (3) efforts to establish new banking relationships.

5.  Hoon Nam: Witness will testify as to (1) the circumstances of termination of Counterclaimant's banking relationships; (2) efforts to have the Bureau assist in retaining banking relationships; and (3) efforts to establish new banking relationships. Witness will appear either live or by deposition.

6.  Brian Kelly: Witness will testify as to (1) the Bureau's failure to provide Nationwide with reasonable notice and opportunity to conform to the government's new regulation of Nationwide; and (2) the Bureau's actions and/or influence caused banks to sever relationships with Nationwide.

**B. The Bureau's Statement**

Other than witnesses the Bureau calls for impeachment or rebuttal, the Bureau intends to call:

---

[1] The parties made pretrial disclosures of exhibit and witness lists on Monday, March 13, 2017.

Joint Pretrial Statement Regarding Nationwide's Counterclaims
Case No. 3:15-cv-02106-RS

1    1.    Alain Kamden, a former employee of U.S. Bank, N.A.  Mr. Kamden will testify regarding U.S. Bank, N.A.'s relationship with Nationwide.  Testimony from Mr. Kamden's deposition dated December 12, 2016 may be designated by April 19, 2017, in accordance with the Court's Guidelines for Final Pretrial Conference, depending on Mr. Kamden's availability for trial.

2.    Sonia Himmelberg, in her capacity as a witness designated to testify on behalf of TD Bank, N.A. pursuant to Fed R. Civ. P. 30(b)(6).[2]  Ms. Himmelberg will testify regarding TD Bank's relationship with Nationwide.  Testimony from Ms. Himmelberg's deposition taken pursuant to Fed. R. Civ. P. 30(b)(6) dated January 6, 2017 may be designated by April 19, 2017, in accordance with the Court's Guidelines for Final Pretrial Conference, depending on Ms. Himmelberg's availability for trial.

**8.**    **Exhibits, Schedules, and Summaries:[3]**

**A. Nationwide's Statement**

Please see Exhibit List attached hereto as "Exhibit A."

**B. The Bureau's Statement**

Other than exhibits offered for impeachment or rebuttal, the Bureau intends to offer the following exhibit:

1.    Audio Transcription of Telephone Conference Dated June 15, 2015, the substance of which is a telephone conversation between Hoon Nam, Nationwide, Susan Whitman, and Alain Kamden regarding Nationwide and U.S. Bank, N.A.  Mr. Kamden, Sherry Ann Scott, or Daniel S. Lipsky will sponsor the exhibit.

**9.**    **Disputed Legal Issues:**

**A. Nationwide's Statement**

---

[2] The Bureau is seeking through a motion in limine to exclude testimony of Ms. Himmelberg in her individual capacity.  *See* Dkt. 202.  Should Defendants' be permitted to include testimony of Ms. Himmelberg in her individual capacity, the Bureau reserves the right to present such testimony in support of its case.

[3] As noted above, the parties made pretrial disclosures of exhibit and witness lists on Monday, March 13, 2017.

Joint Pretrial Statement Regarding Nationwide's Counterclaims
Case No. 3:15-cv-02106-RS

1. <u>Whether the Bureau had a duty to refrain from improper extrajudicial statements that prejudiced Nationwide's banking relationships.</u>

As a government agency, the Bureau had an on-going duty to refrain from improper extrajudicial statements that prejudiced Nationwide's banking relationships. The Bureau breached this duty when it told the world before any finding of liability:

> These companies and their owner, Daniel Lipsky, took advantage of consumers with false promises of savings on their mortgage…Homeowners deserve accurate information in the financial marketplace. Today we are taking action to end these illegal and deceptive practices, and to hold these companies accountable for their actions.

By breaching this duty, the Bureau is liable under the pending Counterclaim.

2. <u>Whether the Bureau is estopped from pursuing damages proximately caused by its own actions.</u>

The Bureau is the proximate cause for the termination of Nationwide's ACH services. By November 2015, Nationwide was unable to maintain existing banking relationships or obtain new banking relationships. As a result, Nationwide was unable to conduct any business and was forced to suspend Interest Minimizer Program services for its 135,000 customers. The Bureau cannot recover the effect (135,000 customers without service) that it caused by terminating Nationwide's banking relationships.

3. <u>Whether the Bureau's actions or influence under its existing structure terminated Nationwide's banking relationships.</u>

The Bureau hurled accusations against Nationwide in May 2015, prior to any finding of liability or wrongdoing. These allegations have destroyed Nationwide's right to hold a bank account. As a result, Nationwide is entitled to relief because the Bureau's actions violate due process under the Supreme Court's "stigma-plus rule."

Nationwide's claim for damages falls within the "stigma-plus" of *Paul v. Davis*, 424 U.S. 693, 708 (1976). Under the stigma-plus rule, there is a due process violation if the plaintiff can show, "in addition to reputational harm, that (1) the government has deprived them of some benefit to which they have a legal right…or (2) the government-imposed stigma is so severe that it 'broadly precludes'

13

1   plaintiffs from pursuing 'a chosen trade or business'." *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 121

2   (D.C. Cir. 2010) (quoting *Paul*, 424 U.S. at 708).

3        Under the first prong, the Bureau deprived Nationwide of its legal right to hold a bank account.

4   *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 204 (D.C. Cir. 2001)

5   ("NCRI"); *see also Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). In order to demonstrate a

6   change in legal status, the Nationwide must show that "it has had so many bank accounts and banking

7   relationships terminated it has effectively been cut off from the banking system." [4] *Advance America*

8   *Cash Advance Centers, Inc. v. FDIC*, Civ. No. 14-953 (GK) (D.D.C. Feb. 23, 2017).

9        Under the second prong, the Bureau's extrajudicial efforts preclude Nationwide from pursuing

10  "their chosen line of business" by terminating all banking relationships. *NCRI*, 251 F.3d at 192;

11  *Constantineau*, 400 U.S. at 433. "To do so, [Nationwide] must show that Operation Choke Point

12  "broadly precludes [Nationwide] from pursuing" the biweekly mortgage payment business. *Id*. at 123

13  (quoting *Gen. Elec. Co.*, 610 F.3d at 121); *see also Trifax Corp. v. District of Columbia*, 314 F.3d 641,

14  644 (D.C. Cir. 2003) ("government stigmatization that broadly precludes individuals or corporations

15  from a chosen trade or business deprives them of liberty in violation of the Due Process Clause"). When

16  the Bureau shut down Nationwide's banking relationships, the Bureau "effectively put [them] out of

17  business." *Trifax Corp.*, 314 F.3d at 644.

18

19       Nationwide's Interest Minimizer Program requires banking relationships. To remit the biweekly

20  payment under the Interest Minimizer Program, Nationwide must utilize ACH services. Without ACH

21  services, Nationwide's proverbial "ship will sink," meaning Nationwide will be cut off from its right to

22  conduct business. The Bureau was well aware, and engaged in an extrajudicial effort to ensure

23  Nationwide's Interest Minimizer Program would be no more.

24       The extrajudicial effort known as "Operation Choke Point" terminated not only (1) Nationwide's

25  existing banking relationships, but also (2) Nationwide's ability to from new banking relationships.

26

27  ----

[4] For example, in *NCRI*, the plaintiffs were designated as terrorist organizations and this designation
28  triggered a *de jure* prohibition on any bank transacting with them. 251 F.3d at 203-04. This blanket
    prohibition constituted the requisite change in legal status. *Id*.

Joint Pretrial Statement Regarding Nationwide's Counterclaims
Case No. 3:15-cv-02106-RS

Within two months of the filing of the lawsuit and Director Cordray's press release, all four of Nationwide's banks terminated their banking relationships. Representatives at U.S. Bank, N.A. and T.D. Bank, N.A. specifically acknowledged under oath that they terminated the Nationwide's relationship because of the Bureau's involvement and accusations. Nationwide sought new banking relationships, but was denied at each and every opportunity.

Because all existing banking relationships were terminated and Nationwide was unable to form new banking relationship, Nationwide not only lost its right to use banks, but also its ability to engage in the biweekly payment profession.

## B. The Bureau's Statement

1. Whether Nationwide lacks standing necessary to maintain this Court's jurisdiction.

Nationwide lacks the standing necessary to maintain this Court's jurisdiction.  Before a court can consider the merits of an action, it must consider the "threshold question" of whether the party asserting the claim has standing. *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011).  Courts are obligated to consider *sua sponte* issues such as standing that go to subject-matter jurisdiction.  *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) (obligation to consider jurisdictional matters *sua sponte*); *City of Oakland v. Lynch*, 798 F.3d 1159, 1163 (9th Cir. 2015), *cert. denied sub nom. City of Oakland, Cal. v. Lynch*, 136 S. Ct. 1486 (2016) (absence of standing deprives Article III courts of subject matter jurisdiction).  To establish standing sufficient for the "case" or "controversy" requirement of Article III, a party must allege (1) that it has "suffered an injury in fact"; (2) a "causal connection between the injury and the conduct complained of," such that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) that it is "likely," not "merely speculative," that a favorable decision will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The requirements for standing apply with equal force to parties asserting counterclaims.  *See Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1384 (9th Cir. 1984).

Standing to sue the government is "substantially more difficult to establish" when a party "is not himself the object of the government action or inaction he challenges," because "[t]he existence of one

15

or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict." *Lujan*, 504 U.S. at 562 (internal quotation marks omitted); *see also Clapper v. Amnesty Int'l USA*, --- U.S. ----, 133 S. Ct. 1138, 1150 (2013) (Supreme Court is "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment").

Because Nationwide's claims hinge on the banks' decisions to close its accounts, its alleged injury was caused by the independent, discretionary actions of third parties; the banks exercised their independent judgment following the Bureau's lawsuit, and decided to sever their relationships with Nationwide. Because, as in *Lujan*, Nationwide's "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed" to meet the constitutional requirements of standing. *Id*. at 562. Accordingly, it is the "burden of the [claimant] to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.*

Whereas at the summary judgment stage Nationwide needed only to establish a dispute of material fact regarding its ability to satisfy these constitutional requirements, at trial this Court's jurisdiction hangs on whether Nationwide can prove such facts through evidence. *See Lujan*, 504 U.S. at 561 (noting "the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing"). Nationwide cannot do so with respect to either causation or redressability.

First, with respect to causation, Nationwide claims that its injuries were caused by the Bureau's conduct with respect to the banks that terminated their relationships with Nationwide. But Nationwide can point to no communications between the Bureau and the banks regarding Nationwide. Nor can Nationwide establish how the Bureau's definition of "risk to consumers" in its Exam Manual played *any* role in the banks' decisions. Instead, the banks made the decision to terminate banking relationships based on their independent assessment following the Bureau's filing of the present lawsuit.

16

Second, Nationwide cannot establish the redressability element of standing. As this Court previously noted, to establish redressability Nationwide must demonstrate that "the banks are looking for a resolution of this litigation in Nationwide's favor as a condition to resuming the business relationship." Dkt. 80 at 6. Nationwide can offer no such evidence. Nationwide cannot establish that any of its former banks has any inclination to resume a business relationship with Nationwide, let alone that this litigation would have effect on their desire to do so. Any suggestion that the relief Nationwide seeks will cause the banks – who are not parties to this litigation — to enter into new contracts with Nationwide is entirely speculative, and thus fails to meet the constitutional requirement of showing "a substantial likelihood that the injury will be redressed by a favorable judicial decision." *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1146 (9th Cir. 2013). *See also Lujan*, 504 U.S. at 561 *Defenders of Wildlife*, 504 U.S. at 571 (environmental groups lacked standing to challenge regulation where "redress of the only injury in fact respondents complain of requires action" by entities not party to the suit); *Allen v. Wright*, 468 U.S. 737, 758 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, --- U.S. ----, 134 S. Ct. 1377 (2014) (parents lacked standing to challenge IRS tax exemption policy on racially discriminatory private schools because it was "entirely speculative" that modifying tax exemption would cause schools to change their behavior); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 43 (1976) (plaintiffs lacked standing to challenge IRS ruling encouraging hospitals to provide fewer services to indigent persons because alleged injury was caused by hospitals; it was "just as plausible that the hospitals . . . would elect to forego favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services"). Nor could retraction of Bureau documents or guidance remedy Nationwide's harm, because Nationwide has not alleged, nor can it show, that its harm was caused by any such Bureau documents or guidance, including the Bureau's definition of "risk to consumers" in its Supervision and Examination Manual. *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Fed. Deposit Ins. Corp.*, 132 F. Supp. 3d 98, 111 (D.D.C. 2015) (complaint adequately alleged redressability via retraction of documents where it identified specific agency documents whose issuance caused plaintiffs' harm).

17

Because Nationwide can establish neither the causation nor redressability elements necessary for standing, this Court lacks jurisdiction over Nationwide's counterclaims.  Accordingly, "the only function remaining to the court is that of announcing the fact and dismissing the cause."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citing *Ex parte McCardle*, 7 Wall. 506, 514 (1868)).

   2.   Whether this Court lacks power to review Nationwide's claims under the APA.

Nationwide's counterclaims also fail for lack of subject matter jurisdiction under the APA.  The agency action at issue in Nationwide's APA claim is committed to agency discretion by law, and the agency action at issue does not constitute final agency action under the APA.  The Court further lacks subject matter jurisdiction over the APA counterclaims because the Bureau's sovereign immunity has not been waived.  It is a foundational legal principle that "the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983).  The government's waiver of sovereign immunity "must be unequivocally expressed in statutory text." *Jachetta v. United States*, 653 F.3d 898, 903 (9th Cir. 2011) (citing *Lane v. Pena*, 518 U.S. 187, 192 (1996)).  The APA provides a limited waiver of an agency's sovereign immunity solely with respect to an action "seeking relief other than money damages," 5 U.S.C. § 702,[5] but this waiver does not apply to Nationwide's APA counterclaims concerning the definition of "risk to consumers" in the Bureau's Exam Manual, for two reasons.[6]

First, before a party may seek federal court review of federal agency activity under the APA, "a party must first clear the hurdle of [Section] 701(a)," which provides that the APA's chapter on judicial review – including the provision waiving sovereign immunity – applies "except to the extent that

---

[5] Section 702 limits its waiver of sovereign immunity to actions "seeking relief other than money damages" and thus bars any request for damages by Nationwide. Fed. R. Civ. P. 13 also does not waive the Bureau's immunity. Fed. R. Civ. P. 13(d) (rule "do[es] not expand the right to assert a counterclaim . . . against the United States or a United States officer or agency"); *United States v. Agnew*, 423 F.2d 513, 514 (9th Cir. 1970) (per curiam) ("[t]he filing of a suit in the name of the United States does not amount to a waiver of sovereign immunity subjecting the United States" to a counterclaim).

[6] Because Nationwide cannot demonstrate how the Bureau purportedly participated in "Operation Choke Point" or exerted pressure on Nationwide's banks, it is impossible to separately examine whether this alleged conduct is committed to agency discretion or constitutes a "final" "agency action."

Joint Pretrial Statement Regarding Nationwide's Counterclaims
Case No. 3:15-cv-02106-RS

(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985) (citing 5 U.S.C. § 701(a)(2)); *E.J. Friedman Co. v. United States*, 6 F.3d 1355, 1359-60 (9th Cir. 1993) (the APA does not waive sovereign immunity to challenge actions committed to agency discretion by law). If a statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," the statute "can be taken to have committed the decisionmaking to the agency's judgment absolutely." *Chaney*, 470 U.S. at 830.

Here, Congress committed the definition of "risk to consumers" to the Bureau's discretion when it granted the Bureau exclusive authority to examine financial institutions with assets over $10 billion to assess compliance with Federal consumer financial laws and "detec[t] and asses[s] associated *risks to consumers* and to markets for consumer financial products and services," 12 U.S.C. § 5515(b)(1)(A),(C) (emphasis added). The CFPA does not define "risk to consumers" or provide a standard against which to judge the Bureau's discretion. When Congress invents an ambiguous term "and then declin[es] to define it, Congress intend[s] to provide agencies with discretion" in how to define the term. *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1033 (9th Cir. 2010).

Second, "the APA applies to waive sovereign immunity only after final agency action" has occurred, *Rattlesnake Coalition*, 509 F.3d at 1104-05 (citing 5 U.S.C. § 704), and the Exam Manual is neither "final" nor an "agency action" at all. To begin, the APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. §§ 551(13), 701(b)(2); none of these definitions applies to the Exam Manual. Notably, the Exam Manual includes a disclaimer that it is intended purely to "provid[e] internal guidance to supervisory staff of the CFPB. It does not bind the CFPB and does not create any rights, benefits, or defenses, substantive or procedural, that are enforceable by any party in any matter. While every effort has been made to ensure accuracy, examination procedures should not be relied on as a legal reference." Exam Manual at 1, *available at* http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf. The Exam Manual's section on "risk to consumers" further notes that "risk

19

assessments are not used to reach conclusions about whether an entity has violated a particular law or regulation." *Id.* at 21.

Additionally, for an agency action to be "final," it must meet two conditions: (1) it "mark[s] the consummation of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature," and (2) "the action must be one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations and quotation marks omitted). The Supreme Court recently concluded that an agency action marks the consummation of the agency's decisionmaking when it is made "after extensive factfinding" and "is typically not revisited." *Army Corps of Eng'rs v. Hawkes*, --- U.S. ----, 136 S. Ct. 1807, 1813-14 (2016). On the second prong, the action had "legal consequences" because it bound the government and created a safe harbor from liability. *Id.* at 1814. The Bureau's Exam Manual meets neither of these prongs; the document is explicit that it serves as internal guidance only, does not bind the Bureau, and is subject to revision. As such, no legal consequences can flow from its interpretation of "risk to consumers."

3. Whether Nationwide can show that the Bureau impermissibly infringed upon speech protected by the First Amendment.

To prevail on its First Amendment claim, Nationwide must prove both that it engaged in activity protected by the First Amendment and that the Bureau impermissibly infringed on its right to engage in that activity. *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985). Nationwide cannot establish either of these elements.

First, the Supreme Court has reiterated that "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980). Governments may regulate commercial speech even where it "is not provably false, or even wholly false, but only deceptive and misleading." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771-72 (1976). When determining whether speech is commercial, courts consider whether the speech is an advertisement, the speech refers to a specific product, and the speaker has an

20

economic motivation.  *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983).

Commercial speech may still receive full First Amendment protection, however, if "commercial aspects

of the speech are inextricably intertwined with otherwise fully protected speech, such that the

publication sheds its commercial character." *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 958

(9th Cir. 2012).  The purported educational function of advertising or marketing materials does not grant

such materials full First Amendment protection.  As the Supreme Court has concluded, the inclusion of

information about "how to be financially responsible and how to run an efficient home" in a sales pitch

for home products "no more convert[s the] presentations into educational speech, than opening sales

presentations with a prayer or a Pledge of Allegiance would convert them into religious or political

speech." *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 474-75 (1989). The same is true

about any arguably educational material in Nationwide's advertising.

Furthermore, in its affirmative case the Bureau has alleged that Nationwide's commercial speech

is false, deceptive, and misleading; such speech not entitled to constitutional protection. *See Cent.*

*Hudson Gas & Elec. Corp.*, 447 U.S. at 563 (1980); *Va. State Bd. of Pharmacy v. Va. Citizens*

*Consumer Council, Inc.*, 425 U.S. at 771-72.  To the extent Nationwide contends that its speech is

accurate and protected, it merely disagrees with the Bureau's characterization of its advertising. That

dispute is properly evaluated via the adjudication of the Bureau's lawsuit and Defendants' affirmative

defenses, not as a counterclaim. *See Stickrath v. Globalstar, Inc.*, No. C07-1941 TEH, 2008 WL

2050990, at *3 (N.D. Cal. May 13, 2008) ("The label 'counterclaim' has no magic. What is really an

answer or defense to a suit does not become an independent piece of litigation because of its label.")

(quoting *Tenneco Inc. v. Saxony Bar & Tube, Inc.*, 776 F.2d 1375, 1379 (7th Cir. 1985)).

Second, even if Nationwide could establish that its advertising is constitutionally protected, it

cannot establish a First Amendment violation because it cannot establish any government restriction on

that advertising other than the Bureau's request for an injunction in its affirmative case.  But the Bureau

has not obtained any injunctive relief prohibiting Nationwide from advertising, and even if it does obtain

such relief as part of its affirmative case, injunctive relief is an appropriate remedy for speech held to be

misleading. *See United States v. Philip Morris Inc.*, 304 F. Supp. 2d 60, 71 (D.D.C. 2004) ("If the

21

Government successfully establishes that the Defendants disseminated their advertising in furtherance of an overall scheme to defraud, the First Amendment will not present an obstacle to appropriate injunctive and equitable relief to remedy the fraud.").  Furthermore, Nationwide can at most establish only economic harm, which is not sufficient "to prevail on a First Amendment claim of constitutional harm." *Outdoor Media Grp., Inc. v. City of Beaumont*, 702 F. Supp. 2d 1147, 1162 (C.D. Cal. 2010), *aff'd*, 464 F. App'x 611 (9th Cir. 2011) (citing cases).  Nationwide cannot establish, for example, that it can no longer advertise because the Bureau shut down its websites or confiscated its direct mailers. Nationwide's First Amendment claims therefore fail.

    4.  <u>Whether Nationwide can identify a constitutionally protected liberty or property interest that it has been deprived of by the Bureau.</u>

    To state a claim for a violation of procedural due process, a party must allege "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process." *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).  The Fifth Amendment prohibits government deprivation of "life, liberty, or property, without due process of law," U.S. Const. amend. V, but "the range of interests protected by procedural due process is not infinite." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 (1972).[7] As the Supreme Court has explained, a constitutionally protected property interest arises when a person has "more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577. That entitlement must be based on "the acts of the sovereign, state or federal, manifested in legislation, rules, or customs." *Moore v. Johnson*, 582 F.2d 1228, 1233 (9th Cir. 1978).[8]

---

[7] While *Roth* concerned the Fourteenth Amendment, the same principles apply under the Fifth Amendment. *Raditch v. United States*, 929 F.2d 478, 481 (9th Cir. 1991).

[8] Courts have identified constitutionally protected property interests in, for example, continuing to receive government benefits, *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970), obtaining a government license where the criteria for the license are non-discretionary, *Groten v. Cal.*, 251 F.3d 844, 850 (9th Cir. 2001), and receiving a salary guaranteed by law or contract. *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist*, 149 F.3d 971, 982 (9th Cir. 1998).

Joint Pretrial Statement Regarding Nationwide's Counterclaims
Case No. 3:15-cv-02106-RS

With respect to liberty interests, the Constitution does not protect "reputation alone," because that would amount to no more than a state-law defamation claim. *WMX Techs., Inc. v. Miller*, 197 F.3d 367, 376 (9th Cir. 1999) (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)).  Reputational harm is not an unconstitutional deprivation of a liberty or property interest unless accompanied by "alteration or extinguishment" of "a right or status previously recognized by law." *Humphries v. City of L.A.*, 554 F.3d 1170, 1185 (9th Cir. 2009) (quoting *Paul v Davis*, 424 U.S. 693, 711 (1976)).  Similarly, allegations of serious impairment to "future employment opportunities" are inadequate without facts showing a change in legal status, "such as loss of tax exemption or loss of government employment." *Paul*, 424 U.S. at 697, 705.  Instead, a due process claim based on stigma requires a "stigma-plus" allegation that the government action harming reputation also "deprived the plaintiff of a protected liberty or property interest or a status recognized by the state." *Id.* at 376 (citing *Paul*, 424 U.S. at 712).

As courts have held, "persons cannot claim a constitutionally protected right to do business with a particular bank." *Groos Nat'l Bank v. Comptroller of Currency*, 573 F.2d 889, 897 (5th Cir. 1978). Courts that have concluded that a person has a right to hold a bank account have noted that "it is insufficient for [parties] to show that they have merely had some bank accounts terminated." *Advance America Cash Advance Centers, Inc., et al. v. FDIC et al.*, Civ. No. 1:14-953 (D.D.C. Feb. 23, 2017). (*quoting Kartseva v. Department of State*, 37 F.3d 1524, 1527-28 (D.C. Cir. 1994)).  A party instead must show that "it has had so many bank accounts and banking relationships terminated it has effectively been cut off from the banking system." *Id.*

Nor is a purely economic interest a constitutionally protected property right. *See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) ("[B]usiness in the sense of *the activity of doing business*, or the activity *of making a profit* is not property in the ordinary sense.") (emphasis in original); *W. Reserve Oil & Gas Co. v. New*, 765 F.2d 1428, 1432 (9th Cir. 1985) (rejecting that "the right to continue the operation of a business is a cognizable property interest").

Violation of the right to choose a line of business requires "a *complete prohibition* on the right to engage in a calling, and not a sort of brief interruption." *Guzman v. Shewry*, 552 F.3d 941, 954 (9th Cir. 2008) (emphasis in original) (citing *Conn v. Gabbert*, 526 U.S. 286, 292 (1999)) (noting that such

Joint Pretrial Statement Regarding Nationwide's Counterclaims
Case No. 3:15-cv-02106-RS

interests have been limited to challenges to "regulations on entry into a particular profession" and states seeking "permanently to bar an individual from public employment") (citations omitted).  *See also Trifax Corp v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003) (requiring that "the government has seriously affected, if not destroyed" the ability to obtain employment or contracts in a field) (quoting *Taylor v. Resolution Tr. Corp.*, 56 F.3d 1497, 1506 (D.C. Cir. 1995)).  Nationwide cannot establish that it has satisfied the based on "stigma-plus"; it cannot establish a cognizable "plus" that it has been prevented from pursuing its lawful, chosen line of business or that it has been deprived of access to banking services.

Even if Nationwide could demonstrate the existence of a constitutionally protected right, its due process claim would still fail because it cannot establish that the Bureau deprived it of that right. The law is clear that "the due process provision of the Fifth Amendment does not apply to the indirect adverse effects of governmental action." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 789 (1980) (citing cases). Put another way, the fact that governmental action leads to substantial harm "does not turn the [action] into a governmental decision to impose that harm." *Id.* at 789. Nationwide can establish no more than an indirect adverse effect of governmental action, which does not suffice to state a due process claim.

5.   Whether the Bureau has a duty to refrain from extrajudicial statements prejudicing an entity's banking relationships.

Nationwide claims that the Bureau had a duty to refrain from extrajudicial statements that prejudiced Nationwide's banking relationships.  However, Nationwide provides no legal authority for the source of that duty.  Nationwide also provides no legal principle distinguishing actionable "extrajudicial" statements from other types of statements, nor does it offer any authority for the proposition that making an "extrajudicial" statement violates the First or Fifth Amendment. In the absence of such authority or legal principle regarding extrajudicial conduct, the Bureau notes its authority under 12 U.S.C. § 5564 to bring civil actions to enforce violations of the Consumer Financial Protection Act, as well as its authority to conduct hearings and adjudication proceedings under 12 U.S.C. § 5563.

24

**10.** **Pending Motions or Matters:**

1. The parties' compliance with the Order Regarding Discovery Dispute Involving Production of Emails, Dkt. No. 224, issued by Magistrate Judge Laporte on March 22, 2017.

2. Motions in Limine.

**11.** **Bifurcation, Separate Trial of Issues:**

**A. Nationwide's Statement**

Nationwide respectfully requests the Court deny the Bureau's attempt to bifurcate this trial. Nationwide's claim state as follows: (1) Nationwide's ability to maintain and form banking relationships was terminated; (2) the Bureau's actions and influence caused this termination; and (3) Nationwide now seeks redress, including injunctive and declaratory relief.

"Courts consider several factors in determining whether bifurcation is appropriate, including separability of the issues, simplification of discovery and conservation of resources, prejudice to the parties, and the suitability of bifurcating trial but not discovery." *Bates v. United Parcel Svc.*, 204 F.R.D. 440, 448 (N.D. Cal. 2001). The party requesting bifurcation has the burden to prove that it warranted in that particular case. *Spectra-Physics Lasers, Inc. v. Uniphase Corp.*, 144 F.R.D. 99, 101 (N.D. Cal. 1992).

Nationwide's Counterclaim and the Bureau's Complaint are intrinsically connected. Both claims relate to (1) the Interest Minimizer Program; (2) Nationwide's ACH services; and (3) the Bureau's influence over Nationwide dating back to 2014. The Bureau will not suffer prejudice at trial. It has been aware of the likelihood of the Counterclaim being addressed at trial since its Motion to Dismiss the Counterclaim was denied on December 13, 2016.  Accordingly, Nationwide requests the Court deny any bifurcation of the issues.

**B. The Bureau's Statement**

With respect to the counterclaim portion of this matter, the Bureau proposes that the court bifurcate the preliminary and discrete question of whether Nationwide has standing to pursue its

25

counterclaims and, thus, whether this Court has jurisdiction to address the merits of those claims.[9]  As

the Ninth Circuit has noted, "[t]he Supreme Court has instructed lower courts to resolve jurisdictional

issues before reaching the merits of a case."  *Rivera v. R.R. Ret. Bd.*, 262 F.3d 1005, 1008 (9th Cir.

2001) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)).  Although the

jurisdictional question of standing generally is dealt with at earlier stages of litigation, "it sometimes

remains to be seen whether the factual allegations of the complaint necessary for standing will be

supported adequately by the evidence adduced at trial."  *Gladstone Realtors v. Vill. of Bellwood*, 441

U.S. 91, 116 n.31 (1979).  This is one such case.  As noted above, the parties remain in dispute whether

Nationwide has established any facts that support the redressability element necessary for Article III

standing.  *See* Parts 1.B, 4.B, *supra*.

Where, as here, redress of a claimant's alleged injuries depends on the choices of independent

third-party actors, "it becomes the burden of the [claimant] to adduce facts showing that those choices

have been or will be made in such manner as to produce causation and permit redressability of injury."

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992).  Thus, as this Court previously noted, Nationwide

must demonstrate that "the banks are looking for a resolution of this litigation in Nationwide's favor as a

condition to resuming the business relationship."  Dkt. 80 at 6.  Whereas at the summary judgment stage

Nationwide needed only to establish a dispute of material fact regarding this question, at trial this

Court's jurisdiction hangs on whether Nationwide can prove such facts through evidence.  *See Lujan*,

504 at 561 (noting "the nature and extent of facts that must be averred (at the summary judgment stage)

or proved (at the trial stage) in order to establish standing").

Should Nationwide fail to meet its burden of proving the factual predicates necessary for Article

III standing, this Court will lack jurisdiction, and "the only function remaining to the court [will be] that

of announcing the fact and dismissing the cause."  *Steel Co.*, 523 U.S. at 94 (quoting *Ex parte*

*McCardle*, 7 Wall. 506, 514 (1868)).  Any further proceedings not only would waste this Court's and the

---

[9] As noted in the parties' Joint Pretrial Statement regarding the Bureau's affirmative claims, the Bureau has requested bifurcation of the trial of the Bureau's affirmative claims from the trial of Nationwide's counterclaims.  The request set forth below concerns bifurcation of the counterclaims alone.

Joint Pretrial Statement Regarding Nationwide's Counterclaims
Case No. 3:15-cv-02106-RS

parties' resources, but would constitute an improper exercise of this Court's authority under Article III. *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 38 (1976) ("Absent such a showing [of redressability], exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation.")  Whether Nationwide can establish redressability is a discrete issue capable of swift resolution, and thus warrants bifurcation to ensure that this Court has jurisdiction to consider the merits of Nationwide's counterclaims.

**12.**   **Estimate of Trial Time:**

    **A. Nationwide's Statement**

        Counterclaimant estimates it requires 20 hours to present its case-in-chief.

    **B. The Bureau's Statement**

        The Bureau estimates that it will require ten hours to present its case in chief.

**13.**   **Miscellaneous:**

    **A. Nationwide's Statement**

        Because current Defendants' counsel have moved to withdraw, if the Court should grant their request, Defendants request the right to further modify or revise this Statement to permit their new counsel to comprehensively review this matter and request such modifications that they deem necessary in order to prevent manifest injustice.

      **The Bureau's Statement**

        Consistent with the Court's Guidelines for Final Pretrial Conference, this order should be modified only to prevent manifest injustice.

***The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues of fact and law remaining to be litigated, this order shall supplement the pleadings and govern the course of trial of this cause, unless modified to prevent manifest injustice.***

For Plaintiff Consumer Financial
Protection Bureau

/s/ Thomas McCray-Worrall
Thomas McCray-Worrall

27

Jonathan Urban
Patrick Gushue
Stephen Jacques
Elizabeth France

*Attorneys*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

***The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues of fact and law remaining to be litigated, this order shall supplement the pleadings and govern the course of trial of this cause, unless modified to prevent manifest injustice.***

For Defendants Nationwide Biweekly Administration, Inc.,
Loan Payment Administration, LLC, and Daniel S. Lipsky

/s/ Helen M. Mac Murray
Helen M. Mac Murray
Lisa A. Messner
Kimon Manolius
Samantha D. Wolff

*Attorneys*

**HANSON BRIDGETT, LLC**
425 Market Street, 26th floor
San Francisco, CA  94105

MAC MURRAY & SHUSTER, LLP
6530 West Campus Oval, Suite 210
New Albany, Ohio  43054

Joint Pretrial Statement Regarding Nationwide's Counterclaims
Case No. 3:15-cv-02106-RS