ANTHONY ALEXIS (DC Bar #384545)
DEBORAH MORRIS (Admitted to the NY Bar)
MICHAEL G. SALEMI (IL Bar # 6279741)
PATRICK GUSHUE (PA Bar #306966)
JONATHAN URBAN (CO Bar #44190)
STEPHEN JACQUES (DC Bar # 464413)
THOMAS MCCRAY-WORRALL (Admitted to the MD Bar)
ELIZABETH FRANCE (DC Bar # 999851)
Patrick.Gushue@cfpb.gov
1700 G Street NW
Washington, DC 20552
Phone: 202-435-7944
Fax: 202-435-7722
*Attorneys for Plaintiff*
*Consumer Financial Protection Bureau*

KIMON MANOLIUS (154971)   HELEN M. MAC MURRAY (admitted *pro hac vice*)
kmanolius@hansonbridgett.com   (OH Bar #0038782)
**HANSON BRIDGETT, LLC**   (PA Bar # 318247)
425 Market Street, 26th floor   (MO Bar # 63646)
San Francisco, CA  94105   (KS Bar # 26606)
Phone:  415-995-5841   (IL Bar # 6318586)
   (NE Bar # 25904)
   (TN Bar # 033783)
   (WI Bar # 1103121)
   (WV Bar # 13015)
   LISA A. MESSNER (OH Bar # 0074034) (admitted *pro hac vice*)
   hmacmurray@mslawgroup.com
   **MAC MURRAY & SHUSTER, LLP**
   6530 West Campus Oval, Suite 210
   New Albany, Ohio  43054
   Phone: 614-939-9955
   *Attorneys for Defendants and Counter-Claimant*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>NATIONWIDE BIWEEKLY ADMINISTRATION, INC., LOAN | Case No. 3:15-cv-02106-RS<br><br>**JOINT PRE-TRIAL STATEMENT – AFFIRMATIVE CLAIMS**<br><br>Trial Date:  April 24, 2017<br>          8:00 a.m.<br><br>Judge:  Hon. Richard Seeborg<br>Courtroom:  Courtroom 3, 17th Floor |

PAYMENT ADMINISTRATION
LLC, AND DANIEL S. LIPSKY,

                Defendants.

---------------------------------------------

NATIONWIDE BIWEEKLY
ADMINISTRATION, INC.,

           Counter-claimant,

           v.

CONSUMER FINANCIAL
PROTECTION BUREAU,

           Counter-defendant.

450 Golden Gate Ave.
San Francisco, CA 94102

### JOINT PRETRIAL STATEMENT

#### Affirmative Case

1.     <u>**Substance of the Action:**</u>

**A. The Bureau's Statement**

This case is about pervasive and systematic deceptive practices Defendants used between at least July 21, 2011 and the end of 2015, in the marketing and sale of Defendants' Interest Minimizer Program (IM Program). Defendants Nationwide Biweekly Administration, Inc. (Nationwide), Loan Payment Administration LLC (LPA), and Daniel S. Lipsky (Lipsky) sent millions of direct-mail marketing letters and used a telemarketing operation to market and sell the IM Program.

At every touchpoint with consumers – the mailers, the enrollment call, the contract, and the receipt – Defendants engaged in deceptive acts or practices. Most seriously, Defendants' marketing of the IM Program obscured the amount and existence of a substantial non-refundable setup fee of up to $995. Defendants' marketing and sales practices left consumers with the net impression that the IM Program involved only a much smaller per transaction fee of $3.50 rather than the substantial non-refundable setup fee Defendants actually charged. Thus, many consumers enrolled thinking that the IM Program cost only the $3.50 per transaction charge rather than the non-refundable fee of up to $995. The

deceptive practices were so effective that many consumers only discovered the existence of the fee after November 2015 when Defendants ceased providing the IM Program services or upon attempting to cancel the enrollment.

In addition to concealing the amount and existence of the non-refundable setup fee, Defendants also misrepresented the terms and benefits of the IM Program. Defendants sent mailers to consumers containing individual loan information and advertised the IM Program either as a feature of the consumers' loans that consumers had to call Defendants in order to "waive," or made statements leaving consumers with the net impression that Defendants were affiliated with the consumers' mortgage servicer. Thus, many consumers called Defendants thinking that they would reach an arm of their servicer or a company that administered a feature of their loan rather than a separate company trying to sell them a product with a substantial hidden cost.

During enrollment calls and in other marketing materials, Defendants misrepresented the benefits of enrolling in the IM Program, falsely guaranteeing that consumers would achieve specific interest savings or achieve "Monthly Interest Savings" that bore no relation to reality. In fact, the average consumer would have to stay in the program for 9 years before they break even – before that point, average consumers have paid more to Defendants in fees than they have saved in interest charges.

If consumers asked why they could not accomplish the same savings on their own by paying more to their principal – which they can do – Defendants falsely told consumers that they could not achieve savings on their own. Defendants told consumers that consumers cannot achieve savings on their own, that lenders do not permit consumers to pay biweekly, or that the consumer's lender requires the consumer to use a third party like Nationwide to pay biweekly and pay their loan principal off more quickly. All of these representations are false – in fact, many lenders administer no or low cost biweekly options, and Defendants knew this.

Since 2011, over 130,000 consumers have enrolled in the IM Program. Between July 21, 2011 and December 31, 2015, Defendants collected $73,955,169 in setup fees from 126,500 consumers. Lipsky personally took over $33 million in shareholder distributions from 2011 through 2015.

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

The operative pleading that raises these issues is the Bureau's Complaint, Dkt. No. 1, which contains four counts. Count One alleges that Defendants Lipsky and Nationwide engaged in abusive acts or practices in violation of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5536(a)(1)(B), 5531(d)(2)(A). Count Two alleges that Defendants engaged in deceptive acts or practices in violation of the CFPA, 12 U.S.C. § 5536(a)(1)(B). Count Three alleges that Defendants Lipsky and Nationwide violated the Telemarketing and Consumer Fraud and Abuse Prevention Act and various provisions of its implementing regulation, the Telemarketing Sales Rule (TSR). Specifically, Defendants failed to disclose truthfully and in a clear and conspicuous manner – and before the consumer consents to pay – the total cost to purchase the IM Program (16 C.F.R. § 310.3(a)(1)(i)). Defendants Lipsky and Nationwide misrepresented, directly or by implication, the total cost to purchase the IM Program (16 C.F.R. § 310.3(a)(2)(i)), material aspects of the performance, efficacy, nature, or central characteristics of the IM Program (16 C.F.R. § 310.3(a)(2)(iii)), and an affiliation with, or endorsement or sponsorship by the consumer's lender or servicer (16 C.F.R. 310.3(a)(2)(vii)). Defendants Lipsky and Nationwide also violated 16 C.F.R. § 310.3(a)(4) by making false or misleading statements to induce consumers to enroll in the IM Program.

## 1. The Bureau's authority to bring this action

The Bureau is an independent agency responsible for enforcing the CFPA, 12 U.S.C. §§ 5491, 5565, and authorized to enforce the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6105(d), and its implementing regulation, the TSR, with respect to the offering or providing of consumer financial products or services, 15 U.S.C. § 6105(d). It may bring civil actions against persons violating these laws to "seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law." 12 U.S.C. § 5564.

## 2. Defendants have violated the CFPA

### a. False and misleading statements concerning the non-refundable setup fee

Throughout the course of the transaction – from the time that consumers receive a mailer to several months after the consumer enrolls when Nationwide takes the first extra biweekly payment as

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

the setup fee – Defendants' pervasive practice was to avoid clearly and unambiguously informing consumers that there was a substantial non-refundable setup fee and the exact amount of that fee.

Defendants' mailers did not acknowledge the existence of a substantial and non-refundable setup fee. Other than a vague fine-print statement that savings estimates are "net of all fees," most mailers made no reference to the fact that there was any cost associated with the IM Program at all. Other mailers falsely claimed that there are no fees to cancel the IM Program and that there is "No Upfront Fee" to enroll in the IM Program, when, in fact, the non-refundable fee becomes due to Defendants upon signing the contract. Defendants also maintained a website, online videos, and an infomercial that did not mention any fees but instead falsely state that consumers pay the same amount they "pay now" to participate in the IM Program.

Once consumers called, Nationwide's scripts required representative to tell consumers that they "do not" increase their monthly payments (when they do), and that the consumer's "extra funds" are "directed 100%" to the principal of the loan (they are not). In fact, the first "extra" payment consumers make is not directed to principal at all. Defendants keep it as the setup fee. During the sales call, Defendants direct representatives first to tell consumers there is a small administrative cost to enroll (generally $3.50 per biweekly debit). If consumers ask how Nationwide makes money, Defendants did not tell consumers about the substantial non-refundable setup fee. Instead, Defendants directed representatives to refer only to the small $3.50 debiting charge. When consumers asked about the cost of the IM Program, Defendants' representatives typically did not tell the consumer the amount of the non-refundable setup fee, but rather downplayed the fee and told consumers they "won't feel the fee," "won't notice it," and that the fee "is not out of pocket expense to enroll…[it] happens naturally" and is "built into the program." In many calls, consumers directly asked the amount of any fee associated with the program and Defendants' representatives expressly misrepresented the fee, falsely stating that the only fee was the $3.50 transaction fee.

Enrollment calls typically lasted anywhere from 15 to 45 minutes and the only scripted reference to the setup fee did not state the amount of the fee. Instead, Defendants' script typically directed its

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

representatives to disclose the existence of the non-refundable setup fee only once, in a paragraph that also described the purported benefits of the program:

> Now, there are 26 biweekly debits annually, which create 2 extra biweekly debits every year that are applied directly to your principal resulting in you saving over $ _____. So you will have a total of (biweekly loan term x 2) extra biweekly debits throughout the course of your loan. There is a one-time setup fee equal to just one biweekly debit (half for 15yr loan) that we defer for you. It is simply taken from the first extra debit that occurs in about 6 months and then the remaining ((biweekly loan term x 2) -1) extra debits will go 100% toward the principal of your loan.

Similarly, the contracts Defendants provided to consumers hide the fee. In the section where consumers agreed to permit Defendants to debit funds from their accounts and provide their banking information, Defendants included an unnumbered paragraph in smaller font entitled "SETUP FEE" that provided:

> SETUP FEE. By signing below, I acknowledge that I agree to a non-refundable deferred set up fee equivalent to one bi-weekly debit minus any additional "extra to principal' and that I currently owe that Amount to NBA; and I authorize NBA to collect such Amount by deducting it from the funds it collects from my Designated Account. In addition, if I cancel my enrollment in the Program for any reason before I have paid such Amount in full, I authorize NBA to collect the unpaid balance by electronically debiting the Designated Account.

As the audio recordings of calls show, Defendants' representatives typically directed the consumers' attention away from this language by asking the consumer to confirm that their banking information was correct and to then click the electronic signature.

Further, the receipts Defendants sent consumers generally do not even mention that Defendants had charged consumers a non-refundable setup fee. Finally, once Defendants took the fee from consumers, Defendants sent only a generic debiting notification saying that the amount was debited from the consumers' account. That notice did not inform consumers that, instead of sending that debit to the consumers' mortgage servicer, Defendants kept that debit as a setup fee.

For these same reasons, Defendants' practices are abusive under the CFPA. Defendants Nationwide and Lipsky took unreasonable advantage of the consumer's lack of understanding regarding the material cost and conditions of the IM Program by guaranteeing consumers will save money even though it takes many years for consumers to achieve any savings after accounting for the substantial fees and the nature of loan amortization.

6

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

1    Here, the Bureau plans to introduce at trial Defendants' own business records, including sample

2    and template mailers, enrollment scripts, rebuttal talking points, training materials, instructional videos,

3    and contracts. The Bureau will also call consumers, who will testify that they would not have enrolled in

4    the IM Program had Defendants made them aware of the setup fee, and will also present audio and

5    transcripts of consumers' enrollment calls. The Bureau will also introduce consumer complaints

6    evidencing similar widespread deception. In fact, some consumers who complained about the fee only

7    learned about the existence of the non-refundable setup fee after Defendants stopped providing services

8    in late 2015 and then tried to collect the fee from recently enrolled consumers. The Bureau will also call

9    former Nationwide employees, who will testify that the script confused many consumers and describe

10   the various techniques and tactics they were taught to employ to obscure elements of the program and

11   enroll consumers.

12   **b.    False and misleading statements concerning savings guarantee**

13   Defendants also made widespread misrepresentations in mailers, during enrollment calls, or in

14   other advertisements that (1) consumers are "guaranteed" to achieve "immediate" interest savings,

15   (2) that consumers enrolled in the IM Program have "saved" a specific amount in interest in past years,

16   or (3) that consumers will achieve "Monthly Interest Savings" of specific amounts by enrolling in the

17   IM Program.

18   All of these representations are false. Consumers are not guaranteed to save money on the IM

19   Program. On this point, the Bureau will call its expert, Neil Librock, who will provide expert opinion

20   demonstrating that, for the average IM Program consumer, she will pay more in fees to Nationwide than

21   realize in interest savings until she has been in the program for 9 years. And, as Defendants know, most

22   consumers leave the IM Program or pay off their mortgage (either through sale of the property or

23   refinance) well before this time. Thus, these consumers end up paying more fees to Nationwide than

24   they realize in interest savings.

25   As to Defendants' representations that consumers enrolled in the IM Program have "saved" a

26   specific amount (e.g., Nationwide saved consumers "$161,680,000 in interest charges" in 2013), this

27   representation is similarly misleading. That amount is based on the total hypothetical interest that,

28
                                                    7

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

assuming all the consumers enrolled in the program stay in the program for the entire life of their loans, a consumer *could* save in the future.

Finally, Defendants included in many mailers a "Monthly Interest Savings" estimate that is demonstrably false. Nationwide calculated this "Monthly Interest Savings" by taking the cumulative interest estimated to be saved over the whole payoff period (i.e., 23.9 years) and dividing it by the number of months in the payoff period (i.e., 286 months). In reality, consumers save $0 in monthly interest until they make their second extra biweekly payment – which is typically 12 months into the program. And, even after consumers begin making extra biweekly payments that Nationwide does not retain as the setup fee, consumers do not realize any monthly interest savings until just before year 10. This is because any reduction in interest charges is completely offset by the setup and debiting fees.

### c. False and misleading statements concerning consumers' ability to achieve savings without Nationwide

Defendants also make widespread misrepresentations, in mailers or during enrollment calls, that consumers cannot achieve savings on their own, that lenders do not permit consumers to pay biweekly, or that the consumer's lender requires the consumer to use a third party like Nationwide to pay biweekly and pay their loan principal off more quickly.

These representations are false. The Bureau intends to call several large mortgage servicers to testify about the servicers' own biweekly programs, which are available at little or no cost, through which consumers can realize the same benefits as through the IM Program, thus dispelling Defendants' false representations that consumers cannot achieve savings on their own and that lenders do not offer such programs in-house.

### d. Misleading statements regarding Nationwide's affiliation with servicers

Defendants also make claims that create the net impression to consumers that Nationwide is affiliated with the consumer's lender or servicer or that Nationwide is administering a feature of the consumer's loan. Virtually all of Defendants' mailers contain the consumer's loan amount and lender name, and most also contain other language that would lead a reasonable consumer to believe that Nationwide is either affiliated with the consumer's servicer or administering a feature of the consumer's

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

loan. For example, Defendants' mailers have stated, "Payment Notice: OPTIONAL CHANGE IN PAYMENT FREQUENCY," "Official Eligibility Letter," or "Subject: Optional Payment Change." Many letters also tell consumers to call just to tell Nationwide if they do *not* want to switch to a biweekly payment. Defendants' mailers warned that, if they call, the consumers will be asked to confirm that they understand they are "waiving" this option:

> Please contact us by **December 11, 2012** to inform us if you want to change to the **biweekly option** or if you would like to remain with a monthly payment. Call **1-800-317-1756**. <u>If you waive the biweekly option</u>, you will be asked to confirm that you understand that you are voluntarily waiving the interest savings and loan term reduction achieved with the biweekly option.

So, even though some of Defendants' mailers included a disclaimer saying that Nationwide was not affiliated with the lender, many consumers called Nationwide thinking that they were calling an arm of their servicer or an affiliated entity. Once Defendants had consumers on the enrollment call, many Nationwide scripts or Q&A documents directed its representatives to avoid directly responding to questions about Nationwide's affiliation with the servicer.

To establish liability, the Bureau intends to rely on Defendants' own records – consisting of envelopes, mailers, enrollment scripts, rebuttal talking points, training materials, instructional videos, and other marketing materials – that plainly exhibit the false and misleading statements. The Bureau also intends to call consumers and former Nationwide employees to testify regarding these representations and consumer confusion over whether Nationwide was affiliated with consumers' servicers.

### 2. Nationwide and Lipsky have violated the TSR

Nationwide and Lipsky violated 16 C.F.R. § 310.3(a)(1)(i), which requires telemarketers to "truthfully" and "in a clear and conspicuous manner" disclose the total cost before the consumer consents to paying for the service. The Bureau will demonstrate that Nationwide and Lipsky are "telemarketers" or "sellers" under the TSR and that their disclosure of the setup fee does not comply with the TSR since Nationwide never provided consumers with a clear and conspicuous disclosure of the cost of the IM Program prior to consenting to pay for the service, which occurred when the representative requested bank account information from the consumer.

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

For the same reasons as those set forth above, Nationwide and Lipsky have also violated the TSR provisions that prohibit telemarketers from misrepresenting, directly or by implication, the total cost to purchase the IM Program (16 C.F.R. § 310.3(a)(2)(i)), any material aspect of the performance, efficacy, nature, or central characteristics of the IM Program (16 C.F.R. § 310.3(a)(2)(iii)), and an affiliation with, or endorsement or sponsorship by, the consumer's lender or servicer (16 C.F.R. 310.3(a)(2)(vii)). Nationwide and Lipsky have also violated 16 C.F.R. § 310.3(a)(4) by making false or misleading statements to induce consumers to enroll in the IM Program.

**B. Defendants' Statement**

Defendants deny, in their entirety, all claims made by the Bureau. The savings promised are true. The Interest Minimizer Program is designed to accelerate the consumer's mortgage amortization rate by applying a thirteenth monthly payment. Defendants did not hide facts regarding the deferred setup fee or $3.50 debit fee. Nor did Defendants misrepresent an affiliation with a mortgage servicer or lender. The Bureau's claims are precluded outright by the affirmative defenses listed in the Third Amended Answer to Complaint and Counterclaim ("TAA"). Its claims are barred under the three-year statute of limitations. The Bureau's Director Cordray had actual knowledge of Defendants' activities as early as 2009. He carried that knowledge to the Bureau in 2010, or five years prior to bringing suit.

**2.      Relief Prayed:**

**A. The Bureau's Statement**

The Bureau seeks three forms of monetary relief in the form of restitution, disgorgement, and civil money penalties. The Bureau also seeks an injunction against Defendants.

Under 12 U.S.C. §§ 5565(a)(1) and (2), the Bureau seeks redress for consumer in the amount of $73,955,169 that Defendants received from deferred setup fees paid (less refunds) by approximately 126,500 consumers who were enrolled in the Interest Minimizer Program from July 21, 2011 to December 31, 2015. These figures – which are derived from Defendants' business records and audited

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

financial statements – account for the amount of illegal setup fees collected by Defendants for the relevant time period.

The Bureau seeks disgorgement in the amount of $33,039,299 against Lipsky for shareholder distributions he received from 2011 to 2015 for his involvement in the scheme. The Bureau will not double collect on disgorgement from Lipsky and restitution for harmed consumers.

The Bureau also seeks first-tier civil money penalties under the CFPA, pursuant to 12 U.S.C. § 5565(c)(1) and its implementing regulation, for violations of the CFPA and the TSR that occurred from at least July 21, 2011 to November 23, 2015.

The Bureau also seeks a permanent injunction prohibiting Defendants (as well as other entities covered under Federal Rule of Civil Procedure 65(d)) from violating sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536, and the TSR, 16 C.F.R. Part 310, in the marketing, sale, and administration of any consumer financial product or service as defined in 12 U.S.C. § 5481(5), including the IM Program.

**B. Defendants' Statement**

Defendants deny that the Bureau is entitled to any money damages or other relief.

### 3. Undisputed Facts:

Although the parties made good faith efforts to identify any undisputed facts, they were unable to do so.

### 4. Disputed Factual Issues:

**A. The Bureau's Statement**

1. Whether information about the IM Program's cost, how the program works, whether consumers can achieve savings on their own, and whether Nationwide is affiliated with, or administering a feature of the consumer's loan on behalf of, the servicer is material – i.e., information that is important – to consumers.

2. Whether Defendants' mailers and other written and multimedia (website) advertisements disclose the existence and amount of the non-refundable setup fee.

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

3.  Whether Defendants' mailers and other written and multimedia (website) advertisements disclose the existence and amount of the non-refundable setup fee or create the net impression that the IM Program is free or only costs a few dollars every other week.

4.  Whether Defendants' claim that consumers "do not increase" their monthly payment on the IM Program is false or misleading.

5.  Whether Defendants' claim that there is no "upfront" fee or cost to enroll in the IM Program is false or misleading.

6.  Whether Defendants make the claim that consumers' "extra funds" are directed "100%" to the principal of the loan.

7.  Whether Defendants' claim that consumers' "extra funds" are directed "100%" to the principal of the loan is false or misleading.

8.  Whether Defendants' telemarketing scripts, written guidance for enrollment specialists, and sales practices misrepresent the existence and amount of the IM Program's non-refundable setup fee.

9.  Whether Defendants' telemarketing scripts, written guidance for enrollment specialists, and sales practices misrepresent how Nationwide makes money off of a consumer's enrollment.

10. Whether Defendants' employees give the exact amount of the non-refundable setup fee when asked about the fee during the telemarketing call.

11. Whether Defendants' telemarketing scripts contain several different ways to explain the non-refundable setup fee rather than provide the actual dollar amount.

12. Whether Defendants' employees told consumers, who specifically asked about the cost of the IM Program or the non-refundable setup fee, that they "won't feel the fee," "won't notice it," and that the fee "is not out of pocket expense to enroll…[it] happens naturally" and is "built into the program."

13. Whether Defendants' savings analysis documents, contracts, receipts, and other written agreements disclose the existence and amount of the non-refundable setup fee.

14. Whether Defendants' employees directed the consumer's attention away from the contract language during the online enrollment process.

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

15. Whether Defendants send notification to the consumer when the non-refundable setup fee is collected.

16. Whether Defendants' setup fee is due and owing to Nationwide when the consumer signs the enrollment form.

17. Whether Defendants clearly and conspicuously disclose – e.g., in large font where the consumers will look, notice, and understand – the existence and amount of non-refundable setup fee for the IM Program.

18. Whether Defendants clearly and conspicuously disclose – e.g., audibly in a way that consumers are likely to hear it and understand – the non-refundable setup fee for the IM Program prior to requesting the consumer's bank account information.

19. Whether Defendants make the claim that consumers achieve "monthly interest savings" while enrolled in the IM program.

20. Whether Defendants' claim that consumers achieve "monthly interest savings" while enrolled in the IM program is false or misleading.

21. Whether Defendants make the claim that consumers are guaranteed to save money on the IM Program.

22. Whether and when the median consumer enrolled in the IM Program achieves savings on the IM Program.

23. Whether Defendants' claim that consumers will achieve "guaranteed savings" on the IM Program is false or misleading.

24. Whether Defendants' claim that consumers have saved a specific amount of money on the IM Program is false or misleading.

25. Whether Defendants make the claim in mailers/written advertisements and during telemarketing calls that consumers cannot achieve savings on their own.

26. Whether Defendants' claim that consumers cannot achieve savings on their own is false or misleading.

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

27. Whether Defendants make the claim in mailers/written advertisements and during telemarketing calls that consumers cannot make biweekly payments on their own.

28. Whether Defendants' claim that consumers cannot make biweekly payments on their own is false or misleading.

29. Whether Defendants make the claim in mailers/written advertisements and during telemarketing calls that consumers must use a third party administrator, like Nationwide, to achieve savings.

30. Whether Defendants make the claim that lenders are not applying 100% of the consumer's so-called "extra debits" to the principal of the loan.

31. Whether Defendants' claim that lenders are not applying 100% of the consumer's so-called "extra debits" to the principal of the loan is false or misleading.

32. Whether Defendants' claim that consumers must use a third party administrator, like Nationwide, to achieve savings is false or misleading.

33. Whether Defendants disclose the availability of biweekly products known to the company through its listing of competitor programs.

34. Whether mortgage servicers or lenders offer a biweekly, or similar, program at little or no cost to the consumer.

35. Whether Defendants' mailers, including envelopes, contain phrases, words, and other markings that create the impression that Nationwide, LPA, or any of its affiliates is related to the consumer's servicer or administering a feature of the loan on behalf of the servicer.

36. Whether Defendants have any contractual relationship with mortgage lenders or servicers.

37. Whether Defendants instruct sales representatives not to directly respond to questions from consumers about Nationwide's relationship with the lender.

38. Whether Defendants' scripts disclose to the consumer that they are calling a third party administrator, rather than the consumer's mortgage servicer.

39. Whether Defendants' mailers contain the consumer's lender and loan amount.

40. Whether Defendants took unreasonable advantage of the consumer's lack of understanding of the cost and conditions of the IM Program.

14

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

41. Whether Defendants' mailers and print and multimedia advertisements were widely disseminated.

42. Whether consumers complained about the setup fee.

43. Whether consumers complained about being misled by Defendants' claims or representations found in mailers, marketing materials, telemarketing calls, sales scripts, contracts, and other promotional materials.

44. Whether consumers complained about being misled by Defendants' sales practices.

45. Whether consumers were confused or misled by the claims or representations in Defendants' mailers, marketing materials, telemarketing calls, sales scripts, contracts, and other promotional materials.

46. Whether Defendants have been subject to prior lawsuits involving similar conduct to the sales practices at issue in this case.

*** 

The following background facts, to which Defendants' counsel initially stipulated during the meet and confer process, were later deemed disputed.

47. Defendant Nationwide Biweekly Administration, Inc. ("Nationwide") is an Ohio corporation based in Xenia, Ohio.

48. Defendant Loan Payment Administration is a wholly-owned subsidiary of Nationwide that provides marketing services to Nationwide.

49. Defendant Daniel Lipsky is Nationwide's founder, president, sole officer, and owner and has managerial responsibility for all marketing and advertising decisions for Nationwide and LPA.

50. Lipsky has been Nationwide's President since 2002 and its only executive officer (sole Director, Secretary, and Treasurer) since 2011.

51. The Consumer Financial Protection Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products and services under federal consumer financial law.

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

52. Since at least July 21, 2011 until November 23, 2015, Defendant Nationwide offered the Interest Minimizer (IM) program to consumers across the country.

53. Under the IM Program, Nationwide contracts with consumers to debit one-half of a mortgage payment every two weeks, holds the consumer's funds in a suspense account until the mortgage due date, and then transmits the amount due to the mortgage servicer on a monthly basis for application toward the loan principal.

54. In 2013, the median consumer using the IM Program for a thirty-year fixed-rate mortgage had a mortgage loan of $160,204 and an interest rate of 4.125%.

55. Nationwide's payment debiting results in the equivalent of a 13th monthly payment on the loan principal and thus purports to reduce the balance at a faster rate than the standard monthly repayment schedule.

56. Nationwide also offered the option to debit consumer accounts on a weekly and semi-monthly basis.

57. For the biweekly, weekly, and semi-monthly programs, Defendants collected a setup fee up to $995 to participate in the IM Program.

58. Both Nationwide and LPA advertise the IM Program through direct-mail marketing letters and make and receive phone calls from consumers nationwide.

59. Lipsky purchases the names, addresses, and loan information (closing date, loan amount, and lender name) from two data sources to target new homeowners and consumers who have recently refinanced.

60. Lipsky sends out mailers under various names, including Nationwide, LPA, Loan Payoff Processor, and Synergistic Payment Processing to give consumers the impression that the entities are competing against one another and to gain more market share in the biweekly product space.

61. Lipsky created, revised, and/or approved all mailers, scripts, question-and-answer (Q&A) documents, talk-offs, talking points, written instructions/guidance for Nationwide's employees, contracts, and terms of service for the IM Program.

62. Lipsky played a key role in designing and creating the training program for the sales department.

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

63. Lipsky played a role in approving sales goals and personnel decisions for the enrollment department.

64. From 2011 to 2015, Lipsky received $33,039,299 in shareholder distributions from Nationwide.

65. Between 2011 and 2015, Lipsky received an annual salary between $100,000 and $200,000 from Nationwide.

66. The mailers typically include the name of the consumer's lender (visible through the front window of the envelope) and the consumer's loan amount, a sample interest rate to calculate estimated savings – often presented graphically in a table – that Nationwide claims consumers will achieve through the IM program, as well as additional information about how the IM Program works.

67. Lipsky is primarily in charge of the design and layout of the mailers and envelopes.

68. Lipsky decides which letters to send for a particular mailing campaign.

69. Lipsky tests consumer reactions to mailers.

70. Lipsky tracks consumer response rates of the mailers.

71. Lipsky has final approval over any changes to mailers and envelopes.

72. In addition to mailers, Defendants maintain an online and multimedia presence.

73. Lipsky is a company spokesman and has appeared in videos posted on Nationwide's websites.

74. Lipsky was involved in writing and approved the script for a paid advertisement in which he appeared ("The Balancing Act") that aired in September 2014 on the Lifetime network and was also on Defendants' website.

75. Defendants require enrollment specialists to follow scripts and Q&A documents word-for-word throughout the entire interaction with the consumer who call Defendants.

76. Although enrollment specialists can add to the script, they are directed not to omit anything from it.

77. Lipsky developed the sales script from scratch.

78. Scripts, as well as mailers and contracts, contain information and markings indicating the dates when a particular document was in use.

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

79. On average, Nationwide received approximately 10,000 to 20,000 calls per month from consumers across the country.

80. Enrollment specialists generate the savings analysis documents using details of the consumer's loan that the consumer provides during the call.

81. Lipsky controls the content of the savings analysis template.

82. After the consumer electronically signs the enrollment form, Defendants send the consumer the executed contract, which includes a two-page Biweekly Program Agreement and receipt.

83. Prior to 2010, Nationwide charged consumers a flat fee of $245 over the phone to participate in the IM program.

84. Under the $245 payment arrangement, consumers were required to present a credit or debit card or check over the phone in order to authorize the charge.

85. Defendants also charge periodic debiting fees of $1.95 and $3.50 per debit for its weekly and biweekly/semi-monthly programs, respectively.

86. Lipsky changed the fee structure in 2010.

87. Instead of the consumer paying a setup fee of $245 over the phone, Defendants began taking one of the consumer's biweekly mortgage payments as a "deferred setup fee," generally equivalent to "one biweekly debit" or half a mortgage payment for consumers with a 30-year mortgage.

88. Lipsky was in charge of setting all price points for the IM Program. Lipsky eventually capped the setup fee at $995 at the end of 2011.

89. Defendants interpret the service agreement such that the setup fee is due upon signing the contract.

90. Defendants collect the setup fee by keeping the first "extra" biweekly payment (approximately the 13th debit), which typically occurs several months after enrollment.

91. After collecting the setup fee, Defendants then direct subsequent debits to the principal.

92. Between July 21, 2011 and December 31, 2015, 126,500 consumers enrolled in the IM Program.

93. Some mailers sent to consumers contain the words "NO UPFRONT FEE."

94. As part of the enrollment process, the enrollment specialist is required to read the following:

> Now there are 26 biweekly debits annually, which create 2 extra biweekly debits every year that are applied directly to your principal resulting in you saving over $(Interest Savings). So you will have a total of (biweekly loan term x 2) extra biweekly debits throughout the course of your loan. The one-time setup fee for the biweekly program is just one biweekly debit and is completely deferred (half a biweekly debit for mortgages with a term less than 20 years). We simply keep the first extra debit that occurs within the first 6 months and then the remaining ((biweekly loan term x 2) -1) extra debits will go 100% toward the principal of your loan saving you the $ _____ in interest charges!

95. Scripts require enrollment specialists to give the exact amount of the small debiting fees, *i.e.*, $3.50 per debit as part of the "Going Over Mortgage Analysis" section of the script.

96. After the enrollment specialist has run the savings analysis, he or she is aware of the exact amount of the setup fee the consumer will be charged to participate in the IM Program.

97. The periodic debiting fees ($3.50) cover bank transaction costs and expenses.

98. Defendants expressly promise that consumers will achieve savings through the IM Program without increasing their monthly payment.

99. Defendants advertise that Nationwide has helped its "customers eliminate over $161 million in interest in 2013."

100. Of the 123,716 active customers enrolled on December 31, 2014, only about 25% had been enrolled for longer than four years.

101. Defendants do not track individual interest savings or know how many consumers have paid off their mortgages while on the IM Program.

102. Lipsky reviews consumer complaints, edits and approves Nationwide's formal responses to consumer complaints received on behalf of third parties, and authorizes consumer refunds.

103. Only very rarely were refunds ever issued without Lipsky's approval.

104. Defendants were parties to prior lawsuits that involved their business practices, including:

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

    i.    A 2014 action brought by Nationwide (as defined herein) against various District Offices and offices located in the State of California (USDC—N.D. Cal., Case No. 5:14-cv-04420) involving marketing and advertising issues;

    ii.    A 2014 action brought by Nationwide Biweekly Administration, Inc. against Jan Lynn Owen as Commissioner of the Department of Business Oversight for the State of California (USDC—N.D. Cal, Case No. 5:14-cv-05166) involving licensing issues;

    iii.    A 2014 action by the Washington State Department of Financial Institutions Washington State Department of Financial Institutions against Nationwide Biweekly Administration, Inc. and Daniel S. Lipsky (Washington State Case No. C-13-1195-14-CO01);

    iv.    A 2013 action brought by Quicken Loans Inc. against Nationwide Biweekly Administration, Inc. and Loan Payment Administration, LLC (USDC—E.D. Mich., Case No. 2:13-cv-13431-LPZ-MKM);

    v.    A 2008 action by the State of Ohio, ex. rel. Richard Cordray against Nationwide Biweekly Administration (Ohio State Case No. 2008 CV 0678).

**B. Defendants' Position**

1.  Whether Defendants' marketing material is "unfair, deceptive, or abusive."

2.  Whether a reasonable consumer is "abused, unfairly treated, and/or deceived" as to lender affiliation.

    a.  Whether the envelope identifies any improper affiliation with a lender or mortgage servicer.

    b.  Whether the envelopes include a disclaimer notifying the consumer that Defendants are not affiliated with a lender or mortgage servicer.

    c.  Whether the letter identifies any improper affiliation with a lender or mortgage servicer

    d.  Whether the letter includes a disclaimer notifying the consumer that Defendants are not affiliated with a lender or mortgager servicers.

    e.  Whether the script identifies any improper affiliation with a lender or mortgage servicer.

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

      f.   Whether the script includes a disclaimer notifying the consumer that Defendants are not affiliated with a lender or mortgage servicer.

      g.   Whether the sales enrollment contract identifies any improper affiliation with a lender or mortgage servicer.

      h.   Whether the sales enrollment script includes a disclaimer that Defendants are not affiliated with a lender or mortgage servicer.

3.   Whether a reasonable consumer is "abused, unfairly treated, and/or deceived" as to the deferred setup fee.

      a.   Whether the letter hides or misrepresents the deferred setup fee.

      b.   Whether the script hides or misrepresents the deferred setup fee.

      c.   Whether the sales enrollment contract does not hide or misrepresent the deferred setup fee.

4.   Whether a reasonable consumer is "abused, unfairly treated, and/or deceived" as to the guaranteed savings of the Interest Minimizer Program.

      a.   Whether all of representations regarding guaranteed savings upon enrolling in the Interest Minimizer Program are true and supported by evidence.

5.   Whether CFPB has met its burden of proof on Count I regarding alleged "abusive" acts or practices.

6.   Whether CFPB has met its burden of proof on Count II regarding alleged "deceptive" acts or practices?

7.   Whether CFPB has met its burden of proof on Count II regarding alleged "deceptive" acts or practices.

8.   Whether CFPB has met its burden of proof on Count III regarding alleged violation of the TSR.

9.   Whether CFPB has met its burden of proof on Count IV regarding alleged violation of the CFPA because of alleged violations of the TSR.

10. Whether CFPB filed its action within three (3) years of discovery.

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

Defendant's Position on Plaintiff's inclusion of facts that Defendants' counsel purportedly stipulated to during the meet and confer process:

A Motion to Withdraw was filed on Friday, March 10, 2017. Since Nationwide was notified at 4:00 PM Eastern on that date, Nationwide has worked diligently with new counsel who has expressed a willingness to step in and represent all the Defendants at the trial on April 24, 2017. Because miscommunication between counsel of record, Nationwide, and new counsel, confusion existed regarding the status of any undisputed facts. A meet and confer with all attorneys present was held, March 15, 2017 at 1:00 PM Eastern, including counsel of record, new counsel and Nationwide. At that meet and confer, new counsel indicated a thorough review of the proposed undisputed facts which were received on Monday (March 13th) from the CFPB, had revealed three problems. (1) Inaccuracies in these facts (2) the facts were argumentative and inaccurate by omission in their expression to only state half the story and most importantly (3) the purpose of undisputed facts would not be accomplished in this case in that all of the issues covered by the alleged undisputed facts will be subject to testimony offered my Nationwide witnesses. After listening to the above points, counsel for CFPB made no objection. The meet and confer then concluded. On March 6 and 9, 2017, Defendants provided its counsel with voluminous comments and revisions on the original 122 proposed Undisputed Facts. Defendants never saw any further list of Undisputed Facts until the evening of Monday, March 13, 2017. Thus, Defendants never saw the "facts" that CFPB claims that Defendants' counsel purportedly stipulated to during the meet and confer process or the date of the alleged meet and confer agreement.

### 5. **Agreed Statement:**

The parties cannot settle on an agreed statement of facts.

### 6. **Stipulations:**

The Bureau sought Defendants' stipulation as to the authenticity and admissibility of business records produced by Defendants in the pre-suit investigation (for which Nationwide previously provided a certification that the documents were business records), as well as documents produced by Defendants in the present litigation (which consist largely of Defendants' scripts, talking points, internal documents, mailers, and advertisements), in order to save the Court's and parties' resources and time at trial. Although Defendants initially appeared open to such stipulation, agreement on this issue is not available

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

at this time. Newly appearing counsel, however, has indicated that they will review these documents and further evaluate the Bureau's request in order to similarly save the Court's and parties' resources and time at trial.

Each party will review exhibit lists and discuss stipulations regarding admissibility thereafter.

7.   **Witnesses to be Called:**[1]

A. **The Bureau's Statement**: The Bureau's witness list is attached as Exhibit A.

B. **Defendants' Statement:**

1.   Daniel S. Lipsky: Witness will testify as to all matter concerning the marketing, sales, and servicing of the Interest Minimizer Program. Testimony will also include quality assurance; handling of customer complaints; statistics and actual number of complaints, the source of complaints; employee discipline for failure to perform appropriately; and information relevant to any or all of Plaintiff's accusations, and as to all matters concerning affirmative defenses.

2.   Sherry Ann Scott:  Witness will testify as to all matter concerning the marketing, sales, and servicing of the Interest Minimizer Program. Testimony will also include quality assurance; handling of customer complaints; statistics and actual number of complaints, the source of complaints; employee discipline for failure to perform appropriately; and information relevant to any or all of Plaintiff's accusations, and as to all matters concerning affirmative defenses.

3.   Paul Courtemanche: Witness will testify as to all matter concerning the marketing, sales, and servicing of the Interest Minimizer Program. Testimony will also include quality assurance; handling of customer complaints; statistics and actual number of complaints, the source of complaints; employee discipline for failure to perform appropriately; and information relevant to any or all of Plaintiff's accusations, and as to all matters concerning affirmative defenses. Witness will appear either live or by deposition.

4.   Hoon Nam: Witness will testify as to all matter concerning the marketing, sales, and servicing of the Interest Minimizer Program. Testimony will also include quality assurance; handling of customer complaints; statistics and actual number of complaints, the source of complaints;

---

[1] The parties made pretrial disclosures of exhibit and witness lists on Monday, March 13, 2017.

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

employee discipline for failure to perform appropriately; and information relevant to any or all of Plaintiff's accusations, and as to all matters concerning affirmative defenses.  Witness will appear either live or by deposition.

5. Jenna Solis: Witness will testify as to all matter concerning the marketing, sales, and servicing of the Interest Minimizer Program. Testimony will also include quality assurance; handling of customer complaints; statistics and actual number of complaints, the source of complaints; employee discipline for failure to perform appropriately; and information relevant to any or all of Plaintiff's accusations, and as to all matters concerning affirmative defenses. Witness will appear either live or by deposition.

6. Nathan Bucher: Witness will testify as to all matter concerning the marketing, sales, and servicing of the Interest Minimizer Program. Testimony will also include quality assurance; handling of customer complaints; statistics and actual number of complaints, the source of complaints; employee discipline for failure to perform appropriately; and information relevant to any or all of Plaintiff's accusations, and as to all matters concerning affirmative defenses. Witness will appear either live or by deposition.

7. Dr. Larry Chiagouris: Witness will testify as to statements made in his expert report, including, but not limited to, the knowability of the Interest Minimizer Program's terms and conditions; the lack of valid empirical research to support the Bureau's Complaint; and the negligible number of consumer complaints.

8. Dr. Harvey Rosen: Witness will testify as to statements made in his expert report, including that the Interest Minimizer Program shortens maturities, reduces financial interest costs, and accelerates equity buildup the moment the first extra biweekly debit is made.

9. Dr. Michael Motley: Witness will testify as to statements made in his expert report, including, but not limited to, the unlikelihood that reasonable consumers were misled, confused, or deceived by communication messages they received from Defendants regarding fees, affiliation with a lender or mortgage servicer, endorsements, or anything else.

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

10. Randall S. Kuvin: Witness will testify as to examination of procedures that represented the savings analysis of the Interest Minimizer Program and other issues discussed in his deposition Witness will appear either live or by deposition.

Per Judge Seeborg's standing order, Nationwide reserves the right to call former employees and customers to the extent necessary to rebut or impeach any of Plaintiff's witnesses.

### 8. Exhibits, Schedules, and Summaries:[2]

**A. The Bureau's Statement**: The Bureau's exhibit list is attached as Exhibit B. The Bureau reserves the right to designate additional exhibits (emails) that may be produced pursuant to the ongoing discovery dispute before Magistrate Judge Laporte (Dkt. No. 193).

**B. Defendants' Statement:** Defendant's exhibit list is attached as Exhibit C. Defendants reserves the right to designate additional exhibits (emails) that may be produced pursuant to the ongoing discovery dispute before Magistrate Judge Laporte (Dkt. No. 193).

### 9. Disputed Legal Issues:

**A. The Bureau's Statement**

Defendants are liable for various violations of the CFPA and TSR in connection with the offering, telemarketing, and sale of the IM Program.

1. Whether Defendants violated the CFPA by engaging in deceptive acts or practices (Count II)

Under the CFPA, it is unlawful for any covered person or service provider to engage in any deceptive act or practice. 12 U.S.C. § 5536(a)(1)(B). An act or practice is "deceptive" if: (1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material. *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) (applying elements of deception claim under the Federal Trade Commission Act to claim under the TSR); *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016) (applying FTC Act standard to CFPA).

To determine whether a representation, omission, or practice is likely to mislead, the Court may

---

[2] As noted above, the parties made pretrial disclosures of exhibit and witness lists on Monday, March 13, 2017.

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

consider the overall net impression the representation creates. *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *10 (C.D. Cal. Aug. 31, 2016) (quotations and citations omitted); *see also FTC v.Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) ("A solicitation may be likely to mislead by virtue of the net impression it creates …."). A representation, omission, or practice "is material if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Cyberspace.Com LLC*, 453 F.3d at 1201, *quoting In re Cliffdale Associates, Inc.*, 103 FTC 110, 165 (1984) (A misleading impression created by a solicitation is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product."); *FTC v. Southwest Sunsites, Inc.*, 105 FTC 7, 149, *aff'd,* 785 F.2d 1431 (9th Cir. 1986) (If consumers are likely to have chosen differently but for the deception, then a misrepresentation is material); *FTC v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012) (finding that representations about the nature of the benefit were material).

Express claims or deliberately-made implied claims used to induce the purchase of a particular product or service are presumed to be material. *See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994) (express claims presumed material); *FTC v. Affiliate Strategies, Inc.*, 849 F. Supp. 2d 1085, 1105 (D. Kan. 2011) (express representations that are shown to be false are presumed material).

Here, Defendants make several material claims. First, Defendants mislead consumers by obscuring the total cost of the program, which is presumptively material. *See Novartis Corp. v. FTC*, 223 F.3d 783, 786 (D.C. Cir. 2000) (citation omitted). Second, Defendants' envelopes, mailers, enrollment scripts, and Q&A documents convey the misleading impression that Nationwide is affiliated with the consumer's lender when, in fact, there is no such partnership or exclusive relationship. This information is important to consumers and thus material for purposes of the CFPA. Third, Defendants make a series of false representations that (1) consumers save money "without increasing" their monthly mortgage payment, (2) consumers are "guaranteed" to achieve "immediate" interest savings and benefits and that Defendants have "saved" a specific amount for consumers, and (3) consumers cannot achieve savings on their own. These false representations are material. *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008) (citation omitted) (express representations that are shown to be false

are presumed material).

Defendants' conduct misleads consumers at every stage of the enrollment process by concealing the existence and amount of the substantial non-refundable setup fee and thus creates a deceptive net impression regarding a central component of the program. Defendants also misrepresent other key features of how the IM Program works, the results achieved by enrolled participants, and whether consumers can attain similar results on their own. Defendants induce the initial contact through deception by never disclosing the non-refundable setup fee in mailers, advertisements/videos, its websites, or other marketing materials. The setup fee is similarly hidden on the enrollment call, buried in the contract, and not disclosed on the consumer's receipt. *See Cyberspace.Com, LLC*, 453 F.3d at 1200 (summarizing case law from other circuits in which fine-print disclaimers are insufficient to overcome evidence of deceptive messaging); *FTC v. Gill*, 71 F.Supp.2d 1030, 1044 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001) (finding disclaimers in contracts signed by consumers insufficient to create dispute of material fact "because each representation must stand on its own merit, even if other representations contain accurate, non-deceptive information[.]") (citation omitted); *FTC v. Health Formulas, LLC*, 2015 WL 2130504, at *12 (D. Nev. May 6, 2015) ("Even if customers read and fully understand the fine print, they are not given the full cost of the product or told how much they will be billed, as there is no price listed next to the dollar sign in the fine print."); *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496–97 (1st Cir. 1989) ("Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings.").

   2.   <u>Whether Defendants Lipsky and Nationwide violated the CFPA by engaging in abusive acts or practices (Count I)</u>

Under the CFPA, it is unlawful for any covered person or service provider to engage in any abusive act or practice. 12 U.S.C. § 5536(a)(1)(B). An act or practice is "abusive" if Defendants have taken unreasonable advantage of the consumer's lack of understanding of the material risks, costs, or conditions of the IM Program. *See* 12 U.S.C. § 5531(d)(2)(A). Here, Defendants Nationwide and Lipsky

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

took unreasonable advantage of the consumer's lack of understanding regarding the material cost and conditions of the IM Program by guaranteeing consumers will save money by enrolling even though it takes many years for consumers to achieve any savings after accounting for the substantial fees and the nature of loan amortization.

   3.   Whether Defendants Nationwide and Lipsky violated the TSR (Count III)

   As an initial matter, Nationwide is a "seller" and "telemarketer" under the TSR. 16 C.F.R. §§ 310.2(dd), (ff). Lipsky is a "seller" under the TSR. *Id*. Defendants Nationwide and Lipsky violated several provisions of the TSR.

   First, Nationwide and Lipsky violated 16 C.F.R. § 310.3(a)(1)(i) by failing to disclose the total cost of the IM Program. Before a customer consents to pay for goods or services, a telemarketer or seller must disclose "truthfully" and "in a clear and conspicuous manner" facts, including "the total costs to purchase . . . goods or services that are the subject of the sales offer." 16 C.F.R. § 310.3(a)(1)(i). The TSR requires telemarketers to disclose the full cost in a way that will be easily understood and noticed by the consumer *before* the consumer consents to pay. *Id*.; Telemarketing Sales Rule, 75 Fed Reg. 48458-01. Courts have determined that terms are not "clear" when they are "inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed." *Rey v. Lafferty,* 990 F. 2d 1379, 1384-85 (1st Cir. 1993) (internal citation omitted). Terms are not "conspicuous" when they are not presented in a way "that the consumer's attention will be drawn to it." *Cole v. U.S. Capital, Inc.*, 389 F.3d 719, 729 (7th Cir. 2004).

   Here, Nationwide and Lipsky do not clearly or conspicuously disclose the total cost of the non-refundable setup fee, but rather repeatedly use vague words toward the end of the sales pitch (so-called "extra biweekly debits"), resort to evasive and misleading answers to questions about the fees, and only refer to the specific amount of the debiting fee ($3.50) when discussing any fees with consumers (even though Defendants in fact know the precise amount of the setup fee). *See FTC v. Arlington Press, Inc.*, 1999 WL 33574020, at *12 (C.D. Cal. Jan. 11, 1999) (finding FTC likely to prevail in preliminary injunction context in case involving a cryptic reference to the total amount of the sale because it was never stated in a clear and conspicuous manner).

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

For the same reasons cited in Section 1, above, Nationwide's and Lipsky's conduct violates 16 C.F.R. §§ 310.3(a)(2)(i), (iii), and (vii), which prohibit sellers and telemarketers from misrepresenting, directly or by implication, "the total costs to purchase . . . goods or services," "[a]ny material aspect of the performance, efficacy, nature or central characteristics" of the goods or services, or the seller or telemarketer's "affiliation with...any person." The evidence will also show that Nationwide and Lipsky violated 16 C.F.R. § 310.3(a)(4), which prohibits sellers or telemarketers from making "a false or misleading statement to induce any person to pay for goods or services." *See Stefanchik*, 559 F.3d at 929–30 (analyzing TSR violation under same analysis of FTC Act); *FTC v. Munoz,* 17 Fed. App'x. 624, 626–27 (9th Cir. 2001).

4. Whether Defendant Lipsky is personally liable for the violations of the CFPA and TSR

Under 12 U.S.C. § 5536(a)(1)(B), it is unlawful for any covered person to engage in any deceptive act or practice. Some courts have applied the standard for individual liability under the FTC Act to claims of individual liability under the CFPA. The Ninth Circuit has done so in one case, stating that an individual may be liable for corporate violations if (1) he participated directly in the deceptive acts or had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth. *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1193 (9th Cir. 2016); *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1102 (9th Cir. 2014) ("[t]he extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability.") (citation omitted).

Here, Lipsky should be held personally liable for several reasons. He is the founder, president, and sole officer of Nationwide and has exercised unfettered authority to execute key decisions regarding the IM Program and maintains extensive oversight of critical aspects of Nationwide's advertising and telemarketing operations. He directs and oversees all aspects of the operations, including drafting, editing, and approving the content and layout of sales scripts, direct-mail marketing letters, contracts, and other marketing materials that contained the deceptive statements that violated the CFPA and TSR.

5. Whether the Bureau is entitled to restitution, disgorgement, and civil money penalties

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

The CFPA authorizes the Court to order any appropriate equitable relief, including, *inter alia*, disgorgement, restitution, limits on the activities or functions of the person, and civil money penalties. 12 U.S.C. §§ 5565(a)(1) and (2); 12 U.S.C. § 5565(c)(1); *see also FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1088 (C.D. Cal. 2012) ("Restitution may be measured by the 'full amount lost by consumers rather than limiting damages to defendant's profits.'") (citation omitted); *Stefanchik*, 559 F.3d at 931-32 ("Because the FTC Act is designed to protect consumers from economic injuries, courts have often awarded the full amount lost by consumers rather than limiting damages to a defendant's profits.").

The Bureau does not need to show that individual consumers were deceived by Defendants' acts or practices, that individual consumers relied upon the misrepresentations, or that deceived consumers did not use Defendants' service or derive any enjoyment from it. *See Commerce Planet*, 878 F. Supp. 2d at 1091. The Bureau also need not prove that every consumer actually relied upon the misrepresentations to prevail. *Stefanchik*, 559 F.3d at 929 n.12, *quoting FTC v. Amy Travel Serv., Inc.*, 875 F.2d at 572; *see FTC v. Figgie Int'l*, 994 F.2d 595, 605 (9th Cir. 1993) (citation omitted). If the Bureau makes the required showing that Defendants made misrepresentations that caused actual consumer injury, Defendants must come forward to show that the Bureau's amount is not accurate. *See FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 603 (9th Cir. 2016); *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997).

Under the CFPA, "any person that violates, through any act or omission, any provision of Federal consumer financial law shall forfeit and pay a civil penalty" of specified amounts depending on the level of scienter of the person. *See* 12 U.S.C. § 5565(c)(1). In determining the amount of any penalty assessed under paragraph (2), the Bureau or the Court shall take into account the size of financial resources and good faith of the person charged, the gravity of the violation or failure to pay, the severity of the risks to or losses of the consumer, which may take into account the number of products or services sold or provided, the history of previous violations, and other matters as justice may require.

6. <u>Whether the clear and convincing standard of proof applies to this case</u>

Defendants erroneously state that the clear and convincing standard of proof applies in this case. The Supreme Court, however, has made clear that the preponderance of the evidence standard applies

1   in civil cases, including civil penalty cases. *See U.S. v. F/V Repulse*, 688 F.2d 1283, 1284 (9th Cir.

2   1982), *citing Addington v. Texas*, 441 U.S. 418, 423 (1978); *see also United States v. Ward*, 448 U.S.

3   242 (1980). Therefore, the Court should reject this defense.

4         7.   Whether the Bureau has violated the Due Process Clause

5         Defendants assert that the Bureau has violated the Due Process Clause by failing to provide

6   notice as to what conduct is prohibited under the law. This argument fails, however, because the Due

7   Process Clause does not require the government to inform subjects prior to filing suit.

8         Defendants cite *United States v. AMC Entertainment, Inc.*, 549 F.3d 760, 768 (9th Cir. 2008),

9   which is inapposite and addresses the separate issue, not present here, when a government agency

10  applies a substantive change in position retroactively. Here, the Bureau does not seek to retroactively

11  expand or change the prohibition against deceptive acts or practices that has existed in federal law for

12  decades. *See Consumer Fin. Prot. Bureau v. Siringoringo*, No. No. SACV 14–01155 JVS, 2016 WL

13  102435, at *4 (C.D. Cal. Jan. 7, 2016) ("[T]he standard for a CFPA deception claim is the same as the

14  standard under section 5(a) of the Federal Trade Commission Act.").

15        Similarly, the TSR has existed in some form for over two decades and the Bureau is not seeking

16  to expand or change its application in this action. The TSR prohibits, for example, telemarketers from

17  failing to disclose truthfully and in a clear and conspicuous manner the total cost to purchase before a

18  consumer consents to pay, or from misrepresenting the total cost to purchase the services. *See* 16 C.F.R.

19  §§ 310.3(a)(1)(i), 310.3(a)(2)(i). Defendants cannot credibly claim – and do not allege – that they

20  needed more notice of these rules before the Bureau could enforce them.

21        With respect to the Bureau's claims that Defendants engaged in abusive conduct in violation of

22  the CFPA (Count I), the CFPA's prohibition on abusive acts or practices is sufficiently clear to put

23  Defendants on notice of what conduct will violate that prohibition. *See* 12 U.S.C. § 5531(d) (describing

24  standard for abusive acts or practices); *see also Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc.*,

25  No. No. 1:14-CV-00292-SEB, 2015 WL 1013508, at *20 (S.D. Ind. Mar. 6, 2015) (CFPA's prohibition

26  on "abusive" practices provides the minimal level of clarity that due process clause demands of non-

27  criminal economic regulation and thus is not unconstitutional).

28

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

Finally, to the extent Defendants suggest that they have been licensed under state law, that states have conducted examinations of Nationwide in connection with those licenses, or that state regulators have reviewed Nationwide's marketing materials – such evidence is irrelevant. The fact "that a defendant operates under a state issued license has no bearing on whether the defendant is engaged in 'deceptive acts.'" *FTC v. USA Fin., LLC*, 415 F. App'x 970, 974 n.2 (11th Cir. 2011). Whether Nationwide was examined by state regulators, had its marketing materials reviewed by state regulators, or received licenses from those state regulators has no bearing on whether Defendants engaged in deceptive and abusive acts or practices in violation of the CFPA or the TSR. Such evidence would not tend to make the existence of any fact that is of consequence to the determination of the action – specifically, whether (1) Nationwide and Lipsky made guarantees to consumers about saving money if they enrolled in the IM Program while knowing that was not true, (2) Defendants made material misrepresentations when marketing the IM Program to consumers, or (3) Nationwide and Lipsky engaged in deceptive telemarketing acts and practices when marketing the IM Program by telephone – more or less probable than it would be without the evidence. There is no fact relating to any element of these claims that is more or less likely to be true because Nationwide received licenses to operate in certain states, because it was examined in certain states, and because certain state regulators reviewed its marketing materials. For these reasons, the Court should reject Defendants' affirmative defense.

8. <u>Whether Defendants have a Due Process right to have the Bureau give them pre-suit notification of the substance of the Bureau's claims in the Bureau's NORA process</u>

Defendants assert that the Bureau has violated its own, discretionary, pre-suit notification process (known as the "NORA process"). However, there is no substantive or procedural right requiring the Bureau to give potential defendants pre-suit notification of the substance of the Bureau's claims through the Bureau's NORA process.

In analogous situations, courts have held that defendants are not constitutionally entitled to pre-suit notification that an agency is considering litigation or an opportunity to respond prior to litigation. *See TRW, Inc. v. FTC*, 647 F.2d 942, 952 (9th Cir. 1981) ("The Commission's prior practice [of allowing pre-complaint presentations to Commissioners] was not a 'rule' to which the Commission is

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

1  constitutionally compelled to adhere."); *SEC v. Nat'l Student Mktg. Corp.*, 538 F.2d 404, 407 (D.C. Cir.

2  1976) (finding no constitutional or statutory procedural infirmity in SEC decision not to follow its

3  discretionary pre-suit notification process; requiring SEC to follow process would seriously burden the

4  SEC's enforcement procedure); *Wellman v. Dickinson*, 79 F.R.D. 341, 353 (S.D.N.Y. 1978) (concluding

5  pre-suit process is not constitutionally compelled because there is no substantive adjudication of rights

6  until after suit is filed and because defendant has an opportunity to present claims at a full trial on the

7  merits). Therefore, the Court should reject Defendants' affirmative defense pertaining to the NORA

8  process.

9       9.   Whether the CFPA, TSR, and UDAAP are unconstitutionally vague

10          Contrary to Defendants' argument, the CFPA, TSR, and UDAAP authority are not

11  unconstitutionally vague. *See Consumer Fin. Prot. Bureau v. Siringoringo*, No.

12  SACV1401155JVSAJWX, 2016 WL 102435, at *4 (C.D. Cal. Jan. 7, 2016) ("[T]he standard for a

13  CFPA deception claim is the same as the standard under section 5(a) of the Federal Trade Commission

14  Act"); *Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc.,* No. 1:14-CV-00292-SEB, 2015 WL

15  1013508, at *20 (S.D. Ind. Mar. 6, 2015), *appeal docketed,* No. 15–1761 (7th Cir. Apr. 8, 2015)

16  (CFPA's prohibition on "unfair" or "abusive" practices is not unconstitutionally vague because

17  longstanding interpretations of the Federal Trade Commission Act should inform interpretation of the

18  CFPA). Therefore, the Court should reject Defendants' affirmative defenses on this point.

19      10.  Whether the Bureau's action is barred by any statute of limitations

20          Under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank

21  Act"), "Except as otherwise permitted by law or equity, no action may be brought under this title more

22  than three years after the date of discovery of the violation to which an action relates." 12 U.S.C.

23  §5564(g)(1). Defendants argue this action is barred by the statute of limitations, based solely on a theory

24  that requires imputing knowledge of a state official to a separate federal agency. Specifically, they allege

25  that because the state of Ohio brought an action against Nationwide while Richard Cordray was Ohio's

26  Attorney General, any knowledge held by the Ohio Attorney General's office became imputed to the

27  Bureau once Cordray joined the Bureau. Defendants cite no authority for this legal theory, nor do they

28                                              33

explain how conduct occurring after July 21, 2011 could have been known to the Ohio Attorney General's office in 2009. Therefore, the Court should reject Defendants' affirmative defense on this point.

11. Whether the Bureau is estopped from pursuing monetary relief in this lawsuit

The cessation of Defendants' banking relationships has nothing to do with the damages (restitution, disgorgement, civil money penalties) sought by the Bureau in this case. The Bureau is not estopped from pursuing monetary relief for consumers harmed by Defendants' IM Program and caused by Defendants' violations of the CFPA and the TSR regardless of whatever occurred with Defendants' termination of ACH services.

12. Whether Nationwide can show that the Bureau impermissibly infringed upon speech protected by the First Amendment

As an initial matter, Defendants appropriately concede that misleading or deceptive commercial speech is not protected by the First Amendment. However, Defendants' alternative position that the First Amendment somehow protects "abusive" speech is baseless. There is no authority to support this defense, and therefore the Court should reject the First Amendment affirmative defense.

**B. Defendants' Statement**

Defendants are not liable for any and all alleged violations of the CFPA and TSR in connection with the Interest Minimizer Program.

1. Whether under the Due Process Clause of the Fifth Amendment, the Bureau's burden of proof is clear and convincing evidence.

Procedural due process is the ultimate safeguard against government unfairness. *See National Ass'n of Recycling Indus. v. ICC*, 627 F.2d 1328, 1344 (D.C. Cir. 1980); *Gilbert v. Johnson*, 601 F.2d 761, 766 (5th Cir. 1979). When government agencies seek to impose sanctions that infringe upon an individual's liberty or property, certain procedural safeguards are constitutionally required. These safeguards are determined by balancing three competing interests:

> (1) The effect of the governmental action upon an individual's constitutionally protected interests; (2) the fairness of the existing proceeding and probable effect that that any additional procedural safeguards will have in increasing the accuracy of the proceeding

34

and further decreasing the risk of an erroneous deprivation of an individual's rights; and (3) the governmental interests implicated in the proceeding. [3]

The first prong is an examination of the individual property and liberty interests that are infringed upon by the governmental action. *Matthews,* 424 U.S. at 335. The Supreme Court held that the possible deprivation of a physical liberty inherent in an involuntary commitment proceeding mandated the use of a clear and convincing burden of proof. *Addington v. Texas*, 441 U.S. 418 (1979). Although Defendants are not deprived of their physical liberty as a result of the Bureau's investigation and lawsuit, the imposition of penalties will deprive them of significant liberty interests.

After nearly three years of investigation and litigation, the Bureau's lawsuit effectively asks the Court to end Defendants—asking for every penny Mr. Lipsky has ever made from the Interest Minimizer Program. The purpose of these sanctions is to disgorge Mr. Lipsky of all assets, and indebt him for generations. The sanctions sought deprive Mr. Lipsky of his right to pursue a livelihood, a constitutionally protected interest that cannot be impaired absent procedural due process safeguards. *Lynch v. Household Fin. Corp.*, 405 U.S. 538, 552 (1972) ("People have rights…a fundamental interdependence exists between the personal right to liberty and the personal right in property."). Courts have frequently applied a higher burden of proof to analogous proceedings that potentially result in the deprivation of a significant liberty interest. *See*, e.g., *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974).

"Liberty is [also] implicated and procedural due process is required when government action threatens an [individual's] good name, reputation, honor, or integrity." *McNeill v. Butz*, 480 F.2d 314, 319 (4th Cir. 1973). Courts have long recognized that allegations that connote corruption and mortal

---

[3] *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("Due process is flexible and calls for such procedural protections as the particular situation demands"); *Cafeteria & Restaurant Workers Local 473 v. McElroy*, 376 U.S. 886, 895 (1961) ("[d]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances"); *see also Matthews v. Eldrige*, 424 U.S. 319, 335-44 (1976).

35

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

turpitude "might seriously damage [one's] standing and associations in the community." *Jordan v. De George*, 341 U.S. 223, 227-28 (1951). As a result, courts have imposed an intermediate burden of proof in civil fraud cases in recognition of the "adverse social consequences to the individual" engendered by such proceedings. *Addington*, 441 U.S. at 426. [4]

The Bureau threatened and harmed Mr. Lipsky's good name, reputation, honor, and integrity when it issues its baseless press release issued at the time suit was filed: "Daniel Lispky [,] took advantage of consumers with false promises of savings on their mortgages." The Bureau lodged these accusations without a finding of any liability and without due process of law. It must now prove these allegations in a manner that protects Mr. Lipsky's liberty interest, namely, the standard of clear and convincing evidence.

The second prong determines whether the existing procedure adequately protects against erroneous deprivations of life, liberty, or property. *Matthews*, 424 U.S. at 345-47. Because this is a case of first impression, it is essential to minimize the risk of erroneous deprivation at the hands of the Bureau—an agency whose constitutional basis is currently in dispute. Raising the burden of proof will decrease the risk of erroneous deprivation because the risk of an innocent party being found liable decreases.  "In cases involving individual rights …the standard of proof…reflects the value society places on individual liberty." *Addington*, 441 U.S. at 425. The risk of erroneous deprivation will decrease, and an individual's right to pursue a livelihood and to protect his reputation will be safeguarded.

The third prong requires an analysis of the governmental interests in the continued use of the present procedure, and the resultant burden accompanying the imposition of additional safeguards.

---

[4] Some courts have imposed the clear and convincing standard to ensure a presumption of honesty and fair dealing on the part of all individuals. *See*, e.g., *United Sates v. Wunderlich*, 342 U.S. 98, 100 (1951); *United States .v Colorado Anthracite Co.*, 225 U.S. 219, 226 (1913); *Planatation Key Developers v. Colonial Mortgage Co.*, 589 F.2d 164, 172 (5th Cir. 1979).

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

*Matthews*, 424 U.S. at 349. The imposition of additional safeguards would pose no additional burden on the Bureau here. The Bureau conducted a full investigation from June 2014 until it filed suit on May 11, 2015. Thus, the decision to pursue sanctions through litigation is made after the agency has committed its resources. The imposition of this standard only affects the mental processes of the fact-finder by establishing a subjective level of persuasion that must be reached before finding Defendants liable for any violation under the CFPA or TSR.

The Bureau seeks to deprive Mr. Lipsky of his liberty, livelihood, and reputation. To satisfy the procedural safeguards guaranteed under the Fifth Amendment's due process clause, the Bureau must meet this burden by clear and convincing evidence.

2.  <u>Whether the Bureau's action violates the Fifth Amendment Due Process clause.</u>

Due process requires that government provide citizens and other actors with sufficient notice of what behavior complies with law. Liberty depends on no less: "[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws given person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *U.S. v. AMC Entertainment, Inc.*, 549 F.3d 760, 768 (9th Cir. 2008). Stated differently, "[t]hose regulated by an administrative agency are entitled to know the rules which the game will be played." *Id.*

The Bureau's suit attempts to twist Defendants' marketing material until it conflicts with federal consumer law. In doing so, the Bureau ignores its obligation to provide sufficient notice of what marketing practices comply with federal law.

3.  <u>Whether the CFPA, UDAAP, and TSR are unconstitutionally vague</u>

The CFPA, UDAAP, and TSR are unconstitutional for vagueness and as applied. As such, the Bureau's actions violate due process because regulated parties lack fair notice of what conduct is prohibited under each statute.

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

4.   Whether the Bureau violated its Notice and Opportunity to Respond and Advise ("NORA") process.

The Bureau failed to follow its NORA process and failed to provide Defendants with an opportunity to respond to the Bureau's allegations in advance of this lawsuit. Under the NORA process, Defendants have at least 14 days to respond to the Bureau's allegations before the agency decides whether to pursue an enforcement action. *See Bronco Wine Co. v. U.S. Dept. of Treasury*, 997 F.Supp. 1309, 1314 (E.D. Cal. 1996) ("[T]he court must look to see whether the agency articulated reasons for its decision, whether those reasons were based on relevant factors, and whether the agency's decision had some rational basis."). Here, the Bureau has no rational basis or reason to decline its NORA process. For this reason, its claims should be denied in full.

5.   Whether the Bureau's action is barred under the Statute of Limitations

Under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), "Except as otherwise permitted by law or equity, no action may be brought under this title more than three years after the date of discovery of the violation to which an action relates." 12 U.S.C. §5564(g)(1).  The Supreme Court, in *Gabelli v. SEC*, recently explained some of the challenges posed by a discovery-based limitations period:

> "Determining when the Government, as opposed to an individual, knew or reasonably should have known of a fraud presents particular challenges for the courts. Agencies often have hundreds of employees, dozens of offices, and several levels of leadership. In such a case, when does 'the Government' know of a violation? Who is the relevant actor? Different agencies often have overlapping responsibilities; is the knowledge of one attributed to all?" 133 S. Ct. at 1216.

In this case, the knowledge of one should be attributed to all. Director Cordray discovered Defendants' actions that he would classify as "unfair," "deceptive," or "abusive" in  2009. He joined the Bureau in 2010 as head of the Enforcement Division. As Director, he brought suit in 2015, more than two years after the statute of limitations expired.

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

The Bureau's lawsuit was filed two years after the statute of limitations expired. For this reason, its claim is barred under the Dodd-Frank Act.

6. Whether Defendants' statements relating to the any of the Bureau's allegations fall within the parameters of commercial free speech protected by the First Amendment.

Defendants' marketing material is protected under the First Amendment's right to free speech. "Commercial expression not only serves the economic interests of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562, 100 S. Ct. 2343, 2349, 65 L. Ed. 2d 341 (1980). In applying the First Amendment to this commercial speech, the Court rejected the "highly paternalistic" view that government has the complete power to suppress or regulate free speech. *Id.* "People will perceive their own best interests only if they are well enough informed, and …the best means to that end is to open channels of communication rather than to close them." *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 762 (1976). "Even when advertising communicates only an incomplete version of the relevant facts, the First Amendment presumes some accurate information is better than no information at all." *Bates v. State Bar of Arizona*, 433 U.S. 350, 363-364 (1977). Deceptive or misleading commercial speech is not protected under the First Amendment. *Virginia Pharmacy Board*, 425 U.S. at 771. Precedent is clear "deceptive" or "misleading" commercial speech is not protected. There is not, however, any such exception from the First Amendment for commercial speech classified as "abusive" or "unfair." Stated differently, under the First Amendment, Defendants cannot be found liable if its marketing material is deemed "abusive" or "unfair."

7. The Bureau is estopped from pursuing damages proximately caused by its own actions.

The Bureau is the proximate cause for the termination of Counterclaimant's ACH services. By November 2015, Counterclaimant was unable to maintain existing banking relationships or obtain new

39

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

banking relationships. As a result, Counterclaimant was unable to conduct any business and was forced to suspend Interest Minimizer Program services for its 135,000 customers. The Bureau cannot recover the effect (135,000 customers without service) that it caused by terminating Counterclaimant's banking relationships.

### 10.    Pending Motions or Matters:

1.   The parties' compliance with the Order Regarding Discovery Dispute Involving Production of Emails, Dkt. No. 224, issued by Magistrate Judge Laporte on March 22, 2017.

2.   Motions in Limine

### 11.    Bifurcation, Separate Trial of Issues:

**A.  The Bureau's Statement**:

The Bureau requests separate trials of the Bureau's affirmative claims and Nationwide's counterclaims.[5] Pursuant to Fed. R. Civ. P. 42(b), "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Factors courts consider in determining whether to bifurcate a trial include "avoiding prejudice, separability of the issues, convenience, judicial economy, and reducing risk of confusion." *Bates v. United Parcel Serv.*, 204 F.R.D. 440, 448 (N.D. Cal. 2001) (*citing* William W Schwarzer, et al., *Federal Civil Procedure Before Trial* § 16:160.4 (Rev. # 1 2001)).

Here, bifurcation of the Bureau's claims from Nationwide's counterclaims would simplify the trial of this matter for the court and the parties. First, bifurcation would avoid the confusion and resulting prejudice that might result should the court considering Defendants' marketing practices as part of the Bureau's affirmative case also hear evidence regarding Nationwide's allegations regarding the Bureau's alleged "extrajudicial tactics" and the loss of Nationwide's banking services as part of its counterclaims. The Bureau's claims and Nationwide's counterclaims share no common core of facts and are easily separable. Whereas the Bureau's claims concern the marketing and operation of Defendants'

---

[5] As noted in the parties' Joint Pretrial Statement regarding Nationwide's counterclaims, the Bureau has requested bifurcation of the counterclaims portion of the trial with respect to the discrete question of the Court's jurisdiction over the counterclaims.

biweekly payment program, Nationwide's claims concern the Bureau's alleged backroom pressure of Nationwide's banks. Nationwide's allegations have no bearing on the Bureau's affirmative claims against Defendants, and risks confusion and prejudice.

The legal issues underpinning the claims are similarly separable. The Bureau's claims rest on the CFPA and the TSR, while Nationwide's claims rest on constitutional claims regarding alleged First and Fifth Amendment violations. Moreover, bifurcation will serve interests of convenience and economy. Under the estimated trial time proposed by the parties, presentation of the affirmative case may last as long 95 hours, whereas the parties estimate that presentation of the counterclaims will require only 30 hours. By bifurcating the claims, the court will allow the parties to avoid the unnecessary time and expense that may be required should the two sets of claims have to be staffed and litigated jointly.

## B. Nationwide's Statement

Nationwide respectfully requests the Court deny the Bureau's attempt to bifurcate this trial. Nationwide's claim state as follows: (1) Nationwide's ability to maintain and form banking relationships was terminated; (2) the Bureau's actions and influence caused this termination; and (3) Nationwide now seeks redress, including injunctive and declaratory relief.

"Courts consider several factors in determining whether bifurcation is appropriate, including separability of the issues, simplification of discovery and conservation of resources, prejudice to the parties, and the suitability of bifurcating trial but not discovery." *Bates v. United Parcel Svc.*, 204 F.R.D. 440, 448 (N.D. Cal. 2001). The party requesting bifurcation has the burden to prove that it warranted in that particular case. *Spectra-Physics Lasers, Inc. v. Uniphase Corp.*, 144 F.R.D. 99, 101 (N.D. Cal. 1992).

Nationwide's Counterclaim and the Bureau's Complaint are intrinsically connected. Both claims relate to (1) the Interest Minimizer Program; (2) Nationwide's ACH services; and (3) the Bureau's influence over Nationwide dating back to 2014. The Bureau will not suffer prejudice at trial. It has been aware of the likelihood of the Counterclaim being addressed at trial since its Motion to Dismiss the Counterclaim was denied on December 13, 2016.  Accordingly, Nationwide requests the Court deny any bifurcation of the issues.

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS

1

**12.** **Estimate of Trial Time:**

2

The Bureau estimates that it will take 55 hours to present its affirmative case.

3

Defendants estimate that it will take 40 hours to present its case-in-chief, cross-examination, and rebuttal

4

if necessary.

5

**13.** **Miscellaneous:**

6

**A. The Bureau's Statement**

7

Consistent with the Court's Guidelines for Final Pretrial Conference, this order should be

8

modified only to prevent manifest injustice.

9

**B. Defendants' Statement**:

10

Because current Defendants' counsel have moved to withdraw, if the Court should grant their

11

request, Defendants request the right to further modify or revise this Statement to permit their new

12

counsel to comprehensively review this matter and request such modifications that they deem necessary

13

in order to prevent manifest injustice.

14

15

*The foregoing admissions having been made by the parties, and the parties having specified the*

16

*foregoing issues of fact and law remaining to be litigated, this order shall supplement the pleadings*

*and govern the course of trial of this cause, unless modified to prevent manifest injustice.*

17

For Plaintiff Consumer Financial
Protection Bureau

18

19

/s/ Patrick Gushue

20

Jonathan Urban
Patrick Gushue

21

Stephen Jacques
Thomas McCray-Worrall

22

Elizabeth France

23

*Attorneys*
Consumer Financial Protection Bureau

24

1700 G Street NW

25

Washington, DC 20552

26

27

28

42

*The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues of fact and law remaining to be litigated, this order shall supplement the pleadings and govern the course of trial of this cause, unless modified to prevent manifest injustice.*

For Defendants Nationwide Biweekly Administration, Inc., Loan Payment Administration, LLC, and Daniel S. Lipsky

s/ Helen M. Mac Murray
Helen M. Mac Murray
Lisa A. Messner
Kimon Manolius
Samantha D. Wolff

*Attorneys*

**HANSON BRIDGETT, LLC**
425 Market Street, 26th floor
San Francisco, CA  94105

MAC MURRAY & SHUSTER, LLP
6530 West Campus Oval, Suite 210
New Albany, Ohio  43054

Joint Pretrial Statement – Affirmative Claims
Case No. 3:15-cv-02106-RS