ANTHONY ALEXIS (DC Bar #384545)
DEBORAH MORRIS (Admitted to the NY Bar)
MICHAEL G. SALEMI (IL Bar #6279741)
PATRICK GUSHUE (PA Bar #306966)
JONATHAN URBAN (CO Bar #44190)
STEPHEN JACQUES (DC Bar # 464413)
ADRIENNE WARRELL (Admitted to the NY Bar)
THOMAS MCCRAY-WORRALL (Admitted to the MD Bar)
ELIZABETH FRANCE (DC Bar #999851)
Patrick.Gushue@cfpb.gov
1700 G Street NW
Washington, DC 20552
Phone: 202-435-9671
Fax: 202-435-7329
Attorneys for Plaintiff Consumer Financial Protection Bureau

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>                                        Plaintiff,<br><br>        v.<br><br>NATIONWIDE BIWEEKLY ADMINISTRATION, INC., LOAN PAYMENT ADMINISTRATION LLC, AND DANIEL S. LIPSKY,<br><br>                                Defendants.<br><br>-----------------------------------------------<br><br>NATIONWIDE BIWEEKLY ADMINISTRATION, INC.,<br><br>                        Counter-claimant,<br><br>        v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>                                Counter-defendant. | Case No. 3:15-cv-02106-RS<br><br>**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING AFFIRMATIVE CASE**<br><br>Trial Date:        April 24, 2017<br>                         9:00 a.m.<br>Judge:             Hon. Richard Seeborg<br>Courtroom:      Courtroom 3, 17th Floor<br>                         450 Golden Gate Ave.<br>                         San Francisco, CA 94102 |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to section D.4 of the Court's Guidelines for Final Pretrial Conference in Bench Trials, Plaintiff the Consumer Financial Protection Bureau (Bureau) submits these Proposed Findings of Fact and Conclusions of Law Regarding the Bureau's Affirmative Case.

## I.  Proposed Findings of Fact

### A.     The Parties

1. The Bureau is an independent agency responsible for enforcing the CFPA, 12 U.S.C. §§ 5491, 5565, and authorized to enforce the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6105(d), and its implementing regulation, the Telemarketing Sales Rule (TSR), with respect to the offering or providing of consumer financial products or services, 15 U.S.C. § 6105(d).

2. Defendant Nationwide Biweekly Administration, Inc. (Nationwide) is an Ohio corporation based in Xenia, Ohio.

3. Defendant Loan Payment Administration (LPA) is a wholly-owned subsidiary of Nationwide that provides marketing services to Nationwide.

4. Defendant Daniel Lipsky (Lipsky) is Nationwide's founder, president, sole officer, and owner and has managerial responsibility for all marketing and advertising decisions for Nationwide and LPA.

5. Lipsky has been Nationwide's President since 2002 and its only executive officer (sole Director, Secretary, and Treasurer) since approximately 2011.

### B.     Defendants' IM Program

6. Since at least July 21, 2011 until November 23, 2015, Nationwide offered the Interest Minimizer (IM) program to consumers across the country.

7. Under the IM Program, Nationwide contracts with consumers to debit one-half of a mortgage payment every two weeks, holds the consumer's funds in a suspense account until the mortgage due date, and then transmits the amount due to the mortgage servicer on a monthly basis for application toward the loan principal.

8.       Nationwide's payment debiting results in the equivalent of a 13th monthly payment on the loan principal after the first year and thus purports to reduce the balance at a faster rate than the standard monthly repayment schedule.

9.       Nationwide also offered the option to debit consumer accounts on a weekly and semi-monthly basis.

10.       In 2013, the median consumer using the IM Program for a thirty-year fixed-rate mortgage had a mortgage loan of $160,204 and an interest rate of 4.125%.

11.       Prior to 2010, Nationwide charged consumers a flat fee of $245 over the phone to participate in the IM Program.

12.       Under the $245 payment arrangement, consumers were required to present a credit or debit card or check over the phone in order to authorize the charge.

13.       Lipsky changed the fee structure in 2010.

14.       After 2010, Defendants collected a "deferred" non-refundable setup fee to participate in the IM Program.

15.       Instead of the consumer paying a setup fee of $245 over the phone, in 2010 Defendants began taking one of the consumer's biweekly mortgage payments as a "deferred setup fee," generally equivalent to "one biweekly debit" or half a mortgage payment for consumers with a 30-year mortgage.

16.       Defendants also charge periodic debiting fees of $1.95 and $3.50 per debit for their weekly and biweekly/semi-monthly programs, respectively.

## C.     Defendants' Telemarketing Operations

17.       Both Nationwide and LPA advertise the IM Program through direct-mail marketing letters (mailers), and Nationwide made and received phone calls from consumers nationwide.

18.       Between 2011 and 2015, Defendants sent millions of mailers advertising the IM Program to consumers across the country.

19.       A consumer may receive an initial mailer advertising the IM Program and, if she does not respond, may receive one to three additional mailers over a one year period.

20.       The mailers typically include the name of the consumer's lender (visible through the front window of the envelope) and the consumer's loan amount, a sample interest rate to calculate

2

estimated savings – often presented graphically in a table – that Nationwide claims consumers will achieve through the IM Program, as well as additional information about how the IM Program works.

21.     On average, Nationwide received approximately 10,000 to 20,000 calls per month from consumers across the country.

22.     Between July 21, 2011 and December 31, 2015, approximately 126,500 consumers enrolled in the IM Program.

23.     Between July 21, 2011 and December 31, 2015, Defendants collected $73,955,169 in setup fees from approximately 126,500 consumers.

24.     Between July 21, 2011 and December 31, 2015, Defendants issued $445,976 in refunds to consumers.

25.     On every call, Defendants require enrollment specialists to follow scripts and question-and-answer (Q&A) documents word-for-word throughout the entire telemarketing interaction with the consumers who call Defendants.

26.     Although enrollment specialists can add to the script, they are directed not to omit anything from it.

27.     Defendants' scripts include responses to a variety of common questions from consumers.

28.     Scripts, as well as mailers and contracts, contain information and markings indicating the dates when a particular document was in use.

29.     During telemarketing calls, Defendants email a savings analysis document to consumers.

30.     Enrollment specialists generate the savings analysis documents using details of the consumer's loan that the consumer provides during the call.

31.     To enroll a consumer, the enrollment specialist reads a script and directs her how to complete the "e-sign" process.

32.     After the consumer electronically signs the enrollment form, Defendants send the consumer the executed contract, which includes a two-page Biweekly Program Agreement and receipt.

33.     The non-refundable setup fee is due upon signing the contract.

34.     The consumer has seven days to cancel without incurring the non-refundable setup fee.

3

35.     The contracts used by Defendants indicate that the consumer "currently" owes the non-refundable setup fee upon signing the contract.

36.     Defendants collect the setup fee by keeping the first "extra" biweekly payment (approximately the 13th debit), which typically occurs several months after enrollment.

37.     After collecting the setup fee, Defendants then direct subsequent extra debits to the principal.

38.     If consumers use the IM Program as designed, Defendants always collect the non-refundable setup fee before making any additional principal payments to the consumer's lender or servicer.

**D.     Defendant Lipsky's Role in the Advertising and Telemarketing of the IM Program**

39.     Lipsky created, revised, and/or approved all mailers, scripts, Q&A documents, talk-offs, talking points, written instructions/guidance for Nationwide's employees, contracts, and terms of service for the IM Program.

40.     Lipsky was in charge of setting all price points for the IM Program.

41.     Lipsky eventually capped the non-refundable setup fee at $995 at the end of 2011.

42.     Lipsky developed the sales script from scratch.

43.     Lipsky played a key role in designing and creating the training program for the enrollment department.

44.     Lipsky played a role in approving sales goals and personnel decisions for the enrollment department.

45.     From 2011 to 2015, Lipsky received $33,039,299 in shareholder distributions from Nationwide.

46.     Between 2011 and 2015, Lipsky received an annual salary between $100,000 and $200,000 from Nationwide.

47.     Lipsky controls the content of Nationwide's websites.

48.     Lipsky is a company spokesman and has appeared in videos posted on Nationwide's websites and was involved in writing and approved the script for a paid advertisement in which he

Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding Affirmative Case
Case No. 3:15-cv-02106-RS

1  appeared ("The Balancing Act") that aired in September 2014 on the Lifetime network and also

2  appeared on Defendants' website.

3      49.    Lipsky reviews consumer complaints, edits and approves Nationwide's formal responses

4  to consumer complaints received on behalf of third parties, and authorizes consumer refunds.

5      50.    Lipsky conducts final review and approval over consumer complaints.

6      51.    Between 2011 and 2015, consumers complained about the non-refundable setup fee and

7  other representations made in mailers, marketing materials, telemarketing calls, sales scripts, contracts,

8  and other promotional materials regarding the IM Program.

9      52.    Only very rarely were refunds ever issued without Lipsky's approval.

10      53.    Lipsky controls the content of the savings analysis template emailed to consumers during

11  the enrollment process.

12      54.    Lipsky purchases the names, addresses, and loan information (closing date, loan amount,

13  and lender name) from data sources to target new homeowners and consumers who have recently

14  refinanced with direct mail marketing letters.

15      55.    Lipsky is primarily in charge of the design and layout of the mailers and envelopes.

16      56.    Lipsky decides which letters to send for a particular mailing campaign.

17      57.    Lipsky tests consumer reactions to mailers.

18      58.    Lipsky has final approval over any changes to mailers and envelopes.

19      59.    Lipsky sends out mailers under various names, including Nationwide, LPA, Loan Payoff

20  Processor, and Synergistic Payment Processing to give consumers the impression that the entities are

21  competing against one another and to gain more market share in the biweekly product space.

22      60.    Defendants received many cease and desist letters from mortgage servicers and lenders

23  regarding the content of Defendants' mailers because the lenders objected to the use of their names and

24  noted the consumer confusion created by Defendants' mailers.

25      61.    Defendants were parties to prior lawsuits that involved business practices that are similar

26  to some of the practices in the present lawsuit, including:

27

28

Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding Affirmative Case
Case No. 3:15-cv-02106-RS

a. a 2014 action brought by Nationwide against various District Offices and offices located in the State of California (USDC—N.D. Cal., Case No. 5:14-cv-04420) involving marketing and advertising issues;

b. a 2014 action by the Washington State Department of Financial Institutions against Nationwide Biweekly Administration, Inc. and Daniel S. Lipsky (Washington State Case No. C-13-1195-14-CO01);

c. a 2013 action brought by Quicken Loans Inc. against Nationwide Biweekly Administration, Inc. and Loan Payment Administration, LLC (USDC—E.D. Mich., Case No. 2:13-cv-13431-LPZ-MKM);

d. a 2008 action by the State of Ohio, ex. rel. Richard Cordray against Nationwide Biweekly Administration, Inc. (Ohio State Case No. 2008 CV 0678);

e. a 2008 action by the State of New Hampshire Banking Department (Case No. 08-241);

f. a 2012 action by the Georgia Department of Banking and Finance against Nationwide Biweekly Administration, Inc. (Case No. DBF-MBL-12-00);

g. a 2013 action by the New Jersey Department of Banking and Insurance against Nationwide Biweekly Administration, Inc., and Loan Payment Administration (Case No. 13-013046);

h. a 2011 case by First Mariner Bank against Nationwide Biweekly Administration, Inc. (USDC-Maryland, Case No. 1:11-cv-1825);

i. a 2015 case by the Illinois Department of Financial and Professional Regulation against Nationwide Biweekly Administration, Inc. (Case No. 2015-DB-01);

j. a 2015 case by the Department of Commerce of the State of Utah against Nationwide Biweekly Administration, Inc., Daniel S. Lipsky, John S. Gregory, Loan Payment Administration, and Michael G. Schwartz (DCP Legal Case No. 83966); and

k. a 2014 case by the Administrator, State of Wisconsin, Department of Financial Institutions, Division of Banking against Loan Payment Administration.

Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding Affirmative Case
Case No. 3:15-cv-02106-RS

**E.      Deceptive and Abusive Acts or Practices Regarding the IM Program**

**i.      False and Misleading Statements Regarding the Non-Refundable Setup Fee**

62.      Defendants' telemarketing scripts, written guidance for enrollment specialists, and sales practices misrepresent the existence and amount of the IM Program's non-refundable setup fee and create the net impression that the IM Program is free or only costs a few dollars every other week.

63.      The average enrollment fee for the IM Program is $550.

64.      None of Defendants' mailers or related marketing materials indicates the amount of the fees – or that Defendants even charge a non-refundable setup fee – to participate in the IM Program.

65.      Defendants' mailers false state that there is "[a]bsolutely" no penalty to cancel and that consumers can "stop and re-start" the IM Program at any time when, in fact, the consumer must pay a non-refundable setup fee to cancel if she cancels after the seven-day cancellation period and before Defendants collect the setup fee.

66.      Some mailers sent to consumers contain the words in boldface, underline text: "NO UPFRONT FEE."

67.      Defendants' claim that there is no "upfront" fee or cost to enroll in the IM Program is false or misleading because the non-refundable setup fee is due upon signing the contract.

68.      Mailers sent to consumers and scripts used on enrollment calls indicate that the consumer's "extra funds" are "directed 100%" to the principal of the loan.

69.      Defendants' claim that consumers' "extra funds" are directed "100%" to the principal of the loan is false or misleading because Defendants retain the consumer's first extra debit to satisfy the non-refundable setup fee.

70.      Defendants' website does not mention the amount or existence of the non-refundable setup fee.

71.      Videos appearing on Defendants' website do not mention the existence of a non-refundable setup fee; the videos state that consumers pay the same amount they "pay now" to participate in the IM Program and that extra funds are directed "100% to the principal."

72.      The savings analysis document emailed to consumers does not mention the amount or existence of the non-refundable setup fee.

7

73.     As part of the enrollment process, the enrollment specialist is required to read the

following, which is the only time the non-refundable setup fee is referred to in the script:

> Now there are 26 biweekly debits annually, which create 2 extra biweekly debits every year that
> are applied directly to your principal resulting in you saving over $(Interest Savings). So you will
> have a total of (biweekly loan term x 2) extra biweekly debits throughout the course of your loan.
> The one-time setup fee for the biweekly program is just one biweekly debit and is completely
> deferred (half a biweekly debit for mortgages with a term less than 20 years). We simply keep
> the first extra debit that occurs within the first 6 months and then the remaining ((biweekly loan
> term x 2) -1) extra debits will go 100% toward the principal of your loan saving you the $ ____
> in interest charges!

74.     There have been no material changes to the setup fee paragraph from 2011 until late

2015.

75.     If the consumer asks how much the program costs, enrollment specialists are required to

read the setup fee section of the script in which no exact fee is mentioned if the enrollment specialist has

already run the savings analysis.

76.     Enrollment specialists are directed not to state the exact amount of the non-refundable

setup fee during the enrollment call.

77.     None of the scripts used prior to late 2015 requires enrollment specialists to state the

exact amount of the setup fee when describing how payments are processed in the section entitled

"Processing Payments/Deferred Setup Fee."

78.     Some scripts contain four different ways to explain the non-refundable setup fee if the

consumer has additional questions – none of which explains the fee with a specific dollar amount.

79.     It was generally against policy to state an exact dollar amount of the non-refundable setup

fee unless the consumer asks about fees several times.

80.     Enrollment specialists were discouraged from giving the consumer the exact amount of

the non-refundable setup fee.

81.     Scripts require enrollment specialists to give the exact amount of the small debiting fees,

i.e., $3.50 per debit, as part of the "Going Over Mortgage Analysis" section of the script.

82.     After the enrollment specialist has run the savings analysis, he or she is aware of the

exact amount of the setup fee the consumer will be charged to participate in the IM Program.

Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding Affirmative Case
Case No. 3:15-cv-02106-RS

83.     If a consumer asks how much the IM Program costs, Defendants' scripts do not direct enrollment specialists to disclose the amount of the non-refundable setup fee or to state that there is a non-refundable setup fee.

84.     Defendants' employees told consumers, who specifically asked about the cost of the IM Program or the non-refundable setup fee, that they "won't feel the fee," "won't notice it," and that the fee "is not out of pocket expense to enroll…[it] happens naturally" and is "built into the program."

85.     Defendants' telemarketing scripts, written guidance for enrollment specialists, and sales practices misrepresent how Nationwide makes money off of a consumer's enrollment.

86.     When consumers ask how Defendants make money, Defendants' scripts direct enrollment specialists to respond by mentioning the debiting fees of $3.50 rather than the setup fee.

87.     The periodic debiting fees ($3.50) cover bank transaction costs and expenses.

88.     The majority of Nationwide's revenue comes from non-refundable setup fees.

89.     In some calls, consumers directly asked the amount of any fee associated with the program, and Defendants' representatives expressly misrepresented the fee, falsely stating that the only fee was the $3.50 transaction fee every other week.

90.     Defendants do not send monthly account statements but only debit notification e-mails.

91.     Defendants' employees directed the consumer's attention away from the setup fee contract language during the online enrollment process.

92.     During the e-sign process, scripts require enrollment specialists to direct consumers to click the "I Agree" box "once everything is filled out correctly" (e.g., bank account information) and do not require enrollment specialists to verbally confirm that the consumer understands that he or she is agreeing to a non-refundable setup fee at this point of the enrollment call.

93.     Defendants' receipts do not itemize or include the amount of the non-refundable setup fee or disclose that Defendants charged consumers a non-refundable setup fee.

94.     Defendants' receipts generally do not mention that Defendants had charged consumers a non-refundable setup fee.

95.     While Defendants' contracts for the $245 pricing structure listed the dollar amount of the setup fee in the setup fee paragraph section of the agreement, Defendants' contracts for the non-

9

refundable deferred setup (2011 through 2015) do not explicitly provide the amount of the non-refundable setup fee in the setup fee paragraph.

96.     The contracts generally state the following in text in an unnumbered paragraph that is smaller from the rest of the agreement:

> SETUP UP. By signing below, I acknowledge and agree to a non-refundable deferred setup fee equivalent to one bi-weekly debit and that I currently owe that amount to NBA; and I authorize NBA to collect such amount by deducting it from the amount it collects from my Designated Account.  In addition, if I cancel my enrollment in the Program for any reason before I have paid such amount in full, I authorize NBA to collect the unpaid balance by electronically debiting the Designated Account.

97.     Defendants do not send consumers a notification or receipt for collection of the non-refundable setup fee.

98.     Defendants do not send any additional notifications or receipts that it collected the non-refundable setup fee – other than a debiting notification that notes that the amount was debited from the consumer's account, but does not identify that amount as a setup fee or disclose that this amount was not paid to the consumer's servicer.

99.     Defendants do not clearly and conspicuously disclose – e.g., in large font where the consumers will look, notice, and understand – the existence and amount of non-refundable setup fee for the IM Program.

100.     Defendants do not clearly and conspicuously disclose – e.g., audibly in a way that consumers are likely to hear it and understand – the non-refundable setup fee for the IM Program prior to requesting the consumer's bank account information.

101.     Of approximately 216 complaints filed with the Better Business Bureau and State Attorneys General since 2012, at least 76 consumers complained that they were not aware or did not know of the setup fee.

### ii.     False and Misleading Statements Regarding Cost of IM Program

102.     Defendants expressly represent that consumers will achieve savings through the IM Program without increasing their monthly payment.

103.  Defendants' mailers claim that consumers "**do not increase** [their] **monthly payment**" by using the IM Program.

104.  Defendants' mailers state that the consumer's "monthly payment is decreased to a much smaller biweekly debit amount (1/2 of a monthly payment)…"

105.  Defendants' online video entitled "Bi-weekly Interest Savings Payment Option" states to consumers that their "monthly payment is decreased to a much smaller biweekly amount…"

106.  Defendants' online video entitled "Bi-weekly Interest Savings Payment Option" tells consumers to "remember you're not increasing your payment…" and "there's no increase in your monthly payment."

107.  Defendants' online video entitled "How it works" states that consumers "pay[] the exact same amount [they] pay now" and "do not increase" their monthly payment.

108.  Defendants' online video entitled "How it works" tells consumers to "remember, you're not increasing your payment. You're just switching to a smaller biweekly amount…"

109.  Defendants' advertisements state to consumers that there is "No Increase in [their] Monthly Payment."

110.  Defendants' rebuttal scripts require enrollment specialists to remind consumers that they are "not increasing [their] monthly payment, but instead switching to a smaller biweekly or weekly payment."

111.  Defendants' claims that consumers "do not increase" their monthly payment on the IM Program and that the "monthly payment is decreased to a much smaller biweekly debit amount" are false or misleading because consumers increase the amount they pay each month while enrolled in the IM Program by paying a debiting fee of $3.50 every other week and, at least twice a year, making three biweekly payments in a month, which is 50% higher than their regular monthly mortgage payment, and the first of which is collected as a non-refundable setup fee.

### iii.   False and Misleading Statements Regarding Defendants' "Savings Guarantee"

112.  Defendants expressly guarantee that consumers will save money on the IM Program, that consumers enrolled in the IM Program have "saved" a specific amount in interest in past years, or that consumers will achieve "Monthly Interest Savings" of specific amounts by enrolling in the IM Program.

Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding Affirmative Case
Case No. 3:15-cv-02106-RS

113.     During the enrollment call, enrollment specialists tell consumers that Nationwide has a "100% savings guarantee" and that the interest savings benefit after year one of enrollment will be $1,500 and $5,000 in year two.

114.     Defendants' savings guarantee is false or misleading because the average consumer will pay more in fees to Nationwide than she will realize in interest savings until she has been in the program for 9 years.

115.     The average consumer does not realize any monthly interest savings until just before year 10.

116.     Of the 123,716 active customers enrolled on December 31, 2014, only about 25% had been enrolled for longer than four years.

117.     On many mailers, Defendants present figures in a table reflecting purported "Interest Savings," and "Monthly Interest Savings" achieved through the IM Program.

118.     Defendants' scripts state that consumers will save a specific amount of money each month while enrolled in the IM Program.

119.     Defendants' claim that consumers achieve "monthly interest savings" while enrolled in the IM Program is false or misleading.

120.     Defendants calculated this "Monthly Interest Savings" by taking the cumulative interest estimated to be saved over the whole payoff period (i.e., 23.9 years) and dividing it by the number of months in the payoff period (i.e., 286 months).

121.     In reality, consumers save $0 in interest until they make their second extra biweekly payment – which is typically 12 months into the IM Program.

122.     In addition, because of the way mortgages amortize, the amount of interest savings varies over the life of the loan, with consumers saving only very small amounts of interest in the months towards the beginning of the life of the loan, and larger amounts towards the end of the life of the loan.

123.     After consumers begin making extra biweekly payments that Nationwide does not retain as the setup fee, the average consumer does not realize any monthly interest savings until just before year 10.

124.     Defendants misrepresent the actual results achieved by consumers on the IM Program.

12

125.     Defendants advertise that Nationwide has helped its "customers eliminate over $161 million in interest in 2013."

126.     Defendants do not track individual interest savings while on the IM Program.

127.     Defendants' figures of interest saved for consumers are false or misleading because the numbers are contingent on consumers participating in the IM Program until paying off the loan and do not reflect actual savings achieved.

128.     Defendants Lipsky and Nationwide took unreasonable advantage of the consumer's lack of understanding of the material cost (substantial non-refundable setup fee that is not clearly disclosed to the consumer) and the conditions of the IM Program (the nature of loan amortization and the time required to achieve interest savings while enrolled in the program).

### iv.     False and Misleading Statements Regarding Consumers' Ability to Achieve Savings on Their Own

129.     Defendants claim that consumers cannot achieve savings on their own, that lenders do not permit consumers to pay biweekly, or that the consumer's lender requires the consumer to use Nationwide to achieve the promised interest savings.

130.     On Defendants' online video entitled "Does my lender offer this program?", consumers are told that "[o]nly a small percentage of lenders actually offer a bi-weekly mortgage program to their customers...The few lenders who do offer a bi-weekly program require you to set it up through an administrator like us."

131.     Enrollment specialists are directed to tell consumers that "lenders that do offer (a biweekly program) are actually not administrating the biweekly program themselves."

132.     These claims are false or misleading.

133.     Many mortgage servicers or lenders offer a biweekly, or similar, program at little or no cost to the consumer.

134.     Defendants maintain an internal listing of competitors' programs which reveals servicers that offer biweekly options at little or no cost to the consumer.

135.     Defendants still direct enrollment specialist to tell consumers that they cannot make biweekly payments or that lenders do not accept a biweekly payment even when Defendants know that

Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding Affirmative Case
Case No. 3:15-cv-02106-RS

1    the consumer on the telemarketing call has a loan serviced by one of the entities on the competitors' list

2    that offers a similar program at little or no cost.

3         **v.   Misleading Statements Regarding Defendants' Affiliation with Servicers**

4         136.   Defendants' mailers, including envelopes, contain phrases, words, and other markings

5    that create the deceptive net impression that Nationwide, LPA, or any of its affiliates is related to the

6    consumer's servicer or administering a feature of the loan on behalf of the servicer.

7         137.   Defendants do not have any contractual relationship with mortgage lenders or servicers.

8         138.   Defendants instruct sales representatives to tell consumers that Nationwide has a

9    "working relationship" with the consumer's lender, that Nationwide is the "administrator" for the

10    biweekly program that is available for the consumer's loan, and that Nationwide "administer[s]" the

11    program to the consumer's lender.

12         139.   Defendants instructed sales representatives not to directly respond to questions from

13    consumers about Nationwide's relationship with the lender and directed them not to say "no" when

14    asked if Nationwide works with or is affiliated with the lender.

15         140.   Some of Defendants' scripts do not disclose to the consumer that they are a third party

16    administrator, as opposed to the consumer's mortgage servicer, and begin the enrollment call by

17    identifying themselves as "the Enrollment Department" when the consumer calls the toll-free number.

18         141.   Many of Defendants' mailers identify the consumer's lender/servicer and loan amount.

19         142.   The envelopes that Defendants sent to consumers contain various words, such as

20    "Mortgage Payment Information Enclosed," "Payment Schedule Change Offer," "Loan Payment

21    Change Request," "Change of Payment Frequency Request," "Confidential Document – Penalty for

22    Tampering,", "Mortgage Loan Audit," "Mortgage Information Enclosed (Accelerated Reduction in your

23    Principal Balance)," "Payment Information Enclosed," "FINAL NOTICE – REQUEST FOR

24    IMMEDIATE ACTION."

25         143.   The backside of Defendants' mailers state that "[t]he biweekly program is administered

26    to your current lender."

27

28

Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding Affirmative Case
Case No. 3:15-cv-02106-RS

144.     Some mailers contain language that "we now offer you the ability to [make biweekly payments]" and request the consumer to contact Defendants by a certain date if she would like to change to the biweekly option or if she would like to remain with a monthly payment.

145.     Other mailers warn the consumer that if she "decline[s]" or "waive[s] the biweekly option, [she] will be asked to confirm that [she] understand[s] that [she] is voluntarily waiving the interest savings and loan term reduction[.]"

146.     Still other mailers state that consumers now have a "choice as to how you would like to pay [the] mortgage," that the consumer is "now able to set up a biweekly payment for [her] new mortgage loan," and that her "current status" is "pending."

1

**II. Proposed Conclusions of Law**

2

    **A.    Jurisdiction**

3

       147.    This Court has subject-matter jurisdiction over the Bureau's claims because they are

4

brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), present a federal question, 28

5

U.S.C. § 1331, and are brought by an agency of the United States, 28 U.S.C. § 1345.

6

       148.    The Bureau is an independent agency responsible for enforcing the Consumer Financial

7

Protection Act of 2010, 12 U.S.C. §§ 5491, 5565, and authorized to enforce the Telemarketing and

8

Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6105(d), and its implementing regulation, the

9

TSR, with respect to the offering or providing of consumer financial products or services, 15 U.S.C.

10

§ 6105(d).

11

       149.    The Bureau may bring civil actions against persons violating these laws to "seek all

12

appropriate legal and equitable relief including a permanent or temporary injunction as permitted by

13

law." 12 U.S.C. § 5564.

14

       150.    Since at least July 21, 2011 until November 23, 2015, Defendants offered and provided a

15

consumer financial product or service within the meaning of the CFPA. 12 U.S.C. §§ 5481(5),

16

5481(15)(A)(iv).

17

       151.    Nationwide and LPA are covered persons under the CFPA. 12 U.S.C. § 5481(6)(A).

18

       152.    LPA is a service provider to Nationwide under the CFPA. 12 U.S.C. § 5481(26)(A)(i).

19

       153.    Lipsky is a related person (and thus deemed a covered person) under the CFPA. 12

20

U.S.C. §§ 5481(25)(C); (25)(B)

21

       154.    Lipsky is a seller under the Telemarketing and Consumer Fraud and Abuse Prevention

22

Act and various provisions of its implementing regulation, the Telemarketing Sales Rule (TSR). 16

23

C.F.R. § 310.2(dd); *FTC v. Stefanchik*, 559 F.3d 924, 930 (9th Cir. 2009) (individual who had authority

24

to review and approve marketing materials and scripts and made decision what to sell through program

25

deemed "seller" under TSR).

26

       155.    Nationwide is a seller and telemarketer under the TSR. 16 C.F.R. § 310.2(dd); 16 C.F.R.

27

§ 310.2(ff).

28

---

Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding Affirmative Case
Case No. 3:15-cv-02106-RS

**B.    Defendants Violated the CFPA By Engaging in Deceptive Acts or Practices (Count II)**

156.    An act or practice is "deceptive" if: (1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material. *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016) (applying FTC Act standard to CFPA).

*Representation, Omission, or Practice*

157.    To decide whether a defendant made certain representations or omissions, a court must first review the advertisements. *See FTC v. Gill*, 71 F. Supp. 2d 1030, 1043-44 (C.D. Cal. 1999) *aff'd*, 265 F.3d 944 (9th Cir. 2001).

158.    Advertisements that are "capable of being interpreted in a misleading way should be construed against the advertiser." *See FTC v. Gill*, 71 F. Supp. 2d 1045-46 (C.D. Cal. 1999) (*quoting Resort Car Rental Systems, Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975)).

159.    A failure to disclose important information may be considered deceptive. *FTC v. Five Star Auto Club*, 97 F. Supp. 2d 502, 532 (S.D.N.Y. 2000) ("Failure to disclose pertinent information is deceptive if it has a tendency or capacity to deceive."); FTC Policy Statement on Deception, *appended to Matter of Cliffdale Associates, Inc.*, 103 FTC 110, 175 n.4 (An omission of fact may be deceptive under Section 5 when "information necessary to prevent a practice, claim, representation, or reasonable expectation or belief from being misleading is not disclosed.").

*Materiality*

160.    If a representation expressly states a claim, materiality is presumed. *See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994) (express claims presumed material).

161.    If a representation concerns cost or price or concerns the nature or alleged benefit of a product, there is a presumption of materiality. *See Novartis Corp. v. FTC*, 223 F.3d 783, 786 (D.C. Cir. 2000) (citation omitted); *FTC v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012) (finding that representations about the nature of the benefit were material); *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 603–05 (9th Cir. 1993) (misrepresentation about benefit product offered concerned "the single most useful piece of information" consumers could receive and was found to be deceptive).

17

162.   If an express representation is shown to be false, the Court should presume that it is material. *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008) (citation omitted) ("Express representations that are shown to be false are presumed material."); *FTC v. Affiliate Strategies, Inc.*, 849 F. Supp. 2d 1085, 1105 (D. Kan. 2011).

163.   A representation or practice is material if it contains information important to consumers and is likely to affect their choice in whether to purchase the service. *FTC v.Cyberspace.Com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006), *quoting In re Cliffdale Associates, Inc.*, 103 FTC 110, 165 (1984) (A misleading impression created by a solicitation is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product."); *FTC v. Southwest Sunsites, Inc.*, 105 FTC 7, ¶ 11*aff'd,* 785 F.2d 1431 (9th Cir. 1986) ("Such facts, if known by certain purchasers, would be likely to affect materially their consideration of whether to purchase…failure to disclose such facts clearly and conspicuously is an unfair or deceptive act or practice.").

164.   A representation that makes an intentionally implied claim is material. *See Novartis Corp. v. FTC*, 223 F.3d 783, 786 (D.C. Cir. 2000) ("The Commission has historically *presumed* materiality for…intentional implied claims"); *see also FTC v. Figgie Int'l, Inc*, 994 F.2d 595, 604 (9th Cir. 1993).

165.   Implied claims are presumptively material if they "address the central characteristics of the product or service offered." *See FTC v. Mortg. Relief Advocates LLC*, No. CV-14-5434-MWF, 2015 WL 11257575, at *2 (C.D. Cal. July 1, 2015) (quoting *FTC v. Lights of America, Inc.*, No. SACV 10-01333 JVS (MLGx), 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013)); *see also FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 603-04 (9th Cir. 1993) (finding that defendant "misled customers about the 'single most useful piece of information' they could have used").

166.   Representations about the IM Program's cost, how the program works, whether consumers can achieve savings on their own, and whether Nationwide is affiliated with, or administering a feature of the consumer's loan on behalf of, the servicer are material – i.e., information that is important – to consumers.

---

1

***Likely to Mislead Consumers Acting Reasonably***

2   167.   A representation may violate the CFPA if (1) the representation has been explicitly stated

3   in Defendants' advertising, materials, or telemarketing calls, or (2) Defendants' advertising, materials,

4   or telemarketing calls, when viewed from the perspective of a reasonable consumer, give the "net

5   impression" that such a representation has been made. *See FTC v. Direct Marketing Concepts, Inc.,* 569

6   F. Supp. 2d 285, 298 (D. Mass. 2008) (citations omitted); *see FTC v. Stefanchik,* 559 F.3d 924, 928 (9th

7   Cir. 2009) ("Deception may be found based on the 'net impression' created by a representation.").

8   168.   To determine whether a representation or practice is likely to mislead, courts examine the

9   overall "net impression" that it leaves on a reasonable consumer. *See Consumer Fin. Prot. Bureau v.*

10   *Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016) (citation omitted); *Consumer Fin. Prot. Bureau v.*

11   *CashCall, Inc.*, 2016 WL 4820635, at *10 (C.D. Cal. Aug. 31, 2016) (quotations and citations omitted).

12   169.   An advertisement is likely to mislead consumers acting reasonably under the

13   circumstances if the claim is false. *FTC v. Medlab*, 615 F. Supp. 2d 1068, 1079 (N.D. Cal. 2009); *see*

14   *also FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994).

15   170.   If a representation conveys more than one meaning to reasonable consumers – one of

16   which is false – then Defendants are liable for the misleading interpretation. FTC Policy Statement on

17   Deception, *appended to Matter of Cliffdale Assocs., Inc.*, 103 FTC 110, 1984 WL 565319 at *47; *U.S. v.*

18   *Corporations for Character, L.C.*, 116 F.Supp.3d 1258, 1269 (D. Utah 2015); *Ward Laboratories, Inc.*

19   *v. Federal Trade Commission*, 276 F.2d 952 (2d Cir. 1960), *cert. denied*, 364 U.S. 827.

20   171.   A representation can be deceptive and violate the law even if the representation is

21   literally true, if its net impression is likely to mislead consumers. *See FTC v.Cyberspace.Com LLC*, 453

22   F.3d 1196, 1200 (9th Cir. 2006) ("A solicitation may be likely to mislead by virtue of the net impression

23   it creates even though the solicitation also contains truthful disclosures."); *FTC v. Peoples Credit First,*

24   *LLC,* 244 Fed.App'x. 942, 944 (11th Cir. 2007) ("[T]he undisputed evidence establishes that the

25   appellants made material representations, express or implied, that were likely to

26   mislead reasonable consumers. The fact that the words in the mail piece are technically or literally true

27   is not persuasive."); *FTC v. NCH, Inc.*, No. 95–16893, 1997 WL 22246, at *2 (9th Cir. Jan.15, 1997)

28

1    ("A representation is deceptive and violates Section 5 of the [FTC Act] if its net impression is likely to

2    mislead consumers, even if the representation is literally true.").

3           172.    Deception can occur through innuendo or implication. *FTC v. Wilcox*, 926 F. Supp. 1091,

4    1098 (S.D. Fla. 1995) ("'Deception may be accomplished by innuendo rather than by outright false

5    statements. . . . It is sufficient that deception is possible.'"), *quoting Regina Corp. v. FTC*, 322 F.2d 765,

6    768 (3d Cir. 1963).

7           173.    It is reasonable to interpret express statements as intending to say exactly what they say.

8    *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000) (citation omitted); *FTC v.*

9    *Int'l Computer Concepts, Inc.*, No. 5:94CV1678, 1994 WL 730144, at *12 (N.D. Ohio 1994); *Thompson*

10   *Medical Co.*, 104 FTC 648, 788 (1984), *aff'd on other grounds* [1986–1 Trade Cases ¶ 67,103], 791

11   F.2d 189 (D.C. Cir. 1986).

12          174.    In determining whether a representation is deceptive, statements must be viewed as a

13   whole and without focusing on isolated words or phrases. *See FTC v.Cyberspace.Com LLC*, 453 F.3d

14   1196, 1200 (9th Cir. 2006) (describing deceptive advertisements based on their net impression, even if

15   they contain truthful disclosures in fine print).

16          175.    The law is violated if Defendants made initial contact with consumers using deceptive

17   representations even if more accurate representations appeared later in the telemarketing. *See Consumer*

18   *Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1194 (9th Cir. 2016) (the fact that consumers later signed

19   an agreement that more accurately described the services do not absolve entity of liability under CFPA);

20   *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) (The FTC Act is "violated if [the

21   seller] induces the first contact through deception, even if the buyer later becomes fully informed before

22   entering the contract.") (citation omitted); *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 632 (6th Cir.

23   2014) ("A court need not look past the first contact with a consumer to determine the net impression

24   from that contact, and a court may consider individual advertisements or messages to determine the net

25   impression."); *FTC v. Gill*, 71 F.Supp.2d 1030, 1044 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir.

26   2001) (finding that disclaimers appearing in contracts signed by consumers were insufficient to create a

27   genuine dispute of material fact "because each representation must stand on its own merit, even if other

28   representations contain accurate, non-deceptive information.").

---

                                                    20

1   176.    Fine-print disclosures do not automatically cure deceptive messaging. *FTC v.*

2   *Cyberspace.Com, LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) (summarizing case law from other circuits

3   in which fine print disclaimers are insufficient to overcome evidence of deceptive messaging); *FTC v.*

4   *John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012) ("deception may not be

5   sufficiently cured merely by the inclusion of disclaimers in small print."); *FTC v. Health Formulas,*

6   *LLC*, 2015 WL 2130504, at *11-12 (D. Nev. May 6, 2015) (finding FTC likely to succeed on several

7   claims of deception despite fine print disclosures).

8   177.    Though not essential, proof of actual deception is highly probative to show that a practice

9   is likely to mislead consumers acting reasonably under the circumstances. *See FTC v.Cyberspace.Com*

10  *LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006); *Simeon Management Corp. v. FTC*, 579 F.2d 1137, 1146 n.

11  11 (9th Cir. 1978) ("Consumer testimony, although sometimes helpful, is not essential" to determine

12  whether ads have the capacity to deceive or mislead); *FTC v. World Travel Vacation Brokers, Inc.*, 861

13  F.2d 1020, 1029-30 (7th Cir. 1988) ("[E]vidence that some customers actually misunderstood the thrust

14  of the message is significant support for the finding of a tendency to mislead.") (citation omitted).

15  178.    The Bureau does not need to prove that Defendants made misrepresentations with the

16  purpose or intention to defraud, deceive, or injure consumers. *See Feil v. FTC*, 285 F.2d 879, 896 (9th

17  Cir. 1960) (whether individual acts in good or bad faith is immaterial under FTCA).

18  179.    Evidence that Defendants may have disciplined employees, refunded money to

19  consumers who complained, or had a system of monitoring sales calls is irrelevant in determining

20  whether the Defendants violated the CFPA and TSR. *See FTC v. John Beck Amazing Profits, LLC*, 865

21  F. Supp. 2d 1052, 1075-76 (C.D. Cal. 2012) (quality assurance, refund policies, and efforts to discipline

22  staff are not relevant to whether deception occurred).

23  180.    Evidence that Defendants were licensed under state law is irrelevant in determining

24  whether they engaged in deceptive acts or practices in violation of the CFPA and TSR. *See FTC v. USA*

25  *Financial, LLC*, 415 Fed. App'x. 970, 974 n.2 (11th Cir. 2011) (that defendant operated under a state-

26  issued license has no bearing on whether the defendant engaged in "deceptive acts").

27  181.    Even if Defendants' conduct was approved by a state regulatory entity, such evidence is

28  irrelevant in determining whether Defendants violated the CFPA and TSR. *See Simeon Management*

21

Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding Affirmative Case
Case No. 3:15-cv-02106-RS

*Corp. v. FTC*, 579 F.2d 1137, 1144 (9th Cir. 1978) ("[w]hether a state official has approved the advertisements or not is irrelevant to the operation of the federal regulatory scheme set forth in the FTCA.").

              a.   **Defendants Made False and Misleading Statements Regarding the Cost of the IM Program**

182.    Defendants violated the CFPA by making false and misleading statements that create a deceptive net impression about the cost of the IM Program.

183.    Defendants induce the initial contact with consumers without ever disclosing the amount or existence of the substantial, non-refundable setup fee in mailers, advertisements/videos, its websites, or other marketing materials.

184.    Defendants make false statements in millions of mailers and videos that the consumer's funds are directed "100% to the principal of the loan" while enrolled in the IM Program without disclosing that Defendants retain the first "extra" debit as a non-refundable setup fee.

185.    Defendants' mailers and videos falsely represent that consumers do not increase their monthly mortgage payment, when in fact, the monthly payment increases about $72 for the average consumer enrolled in the IM Program.

186.    Defendants do not clearly disclose the existence or amount of the non-refundable setup fee during telemarketing calls offering the IM Program to consumers.

187.    During the telemarketing call, Defendants primarily refer to the debiting fee of $3.50 when discussing fees and administrative costs for the IM Program.

188.    Defendants use misleading, vague, and confusing language throughout the sales script by referring repeatedly to "biweekly debits" without clearly and conspicuously informing consumers that Defendants charge a non-refundable setup fee (generally equivalent to half of a mortgage payment).

189.    If consumers ask for clarification about the fees ("How much does the program cost?"), Defendants direct enrollment specialists to read a portion of the script that does not state the amount of the non-refundable setup fee, even after the enrollment specialists runs the analysis and knows the exact amount the consumer will be charged.

---

Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding Affirmative Case
Case No. 3:15-cv-02106-RS

190.    If consumers directly ask how Defendants make money, Defendants' scripts direct employees to refer only to the small $3.50 debiting charge.

191.    In some calls, consumers directly asked the amount of any fee associated with the program, and Defendants' representatives expressly misrepresented the fee, falsely stating that the only fee was the $3.50 transaction fee every other week.

192.    Defendants' contracts, receipts, and online enrollment form do not explicitly provide the amount of the non-refundable setup fee which is due and owing to Defendants at the time the consumer executes the enrollment agreement.

193.    Defendants do not inform consumers when the non-refundable setup fee is retained (which occurs generally six months into the IM Program).

194.    Defendants' representations and practices mislead consumers acting reasonably and create a deceptive net impression regarding existence or amount the IM Program's non-refundable setup fee.

195.    Defendants' contracts and scripts do not cure the deceptive net impression created by the representations and practices conveyed to consumers by Defendants' advertising and telemarketing.

**b.    Defendants Made False and Misleading Statements Regarding Defendants' "Savings Guarantee"**

196.    Defendants violated the CFPA by making false and misleading statements concerning the IM Program's savings guarantee and the results achieved by consumers enrolled in the program.

197.    Consumers are not guaranteed to achieve interest savings by enrolling in the IM Program.

198.    In fact, the average consumer will pay more in fees than they realize in interest savings until about year 9 in the IM Program.

199.    Defendants' representations of "Monthly Interest Savings" achieved while participating in the IM Program and found in every sales script are false and misleading.

200.    Defendants calculated this "Monthly Interest Savings" by taking the cumulative interest estimated to be saved over the whole payoff period (i.e., 23.9 years) and dividing it by the number of months in the payoff period (i.e., 286 months).

23

1  201.   Consumers therefore do not save the promised "Monthly Interest Savings" each month on

2  the IM Program.

3  202.   In reality, consumers save $0 in interest until they make their second extra biweekly

4  payment – which is typically 12 months into the IM Program.

5  203.   In addition, because of the way mortgages amortize, the amount of interest savings varies

6  over the life of the loan, with consumers saving only very small amounts of interest in the months

7  towards the beginning of the life of the loan, and larger amounts towards the end of the life of the loan.

8  204.   Finally, Defendants' representations of the amount of interest saved for consumers (e.g.,

9  Nationwide saved consumers "$161,680,000 in interest charges" in 2013) found on mailers, scripts, and

10  videos are false and represent an amount based on the total hypothetical interest that consumers *could*

11  save in the future, assuming all the consumers enrolled in the program stay in the program for the entire

12  life of their loans.

13          **c.   False and Misleading Statements Regarding Consumers' Ability to Achieve Savings**

14              **on Their Own**

15  205.   Defendants violated the CFPA by making false and misleading statements that consumers

16  cannot achieve savings on their own, that lenders do not permit consumers to pay biweekly, or that the

17  consumer's lender requires the consumer to use a third party like Nationwide to pay biweekly and pay

18  their loan principal off more quickly.

19  206.   Defendants' scripts falsely state to consumers that they cannot pay their mortgages on a

20  biweekly basis or that lenders do not accept biweekly payments regardless of the consumer's lender or

21  servicer.

22  207.   Defendants similarly falsely tell consumers that lenders require third party administrators

23  like Nationwide to handle the biweekly program.

24  208.   Defendants maintain an internal listing of competitors' programs which reveals servicers

25  that offer biweekly options at little or no cost to the consumer.

26  209.   Even when Defendants know that the consumer on the telemarketing call has a loan

27  serviced by one of the entities on the list of competitors, Defendants still direct enrollment specialist to

28  tell consumers that they cannot make biweekly payments on their own or through their servicer.

Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding Affirmative Case
Case No. 3:15-cv-02106-RS

**d.  Defendants Made Misleading Statements Regarding Nationwide's Affiliation with Servicers**

210.    Defendants violated the CFPA by making misleading statements concerning Nationwide's affiliation with mortgage servicers that create the deceptive net impression that Nationwide is a part of the servicer or administering a feature of the consumer's loan on behalf of the servicer.

211.    For example, some mailers contain language warning the consumer that if she "decline[s]" or "waive[s] the biweekly option, [she] will be asked to confirm that [she] understand[s] that [she] is voluntarily waiving the interest savings and loan term reduction[.]"

212.    Other mailers state that consumers now have a "choice as to how you would like to pay [the] mortgage," that the consumer is "now able to set up a biweekly payment for [her] new mortgage loan," and that her "current status" is "pending."

213.    The backside of Defendants' mailers state that "[t]he biweekly program is administered to your current lender."

214.    Defendants' envelopes and mailers contain language that induces consumers to call into Nationwide, which directs its enrollment specialists not to say "no" when consumers ask whether the mailer is a communication from the mortgage servicer and instead to respond that Nationwide "administers thousands of payments to (your lender)" and has a "working relationship" with the servicer through the IM Program.

215.    Other scripts used by Defendants do not identify that the consumer has reached "Nationwide Biweekly Administration" but instead directs the enrollment representative to begin the conversation by indicating that the consumer has reached "the enrollment department."

216.    Even though some of Defendants' mailers contain disclaimers, the language does not cure the deceptive net impression created by Defendants' mailers that contain information about the consumer's lender and loan amount, that warn consumers that "mortgage payment information" is enclosed, and that direct consumers to call into Nationwide in order to "waive" the biweekly option available for their loan.

217.     This leads consumers acting reasonably to conclude that Nationwide is part of the servicer or administering the option on behalf of the servicer.

**C.     Defendants Lipsky and Nationwide Violated the CFPA by Engaging in Abusive Acts or Practices (Count I)**

218.     An act or practice is "abusive" if, among other things, Defendants have taken unreasonable advantage of the consumer's lack of understanding of the material risks, costs, or conditions of the IM Program. *See* 12 U.S.C. § 5531(d)(2)(A).

219.     Defendants' customers lacked understanding of the material risks, costs, or conditions of the IM Program, including the substantial non-refundable setup fee that is not clearly disclosed to the consumer, the fact that consumers will pay more in fees to Defendants than the save in interest for the first several years of participating in the IM Program, and the nature of loan amortization which requires consumers to stay enrolled for several years before achieving any interest savings.

220.     Defendants Nationwide and Lipsky took unreasonable advantage of the consumer's lack of understanding regarding the material cost (non-refundable setup fee) and conditions of the IM Program by guaranteeing consumers will save money by enrolling even though it takes many years for consumers to achieve any savings after accounting for the substantial fees and the nature of loan amortization.

**D.     Defendants Nationwide and Lipsky Violated Several Provisions of the TSR (Count III)**

     **a.     Defendants Nationwide and Lipsky Violated 16 C.F.R. § 310.3(a)(1)(i)**

221.     Defendants Nationwide and Lipsky failed to disclose truthfully and in a clear and conspicuous manner – and before the consumer consents to pay – the total cost to purchase the IM Program. 16 C.F.R. § 310.3(a)(1)(i); *see* Telemarketing Sales Rule, 75 Fed Reg. 48458-01 ("disclosures must be made *before* any act or communication that signifies the consumer's consent to pay, such as sending full or partial payment; providing credit card, *bank account* or other billing information…") (emphasis added).

222.     Defendants Nationwide and Lipsky violated the TSR by failing to make clear and conspicuous disclosures of the total cost of the IM Program *before* asking the consumer for his or her bank account information to pay for the service during the course of the telemarketing call.

223.    Clear and conspicuous means that information is presented in a way that is difficult to miss and that ordinary consumers will easily notice and understand, so that required disclosures are communicated as effectively as the sales message. *See* Federal Trade Commission, Complying with the Telemarketing Sales Rule, available at https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule.

224.    When disclosures are oral, clear and conspicuous means at an understandable speed and pace, and in the same tone and volume as the sales offer(s) so that ordinary consumers can easily hear and understand it. *Id.*

225.    When disclosures are written, clear and conspicuous information must be printed in a type size that a consumer can readily see and understand; that has the same emphasis and degree of contrast with the background as the sales offer; and that is not buried on the back or bottom, or in unrelated information that an ordinary consumer would not think important enough to read. *Id.*

226.    If certain words that appear in the script or contract are inconsistent on their face, or the meaning behind the words can be interpreted in different ways, a disclosure is not clear. *See, e.g.*, *Rey v. Lafferty*, 990 F. 2d 1379, 1384-85 (1st Cir. 1993) (internal citation omitted) (describing the conditions under which contract language is ambiguous).

227.    If certain words or terms are presented in such a way during the telemarketing call such that the consumer's attention will not be drawn to it, a disclosure is not "conspicuous." *See Cole v. U.S. Capital, Inc.*, 389 F.3d 719, 729-31 (7th Cir. 2004) ("drawing upon the wealth of UCC and TILA case law in determining the meaning of 'clear and conspicuous' under the FCRA").

228.    If reasonable consumers can interpret a disclosure in more than one way, a disclosure is not clear or conspicuous. *See, e.g.*, *Rubio v. Capital One Bank*, 613 F.3d 1195, 1202 (9th Cir. 2010).

229.    Because a reasonable consumer can interpret the ambiguity about the total cost of the IM Program in a way that is not accurate, Defendants Nationwide and Lipsky violated the TSR. *See FTC v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338, 1355 (D. Nev. 2014), *citing Rubio*, 613 F.3d at 1202 (citing *Rossman v. Fleet Bank (R.I.) Nat. Ass'n*, 280 F.3d 384, 394 (3d Cir. 2002)) ("any misleading ambiguity—any disclosure that a reasonable person could read to mean something that is not accurate—should be resolved in favor of the consumer.'"); *see also FTC v. Arlington Press, Inc.*, 1999 WL

33574020, at *12 (C.D. Cal. Jan. 11, 1999) (finding FTC likely to prevail in preliminary injunction context in case involving "a cryptic reference to the total amount of the sale" that because it was never stated in a clear and conspicuous manner).

230.    Because Defendants Nationwide and Lipsky do not clearly and conspicuously disclose the total cost of the IM Program (the total number of payments for the periodic debiting fee and the non-refundable setup fee) before the consumer consents to pay for the service, Defendants Nationwide and Lipsky violated the TSR.

**b.  Defendants Nationwide and Lipsky Violated 16 C.F.R. § 310.3(a)(4)**

231.    For the reasons stated above, Defendants Nationwide and Lipsky made false or misleading statements to induce someone to buy the IM Program during the telemarketing call. 16 C.F.R. § 310.3(a)(4); *FTC v. Stefanchik*, 559 F.3d 924, 929-30 (9th Cir. 2009) (applying elements of deception claim under the Federal Trade Commission Act to claim under the TSR).

**c.  Defendants Nationwide and Lipsky Violated 16 C.F.R. § 310.3(a)(2)(i), (iii), and (vii)**

232.    For the reasons stated above, Defendants Nationwide and Lipsky misrepresented, directly or by implication, the total cost of the IM Program. 16 C.F.R. § 310.3(a)(2)(i).

233.    For the reasons stated above, Defendants Nationwide and Lipsky misrepresented, directly or by implication, the interest savings guaranteed to consumers participating in the IM Program. 16 C.F.R. § 310.3(a)(2)(iii).

234.    For the reasons stated above, Defendants Nationwide and Lipsky misrepresented, directly or by implication, that Defendant Nationwide was affiliated or administering a feature of the consumer's loan on behalf of the consumer's mortgage lender or servicer. 16 C.F.R. § 310.3(a)(2)(vii).

**E.    Defendants Nationwide and Lipsky Violated the CFPA (Count IV)**

235.    Because Defendant Lipsky violated the TSR (Count III), Defendant Lipsky is liable for violations of the CFPA. 15 U.S.C. § 6102(c)(2).

236.    Because Defendant Nationwide violated the TSR (Count III), Defendant Nationwide is liable for violations of the CFPA. 15 U.S.C. § 6102(c)(2).

1

**F.      Defendants' Have Not Established Any Affirmative Defenses**

2          237.    Defendants have failed to meet their burden of establishing any affirmative defense

3    avoiding the Bureau's claims.

4          **G.      Damages – Restitution, Disgorgement, Civil Money Penalties**

5          238.    The CFPA authorizes the Court to order any appropriate equitable relief, including, *inter*

6    *alia*, disgorgement, restitution, limits on the activities or functions of the person, and civil money

7    penalties. 12 U.S.C. §§ 5565(a)(1) and (2); 12 U.S.C. § 5565(c)(1); *see also Stefanchik*, 559 F.3d 924,

8    930-31 (9th Cir. 2009) ("Because the FTC Act is designed to protect consumers from economic injuries,

9    courts have often awarded the full amount lost by consumers rather than limiting damages to a

10   defendant's profits.").

11         239.    The Bureau need not prove that every consumer relied on the misrepresentations or

12   practices. *See Stefanchik*, 559 F.3d at 929 n.12, *quoting FTC v. Amy Travel Serv., Inc.*, 875 F.2d at 572;

13   *see Figgie Int'l, Inc.*, 994 F.2d at 605 (citation omitted); *FTC v. Kitco of Nevada, Inc.*, 612 F.Supp.

14   1282, 1293 (D. Minn. 1985); *FTC v. Security Rare Coin & Bullion,* 931 F.2d 1312, 1316 (8th Cir.

15   1991).

16         240.    Because Defendants made the challenged misrepresentations in the advertising and

17   telemarketing of the IM Program and consumers purchased the IM Program, there is a presumption that

18   consumer relied on the representations. *See FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993).

19         241.    The Bureau can prove its claim though a small number of injured consumers. *See Figgie*

20   *Int'l*, 994 F.2d at 605-06. From this small sample, a court can infer a pattern or practice of deceptive

21   behavior. *See FTC v. Sec. Rare Coin & Bullion Corp*., 931 F.2d 1312, 1316 (8th Cir. 1991).

22         242.    To determine the appropriate amount of monetary relief for both restitution and equitable

23   disgorgement, the Bureau bears the initial burden of showing that its "calculations reasonably

24   approximated the amount of customers' net losses, and then the burden shifts to defendants to show that

25   those figures were inaccurate." *See FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997); *FTC v. Medicor,*

26   *LLC*, 217 F. Supp. 2d 1048, 1058 (C.D. Cal. 2002).

27         243.    Whether consumers received something of value from a defendant is not relevant in

28   determining liability or restitution. *See Figgie Int'l*, 994 F.2d at 604; *see also FTC v. John Beck Amazing*

                                                        29

1    *Profits, LLC*, 888 F. Supp. 2d 1006, 1018 (C.D. Cal. 2012); *FTC v. Bronson Partners, LLC*, 674 F.

2    Supp. 2d 373, 385-86 (D. Conn. 2009).

3         244.    Here, the appropriate measure of restitution is $73,955,169 in Nationwide's total revenue

4    from non-refundable setup fees (less refunds) paid by approximately 126,500 consumers who were

5    enrolled in the IM Program from July 21, 2011 to December 31, 2015. *See, e.g.*, *FTC v. Neovi, Inc.*, 604

6    F.3d 1150, 1159 (9th Cir. 2010) (disgorgement of total revenue without any offset for development and

7    operating costs of defendant); *Stefanchik*, 559 F.3d at 931; *Bronson Partners*, 674 F. Supp. 2d at 385-86

8    (no offset for value of product); *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1271 (S.D. Fla.

9    2007) (award of total sales minus refunds already provided to consumers).

10        245.    The Bureau is entitled to a judgment of restitution from Defendants jointly and severally

11   in the amount of $73,955,169. *See Gordon*, 819 F.3d at 1196 (affirming decision to hold individual and

12   company jointly and severally liable for full amount of sales because, *inter alia*, individual had control

13   over and approved deceptive marketing materials); *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 600

14   (9th Cir. 2016).

15        246.    District courts also have broad powers to order disgorgement, which is designed to

16   deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making

17   violations unprofitable. *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010).

18        247.    Here, in addition to liability for consumer harm (restitution), Defendant Lipsky is also

19   personally liable in the amount of $33,039,299, which accounts for shareholder distributions he received

20   from 2011 to 2015 for his involvement in the scheme.

21        248.    The Bureau is entitled to a judgment of disgorgement from Defendant Lipsky in the

22   amount of $33,039,299.

23        249.    Finally, "[a]ny person that violates, through any act or omission, any provision of Federal

24   consumer financial law shall forfeit and pay a civil penalty" of specified amounts depending on the level

25   of scienter of the person. *See* 12 U.S.C. § 5565(c)(1).

26        250.    In determining the amount of any penalty assessed under 12 U.S.C. § 5565(c)(2), the

27   Bureau or the Court shall take into account the size of financial resources and good faith of the person

28   charged, the gravity of the violation or failure to pay, the severity of the risks to or losses of the

consumer, which may take into account the number of products or services sold or provided, the history of previous violations, and other matters as justice may require. 12 U.S.C. § 5565(c)(3).

251.     Here, each of the Defendants is liable for first-tier civil money penalties under the CFPA, pursuant to 12 U.S.C. § 5565(c)(1) and its implementing regulation, for violations of the CFPA and the TSR that occurred from at least July 21, 2011 to November 23, 2015, a total of 1,586 days, in the amount of $7,930,000.

**H.     Personal Liability of Defendant Lipsky**

252.     It is unlawful for any covered person to engage in any deceptive or abusive act or practice. 12 U.S.C. § 5536(a)(1)(B).

253.     An individual may be liable for corporate violations if (1) he participated directly in the deceptive acts or had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud along with an intentional avoidance of the truth. *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1193 n.8 (9th Cir. 2016) (applying the standard for individual liability under the FTC Act to claims of individual liability under the CFPA); *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 600 (9th Cir. 2016).

*Control*

254.     An individual who is the sole owner and sole officer of a company is deemed to control all of or have authority over the business activity of the company. That fact is sufficient to establish the individual liability for the corporate conduct. *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (finding an individual who was the owner, manager, president, director, and sole shareholder as having control of the company); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989) (finding that an individual assuming the duties of a corporate officer is probative of that individual's participation or authority and holding individuals liable because they wrote deceptive scripts and managed the day-to-day activities of the corporation); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997) (individual's status as president and authority to sign documents on behalf of corporate defendant sufficient to demonstrate "the requisite control over the corporation" for finding individual liability).

31

1

*Knowledge*

2       255.     An individual defendant who is liable for injunctive relief is liable for equitable monetary

3  relief if the individual had sufficient "knowledge" of the company's violative conduct. *See FTC v.*

4  *Network Services Depot, Inc*., 617 F.3d 1127, 1138 (9th Cir. 2010); *FTC v. Affordable Media, LLC*, 179

5  F.3d 1228, 1234 (9th Cir. 1999); *Publ'g Clearing House*, 104 F.3d at 1171.

6       256.     The requisite degree of knowledge can be demonstrated by showing actual knowledge of

7  material misrepresentations, reckless indifference to the truth or falsity of the misrepresentations, or an

8  awareness of a high probability of fraud along with an intentional avoidance of the truth. *Network*

9  *Services,* 617 F.3d at 1138; *Cyberspace.com*, 453 F.3d at 1202; *Publishing Clearing House*, 104 F.3d at

10  1170-71.

11       257.     Reckless indifference to the truth or falsity of the misrepresentations standard is

12  evaluated objectively, and does not require any analysis of a defendant's subjective state of mind.

13  *Network Services*, 617 F.3d at 1140 & n.12; *FTC v. Solomon Trading Co.*, No. CIV 91-1184-PHX-

14  SMM, 1994 WL 421478, *4 (D. Ariz. June 28, 1994); *FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev.

15  1991).

16       258.     The Bureau need not show that a defendant intended to defraud consumers in order for

17  that individual to be personally liable. *See FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1102 (9th Cir.

18  2014); *accord FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997). The issue is

19  whether the individual defendant "knew or should have known" of the company's violative conduct.

20  *FTC v. Freecom Communications, Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005).

21       259.     The extent of an individual's involvement in the business affairs of a company engaged

22  in deception "is sufficient to establish the requisite knowledge for personal restitutionary liability."

23  *Affordable Media*, 179 F.3d at 1235; *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1102 (9th Cir. 2014);

24  *see Amy Travel*, 875 F.2d at 574; *Am. Standard Credit Systems,* 874 F. Supp. at 1089; *see also*

25  *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d at 1193 (holding there was no dispute of individual

26  liability where the defendant "had control over the marketing materials and knowledge of their

27  contents"); *FTC v. Stefanchik*, 559 F.3d 924, 930-31 (9th Cir. 2009) (holding an individual liable under

28  the FTC Act who "retained authority to review and approve all marketing materials"); *FTC v.*

1   *Cyberspace.com, LLC,* 2002 WL 32060289, at *5 (W.D. Wash. 2002) ("There is ample evidence in the

2   record that defendant Eisenberg was directly involved in the development of the deceptive marketing

3   scheme ... that he reviewed at least some of the solicitation forms before they were mailed, that he knew

4   very few subscribers used the internet services for which they were being billed, and that he was aware

5   that some of the consumers ... did not realize they had contracted for internet services."); *cf. Southwest*

6   *Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1439 (9th Cir.), *cert. denied*, 479 U.S. 828 (1986) (upholding

7   individual liability against two defendants "based on their managerial and policy-making

8   responsibilities").

9           260.    Additionally, awareness of consumer complaints is sufficient to establish the

10   "knowledge" requirement for individual liability. *Cyberspace.com*, 453 F.3d at 1202; *see FTC v.*

11   *MacGregor*, 360 F. Appx 891, 894 (9th Cir. 2009); *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1102

12   (9th Cir. 2014) (receipt of consumer complaints and chargebacks "can constitute evidence of an

13   individual's knowledge"); *FTC v. Bay Area Bus. Council, Inc.* 423 F.3d 627, 638 (7th Cir. 2005) ("To

14   claim ignorance in the face of the consumer complaints and returned checks amounts to, at the least,

15   reckless indifference to the corporations' deceptive practices").

16           261.    Finally, prior experience with enforcement actions by regulators for nearly identical

17   conduct can establish knowledge of a corporate defendant's misrepresentations. *See FTC v. Grant*

18   *Connect, LLC*, 763 F.3d at 1104 (9th Cir. 2014) (reasons for the court finding defendant had knowledge

19   of or reckless indifference to the deception include the defendant's "history of trouble with the FTC

20   related to 'upsells'").

21           262.    With respect to the knowledge prong, reliance on the advice of counsel is not a defense to

22   knowledge of the misrepresentations. *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1102 (9th Cir. 2014);

23   *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 575 (7th Cir. 1989) ("The reliance on advice of counsel

24   was not a valid defense on the question of knowledge…").

25           263.    Here, Defendant Lipsky knew of the corporate Defendants' material misrepresentations,

26   was recklessly indifferent as to the truth or falsity of the representations, or was aware of a high

27   probability of fraud along with an intentional avoidance of the truth given his integral role in the direct

28   mailing and telemarketing operations, and thus is personally liable for equitable monetary relief.

---

1

## I.      Injunctive Relief

2      264.    The CFPA gives the Bureau authority to pursue injunctive relief, and this Court the

3  jurisdiction to grant appropriate injunctive relief. *See* 12 U.S.C. § 5564(a) (giving CFPB authority to

4  seek "all appropriate legal and equitable relief ... permitted by law"); *id.* § 5565(a)(1) (giving courts

5  "jurisdiction to grant any appropriate legal or equitable relief with respect to a violation of Federal

6  consumer financial law"); *Consumer Fin. Protec. Bureau v. Gordon*, 819 F.3d 1179, 1202 (9th Cir.

7  2016).

8      265.    The Bureau has established that an injunction is appropriate.

9

10  Date: March 31, 2017                                          ANTHONY ALEXIS
                                                                  Enforcement Director

11                                                                DEBORAH MORRIS
12                                                                Deputy Enforcement Director

13                                                                MICHAEL G. SALEMI
                                                                  Assistant Litigation Deputy

14                                                                */s/ Patrick Gushue*
15                                                                Patrick Gushue
                                                                  patrick.gushue@cfpb.gov
16                                                                202-435-9671
                                                                  Jonathan Urban
17                                                                jonathan.urban@cfpb.gov
                                                                  202-435-7371
18                                                                Stephen Jacques
                                                                  stephen.jacques@cfpb.gov
19                                                                202-435-7368
                                                                  Adrienne Warrell
20                                                                adrienne.warrell@cfpb.gov
                                                                  *Enforcement Attorneys*

21                                                                Consumer Financial Protection Bureau
22                                                                1700 G Street NW
                                                                  Washington, DC 20552

23

24

25

26

27

28

Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding Affirmative Case
Case No. 3:15-cv-02106-RS

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that a true and correct copy of the foregoing was served on March 31, 2017, via

3   ECF upon counsel of record in this action.

4

5
                                        */s/ Patrick Gushue*
6                                        Patrick Gushue

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding Affirmative Case
Case No. 3:15-cv-02106-RS

ANTHONY ALEXIS (DC Bar #384545)
DEBORAH MORRIS (Admitted to the NY Bar)
MICHAEL G. SALEMI (IL Bar #6279741)
PATRICK GUSHUE (PA Bar #306966)
JONATHAN URBAN (CO Bar #44190)
STEPHEN JACQUES (DC Bar # 464413)
ADRIENNE WARRELL (Admitted to the NY Bar)
THOMAS MCCRAY-WORRALL (Admitted to the MD Bar)
ELIZABETH FRANCE (DC Bar #999851)
Patrick.Gushue@cfpb.gov
1700 G Street NW
Washington, DC 20552
Phone: 202-435-9671
Fax: 202-435-7329
Attorneys for Plaintiff Consumer Financial Protection Bureau

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>                        Plaintiff,<br><br>            v.<br><br>NATIONWIDE BIWEEKLY ADMINISTRATION, INC., LOAN PAYMENT ADMINISTRATION LLC, AND DANIEL S. LIPSKY,<br><br>                        Defendants.<br><br>-------------------------------------------<br><br>NATIONWIDE BIWEEKLY ADMINISTRATION, INC.,<br><br>                        Counter-claimant,<br><br>            v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>                        Counter-defendant. | Case No. 3:15-cv-02106-RS<br><br>**[PROPOSED] ORDER REGARDING PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Judge:          Hon. Richard Seeborg<br>Courtroom:   Courtroom 3, 17th Floor<br>                     450 Golden Gate Ave.<br>                     San Francisco, CA 94102 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**[PROPOSED] ORDER**

The Court adopts the findings of fact and conclusions of law set forth above in Plaintiff's

Proposed Findings of Fact and Conclusions of Law Regarding the Affirmative Case.

**IT IS SO ORDERED**.

Dated: _____          _____

                                        RICHARD SEEBORG
                                        UNITED STATES DISTRICT JUDGE

Proposed Order on Plaintiff's Findings of Fact and Conclusions of Law
Case No. 3:15-cv-02106-RS