UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CONSUMER FINANCIAL PROTECTION
BUREAU,

               Plaintiff,

      v.

NATIONWIDE BIWEEKLY
ADMINISTRATION, INC., et al.,

           Defendants.

Case No.  15-cv-02106-RS

**OPINION AND ORDER**

## I.  INTRODUCTION

This is a civil enforcement action brought by the Consumer Financial Protection Bureau (CFPB) against entities and an individual whom the CFPB contends misled consumers.  In defendants' view, the financial services product they sell provides their customers the chance to save thousands and thousands of dollars that they might otherwise pay in mortgage interest. CFPB insists, in contrast, that few, if any, consumers will come out ahead financially, given the effect of the fees defendants charge. CFPB challenges several aspects of defendants' marketing as allegedly misleading.  After the completion of a seven day bench trial, the parties submitted post-trial briefing and proposed findings of fact and conclusions of law, before returning to present closing arguments.[1]

---

[1] Although this opinion differs substantially in form and substance from both parties' proposed findings and conclusions, those submissions were nonetheless very helpful for purposes of tracking and understanding the evidence and the parties' respective contentions.

After carefully considering the sufficiency, weight, and credibility of the testimony of the witnesses, their demeanor on the stand, the documentary evidence admitted at trial, and the post-trial submissions of the parties, the Court finds that CFPB has adequately shown that some, but not all, of defendants' challenged marketing statements were false or misleading. For reasons explained below, the Court finds that CFPB has not met its burden to show that the restitutionary relief it proposes is warranted, but a civil penalty will be imposed, as well as injunctive relief. The parties will be directed to meet and confer to present a proposal or proposals as to the exact terms of the injunctive relief. Defendants in turn, failed to meet their burden to establish the validity of their counterclaims. This Opinion and Order comprises the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a).

## II. LIABILITY

### A. The "Interest Minimizer" Program

Defendants are Nationwide Biweekly Administration, Inc. ("Nationwide"), its wholly-owned subsidiary Loan Payment Administration ("LPA"), and Daniel Lipsky, the founder, president, sole officer, and sole owner of Nationwide. LPA functions essentially as a second name under which Nationwide markets its services.

The subject of this action, which formed the core of defendants' business, is a financial service product known as the Interest Minimizer Program ("the IM program"). A customer who signs up for the IM program, in its most typical form, agrees that every two weeks Nationwide will automatically debit from the customer's bank account an amount equal to one-half of the customer's monthly home mortgage payment. Nationwide then forwards the funds to the customer's lender on a monthly basis. Because this results in 26 debits per year of an amount equal to one-half of a mortgage payment, the customer effectively makes one extra mortgage payment each year (26 half payments = 13 full payments). Apart from an initial set-up fee, discussed below, these "extra" payments each year are applied by lenders to the principal of the loan balance, thereby reducing it more quickly than would be the case if only twelve payments

were made per year. With the loan principal being paid off more quickly, the total interest charges

a borrower will pay over the life of the loan are reduced.[2]

Nationwide obtains its customers by first purchasing names and addresses from certain

companies that use public records to compile lists of persons who have recently taken out home

mortgages, and then sending those persons mailers. At the height of its operations, Nationwide

sent out approximately 300,000 mailers per week, some under the Nationwide name, and some

under the LPA name. While there were 50 to 60 different versions of the mailers used during the

time period relevant to this case, the parties are in agreement many of the changes from version to

version were minor, and that the exemplars they put into evidence at trial fairly present the

subjects of dispute.

The Nationwide mailers generally had two sides (see Trial Exh. 36), whereas the LPA

mailers typically were single-sided and conveyed less information about the IM program (see Trial

Exh. 57). The mailers were transmitted in window envelopes typically bearing bold, colored, text

such as "Payment Information Enclosed," "Mortgage Information Enclosed (Accelerated

Reduction in your Principal Balance), and "Mortgage Payment Information Enclosed." See Trial

Exhs. 76-81. Ordinarily, the name of the lender would appear on the mailer immediately above the

consumer's name and address, with the result that the lender's name would be visible through the

envelope window. In those instances, the envelopes also bore a notice that "Nationwide Biweekly

Administration is not affiliated with the lender." Defendants' witnesses explained that some states

prohibit using the lender name, and that in those states the envelopes did not include the

disclaimer.

Although the percentage of persons who responded was always very small, given the

volume of mailers sent out, Nationwide fielded millions of incoming telephone calls at its call

---

[2] Nationwide offers other options, such as weekly payments, and provides certain other services as
part of the IM program, discussed below. The option of other payment schedules does not affect
the analysis. For convenience, this opinion and order will hereafter refer only to the bi-weekly
payment structure, which is also what the parties focused on at trial.

center.[3]  Among those who ultimately enrolled in the IM program, the telephone calls typically would last between 30 minutes and one hour.  During the calls, Nationwide's representatives used prepared "scripts" to explain and sell the product, and to respond to any questions customers might have.  Nationwide introduced evidence that it trained its representatives to follow the scripts as closely as possible, that it monitored representatives' performance, and that it imposed discipline if a representative failed to make any of the disclosures called for by the scripts.  In this action, CFPB is not attempting to impose any liability based on what representatives from time to time may or may not have added to, or omitted from, the scripts.  CFPB's position is that the sales presentation included false or misleading statements, and that there were material omissions, even where representatives followed the scripts scrupulously.

The evidence adduced at trial showed that the scripts and mailers were all largely written by Lipsky himself.  Lipsky personally reviewed and approved all or virtually all changes in language to any of the documents.  It was undisputed that Lipsky was intimately involved in managing all aspects of the business on a day-to-day basis.

### B.  Legal standards

CFPB's complaint sets out four counts.  First, CFPB contends defendants' conduct violates the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531 ("CFPA"), as "abusive." An act or practice is "abusive" if, among other things, defendants have taken "unreasonable advantage of the consumer's lack of understanding of the material risks, costs, or conditions" of, the service or product they are selling.  *See* 12 U.S.C. § 5531(d)(2)(A).

At trial, and in most of the briefing over the course of this action, CFPB has placed primary emphasis on the second count of it complaint, which seeks to impose liability under the prong of the CFPA that prohibits "deceptive" practices.  *See* 12 U.S.C. § 5536(a) ("It shall be

---

[3] Nationwide did not make outgoing telephone sales calls, other than in response to inquiries received from potential customers.

unlawful . . . to engage in any unfair, deceptive, or abusive act or practice.").  An act or practice is "deceptive" if: (1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material.  *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016). To determine whether a representation or practice is likely to mislead, courts examine the overall "net impression" that it leaves on a reasonable consumer.  *Id.*

Defendants urge the court not to follow the articulation of the standard for deceptiveness set out in *Gordon*, which that court expressly acknowledged it was borrowing from jurisprudence under the FTC act.  *See* 819 F.3d 1193 n.7.  Even assuming *Gordon* was not binding here, however, defendants have not made a persuasive showing that some other standard should apply.

Moreover, the standard defendants propose is not materially different from that set out in *Gordon.*  Defendants have offered only two minor additions to the *Gordon* language.  First, defendants would expressly state that to be deceptive, the challenged representations or omissions must be likely to mislead "*a significant portion of targeted* consumers . . . ."  The concept that "deception" requires something that misleads more than only the most gullible or inattentive is already embedded in the borrowed FTC definition—" likely to mislead consumers *acting reasonably under the circumstances.*"  *See also*, *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (upholding finding of deception where "overwhelming number of consumers" were misled.)

Second, defendants would add an express element that consumers be misled "to their financial detriment."  As defendants point out in arguing for such an element, in the absence of an injury-in-fact that is "concrete and particularized," there is no standing under Article III of the Constitution.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016).  Even assuming the FTC act allows for claims based on concrete and particularized *non-monetary* injuries, and that the CFPA for some reason applies only where consumers have suffered *monetary* losses, there is no occasion to draw that distinction here, where the claim is that consumers were deceived in connection with

signing up for services offered by defendants for a fee—a financial detriment.[4]  Accordingly, while there are no grounds to depart from the definition of "deceptive" provided in *Gordon*, the result here would be the same even under the standard proposed by defendants.

The third count of CFPB's complaint asserts defendants have violated the Telephone Sales Rule, 16 C.F.R. § 310.2(dd) ("TSR"), a regulation implementing the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6105(d).  Finally, the fourth count alleges that defendants' violation of the TSR by definition constitutes a violation of the CFPA.[5]

### C. Alleged Misrepresentations

CFPB contends it has proven that defendants committed four basic misrepresentations or omissions in the mailers and/or the phone scripts, involving a number of sub-misrepresentations or omissions.

### (1) The existence and/or amount of the "set up fee"

Prior to some point in 2011, Nationwide charged $245 as a one-time set up fee to participate in the IM program.  That precise dollar amount was expressly disclosed during the phone enrollment call, and paid for by consumers during the call.  In 2011, Nationwide switched

---

[4] Defendants appear to believe that if a "financial detriment" element is added, they can argue there was no "deceptiveness" here because, under their view of how the IM program works, all or virtually all consumers will financially benefit from participating, even if only for a short period of time.  Even if that is factually accurate, it would not mean there is no financial detriment.  The basic claim here is not that the IM program never could provide a financial benefit, but that consumers are misled into enrolling through misrepresentations and omissions as to the nature and timing of those benefits, and as to how easily similar benefits might be available from other sources at lower cost.  If a seller of Blackacre misrepresents some material fact in connection with the sale of the property, it is entirely conceivable that the buyer might still realize an overall financial benefit from the property.  If the buyer's gain is less than it would have been had the representations been true, or if the investment would have been more profitable if made elsewhere, however, there still is a cognizable financial detriment resulting from the fraud.  Any definition of "deception" that excludes such circumstances merely because a buyer has a net financial gain is not a viable standard.

[5]  As such, the fourth claim is wholly derivative of the third. CFPB has identified no additional consequences that might flow from labeling any violation of the TSR as also constituting a violation of the CFPB.  Indeed, CFPB has not sought any separate remedies under the TSR at all, under either the third or the fourth claim.

to a "deferred fee" model, where consumers were not required to pay a set-up fee at the time ofenrolling in the IM program.  Instead, the amount of the fee was set to be equal to one of the bi-weekly payments the consumer was agreeing to make, and Nationwide simply kept for itself the first "extra" payment that the consumer made.[6]  Nationwide capped the fee at $995.[7]

CFPB first contends defendants did not adequately disclose the existence of the setup fee, and/or its amount in the mailers.  The statements CFPB points to, however, more reasonably are characterized as misrepresentations regarding the actual savings achievable in light of the fee, rather than a failure to disclose the fee. Indeed, the "distinctive, eye-catching bold text" stating "NO UPFRONT FEE" serves as an implied warning that there likely were some fees, rather than deception.[8]  As CFPB points to no rule that requires fee details to be disclosed in those initial written solicitations, the mailers present no basis to hold defendants liable for failure to disclose the set-up fee adequately.[9]

CFPB further contends that the existence and/or amount of the set-up fee was deliberately concealed and/or inadequately disclosed in the phone conversations when consumers called in response to the mailers.  Indeed, the scripts, and the directions for using them, were plainly

---

[6] Consumers had the ability to select which day of the week the payment would be deducted every other week.  In every calendar year there are always four months that have five occurrences of any given day of the week.  For example, in 2017, there are five Mondays in January, May, July, and October.  There are five Fridays in March, June, September, and December. The length of time until a customer would make the first "extra" payment therefore would depend on when he or she signed up, and which day of the week was selected for the automatic withdrawals.  It could happen as early as the first month after enrollment (or possibly even in the same month), or could be a few months later.

[7] When Nationwide first switched to the deferred fee, the cap was much higher.  The parties have not assigned any significance to that fact.

[8] CFPB's contention to the contrary that "no upfront fee" would leave reasonable consumers with the impression that there are *no* fees is not persuasive.  Although a Nationwide customer testified at trial that she drew that conclusion, her testimony is not sufficient credible evidence standing alone to establish that a reasonable consumer likely would be misled by the language "no upfront fee" into believing there was no fee.

[9] Similarly, there is no requirement that defendants disclose the amount of the setup fee in promotional videos.

designed to minimize the attention a consumer likely would pay to the set-up fee. CFPB particularly objects to the fact that the amount of the fee is not stated in dollars, but is instead merely referenced as "one bi-weekly payment."

The dollar amount of the bi-weekly payments is clearly disclosed. Moreover, because it is the amount a consumer who enrolls in the program will thereafter be expecting to have withdrawn from his or her account every two weeks, any consumer acting reasonably under the circumstances will have that dollar figure well in mind. CFPB's insistence that it is too much to ask the consumer to "cross-reference" the set-up fee amount to the known amount of the bi-weekly payment is not persuasive.

After the point in time that the amount of the bi-weekly payment has been calculated and disclosed to the consumer, the scripts direct Nationwide's representatives as follows:

> Your one-time deferred set-up fee, which covers your lifetime program enrollment, is equal to just one standard biweekly debit . . . . We will simply deduct it from the first extra biweekly debit that occurs on the program within the first 6 months. The remaining extra biweekly debits will go 100% to the principal of your loan. (Pause here.) Do you have any questions? (Make sure customer understands this specific point.)

See Trial Exh. 13.[10]

Nationwide's representatives are also directed to read that paragraph in response to any question from a potential customer as to what the program costs if the bi-monthly payment amount has already been calculated. If not, the representative is directed to do that analysis with the customer first, and then to read the paragraph. See Trial Exh. 15.

The enrollment contact every Nationwide customer is required to sign states:

> SETUP FEE. By signing below, I acknowledge that I agree to a non-refundable deferred setup fee equivalent to one bi-weekly debit and

---

[10] As noted, the precise wording of the scripts varied to some degree at different points in time. This language is representative.

> that I currently owe that amount to NBA; and I authorize NBA to collect such amount by deducting it from the amount it collects from my Designated Account. In addition, if I cancel my enrollment in the Program for any reason before I have paid such amount in full, I authorize NBA to collect the unpaid balance by electronically debiting the Designated Account.

This paragraph regarding the setup fee appears directly below a paragraph setting out the bi-weekly debit amount. See Trial Exh. 88. Consumers enrolling in the IM program must check a box labeled "I agree" appearing immediately below the setup fee paragraph.[11] Accordingly, CFPB has failed to show that the disclosure of the setup fee is inadequate, or that defendants have made actionable misrepresentations or omissions with respect to the existence or amount of the setup fee, or the cost of the IM program.[12]

(2) <u>Defendants' affiliation with consumer's lenders</u>

CFPB contends that defendants' mailers and phone scripts create a misleading impression as to the relationship between Nationwide (or LPA) and the potential customers' lenders. As noted above, the mailer envelopes that revealed the lender's name through the window also included a notice that Nationwide/LPA was not affiliated with the lender. The mailers themselves typically contained a more robust disclaimer that Nationwide/LPA was not "affiliated, connected, associated with, sponsored, or approved by the lender." Although those disclaimers appeared at the bottom of the page, they were printed in the same size font as the body of text. *Cf*, *F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006)("Fine print" disclaimers on the *reverse* side of mailers insufficient to preclude misleading effect.).

---

[11] Consumers were also charged $3.50 per automatic debit. CFPB does not contend this fee was inadequately disclosed. Indeed, CFPB argues that defendants deliberately emphasized the debt fees as part of their effort to downplay the setup fee. While that undoubtedly is the case, it does not render the disclosures of the setup fee inadequate.

[12] That said, in their response to CFPB's request for injunctive relief, defendants have volunteered that upon resuming operations, they will disclose the setup fee as a specific dollar amount in future scripts and contracts. Because doing so will put defendants' practices on more solid ground, they will be held to that promise, and it should be incorporated into the parties' proposal for the terms of the injunctive relief.

Additionally, other portions of the marketing materials and the telephone scripts would necessarily make clear to consumers that Nationwide was independent from the lender, including the fact that Nationwide's representatives had to obtain monthly payment figures from the customers, and various statements by which Nationwide contrasted itself from the lender. At least by the time of enrollment, no reasonable consumer could have been laboring under any misunderstanding that Nationwide was the lender, or even directly affiliated with the lender.

The law is clear, however:

> A later corrective written agreement does not eliminate a defendant's liability for making deceptive claims in the first instance. *See Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir.1975) (per *curiam*) (explaining that advertising is deceptive "if it induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract").

*Gordon*, *supra*, 819 F.3d at 1194 (9th Cir. 2016).

Here, the disclaimers on the mailer envelopes and at the bottom of the mailers ordinarily will be sufficient to preclude any reasonable consumer from believing that Nationwide actually was the lender, or meaningfully affiliated with the lender. Nevertheless, a reasonable consumer likely would be confused—and therefore misled—by the net impression created by many of the mailers, which contained additional language designed to instill in potential customers a sense that they had some kind of existing obligation by virtue of their loan to respond to the mailers. Examples include mailers marked "Second Notice," and those including statements such as "If you waive the biweekly option, you will be asked to confirm that you understand you are voluntarily waiving the interest saving and loan term reduction achieved with the biweekly option." See, *e.g.*, Trial Exh. 42. Indeed, even the name "Loan Payment Administration," while perhaps an accurate description of the service defendants provide, potentially creates an initial impression that the consumer is being contacted by some arm or department of the lender.

That some of the mailers actually create a misleading impression is evidenced by the fact that Nationwide's scripts include responses to be given to callers who ask whether Nationwide is,

or is affiliated with, the lender.[13]  Accordingly, CFPB has adequately shown that some, but not all, of the mailers are likely to mislead consumers acting reasonably under the circumstances.  The record does not contain a basis for determining how many of Nationwide's customers would have been impacted by this issue.[14]  As such, these misrepresentations contribute to the liability finding, and must be addressed in the injunctive relief.  They provide less support for monetary relief, however, than do the misrepresentations and omissions that can be presumed to have been material to virtually all Nationwide customers.

(3)  <u>Timing and amount of interest savings</u>

Second only to the question of whether the set-up fee was adequately disclosed, the parties' focused most heavily on whether Nationwide's representations as to the timing and amount of interest savings were false or misleading.  CFPB relied on the testimony of its expert witness, Neil Librock, who opined that given the setup fee and the per-debit fees, the typical Nationwide customer would not reach a "break-even" point until after making approximately nine years' worth of payments under the IM program.  CFPB further argues that because consumers on average stay in a specific mortgage for only four and a half years, most will end up having paid more to Nationwide in fees than they will ever realize in savings.

Librock and CFPB do not dispute that a consumer who participates in the IM program until the loan is paid in full, (1) will pay off the loan sooner, and therefore, (2) will pay less in total

---

[13] CFPB faults Nationwide's scripts for not directing representatives to eliminate any possible ambiguity by answering with a simple "no."  The scripted response is sufficiently accurate to preclude finding liability based thereon.  Nevertheless, an arguably better practice would be for the scripts to direct representatives to give a "no, but . . ." answer, rather than never clearly saying "no."  A "no, but . . ." response would not necessarily have to include the word "but."  It could be any answer that begins with a "no" and is followed immediately with a more fulsome explanation.

[14] Because CFPB has shown there were other misrepresentations affecting all of Nationwide's customers, the failure to quantify the number implicated by this issue is not critical.  It would, however, preclude awarding restitution to all customers based only on these misrepresentations, were restitution otherwise appropriate.  As such, this issue contributes to the conclusion set out below that CFPB has not shown a restitutionary award to be warranted.

interest charges. Librock's analysis is premised on looking at how much total interest a borrower will have already paid as of a particular time under the IM program, contrasted with how much total interest he or she would have already paid at the same point in time without the IM program. Under that mode of analysis, the total decrease in interest payments already made will not exceed the total fees paid until approximately the ninth year, given a loan amount and interest rate that is typical of Nationwide customers.

Apart from certain quibbles not affecting the analysis, defendants do not challenge Librock's math. Rather, they and their expert Harvey Rosen, reject Librock's theoretical approach to the question.[15] Defendants argue that the interest savings resulting from making *any* extra payment towards principal can only be meaningfully measured by looking at the total interest amount that will have been paid by the end of the loan term, given the extra principal payments, and comparing that to what the total interest would have been absent those payments. Defendants point out that Truth in Lending Act disclosures lenders must provide at loan initiation calculate interest exactly that way, and show what the total interest paid will have been assuming monthly payments are timely made over the full term of the loan. Rosen testified that even if a Nationwide customer made only one extra principal payment prior to dropping out of the IM program, the reduction in total interest paid over the full term of the loan would exceed the setup fee and the charge for the one automatic debit.

Defendants further argue that looking at it from the perspective of a reduction in the total interest obligation, it becomes irrelevant that many consumers may refinance before the loan term ends, or even before the "break-even" point claimed by Librock. Because the amount refinanced will be a lower principal balance, the interest savings will automatically carry through to the new loan (although the precise amount of savings may vary, depending on differences in interest rates as between the loans).[16]

---

[15] Because of illness, Rosen was unable to testify at trial. The parties stipulated to admission of his deposition transcript in lieu of live testimony.

[16] Of course, as defendants also point out, the IM program is fully-transferable to any new loan,

The problem with defendants' position is even if they are technically correct, at least some portions of their marketing materials are "likely to mislead consumers acting reasonably under the circumstances." *Gordon*, 819 F.3d at 1192. Using their calculations for savings over the full loan term, defendants divide that by the number of months and repeatedly represent to potential customers that they will save an "average" of some specific dollar amount per month. Under the same reasoning, defendants make representations that customers will save amounts such as $1500 in the first year, and $5000 after only two years. Defendants also use the same approach in calculating figures they tout as the total savings its customers have already achieved.

A reasonable consumer is likely to misunderstand how defendants are using "average" in this context, and is likely to assume the "average" is a caveat to address minor variations or imprecisions in the numbers from month to month.[17] A reasonable consumer is likely not to understand that in terms of actual out-of-pocket dollars being applied as interest each month, the reduction will be minimal until much later in the term of the loan, and that the total "savings" will be even less in light of the fees. In other words, a reasonable consumer is likely to understand the promises of "average monthly savings" or of the savings in the first year in a manner more congruent with the approach taken by Librock. Upon being told, for example, that there will be $1500 in interest savings the first year, a reasonable consumer can be misled into believing that his or her actual interest payments to the lender *that year* will be $1500 less than if he or she elects not to buy the IM program.

To be sure, defendants often included disclaimers explaining that their figures were based on the "life of the loan."[18] Those caveats, however, are insufficient to offset the misleading effect

---

without a requirement that another setup fee be paid. There was little evidence, though, as to how often Nationwide's customers took advantage of that option.

[17] Additionally, at least some mailers did not use the term "average" and instead merely stated a "monthly interest savings" amount. See *e.g.* Trial Exh. 70.

[18] Defendants also stated that the figures were "net of fees," which ordinarily means the fees have already been deducted from the numbers given. There is some implication in the briefing that defendants may be using the term to mean that the claimed savings do *not* reflect the fees a customer will have to pay to achieve those savings. If defendants in fact deducted the fees when

of the assertions about monthly savings, or savings in the first and second year. *See Cyberspace.Com*, *supra*, 453 F.3d at 1200 ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures.").

Additionally, even under defendants' approach, they are forced to concede there is no reduction in the lifetime interest obligation at any time before Nationwide "submits the first extra biweekly debit to the lender that is directly applied to the principal." As that may not occur for several months, and certainly does not occur for some time after Nationwide collects the set-up fee, any and all representations regarding "immediate" savings are misleading.[19]

Plainly, defendants cannot be precluded from offering projected savings calculations under the same method that lenders are required to use when disclosing lifetime interest savings. Nor is it inherently misleading or unreasonable to use a "life of the loan" assumption, regardless of the fact that most consumers may refinance long before either the original term of the loan, or the shortened payoff period that will result under the IM programs. Thus, except for the problem of customers who cancel after seven days but before an extra principal payment has been made, CFPB has not shown it to be wrongful for Nationwide to "guarantee" savings, or to use savings figures that compare total interest on the same loan over its full term with total interest on the same loan under the IM program. Where defendants went astray was in reducing that to "monthly" and "yearly" savings figures that likely would mislead a reasonable consumer, even if not literally false.

Finally, in what may have been a holdover from the time that Nationwide collected the setup fee upon enrollment, some of the marketing materials represented that "100%" of the "extra"

---

calculating the stated savings figures, there is not an additional problem. If, however, they are using "net of fees" to mean its opposite, this is another misleading aspect of the marketing materials.

[19] Additionally, Nationwide by policy offers only a seven day period in which to cancel, although there was evidence it would waive the setup fee in some other circumstances. In the event Nationwide retains the setup fee even where a customer leaves the program before making the first extra payment towards principal, the "guarantee" of savings will not be realized.

payments went to reducing the loan principal. This, of course, was false insofar as the first "extra" payment was retained by Nationwide as the setup fee. While the setup fee itself was adequately disclosed elsewhere, that cannot excuse this misrepresentation.

(4) <u>Consumers' ability to achieve similar savings without the IM program</u>

Defendants' telephone scripts and promotional videos included multiple statements suggesting to potential customers that, with few exceptions, the only way to achieve savings through making bi-weekly payments was to enroll in the IM program, or perhaps through some other third party "administrator." For example, defendants claimed that "[o]nly a small percentage of lenders actually offer a bi-weekly mortgage program to their customers . . . . The few lenders who do offer a bi-weekly program require you to set it up through an administrator like us."[20]

For customers whose loans are with lenders who in fact do not offer a biweekly payment option, any inaccuracy in defendants' representations on this issue is immaterial. The evidence shows, however, that defendants actively compiled and maintained a list of lenders who *do* offer some form of a biweekly payment plan, and that some, or perhaps many, of Nationwide's customers had loans with those lenders.

The record is unclear as to how many lenders offer a biweekly payment option that is functionally equivalent to the IM program—*i.e.*, a program in which one-half the ordinary monthly payment is automatically deducted from the consumer's account, with the result that the loan principal is decreased by the equivalent of one "extra" monthly payment each year. Additionally, under the IM program, payment of the setup fee entitled consumers to use the

---

[20] No one suggests that a sufficiently self-disciplined consumer could not follow a biweekly payment plan, even where the lender does not accept biweekly payments. For example, the consumer could make transfers of half the monthly mortgage amount from his or her main checking account into another account on a biweekly basis, and then make monthly payments to the lender from that second account—i.e., doing exactly what Nationwide does, but without either the setup fee or the per debit fee. That possibility, however, does not mean the IM program is without value, as it plainly provides both convenience and a substitute for self-discipline that a reasonable consumer might very much like to have.

biweekly payment program indefinitely—*i.e.*, even on different loans if they refinanced later. Payment of the fee also entitled the consumer to use the program on other debts, *e.g.* credit cards. Finally, the fee also entitled consumers to receive the purported benefits of "payment audits." While there was very little evidence as to the degree to which any consumers actually used these other services or as to the value they actually provided, at least in theory they distinguish the IM program from the programs some lenders offer, and therefore could serve as a basis for consumers to elect the IM program.

That said, CFPB has adequately shown that defendants' representations to the effect a consumer must use the IM program, or perhaps a similar program from another third party administrator, were materially misleading when made in the course of enrollment telephone calls with potential customers whose loans were with lenders known to CFPB to offer a functionally-equivalent biweekly payment plan. CFPB has not shown, however, how many of Nationwide's customers fell into that class. As such, these misrepresentations, like those relating to lender affiliation, contribute to the liability finding, and must be addressed in the injunctive relief. Again, however, they provide less support for monetary relief than do the misrepresentations and omissions affecting all the customers.

D. Statute of limitations

Defendants contend this entire action is barred by the three-year statute of limitations of the CFPA. *See* 12 U.S.C. § 5564(g)(1) ("Except as otherwise permitted by law or equity, no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates.") Defendants argue the statute began to run on March 3, 2012, when CFPB received a relevant consumer complaint alleging that Nationwide engaged in misleading marketing practices. This action was filed on May 11, 2015, just over two months late, in defendants' view. [21]

---

[21] Defendants also suggest that the statute was running as early as 2010, based on information learned by CFPB director Richard Cordray in his prior capacity as Attorney General for the State

The notion that mere receipt of a consumer complaint can trigger the statute of limitations as against CFPB is unsupported by any authority and would be unworkable. At most, a credible and specific consumer complaint might in some circumstances serve as a "storm warning" and put the CFPB on "inquiry notice" that it should begin investigating. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010). As the *Merck* court made clear, however, "discovery" of facts that would prompt a reasonably diligent plaintiff to begin investigating is not equivalent to discovery of the facts constituting the violation, and "does not automatically begin the running of the limitations period." *Id.*

Thus, even assuming the receipt of an unverified complaint from a consumer containing allegations somewhat similar to the claims later pursued by CFPB was sufficient to create a duty for CFPB to begin investigating those allegations, the statute did not begin to run until CFPB "thereafter discover[ed] or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation.'" *Id.*[22] Nothing in the record suggests that CFPB actually discovered the facts, or that a reasonably diligent plaintiff would have discovered the facts, in less than the two-plus months between March 3, 2012 and May 10, 2012—the date three years prior to filing. Accordingly, there is no basis to conclude this action is time-barred.[23]

---

of Ohio. Defendants have not shown that the Ohio Attorney General's office in 2010 had knowledge of the matters on which the CFPB's claims in this action are based. Indeed, it is undisputed the change to the deferred set-up fee lying at the heart of the present case did not occur until 2011.

[22] For the statute of limitations to be running, CFPB necessarily would have to be in possession of sufficient facts to file suit. Had CFPB rushed into court on March 4, 2012 with a complaint based on no information other than the consumer complaint received the prior day, it would have been a clear violation of Rule 11. Plainly the statute was not yet running.

[23] Defendants' post-trial briefing raises an additional contention in the nature of an affirmative defense, not previously advanced in this action, that the CFPB is unconstitutional. The arguments defendants make were accepted in *PHH Corp. v. CFPB*, 839 F.3d 1 (D.C. Cir. 2016), but that opinion was vacated when rehearing *en banc* was granted, and no new decision has yet issued. Remaining authority is in accord that the arguments are not tenable. *See Consumer Fin. Prot. Bureau v. Navient Corp.*, 2017 WL 3380530, at *13-18 (M.D. Pa. Aug. 4, 2017)(surveying cases).

A. <u>Restitution</u>

The CFPA vests the court with broad authority to impose appropriate remedies for any violations.[24]  It provides, in pertinent part:

> The court . . .  in an action or adjudication proceeding brought under Federal consumer financial law, shall have jurisdiction to grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law . . . .
>
> Relief under this section may include, without limitation—
>
> (A) rescission or reformation of contracts;
> (B) refund of moneys or return of real property;
> (C) restitution;
> (D) disgorgement or compensation for unjust enrichment;
> (E) payment of damages or other monetary relief;
> (F) public notification regarding the violation, including the costs of notification;
> (G) limits on the activities or functions of the person; and
> (H) civil money penalties . . . .

12 U.S.C. § 5565(a).[25]

Here, CFPB seeks "restitution" on behalf of consumers from Nationwide and LPA, in the amount of $73,955,169, which it established at trial represents revenue from setup fees (less refunds) paid by approximately 126,500 consumers who participated in the IM Program from July 21, 2011 to December 31, 2015.[26]  To the extent such restitution is not paid, CFPB also seeks

---

[24]  The conclusions set forth above that defendants made certain misrepresentation and omissions is sufficient to support liability under both the "abusive" and "deceptive" prongs of the CFPA and under the TSR. There is no suggestion that separate remedies for those violations would be appropriate.

[25]  Defendants suggest that under 12 U.S. Code § 5564(a) CFPB is required to elect between civil penalties or "all appropriate legal and equitable relief."  Although the statute uses the term "or," in context it plainly is listing non-exclusive options CFPB is permitted to pursue, as is confirmed by the listing of the available remedies set out in § 5565(a).

[26]  At argument, CFPB initially was hard-pressed to identify the rationale on which it selected refund of the setup fee as an appropriate remedy to seek.  Ultimately, however, it explained that the setup fee effectively represents the purchase price of the financial services product, which consumers were misled into purchasing—even assuming the setup fee itself was adequately disclosed.  Under that reasoning CFPB likely could have also sought refund of the debit charges. Its election not to do so, however, does not warrant rejecting refund of the setup fee as a

"disgorgement" from Lipsky in the amount of $33,039,299, representing shareholder distributions he received from 2011 to 2015, discussed below.[27] At trial, defendants presented no evidence or argument calling into question the accuracy of these dollar figures. The question, therefore, is only whether restitution, and potentially disgorgement, in these amounts is otherwise appropriate.

Much of Ninth Circuit case law has arisen in the context of egregious frauds where the issue is what the upper limits are on restitution awards. Relatively little guidance exists as to how a court should exercise discretion in circumstances where appropriate equitable relief may be less than the full measure that would theoretically be available. As the discussion above reflects, CFPB has not proved that defendants engaged in the type of fraud commonly connoted by the well-worn phrase "snake oil salesmen." Defendants have not shown, and could not show, that the IM Program never provides a benefit to consumers, or that no fully-informed consumer would ever elect to pay to participate in the program.

The law is nonetheless clear that it is not automatically a defense to claim a consumer realized some benefit from a product that he or she would not have bought, absent misrepresentations. The Ninth Circuit explains:

> [I]t is dishonest to represent that rhinestone jewelry is actually diamond, and to charge diamond prices for it. A district court may properly find that a rhinestone merchant who engages in such practices has behaved in a way that a reasonable person in the circumstances would have known was dishonest or fraudulent.

*F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993).

The *Figgie* court went on to observe:

> The seller's misrepresentations tainted the customers' purchasing decisions. *If they had been told the truth, perhaps they would not have bought rhinestones at all or only some . . . .* The fraud in the selling, not the value of the thing sold, is what entitles consumers in

theoretically appropriate remedy.

[27] CFPB additionally seeks civil monetary penalties, as also discussed below.

this case to full refunds *or to refunds for each detector that is not useful to them.*

994 F.2d at 606 (emphasis added).

Thus, in the abstract, *Figgie* arguably would support awarding the restitutionary measure that CFPB requests here—complete refund of all of the setup fees Nationwide's customers paid in the relevant time period, deducting only those refunds previously made. As noted above, however, some of the matters found to constitute misrepresentations or omissions did not apply to all customers. It is also of some consequence that CFPB did not succeed in proving that the setup fee itself was not adequately disclosed. Additionally, the one category of misleading representations that affected all or virtually all Nationwide customers – the timing of savings—involved statements that had an articulable basis in fact. While the literal truth of nearly all of those statements does not absolve defendants of liability for the misleading way they chose to present the savings calculations, it does further undercut the appropriateness of requiring refund of all setup fees customers paid.

Finally, it is worth noting that even in *Figgie*, the restitutionary award was structured in a way that those customers who elected to retain the benefits of the products they had purchased (however minimal) would not receive the windfall of both the benefit and a refund. *See* 994 F.2d at 606 ("The district court's order creates no windfall for Figgie's customers . . . . Those consumers who decide, after advertising which corrects the deceptions by which Figgie sold them the heat detectors, that nevertheless the heat detectors serve their needs, may then make the informed choice to keep their heat detectors instead of returning them for refunds."). While such a structure may not be legally required in every instance, it further underscores that restitution is an equitable remedy, to be applied with as much fairness as is feasible.[28]

Accordingly, taking into account all of the circumstances present here and balancing the

---

[28] Although *Figgie* involved a tangible product that customers could simply keep if they desired to do so, there could be circumstances under which a similar remedy could be fashioned even where services, as opposed to tangible goods, are at issue.

equities, the conclusion that follows is CFPB has failed to show restitution of all customers' setup fees is appropriate. Furthermore, CFPB has not offered a basis for any restitution that might be limited in some way so as to make it a just result. Thus, no restitutionary award will issue.

### B. Disgorgement from defendant Lipsky

The CFPB sought disgorgement from individual defendant Lipsky, but acknowledged that if the corporate entities complied with a judgment requiring them to make the full measure of restitution requested, disgorgement would be cumulative, and Lipsky would have no obligation to disgorge the shareholder distributions he derived during the relevant time periods. In light of the fact that no restitutionary award is being made, an order for disgorgement by Lipsky is likewise unwarranted.

### C. Statutory Penalties

The CFPA provides: "Any person that violates, through any act or omission, any provision of Federal consumer financial law shall forfeit and pay a civil penalty . . . ." 12 U.S.C. § 5565(c)(1). The statute provides for a basic penalty of up to $5000 per day, with reckless or knowing violations at progressively higher maximum rates. In setting the penalty amount, a court may consider the following mitigating factors:

> (A) the size of financial resources and good faith of the person charged;
> (B) the gravity of the violation or failure to pay;
> (C) the severity of the risks to or losses of the consumer, which may take into account the number of products or services sold or provided;
> (D) the history of previous violations; and
> (E) such other matters as justice may require.

Here, CFPB is requesting the maximum first tier penalty of $5000 per day from July 21, 2011, through November 23, 2015, for a total award of $7,930,000. While it may be that CFPB only sought first tier penalties because it believed the restitutionary award would be large, under all the circumstances that penalty figure is appropriate. The record plainly supports an inference

that defendants sought to use the most effective sales tactics possible to market the IM program, and that in doing so they were willing to push up against the legal limits. The record also shows, however, that defendants took affirmative steps such as training, quality control, and seeking legal counsel, in an effort to stay on the right side of the line. As such, imposing a penalty at the higher tiers for reckless or knowing violations is not warranted. The aggressiveness with which defendants pushed the line, however, supports imposition of the first tier maximum.

Finally, CFPB proposes that the award be made against "each" defendant, without specifying whether it intends joint and several liability for the $7,930,000 amount, or three separate penalties, each in that amount. Although Nationwide, LPA, and Lipsky are legally three separate persons, there is not a sufficient basis to impose a total penalty of almost $24 million. Accordingly, a single penalty of $7,930,000 will be imposed, for which defendants are jointly and severally liable.

### D. Injunctive relief

The parties are hereby ordered to meet and confer to negotiate as to the form and content of appropriate injunctive relief, which will govern any future operation by defendants of the IM program or any substantially similar program, regardless of how it may be named. Within 30 days of the date of this opinion and order, the parties shall submit a joint proposal, or to the extent they cannot agree, separate proposals. Generally speaking, the injunctive relief should permit defendants to resume operation of the IM program, provided they make changes to the mailers, phone scripts, and promotional videos sufficient to eliminate each of the misleading or deceptive points addressed above.

### IV. COUNTERCLAIMS

Defendants' counterclaims allege, in essence, that CFPB acted wrongfully by engaging in extra-judicial "back-room pressure tactics" designed to coerce Nationwide's banking partners to cease doing business with it. The counterclaims were the subject of two rounds of motions to

1   dismiss, and a motion for summary judgment. The first motion to dismiss was granted because

2   Nationwide had failed to set out sufficient plausible facts to show (1) that CFPB had participated

3   in allegedly wrongful conduct as part of the so-called "Operation Chokepoint" program,[29] or (2)

4   that the banks terminated their relationships with Nationwide as the result of any such

5   participation by CFPB in Operation Chokepoint, or any other allegedly wrongful extra-judicial

6   conduct. A second motion to dismiss, however, was denied, because defendants presented

7   additional factual allegations—and arguments regarding the inferences reasonably to be drawn

8   from those averments—that a decision on the basis of the pleadings alone would not have been

9   appropriate.

10       Then, summary judgment was also denied. The order observed that "the direct evidence

11   tying the CFPB to any actionable wrongs remains thin," but concluded defendants had pointed to

12   enough inferences potentially arising from all the circumstances under which their banking

13   partners terminated the relationships that it would be premature to conclude as a matter of law no

14   reasonable fact finder could find in their favor.

15       Sitting now as a trier of fact, the Court concludes the evidence at trial—no more robust

16   than that previously presented—does not warrant drawing an inference in this case that CFPB

17   engaged in any "back-room pressure tactics" as part of "Operation Chokehold" or otherwise, or

18   that the banks terminated their relationships with defendants based on any such wrongful conduct

19   by CFPB. Rather, the evidence supports a conclusion that while the filing of this action itself—a

20   privileged and non-actionable act—may have contributed to the termination of the banking

21   relationships, those relationships were already strained for reasons unrelated to any conduct by

22   CFPB. Lipsky's testimony on the point demonstrates that defendants lack any facts to support the

23   claim of wrongful extra-judicial pressure. Rather, Lipsky testified he has drawn his own

24   conclusion that the banks terminated the relationships because of CFPB's mere identity as the

25

26   [29] Nationwide alleged "Operation Chokepoint," was a campaign initiated by the United States Department of Justice to force banks to terminate their business relationships with payday lenders,

27   and speculated that the campaign had been extended to other businesses such as its own.

28

plaintiff in this action. Defendants submitted no evidence from the banks sufficient to establish the factual predicates for their counterclaims, even assuming "extra-judicial" pressure might, in some circumstances, support a claim under the legal theories advanced. Accordingly, the counterclaims fail for lack of proof.

## V. CONCLUSION

On the complaint, CFPB is entitled to judgment in its favor for a statutory penalty of $7,930,000, as against defendants Nationwide, LPA, and Lipsky jointly and severally. CFPB is further entitled to injunctive relief consistent with the findings above, the exact terms of which shall be determined after the parties engage in meet and confer and present their joint or separate proposals, which shall be submitted within 30 days of the date of this opinion and order. CFPB is also entitled to judgment in its favor on the counterclaims.

**IT IS SO ORDERED**.

Dated: September 8, 2017

_____
RICHARD SEEBORG
United States District Judge

OPINION AND ORDER
CASE NO. 15-cv-02106-RS