HELEN M. MAC MURRAY
(OH Bar #0038782 - admitted *pro hac vice*)
hmacmurray@mslawgroup.com
LISA A. MESSNER
(OH Bar #0074034  - admitted *pro hac vice*)
lmessner@mslawgroup.com
MAC MURRAY & SHUSTER, LLP
6530 West Campus Oval, Suite 210
New Albany, Ohio  43054
Telephone:      (614) 939-9955
Facsimile:      (614) 939-9954

HANSON BRIDGETT LLP
KIMON MANOLIUS, SBN 154971
kmanolius@hansonbridgett.com
SAMANTHA D. WOLFF, SBN 240280
swolff@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:      (415) 777-3200
Facsimile:      (415) 541-9366

Attorneys for Defendants
Nationwide Biweekly Administration, Inc., Loan
Payment Administration, LLC, and Daniel S.
Lipsky and Counterclaimant Nationwide
Biweekly Administration, Inc.

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | Case No. 3:15-cv-02106-RS |
| Plaintiff, | Judge:          Hon. Richard Seeborg |
| v. | Trial Date:     April 24, 2017 |
| NATIONWIDE BIWEEKLY ADMINISTRATION, INC., LOAN PAYMENT ADMINISTRATION LLC, and DANIEL S. LIPSKY, | **NOTICE OF COMBINED MOTION UNDER RULES 59 AND 60 TO ALTER OR AMEND JUDGMENT AND FOR RELIEF FROM JUDGMENT ON BEHALF OF ALL DEFENDANTS** |
| Defendants. | **ORAL ARGUMENT REQUESTED** |

## I.   INTRODUCTION TO MOTION ON CIVIL PENALTIES

Pursuant to Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure, Defendants, Nationwide Biweekly Administration, Inc. ("Nationwide"), Loan Payment Administration LLC, ("LPA") and Daniel S. Lipsky (collectively "Defendants") hereby move to alter or amend the judgment with regard to the underlying violation of law on which the Court ordered civil penalties on the grounds that there are clear errors of both fact and of law and that the judgment is manifestly unjust.  Moreover, Defendants move this Court to grant relief from judgment based on new evidence demonstrating the Defendants' inability to pay the civil penalty and the severe and inequitable hardship resulting from the judgment.

### Final Money Judgment - Exclusively for Civil Penalties

On May 11, 2015, the Bureau commenced a civil action against Defendants. Beginning on April 24, 2017, the Court tried this matter.  On September 8, 2017, the Court, having considered the evidence presented at trial and the post-trial submissions of the parties, issued an Opinion and Order with findings of fact and conclusions of law, as required by Fed. Rule Civ. Pro. 52, resolving various contentions in favor of Defendants and various contentions in favor of the Bureau.  (ECF Doc. 315) (hereafter referred to as "Opinion and Order".) The Court found certain violations of law and awarded a civil penalty in the amount of $5,000 per day, for a certain number of days, totaling $7,930,000, for which the Defendants are each jointly and severally liable. The Court determined and calculated the penalty pursuant to the Consumer Financial Protection Act ("CFPA"), specifically 12 U.S.C. § 5565(c), Thereafter, on November 9, 2017, the Court entered final judgment which included a money judgment for the total amount of $7.93 Million, all of which consists entirely of civil penalties. Dkt. #331.

## II.   ARGUMENT ON CIVIL PENALTIES

### A.   LEGAL STANDARD

#### 1.   Rule 59(e)

Defendants move the Court to alter or amend the judgment pursuant to Rule 59(e). Courts have interpreted Rule 59(e) to require the movant to meet one or more of the following four

grounds: (1) to correct clear error in the conclusions of law or in the findings of fact upon which the judgment is based; (2) to consider newly discovered evidence or previously unavailable evidence; or (3) to prevent manifest injustice; and (4) to consider an intervening change in controlling law. *McDowell v. Calderon,* 197 F. 3d 1253, 1255 n.1 (9th Cir. 1999) (quoting Wright, *Federal Practice and Procedure* § 2810.1 (2d ed. 1995)).

District courts have "considerable discretion" in ruling on a motion to amend or alter a judgment under Rule 59(e). *McDowell*, 197 F.3d at 1255 n. 1 (9th Cir. 1999). However, a failure to correct a clear error of law constitutes an abuse of discretion. *Perez v. State Farm Mut. Auto. Ins. Co.*, 291 F.R.D. 425, 430 (N.D. Cal. 2013). *See also Yniques v. Cabral*, 985 F. 2d 1031, 1034 (9th Cir. 1993). If the underlying judgment is clearly erroneous, then it is an abuse of discretion not to grant the motion. *McDowell* 197 F. 3d at n. 4.

### 2.      Rule 60(b)

Defendants also move the Court to grant them relief from the civil penalties awarded in the judgment based on newly submitted evidence. Relief from judgment on the basis of newly discovered evidence is warranted if (1) the moving party can show the evidence relied on in fact constitutes "newly discovered evidence" within the meaning of Rule 60(b); (2) the moving party exercised due diligence to discover this evidence; and (3) the newly discovered evidence must be of "such magnitude that production of it earlier would have been likely to change the disposition of the case." *Future Realty, Inc. v. City of Spokane*, 331 F.3d 1082, 1093 (9th Cir. 2003). Similar to Rule 59(e), Rule 60(b) must be used to correct manifest errors of law. *Faile v Upjohn Co.*, 988 F. 2d 985 (9th Cir. 1993) (reversing denial of a Rule 60(b) motion to vacate dismissal, where the district court had failed to apply provision of Fed. R. Civ. P 5 (b) that service is complete upon mailing.) As discussed below, evidence of the Defendants' finances is highly relevant to the civil penalties; however, the CFPB failed to follow the statutory requirements and did not submit that information so that the Court could reach an informed decision about penalties.

### B.      MANIFEST ERRORS OF LAW AND FACT AFFECT JUDGMENT FOR CIVIL PENALTIES

This motion addresses the judgment on civil penalties. As discussed more fully below,

-3-

Defendants seek to correct clear errors of law and fact regarding the imposition of any civil penalties, and on this basis seek to vacate the judgment on civil penalties in its entirety.

> **1.      Manifest Error of Fact and Law: FTC Requires Specific Advance Notice Before Civil Penalties Could Be Imposed, and CFPB Cited FTC Law as Controlling Yet Failed to Follow FTC Civil Penalty Standards.**

CFPB consistently maintained throughout this case that the Federal Trade Commission rules and case law controlled,[1] CFPB however did not follow these processes for civil penalties. As such, this is a clear error of fact and law.  Rather, CFPB "cherry-picked" the processes that benefited its positions only.

FTC can bring enforcement actions either through an administrative process (under 15 U.S.C. § 45(b)) or judicial process (15 U.S.C. § 53(b)).  Civil penalties are available to the FTC in only limited circumstances – which do not include judicial proceedings.[2]  In fact, an FTC respondent only faces a civil penalty after an administrative hearing is held, an order is issued, the order becomes final, and the respondent then violates the order.

> If a respondent violates a final order, it is liable for a civil penalty for each violation, as set forth in Commission Rule 1.98(c).  The penalty is assessed by a district court in suit brought to enforce the Commission's order.[3]

This process provides fair notice to a respondent about what is required - and does so prior to any potential liability for civil penalties.

_____

[1] *See, e.g.*, Plaintiff's Post-Trial Proposed Findings of Fact and Conclusions of Law Regarding Affirmative Case, ECF Doc. 296, p. 46, ¶ 236 (applying FTC case law); *id.* at p. 47, ¶ 239 – p. 48, ¶ 247 (applying FTC standards); *id.* at p. 64, ¶ 332 (relying on FTC's website for definition of "clear and conspicuous"); *id.* at p. 66, ¶ 341 (arguing FTC case law should apply to "deceptive" standard).

[2] In judicial enforcement proceedings, the FTC may seek injunctive relief and *equitable* monetary relief under 15 U.S.C. § 53(b).  *See, e.g., Willis v.* Lipton, 947 F.2d 990 (1st Cir. 1991).  While this may include divestiture of assets, appointment of a receiver and/or an award of restitution, it does not allow civil penalties in most circumstances.

[3] See Request for Judicial Notice, Exhibit A, A Brief Overview of the Federal Trade Commission's Investigative and Law Enforcement Authority, available at https://www.ftc.gov/about-ftc/what-we-do/enforcement-authority

*Motions under Rules 59 and 60 on Behalf of Defendants*
Case No. 3:15-cv-02106-RS

In contrast herein, CFPB initiated a demand for civil penalties in its Complaint (ECF Doc 1).  In this case, for example, after obtaining information from Defendants through its Civil Investigative Demand,[4] CFPB demanded civil penalties from the outset of the litigation.  Again, CFPB re-asserted its demand for civil penalties at trial after obtaining more information through litigation discovery.[5]  (See Complaint, ECF Doc. 1, Demand for Relief at p. 13, ¶ c; CFPB Post-Trial Brief Regarding Affirmative Case, ECF Doc. 294, at p 23).

Absent was any evidence of any notice by CFPB to Defendants, at any time, about any concerns or demands CFPB had, either formal or informal, in any way. The difference in the procedures between the FTC and the CFPB cannot be legitimately disputed.  Obviously, CFPB failed to follow FTC rules.  The civil penalties CFPB sought in this case are imposed without the limiting principles followed by the FTC.  These FTC procedures provide fair notice to those against whom the civil penalties may be assessed. As will be further discussed below, fair notice is a requirement of the United States Constitution. Had CFPB followed the FTC procedures, it would have provided fair notice.  As such, it is a clear error of fact.

Since it opened its doors in July 2011, CFPB has sought and obtained civil penalties in many enforcement actions against many Defendants. CFPB reports that it has obtained over One-Half Billion Dollars ($566,769,642) in civil penalties during the last six years since its inception.[6]

---

[4] During 2014 through 2015, CFPB propounded 37 questions in its Civil Investigative Demand, 28 requests for production of documents which resulted in the production of 45, 614 pages of documents and three investigational hearings (depositions).  See Declaration of Helen MacMurray, ECF Doc. 183-3, pp. 1 -3.

[5] During this litigation, CFPB propounded several interrogatories, 35 requests for production of documents which resulted in the production of over 24,000 documents, and no less than 10 depositions.  See Declaration of John D. Smith, ECF Doc. 183-2, p. 1.

[6] See Request for Judicial Notice, Exhibit B, Financial Report of the Consumer Financial Protection Bureau, Fiscal Year 2017, which includes the Civil Penalty Fund annual report and provides FY 2012 – 2017 data on the Civil Penalty Fund, at p 29, November 15, 2017, available at https://www.consumerfinance.gov/about-us/budget-strategy/financial-reports/

*Motions under Rules 59 and 60 on Behalf of Defendants*
Case No. 3:15-cv-02106-RS

In its annual reports, CFPB lists the cases and the amounts of civil penalties that it has collected from the listed Defendant(s) in each case.[7]  For example, in fiscal year 2017, the annual report states that CFPB collected civil penalties in 38 cases totaling $42.5 Million.[8]  CFPB has a focused and regular practice to demand civil penalties.

But, CFPB does not have a focused and regular practice of providing fair notice to those against whom it seeks civil penalties, as would the FTC under the same circumstances. Instead, CFPB posits that the FTC rules control, but then fails to follow those rules in its own process for seeking civil penalties - without any notice at all.

### 2.    Manifest Error of Fact and Law: Failure of Proof of Injury to the Public and Ability to Pay

CFPB has maintained throughout this action that the Federal Trade Commission Act and case law interpreting it should guide the CFPB's claims and remedies.  CFPB has, however, only adhered to the requirements of the FTC Act selectively and to its benefit.  One of the prime examples of this shortcoming is the arbitrary and strong-armed methodology behind its asserted civil penalties, disgorgement, and related monetary relief.

The FTC Act permits civil penalties only when the Commission has established the (1) good or bad faith of Defendants, (2) injury to public, and (3) Defendants' ability to pay. 15 U.S.C. § 45(m)(1)(C).  *See also, United States v J. B. Williams Co.,* 498 F.2d 414 (2d Cir. 1974). Evidence of these factors is a necessary part of the FTC's claim to civil penalties.  Where it is lacking, there can be no penalty.

Here, the CFPB failed to submit evidence for the Court to consider on these issues. Instead, it simply claimed entitlement to every dollar received by Defendants over several years.

---

[7] *Id*. at p.31-33.

[8] *Id.* at p 33.

-6-

There was a complete absence of proof of actual injury as well as the ability to pay.  The CFPB deprived the Court of the opportunity to consider this evidence.  In the process, it failed to present a prima facie case for monetary relief under the FTC Act – the same law that it relies on.

The CFPB's error permeated through the judgment and worked considerable prejudice upon the Defendants.  Understandably, due to the complete lack of evidence on factors such as the lack of injury (the Court did not even order any consumer restitution) to the public and the Defendants' ability to repay, the Court did not consider those factors.   Defendants have demonstrated in subsequent motions that they (particularly Mr. Lipsky, personally) lack the ability to pay these penalties.

Moreover, the CFPB's proof of injury to the public is lacking.  The Court found, in its Opinion and Order, that some of NBA's marketing materials misled consumers about an affiliation with a lender.  Even accepting that as true, the Court went on to note that the "record does not contain a basis for determining how many of Nationwide's customers would have been impacted by this issue." (Opinion and Order, ECF Doc. 315, at p. 11).  Defendants agree with the Court that the CFPB failed to present evidence about the injury to the public resulting from the violation.  This failure by the CFPB is fatal to the assessment of a penalty.  The CFPB's lack of evidence on these factors left the Court unable to adequately consider the amount of a penalty and the resulting judgment was manifestly erroneous at a matter of law.

### 3. Manifest Error of Fact: CFPB Admits to Rulemaking Through Court Orders in Enforcement Cases and Its Own Disclaimer Contradicts Statement in this Case that FTC Rules Apply

At the same time CFPB is seeking civil penalties as routine matter, however, the CFPB decided not to publish any regulatory rules setting forth its interpretation and definition of "deceptive."  The statute uses only one word – "deceptive."  The fact that the CFPB has issued no rules regarding its regulatory interpretation of "deceptive" comes within a criticism negatively describing this no-rules process as "rulemaking through enforcement" actions.  This description

-7-

was referenced by Director Cordray in a speech Director Cordray made wherein he answered his

critics.   He first described this criticism using the term used by the critics, "regulation by

enforcement," and then set forth the reasons why this was this intentional approach decided by the

CFPB:

> [O]ur enforcement actions have been marked by ***orders, whether entered by our agency or by a court,*** which specify the facts and the resulting legal conclusions…
>
> Indeed, it would be ***"compliance malpractice"*** for executive not to take careful bearings from the ***contents of these orders about how to comply with the*** law and treat consumers fairly…
>
> ***Some have criticized this approach as regulation by enforcemen***t, but I think that criticism is badly misplaced.  Certainly, any responsible official or agency charged with enforcing the law is bound to recognize that they should develop a thoughtful strategy for how to deploy their limited resources most efficiently to protect the public. This means working toward a pattern of actions that conveys an intelligible direction to the marketplace, so as to create deterrence that can be readily understood and implemented.  The alternative is just a random series of actions that takes a few wild swipes at the bad actors without systematically cleaning up the practices that harm consumers across the marketplace…
>
> ***Others have framed*** this criticism as a suggestion that law enforcement officials should think through and ***explicitly articulate rules*** for every eventuality before taking any enforcement actions at all. But that aspiration would lead to paralysis because it simply ***sets the bar too high***.  Particularly in an area like consumer financial protection, the vast majority of our enforcement actions involve some sort of deception or fraud.[9]

Director Cordray's speech clearly shows that (1) there was an intentional decision by the agency

not to issue any rules on the meaning of "deceptive", and (2) the best source for a compliance

executive to look for further information is the enforcement orders themselves.

When CFPB, however, needs to provide a definition of "deceptive" in a lawsuit seeking

civil penalties, CFPB takes a *litigation position* that backtracks Director Cordray's

recommendation to look at enforcement orders.  In the case of litigation, CFPB's position is that

---

[9] See Request for Judicial Notice, Exhibit C, Prepared Remarks of CFPB Director Richard Cordray at the Consumer Bankers Association, March 9, 2016, (Emphasis added.) available at **https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-of-cfpb-director-richard-cordray-at-the-consumer-bankers-association/**

*Motions under Rules 59 and 60 on Behalf of Defendants*
Case No. 3:15-cv-02106-RS

the Court must follow the rules and interpretation of the FTC about "deceptive." (See CFPB Post-Trial Brief Regarding Affirmative Case, ECF Doc. 294, p. 3-4 (including FTC caselaw citations and FTC Policy Statement on Deception referenced in footnotes 2-8.))

Any reliance on CFPB's *litigation position* is a clear error of fact because CFPB itself has disclaimed reliance on the FTC definition of "deceptive."  In its supervisory manual issued in 2012, shortly after opening its doors, CFPB provided multiple pages detailing and stating the FTC interpretation of "deceptive", for purposes of CFPB bank examiners performing an audit of a bank at which time the examiners were to assess whether any bank practices were "deceptive."  At the end of the document, however, CFPB adds the disclaimer shown below - that CFPB explicitly denies any reliance on the FTC rules/interpretations by any party:

> **Disclaimer**:
> Please note:  This Supervision and Examination Manual provides internal guidance to our supervisory staff.  It does ***not bind the CFPB*** and does **not create** any rights, benefits or defenses, substantive or procedural, that are **enforceable by any party in any manner.**  While every effort has been made to ensure accuracy, examination procedures ***should not be relied on as a legal reference***. [10]

In sum, when CFPB says that the FTC rules and interpretations govern, this is merely a *litigation position*, subject to change at any time, and does not have the binding effect of a *regulatory rule* on CFPB.  This is a clear error of fact, therefore, in that CFPB has taken only a *litigation position,* without issuing any regulatory rule on its own binding interpretation of "deceptive" as having the meaning as determined by the FTC.

> **4.    Manifest Error of Law: The Prohibition of "Deception" in the Statute is Unconstitutionally Vague to Support Civil Penalties**

The prohibition against "deceptive" acts or practices in the Consumer Financial

---

[10] See Request for Judicial Notice, Exhibit D,  Supervisory and Examination Manual, October 1, 2012  (Emphasis added.), available at https://www.consumerfinance.gov/policy-compliance/guidance/supervision-examinations/unfair-deceptive-or-abusive-acts-or-practices-udaaps-examination-procedures/

*Motions under Rules 59 and 60 on Behalf of Defendants*
Case No. 3:15-cv-02106-RS

1   Protection Act, 12 U. S. C. §5536(a)(B), is unconstitutionally vague and cannot support an

2   underlying violation resulting in civil penalties.  As discussed below, the term is so vague and

3   incapable of being understood by ordinary people that it runs afoul of the Fifth Amendment under

4   *Johnson v. United States,* 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015).  The statute also sets forth no

5   limiting principles and is therefore unconstitutionally vague because it does not set out with clarity

6   what acts or practices fall within its coverage and what do not.

7
8                     a)        **The FTC Standard for "Deceptive" Requires a Judge-Imagined
                                Hypothetical Category to be Determined**

9
10          As discussed above, CFPB's litigation position was that the FTC rules and case law are

11   applicable to this case.  The Court agreed.  Therefore, this view of what "deceptive" means will be

12   addressed first.

13          In its Opinion and Order, the Court defined "deceptive" as follows:

14                  An act or practice is "deceptive" if: (a) there is a representation, omission, or
                    practice that, (2) is likely to mislead **consumers acting reasonably** under the
15                  circumstances, and (3) the representation, omission or practice is material.  To
                    determine whether a representation or practice is likely to mislead, courts examine
16                  the overall "net impression" that it leaves on a **reasonable consumer**.

17   (Opinion and Order, Dkt. # 315 at p 5) (internal citation[11] omitted.) (Emphasis added.)

18
19          The application of the FTC interpretation of "deceptive" to a CFPB enforcement action for

20   civil penalties requires that a federal district judge determine what a "reasonable consumer"

21   understands or thinks or knows, in the context of specific marketing materials at issue in a case.

22   The Court followed the FTC protocol throughout its Opinion and Order.[12]

23

24   ────────────────

25   [11] The Opinion and Order cited *Consumer Fin Prot. Bureau v. Gordon*, 819 F. 3d 1179, 1192 (9th
     Cir. 2016).  However, the *Gordon* case did not involve a judgment for civil penalties. As such, the
26   Ninth Circuit did not have the opportunity to address the issues raised in this motion regarding
     civil penalties in the *Gordon* case.  The Ninth Circuit has addressed these issues in other cases
27   which are discussed below.

28   [12] There are nine findings with regard to a "reasonable consumers" in the Opinion and Order, at
     Pages, 7,10,13, 14 and 15. Dkt # 315.

                                                  -10-

The issue of whether a categorical approach – requiring a court to determine what fits into a certain category, such as "reasonable consumer" – is problematic because this question is separate from and specifically not based on any required factual proof in the case.  How does the court perform this determination?  In the Opinion and Order, the Court did not reveal the method it used to determine what a "reasonable consumer" thinks or knows.  Nor did CFPB present the Court with any evidence of what groups of consumers think or know, in general, much less what a sub-group of consumers - who had just bought a home and who want to accelerate payment of their mortgage to reduce their financing interest charges -  the consumers to whom the direct mail marketing letters were addressed - think or know.

The constitutionality of this categorical approach was discussed and found wanting both by the United States Supreme Court as well as by the Ninth Circuit Court of Appeals.  First, the U. S. Supreme Court in *Johnson v. United States,* 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015), stated that the Fifth Amendment's Due Process Clause requires that a law (in the sentencing context) define the criteria "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner, that does not encourage arbitrary and discriminatory enforcement." *Id.* at 2566. Finding that the statute in question before the Court failed that test, the Court held that a statute that calls on judges to look at a Defendant's record, learn the name of the offense where conviction occurred, and then determine whether this named category of offenses "in the ordinary case" - not the specific facts in Defendant's case but "ordinary case" of the category itself - involved a substantial risk of force. *Id* at 2564. The Court found that the combination of the indeterminateness of the categorical approach was unconstitutional and void for vagueness.

Thereafter, the Ninth Circuit Court of Appeals in *Dimaya v Lynch,* 803 F.3d 1110 (9th Cir. 2015) (cert. granted 137 S. Ct. 31 (2016)), addressed this categorical approach, applied *Johnson* to the facts, and held that the immigration statute in question also failed the fair notice test for constitutionality.   The Ninth Circuit reasoned that "the vast majority of …statutes pose no vagueness problems because they 'call for the application of a qualitative standard such as 'substantial risk' to real-world conduct.'" citing *Johnson*, 135 S. Ct at 2561. The Ninth Circuit

-11-

further described what was unconstitutional about the sentencing statute in Johnson, focusing on the "**judge-imagined abstraction** of a crime in the ordinary case." *Id.* at 2558 (Emphasis added) Further refining the contours of Johnson, the Ninth Circuit explained that statutes are unconstitutionally vague when they require courts to (1) measure the risk by an indeterminate standard of a **"judicially imagined 'ordinary case'"** and 2) determine by vague and uncertain standards when a risk is sufficiently substantial. *Id.* at1120. (Emphasis added.)

The categorical approach of the judicially imagined, abstract "reasonable consumer" in the FTC interpretation of "deceptive" has the same inherent constitutional defect as found to render the statutes in *Johnson* and *Dimaya* each void for vagueness. The FTC presented three elements, only the first of which is factually determined at trial – the "representation, omission or practice" at issue.  The second and third elements each require the judicially imagined "reasonable consumer."  In the second element, it must be determined whether the representation, for example, is "likely to mislead consumers acting reasonably under the circumstances."  Thus, the judicially imagined "reasonable consumer" must be role-played into the circumstances and have a representation placed before them, hypothetically, and then the court determines their reaction.  In the third element, it must be determined whether the representation is "material" based on the "net impression" of a judicially imagined "reasonable consumer," role-played into the circumstances.

The FTC itself never structured their interpretation of deception for the purposes of fair notice for enforcement of civil penalties.  Instead, the FTC structured its approach to civil penalties in a way that meets the constitutional requirements for fair notice. As discussed above, the FTC does not seek civil penalties based merely on the Commission's determination that a particular act or practice is adjudicated "deceptive."  As stated above, the FTC only then issues an order – providing specific fair notice – and only imposes civil penalties thereafter if the order is violated.

CFPB however, failed to follow the FTC approach.  The CFPB approach carries with it inherent and fundamental flaws that render unconstitutional any violation of law that -  at the same time as the violation is determined - is used by the CFPB as an immediate basis for the imposition

-12-

of civil penalties.   Quite simply, there was no fair notice as a result of CFPB taking a litigation position that the FTC rules are applicable, but then not following the FTC rules for civil penalties.

### b)  The CFPA Text Uses Only the One Word "Deceptive"

In the alternative, if the FTC rules and case law are applicable in the context of civil penalties, then the fair notice analysis depends exclusively on only one word in the CFPA, "deceptive." 12 U. S. C. §5536(a)(B). The statute provides no further elaboration or guidance in any other sections as to its meaning or interpretation.

### c)  One Word, Alone, is Unconstitutionally Vague and Cannot Provide Fair Notice with No Binding Regulatory Rules Promulgated by CFPB

There is no question that the void for vagueness doctrine is applicable to cases that involve civil penalties and not just criminal sentencing (as in *Johnson*) or immigration (as in *Dimaya*). "Regulated parties should know what is required of them, so they may act accordingly" was stated by the United States Supreme Court in *FCC v. Fox Television Stations, Inc.* 567 U. S. 239, 132 S. Ct. 2307, 183 L. Ed. 2d 234 (2012), for example**.**  In *FCC v Fox,* the Supreme Court recently re-iterated that the void for vagueness doctrine is applicable to cases that involve civil penalties and not just criminal liability.  In *FCC v Fox*, the Court stated that "[t]his requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment."  *Id.* at 253.  The application of the fair notice constitutional doctrine to civil penalties cannot be legitimately disputed as a matter of law.

As such, it is a clear error of law to impose civil penalties based upon a statute that does not provide fair notice to those who are regulated of what is within and what is outside of the meaning of "deceptive."  This is axiomatic and even CFPB does not suggest that the statute alone, without more, meets the requirements of the Constitution. As discussed below, this principle becomes even more important given the aftermarket context in which a biweekly interest savings program operates, by its nature.

Moreover, in addition to the fair notice aspect of the constitutional violation, there is also a risk of arbitrary enforcement which arises when the statute is vague.  This risk cannot be

-13-

legitimately disputed here, where the CFPB has issued no regulatory rules regarding the meaning of 'deceptive."

> **5.** **Manifest Error of Fact: Biweekly Interest Savings Programs Exist in Aftermarket Competition, Wherein There are No CFPB Rules or Orders to Govern References and Comparisons to the Original Product by the Aftermarket Product**

The civil penalties applied in this case involve a biweekly interest savings program. Importantly, there are a number of such programs competing with each other, including but not limited to the ones offered by some (but not all) lenders themselves and also including programs independent of the banks, such as the one provided by Nationwide. (See Trial Exhibit 101). In short, a biweekly interest savings program is offered as an aftermarket service following the closing of a mortgage. The mortgage itself is not replaced and the biweekly program "fits with" the mortgage, which stays in place. Another example of this type of product or service is seen in the area of car parts used to service or repair a vehicle after purchase. On the one hand, there are independent companies that manufacture car parts to "fit with" certain brands and models. On the other hand, car parts are also made by the brand-name vehicle manufacturer. When a vehicle is serviced or repaired, either part could be used as either "fits with" the vehicle. In an analogous fashion, a biweekly interest savings program competes with the lender in the aftermarket of a mortgage loan closing.

While we have discussed the fact that CFPB has not issued any general rules interpreting "deceptive," significantly, CFPB has not issued any regulatory rules specifically applicable to biweekly interest savings programs. This is important because there is no CFPB interpretation of "deceptive" in the context of comparative advertising fundamental to the aftermarket type of product or service. One would expect an independent aftermarket car part company to advertising why its "fit with" auto part should be the consumer's choice when compared with the brand-name manufacturer's car part. Moreover, one would expect an independent aftermarket car part

*Motions under Rules 59 and 60 on Behalf of Defendants*
Case No. 3:15-cv-02106-RS

company to refer to the brand-name of the car – in order to identify the vehicle its aftermarket

parts fit.  In an analogous fashion, a company with an independent biweekly interest savings

program would be expected to reference and identify that its service fits with the mortgage loan a

consumer has recently closed with a lender, the amount of which and the lender's name both being

identified in the public filing made by the lender.

As is normal with comparative advertising, one would expect a comparison of the financial

advantage, if any, of the independent product over the manufacturer's product, in the car parts

business.  Similarly, one would expect a comparison of any financial advantage that an

independent biweekly interest savings program has over the lender's regular payoff schedule, for

example the ability to pay off a mortgage in less than its full term or a dollar savings in the

financing cost of the mortgage loan. Yet CFPB has not promulgated any rules of the road or any

line-drawing with CFPB-determined right or wrong approaches in the context of these aftermarket

biweekly interest savings programs.

Given Director Cordray's statement of his intentional approach in the speech referenced

above, this is not surprising. Director Cordray's recommendation that people look to enforcement

orders provides no guidance in the biweekly programs context.  The lone Bureau enforcement

order with regard to biweekly programs occurred in July 2015[13] - too late to provide any useful

information to any company already sued, such as Nationwide, having been sued two months prior

in May 2015.  Director Cordray's admonition to compliance executives to study enforcement

orders fails to provide any timely information to any company (1) that already had an enforcement

action filed against it before the Order to be studied occurred; and (2) that is being prosecuted for

activities going back to the beginning of CFPB in 2011 which inherently precludes any benefit

---

[13] See Request for Judicial Notice, Exhibit E, Consent Order and Stipulation with Paymap, July 28, 2015, available at https://www.consumerfinance.gov/policy-compliance/enforcement/actions/paymap/

-15-

from studying an Order when the claim is for activities that have already occurred.  Not only is the logic of this decision by CFPB fundamentally flawed for these reasons, but this decision also inherently puts any company that is the first to be prosecuted for any given type of product or service in the position of not having any enforcement order to study, as it is the first company to come under an enforcement claim for this product or service.

      **6.**      **Manifest Error of Law:  Liability Under the Abusive Prong or the TSR Was Only Found Derivatively, Based on a Finding on the "Deceptive" Prong**

In the Opinion and Order, there is a reference to the claims brought by the CFPB under the abusive prong of the CFPA.  In a footnote, the Court stated: "The conclusions set forth above that defendants made certain misrepresentation and omissions is sufficient to support liability under both the "abusive" and "deceptive" prongs of the CFPA and under the TSR." See Opinion and Order at p 18, footnote 24.   Therefore, there was no separate consideration or findings of fact or conclusions of law with respect to these two claims. The finding on these two claims was entirely derivative of the finding on the "deceptive" claim. Following that same logic, therefore, the constitutional infirmities discussed above also apply derivatively across all claims in the case, including the abusive and TSR claims. Thus, this motion applies to the entire judgment, including all claims.

      **7.**      **Manifest Error of Fact: Defendants Will Suffer Grave Consequences as well as Loss of Liberty and Property as a Result of the $7.93 Million Civil Penalties**.

            **a.**      **The Civil Penalties Will Cause Severe Consequences to Nationwide by Stopping its Ability to Resume Services for 135,000 Customers Who Are Currently Without Their Biweekly Interest Savings Services**

The civil penalty of $7.93 million will cause severe consequences to Nationwide because it will eliminate the ability of Nationwide to resume the operation of the Interest Minimizer program.  See Declaration of Daniel S. Lipsky at ¶ 5, filed on November 13, 2017 (hereafter

-16-

"Lipsky Dec. Dkt #332-1".) This is because Defendants do not have the financial resources to pay the full amount of the $7.93 million.  Lipsky Dec Dkt #332 at ¶ 6; Declaration of Daniel S. Lipsky and Exhibits filed on November 13, 2017, Dkt #334 (hereafter Lipsky Dec Dkt #334"); Declaration of Daniel S. Lipsky and Exhibits filed on October 20, 2017, Dkt #326 (hereafter Lipsky Dec Dkt #326).  Therefore, the payment of this amount of money will take all cash and all assets of all Defendants and divert them to the CFPB for civil penalties.  As such, this will put a permanent stop to Nationwide's efforts to resume its operations.  This will prevent Nationwide from keeping its current employees, from continuing the payments on the building in which Nationwide employees would work and from those employees using Nationwide's business equipment to do their work, all of which will put a stop to Nationwide's efforts to resume operations. Lipsky Dec Dkt #332 at ¶ 7.  Moreover, since the suspension of services, Daniel S. Lipsky has provided from his personal funds, the monies needed to pay for the business building and the monies needed for a minimum staff of Nationwide employees, both essential preparations required for a re-start of operations.  Lipsky Dec Dkt #332 at ¶8; Lipsky Dec. Dkt #334; Lipsky Dec. Dkt #326. Since the civil penalty judgment is joint and several, these civil penalties will take all the funds Daniel S. Lipsky has remaining, and divert them to the CFPB, rather than to fund the resumption of services to the consumers whose services were suspended as a result of the banks termination of ACH services.   Lipsky Dec Dkt #332 at ¶ 9.

Also, there are about 135,000 consumers who would also suffer harm if Nationwide is not able to resume the operation of the Interest Minimizer Program. As is well documented in this case, at the time that the services had to be suspended in November 2015, there were about 135,000 customers in about 40 states.  Generally speaking, these suspended customers have already paid their enrollment fee. Lipsky Dec Dkt #332 at ¶ 11. Therefore, these customers would suffer harm if Nationwide is not able to resume their biweekly interest savings services. Moreover,

-17-

the enrollment of each suspended customer is still valid.  Lipsky Dec Dkt #332 at ¶ 11. In a survey conducted in 2017, 85% of the suspended customers indicated that they want their program back, as was testified at trial.  Lipsky Dec. Dkt #332 at ¶ 12.  Moreover, about 80% of the suspended customers indicated that they had not made an extra payment to the principal of their loans. Lipsky Dec Dkt #332 at ¶ 12.  This data supports the fact that the clear majority of the customers with suspended programs did not have the discipline to make their extra payments of principal without the program. The data indicates that about 85% are likely to resume their program. Moreover, about 80% would be likely to resume making their extra principal payment through their program, thereby resuming their interest savings amounting to billions of dollars for this group of about 80% who did not make extra payments once the program lost its banking services. Lipsky Dec. Dkt #332 at ¶ 12. Even if a small percentage of these customers would choose not to resume the service for their mortgages, then these customers would be offered that opportunity to resume these services for another loan. Lipsky Dec Dkt #332 at ¶ 12.

Either way, each of these suspended customers would suffer substantial financial harm if Nationwide is not able to resume the program. In sum, the combination of the grave consequences to Nationwide as a company and the harm that the suspended customers would suffer combine to constitute such a severe and grave situation that the imposition of civil penalties rises to the level that would be unconstitutional for all the reasons discussed above.

### b. Defendants will Suffer Loss of Property and Risk of Loss of State Licenses.

As discussed above, if Nationwide is not able to reopen, this will be a huge loss of property for the company and its owner, Daniel S. Lipsky. Additionally, a finding of a violation and the civil penalty will go on Nationwide's record. For purposes of application of the fair notice aspect of the void for vagueness doctrine, the U. S. Supreme Court held that a reputational injury, arising from findings of wrongdoing, constitutes a grave consequence when there is a risk of a negative

-18-

impact on licensing. In such circumstances, a vague statute cannot be applied within the bounds of the Due Process Clause.  *FCC v. Fox Television Stations, Inc. 567 U. S. 239 (2012)*.  Nationwide was licensed in over 40 states.  As such, the risk of this violation and civil penalties having a negative impact on Nationwide's licenses constitutes a grave consequence.

### c.      Defendants will Suffer Loss of Liberty Interest.

As discussed above, if this finding of liability and civil penalties are not vacated, and if Nationwide is not able to reopen, Daniel S. Lipsky will suffer a loss of his liberty interest in working in his chosen profession.  Likewise, Nationwide will be unable to offer a biweekly interest savings program and thereby will suffer a loss of their liberty interest in their business

### 8.      Relief Requested and Conclusions Regarding Civil Penalty Judgment

Director's Cordray's admonition in his speech (i) to study enforcement Orders, where there were no prior enforcement orders involving a particular industry, along with the exercise of his discretion (ii) to not promulgate rules interpreting and defining "deceptive" either in general or applicable to a particular industry, but (iii) to nevertheless seek civil penalties immediately upon a determination that a particular practice is "deceptive" to "reasonable consumers", all combined, renders unconstitutional any civil penalties in that there was no fair notice in violation of the Due Process Clause of the Fifth Amendment.

As stated in *FCC v Fox*:

> …[T]his opinion leaves the Commission **free to modify its current …policy** in light of its determination of the public interest and **applicable legal requirements**. And it leaves the courts free to review the current policy or any modified policy in light of its content and application.

567 U. S. at 259 (Emphasis added.)

Likewise, the CFPB is "free to modify" its approach to civil penalties.  In the meantime, however, under all the circumstances described above, the statutory prohibition of "deceptive" acts or practices in the statute does not meet constitutional guarantees of fair notice required for civil

-19-

penalties, is void for vagueness both on its face and as applied to Defendants in this case. Civil

penalties under the CFPA are not constitutionally permissible for an alleged violation of the

"deceptive" prohibition because neither Congress nor the CFPB took necessary actions to cure its

inherent imprecision and lack of limiting principles.  The imposition of civil penalties by the Court

on September 8, 2017, pursuant to the demands of the CFPB, is clearly erroneous because the civil

penalties do not meet the clear requirements imposed by the U. S. Constitution pursuant to the

United States Supreme Court and the Ninth Circuit Court of Appeals.

Defendants ask this Court to vacate the judgment for civil penalties and enter judgment in

favor of Defendants on all counts, on CFPB's demand for civil penalties.

## III.   <u>INTRODUCTION TO MOTION ON PERMANENT INJUNCTION</u>

In its Judgment filed on November 9, 2017, the Court also issued a permanent injunction.

(Judgment and Permanent Injunction, ECF Doc. 331, p. 1-6).  Prior to its issuance, in the Opinion

and Order, the Court asked both sides to submit terms for the proposed injunction in accordance

with the findings in its Opinion and Order. (Id. at p. 2; Opinion and Order, ECF Doc. 315, p. 2).

CFPB submitted its proposal for the terms of the permanent injunction. (Notice of Filing Proposed

Judgment and Order of Permanent Injunction, ECF Doc. 317). Defendants followed the Court's

instruction and submitted its proposal in accordance with the Opinion and Order.  ([Proposed]

Final Judgment, ECF Doc. 318).

The permanent injunction is detailed and listed sixteen (16) paragraphs of specifications.

(ECF Doc. 331, at pp 3-6). With reference to this permanent injunction, Defendants make this

motion to alter or amend the permanent injunction portion of the judgment on the grounds that

there are clear errors of both fact and of law and in the underlying violation of law on which the

permanent injunction was based and that the permanent injunction is manifestly unjust**.**

## IV.   <u>ARGUMENT ON PERMANENT INJUNCTION</u>

As discussed more fully below, Defendants file this motion based on clear errors of law

and fact regarding the permanent injunction.

*Motions under Rules 59 and 60 on Behalf of Defendants*
Case No. 3:15-cv-02106-RS

**A.      Manifest Error of Fact:  Comparative Advertising in the Aftermarket
Inherently References the Original Product or Brand Name**

As discussed above, the CFPB urged this Court to use the regulatory rules and guidelines

adopted by the FTC.  CFPB was not entirely forthcoming, however, and did not provide to the

Court the FTC Statement of Policy Regarding Comparative Advertising.  This policy has direct

application to aftermarket biweekly interest savings businesses, as discussed above.  The policy

addressed industry codes and standards that that "could be interpreted as discouraging the use of

comparative advertising."  The FTC "Policy Statement enunciates the Commission's position" [14]

on the issues involved in comparative advertising:

> Commission policy in the area of comparative advertising **encourages**
> the naming of, or **reference to competitors,** but requires clarity, and,
> if necessary, disclosure to avoid deception of the consumer.[15]

Thus, the FTC has a policy that "encourages" a "reference to competitors," which in this case

involves the reference to the lender name by a biweekly interest savings company in the

aftermarket, as discussed above.  Moreover, the FTC details its rules which encourage and support

comparisons:

> The Commission has **supported the use of brand comparisons** where the bases of
> comparison are clearly identified.  Comparative advertising, when truthful and non-
> deceptive, is a **source of important information to consumers** and assist them in
> making rational purchase decisions.  Comparative advertising encourages product
> improvement and innovation, and can lead to lower prices in the marketplace.  **For
> these reasons, the Commission will continue to scrutinize carefully restraints
> upon its use**[16]

The rationale that comparative advertisements are a "source of important information to

consumers" is listed as one of the reasons for an FTC policy "to scrutinize carefully restraints" on

comparative advertisements." *Id.*

---

[14] See Request for Judicial Notice, Exhibit F, Statement of Policy Regarding Comparative
Advertising, at Paragraph (a), August 13, 1979, available at https://www.ftc.gov/public-
statements/1979/08/statement-policy-regarding-comparative-advertising  (Emphasis added)
[15] Id., at ¶ (b) (emphasis added)
[16] Id. at Paragraph (c). (Emphasis added.)

*Motions under Rules 59 and 60 on Behalf of Defendants*
Case No. 3:15-cv-02106-RS

The CFPB, rather, has attacked the comparison advertising aspects of informing consumers that they have a choice and that a biweekly interest savings program will save them interest money when compared with their lender's repayment schedule.  And at its urging, the Court determined that certain actions will be permanently enjoined:

> (j) Defendants are enjoined from making false or misleading statements, directly or by implication, regarding the existence or non-existence of alternatives to the IM program.  If Defendants elect to raise the point, or if a consumer asks whether he or she can achieve savings on his or her own, Defendants must clearly and conspicuously disclose that some lenders may directly accept biweekly payments and may administer their own program s at no cost, and **that the consumer should check with his or her own servicer to verify whether such a program exists**.  This does not preclude Defendants from making truthful statements regarding any features of the IM program that may distinguish it from other programs. [17]

This portion of the permanent injunction is illustrative of a favoring of the original product or service (in this case the lender), and imposes significant burdens on a competitor in the aftermarket (in this case, a biweekly interest savings program.)  The logic of this situation shows the tremendous benefit that the lender has just received:  Had a lender informed the consumer of their biweekly program, why would the consumer even call a company offering this service based on a letter received in the mail?  Logically, therefore, a consumer who makes such a call after receiving a letter has not been informed by the lender of a way to pay them less interest money than the amount they just agreed to pay at the closing of the loan.  Yet this portion of the permanent injunction makes a decision in favor of the lender and puts a burden on the competitor - compelling advice to a consumer to call the lender/competitor.   In the analogy regarding the auto parts market after the sale of the car, this type of permanent injunction would, for example, require all aftermarket car parts manufacturers to tell the owner of the vehicle or servicer of the vehicle that they should check with the original brand name car company to see if they would prefer to purchase the brand name car part.

---

[17] See Permanent Injunction ECF Doc. 331, p. 5

*Motions under Rules 59 and 60 on Behalf of Defendants*
Case No. 3:15-cv-02106-RS

Other portions of the permanent injunction follow this pattern, imposing burdens on the competitor in the aftermarket and limiting their comparative advertising in the exact ways that the FTC said in its Policy Statement that it would scrutinize in order "to assist [consumers] in making rational purchase decision."  Another example is paragraph (a) which prohibits "misleading statements" including "by implication" that the biweekly aftermarket program at issue is,

> affiliated with, related to, sponsored by, or in partnership with the consumer's bank, **mortgage lender,** mortgage servicer, or any other financial entity in any way already associated with the consumer's loan or finances.[18]

The logical issue arises, however, as to when is enough, enough?  This provision of the permanent injunction provides no insight as to whether the combination of a disclaimer that there is "no affiliation" -  which was on the outside of the envelopes at issue in this case - plus a second repetition of "no affiliation" in a longer, full sentence at the bottom of the first page of the direct mail marketing letter – which was on the letters at issue in this case - is or is not sufficient to meet this mandatory injunction?  There is nothing in the permanent injunction that would provide Defendants with an intelligible principle upon which to conform their behavior in the competition in the aftermarket following a home loan closing.  Just how many times is one required to say, "no affiliation" to have it be determined that it is enough?  The reference to the lender is inherent in the aftermarket and comparative advertising.  The permanent injunction provides no limiting principle to determine where the line between enough, and not enough, would be located.

This same troubling analysis is true throughout all the terms of the permanent injunction.  All the sixteen (16) terms, both separately and in combination, burden Defendants without an intelligible principle upon which to determine when enough is enough?   This permanent injunction restrains only one side to the competitive aftermarket of home mortgage loans, to the advantage of the original provider of the product or service, in this case, the lender.

---

[18] Id. at Paragraph (a), p 3.

*Motions under Rules 59 and 60 on Behalf of Defendants*
Case No. 3:15-cv-02106-RS

**B.      Manifest Error of Law:  Judicially Administered Statute Violates Nondelegation Doctrine**

The delegation of power by Congress to another branch of the government is generally discussed with regard to a delegation to an administrative agency.  For example, with reference to the FTC, this agency has developed expertise in the areas that it regulates, and has issued rules, guidance, policies and other ways of communicating their decisions as an agency expert in their field. As discussed above, the FTC issues cease and desist orders. As discussed above, however, in this case the CFPB has failed to promulgate any regulatory rules regarding the definition or interpretation of "deceptive."  As such, the legal issue of whether the delegations by Congress to the CFPB were legally within constitutional bounds or whether it was a violation of the nondelegation doctrine is not at issue on the facts of this case.

Instead, the CFPB has looked to enforcement lawsuits, as Director Cordray defended against the criticism that this was rulemaking by enforcement. The result is that the federal judiciary ends up not only performing the function of determining the meaning of "deceptive' but also thereafter exercises its equitable powers to issue a permanent injunction. The question is whether this leaves the courts exercising a lawmaking function when it fills in the gaps left by the broad statutory language – in this case one word - and on this basis issues a permanent injunction.

Assessing the limits on delegation has long been established by the U. S. Supreme Court. The prevailing rule for assessing limits on permissible delegations is as follows: "[i]f Congress shall lay down by legislative act an **intelligible principle** to which the person or body authorized [to implement the statute] is directed to conform, such legislative action is not a forbidden delegation of legislative power" *J. S. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409, 48 S. Ct. 348, 72 L. Ed. 624 (1928).  (Emphasis added.) The main ingredient is that Congress must make the key choices and establish the "**primary standards.**" *Panama Refining Co. v Ryan*, 293 U. S. 388, 426, 55 S. Ct. 241, 79 L. Ed. 446 (1935). (Emphasis added.)

-24-

The CFPA, however, provides no "intelligible principle" upon which the federal judiciary is to make its choices. Therefore, crafting an injunction involving what a "reasonable consumer" needs to be told in a comparative advertising context in the aftermarket - where reference to the brand name of the original product is inherent – is left to the federal judge without any guidance at all from Congress. As a whole, the federal judiciary has no particular expertise to fill in the gaps. Yet, the CFPA leaves to the federal judiciary this task, in the situation such as we have here where the agency has chosen to issue no regulatory rules or otherwise bind themselves and inform those whom it regulates how it interprets and defines "deceptive."

As a result, the authorizing statute providing the federal judiciary with the equitable power to issue a permanent injunction, 12 U. S. C. ¶ 1055 (a)(1) violates the doctrine of nondelegation, as applied in the context when the CFPB has failed to issue any regulatory rules on the subject at issue on the grounds that no intelligible principle is provided either by Congress or by the CFPA to guide the text and structure of the injunction.

**C.    Relief Requested and Conclusion on Injunction**

Defendants ask this Court to vacate the permanent injunction.

# V. <u>CONCLUSION</u>

For all the reasons as stated herein, Defendants respectfully request that the Court grant its motion.

December 7, 2017

**MAC MURRAY & SHUSTER, LLP**

*/s/ Helen Mac Murray*
HELEN MAC MURRAY
(OH Bar #0038782 - admitted *pro hac vice*)
6530 West Campus Oval, Suite 210
New Albany, Ohio  43054
Phone: 614-939-9955
hmacmurray@mslawgroup.com
Attorney for Defendants
Nationwide Biweekly Administration, Inc., Loan Payment
Administration, LLC and Daniel S. Lipsky

-25-

1

## <u>CERTIFICATE OF SERVICE</u>

2

The undersigned does hereby certify that the foregoing was served on all counsel of record

3

on this 7th day of December 2017 through the Court's electronic filing system.

4

5

                            */s/ Helen Mac Murray*

                            HELEN MAC MURRAY

6

                            (OH Bar #0038782 - admitted *pro hac vice*)

7

                            hmacmurray@mslawgroup.com

                            **MAC MURRAY & SHUSTER, LLP**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Motions under Rules 59 and 60 on Behalf of Defendants*
Case No. 3:15-cv-02106-RS