UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>NATIONWIDE BIWEEKLY ADMINISTRATION, INC., et al.,<br><br>Defendants. | Case No. 15-cv-02106-RS<br><br>**ORDER SUPPLEMENTING, MODIFYING, AND REAFFIRMING PRIOR FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING REMAND, AND REAFFIRMING JUDGMENT** |

I. INTRODUCTION

This is a civil enforcement action brought by the Consumer Financial Protection Bureau (CFPB) against entities and an individual whom the CFPB contends misled consumers. Defendants sold a financial services product that purportedly allowed consumers to save significant sums they would otherwise pay in mortgage interest. CFPB contended that few, if any, consumers would come out ahead financially, given the effect of the fees defendants charged. CFPB challenged several aspects of defendants' marketing as allegedly misleading.

After a seven-day bench trial, the Court entered an Opinion and Order comprising the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a). Then, following consideration of briefing as to the appropriate form of a judgment and a motion for reconsideration, a monetary judgment was entered against defendants Nationwide Biweekly

Administration, Inc., its wholly owned subsidiary Loan Payment Administration ("LPA")[1], and Daniel Lipsky, the founder, president, sole officer, and sole owner of Nationwide. The joint and several judgment was in the amount of $7,930,000, representing a civil penalty under 12 U.S.C. § 5565(c)(1). The judgment also included a permanent injunction against various specified marketing practices.

Proceedings on appeal were protracted as the result of the fact that other cases addressing potentially dispositive issues were percolating through the appellate process. Ultimately, the Ninth Circuit issued a memorandum decision in this action stating: "we vacate the district court's order and remand, allowing it to reassess the case under the changed legal landscape since its initial order and opinion." Although the Ninth Circuit expressly identified several potentially relevant questions and precedents, it also emphasized that it did not intend to "limit the issues for consideration on remand." The court stated:

> In addition to these questions, the parties may raise, and the district court may consider, other issues raised on appeal. Our framing of the questions above should not be taken to provide our view of their merits. The parties and the district court are free to reframe the questions as they wish.

Following that remand, the parties were invited to report what further proceedings they believed should take place in light of the Ninth Circuit's mandate. See Dkt. No. 382. The parties jointly responded that they "agree that no issues besides those explicitly identified by the Ninth Circuit in its January 27, 2023 Memorandum Disposition (Dkt. 380) should be briefed and decided by the Court." The parties labeled those three questions as: (1) the *Seila Law* issue identified in the Memorandum Disposition at pages 3-4, (2) the restitution issue identified in the Memorandum Disposition at pages 4-5, and (3) the issue of the constitutionality of the CFPB's funding mechanism. Defendants have subsequently withdrawn the third issue, in light of the Supreme

---

[1] LPA functioned essentially as a second name under which Nationwide marketed its services.

Court's ruling earlier this year in *Community Financial Services Association of America v. Consumer Financial Protection Bureau*, No. 22-448, rejecting the argument that the CFPB's funding mechanism is unconstitutional.

Accordingly, the only issues to be decided are defendants' challenge to the validity of the judgment in light of the "*Seila Law* issue," and CFPB's contention that the judgment should include restitution, in addition to the civil penalty previously awarded.[2] No party has suggested that it would be appropriate to reopen proceedings to take additional evidence on either of these issues, or made any request to do so. The decision will therefore be based on the briefing and on the evidence admitted at trial.[3]

## II. DISCUSSION

A.  *Seila Law*

In post-trial briefing prior to the appeal, defendants raised an argument that the CFPB's institution of this action was "void" because the "CFPB is an unconstitutional entity." Dkt. No. 295 at p. 15. Defendants cursorily advanced both the contention that the CFPB director was impermissibly insulated from removal without cause, and that the funding structure of the agency was constitutionally flawed. *Id.* The prior Opinion and Order rejected those underdeveloped arguments, given the state of then-existing precedent. *See* Dkt. No. 315, p. 17 n. 23. As noted above, the Supreme Court has since rejected the claim that the CFPB's funding mechanism is improper.

During the pendency of the cross-appeals in this action, however, the Supreme

---

[2] Also under submission is defendants' motion for release of $409,685.99 held in escrow pursuant to an agreement between the parties reached during the pendency of the appeal. That motion is addressed in section C of the discussion below.

[3] Plaintiff expressly states it does not request a hearing, and defendants do not state otherwise. The matter is suitable for disposition without oral argument, and no hearing will be set.

CASE NO. 15-cv-02106-RS

3

1  Court held the CFPB Director's for-cause removal protection violated the Constitution. *See Seila*

2  *Law LLC v. CFPB*, 140 S. Ct. 2183, 2211 (2020) ("*Seila Law I*"). The Court severed the offending

3  statutory provisions, and remanded to the Ninth Circuit to consider whether the CFPB's pursuit of

4  the civil investigative demand in dispute in that proceeding had subsequently been validly ratified

5  by an acting director and/or by a director who acknowledged she served at-will. *Id.*

6  Shortly after *Seila Law I* issued, the CFPB director in office at the time, Kathleen L.

7  Kraninger, expressly ratified the agency's prior decision to file *this* lawsuit, and to pursue its

8  cross-appeal. The Ninth Circuit held argument on the cross-appeals in this action, but following

9  that argument, it vacated submission of the matter pending resolution of the *Seila Law* remand.

10  The Circuit subsequently held in *Seila Law II*, 997 F.3d 837 (9th Cir. 2021) that the

11  CFPB's actions in that matter had been validly ratified. *Id.* at 846. A decision on the appeals in

12  this action, however, was further held pending the outcome of another CFPB case, which

13  ultimately resulted in a published opinion, *CFPB v. CashCall, Inc.*, 35 F.4th 734 (9th Cir. 2022).

14  Additionally, while the cross-appeals were being held in abeyance, the Supreme Court decided

15  *Collins v. Yellen*, 141 S. Ct. 1761 (2021), which addressed remedies for constitutional separation-

16  of-powers violations.

17  In remanding this case, the Circuit stated:

> Nationwide believes that this case is distinguishable from *Seila Law II* and *CashCall* and that it is entitled to dismissal for the CFPB Director's unconstitutional for-cause removal provision. Nationwide argues that Director Kraninger's ratification was untimely and therefore invalid and that it can show "actual" or "compensable harm" entitling it to relief. See *CashCall,* 35 F.4th at 742–43; *Collins*, 141 S. Ct. at 1788–89. On remand, the district court should determine the correct application of *Seila Law II*, *CashCall*, and *Collins*, in deciding these issues. The inquiries into the validity of the CFPB's ratification and Nationwide's showing of harm "turn[] on case-specific factual and legal questions" that should be resolved in the first instance by the district court. *Seila Law I*, 140 S. Ct. at 2208.

27  In their post-remand briefing, defendants argue ratification is no longer an issue, in light of

*Collins* and *CashCall*. In *CashCall*, the Ninth Circuit held that it did not need to decide the validity of ratification, because the Supreme Court made clear in *Collins* "that despite the unconstitutional limitation on the President's authority to remove the Bureau's Director, the Director's actions were valid when they were taken." *CashCall*, 35 F.4th at 742. While the CFPB argues Director Kraninger's ratification provides an *additional* reason to reject defendants' claim that they are entitled to a remedy for the constitutional infirmity in the statute as drafted, it acknowledges there is no need to reach the ratification issue. *See* Dkt. No. 401, ECF p. 16

With ratification put to the side, defendants insist they have shown they are entitled to dismissal here under the following observations of the *CashCall* court:

> That is not to say that the unlawfulness of a removal provision can never be a reason to regard an agency's action as void. *See Collins*, 141 S. Ct. at 1788. But at a minimum, the "party challenging an agency's past actions must . . . show how the unconstitutional removal provision actually harmed the party." *Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022); *see also Collins*, 141 S. Ct. at 1788–89.

35 F.4th at 742–43.

Defendants' effort to show they suffered actual harm as a result of the unconstitutional removal provision is perhaps hobbled by the fact that they first raised the constitutional argument in post-trial briefing. Their claim that they were harmed by the provision was not pleaded or the subject of discovery during the litigation. No evidence or argument specifically on the point was presented at trial.

Defendants have instead cobbled together an argument that "a culture of recklessness" existed at CFPB, citing to various arguments and some evidence they presented at trial in connection with their defense on the merits and/or their counterclaims. Defendants' presentation, however, falls woefully short of what would be necessary to support a factual finding that they suffered cognizable harm as a consequence of the provision purporting to insulate the CFPB director from removal at will by the President. Even assuming there was merit to one or more of defendants' criticisms of how the CFPB operated, it is sheer speculation that this litigation would

not have been pursued, or that it would have been pursued in a different manner, had the CFPB directors known from the outset that the removal provision was unconstitutional. Indeed, while the validity of ratification may no longer be a critical issue, the fact that this litigation has continued to be pursued vigorously by the CFPB under multiple directors who were fully aware that they were not insulated from removal at the discretion of the President, supports a conclusion to the contrary.

*CashCall* offered that "a party might demonstrate harm by showing that the challenged action was taken by a Director whom the President wished to remove but could not because of the statute." 35 F.4th at 743. Defendants have not even argued that occurred here. While *CashCall* did not suggest that was the only way to show harm, defendants' failure to make any comparable showing dooms their claim that they are entitled to dismissal, or any other remedy based on the unconstitutional removal provision.

### B. Restitution

The Ninth Circuit described the restitution issue as follows:

> On cross-appeal, the CFPB urges this court to reverse the district court's denial of restitution, which the CFPB maintains is mandatory and should be ordered in the amount of $73,955,169. We remand to allow the district court to consider the effect, if any, of *CashCall* and *Liu v. SEC*, 140 S. Ct. 1936 (2020) (discussing the bounds of equity practice), and whether the CFPB waived its claim to legal restitution by characterizing it only as a form of equitable relief before the district court. See *CashCall*, 35 F.4th 734 at 750.

Memorandum Disposition at pages 4-5

The CFPB is now unambiguously claiming a right to *legal* restitution, as opposed to *equitable* restitution. The Supreme Court has explained restitution "'is a legal remedy when ordered in a case at law and an equitable remedy . . . when ordered in an equity case,' and whether it is legal or equitable depends on 'the basis for [the plaintiff's] claim' and the nature of the underlying remedies sought." *Great-Western Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213, (2002) (second and third alterations in original) (quoting *Reich v. Continental Cas. Co.*, 33 F.3d 754, 756 (7th Cir. 1994)). Accordingly, where a plaintiff cannot "assert title or right to

possession of particular property" but instead has "just grounds for recovering money to pay for some benefit the defendant had received from him, the claim is for legal restitution." *Id.* Equitable restitution, applies "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* See also *CashCall* at 750 (citing *Great-Western*). The Supreme Court acknowledged, however, that its cases had "not previously drawn this fine distinction between restitution at law and restitution in equity." *Great-Western*, 534 U.S. at 214.

In post-trial briefing, the CFPB labeled restitution as one form of "appropriate equitable relief" that was available. *See* Dkt. No. 294, ECF p. 28. The Opinion and Order similarly included language suggesting CFPB's claim for restitution was subject to equitable considerations. Because the CFPB was never attempting to recover "particular funds or property," however, its claim necessarily was for legal restitution, not equitable restitution. Furthermore, despite the passing references to restitution as a form of equitable relief, the CFPB presented no argument that turned on any distinction between equitable and legal relief. Indeed, as the district court observed following remand in *CashCall*, "before the Supreme Court's decision in *Liu*, there was little or no reason to differentiate between the two forms of restitution." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, , 2023 WL 2009938, at *7 (C.D. Cal. Feb. 10, 2023) ("*CashCall II*").

Under these circumstances, there is no basis to conclude the CFPB waived its claim to legal restitution. *See CashCall II*, 2023 WL 2009938, at *7 (reaching same conclusion where CFPB also had previously referred to the restitution it sought as equitable). Although defendants apparently argued waiver during the appellate proceedings, they have not pursued that contention on remand. Accordingly, the issue is whether legal restitution should be awarded, and any statements in the prior Opinion and Order addressing points that would only apply to a claim for equitable restitution are no longer relevant.

Furthermore, because the claim is for legal restitution, the CFPB is correct that the principles discussed in *Liu* and its holding have no direct application here. *See CashCall II*, 2023 WL 2009938, at *7 ("Because the Supreme Court's decision in *Liu* did not purport to limit the

scope of legal restitution, the Court need not limit the restitution in this case to net profits.")
Defendants do not contend *Liu* has any impact here except to the extent that it should be seen, in defendants' opinion, as supporting the general principle that "words used by Congress that limit the authority of a regulatory agency should be enforced in full measure to protect the rights of citizens," and as an exemplar of how the Supreme Court will act to curb agency overreach. Whatever merit that generalized characterization may have, *Liu* provides no particular guidance on the issues in this case.

The remaining issue identified by the Ninth Circuit's remand is "the effect, if any, of *CashCall*." In *CashCall*, the district court had denied restitution on grounds that the CFPB had not shown the defendants "intended to defraud consumers or that consumers did not receive the benefit of their bargain." 35 F.4th 750. While the *CashCall* court "emphasize[d] at the outset" that it was not holding restitution was necessarily appropriate in the case, or deciding what amount, if it were warranted," it did find that intent to defraud was not a relevant consideration. *Id.* The circuit court then remanded for the district court to apply the circuit's two-step burden-shifting framework for calculating restitution. *See Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1195 (9th Cir. 2016)

Under that framework, at step one the CFPB "bears the burden of proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains." *Id*. (citation omitted). If the CFPB makes that threshold showing, then "the burden shifts to the defendant to demonstrate that the net revenues figure overstates the defendant's unjust gains." *Id*. Furthermore, a district court may use a defendant's net revenues as a basis for measuring unjust gains. *Id.*

The prior Opinion and Order in this case did not reject restitution on the grounds that defendants had acted in good faith, so that aspect of *CashCall* is not directly implicated. As mentioned, however, the order included some language regarding equitable considerations. Not only should that language be disregarded to the extent it is inapplicable to legal restitution, in light of *CashCall* it cannot support denying restitution, insofar as it may have reflected considerations similar to good faith.

1    Additionally, the prior Opinion and Order reflected a concern that at least some of
2    defendants' customers derived benefits from the services defendants provided. *CashCall* flatly
3    states that restitution may not be denied simply because "consumers received the benefit of their
4    bargain." 35 F.4th at 751. That said, precedent is less clear as to when and how a restitutionary
5    award should account for any valuable benefits some consumers may have obtained, to avoid a
6    windfall to those individuals. *See*, *e.g. CashCall II,* 2023 WL 2009938, at *9 ("the Court
7    concludes that the amount of restitution should not include the interest and fees paid by any
8    consumer who paid CashCall less than that consumer received in principal . . . . Failing to adjust
9    the restitution amount for consumers who paid Defendants less than they received from CashCall
10   would result in a windfall to consumers and overcompensate them for their loss."); *F.T.C. v.*
11   *Figgie Int'l, Inc.*, 994 F.2d 595, 606 (9th Cir. 1993) ("The district court's order creates no windfall
12   for Figgie's customers . . . . Those consumers who decide, after advertising which corrects the
13   deceptions by which Figgie sold them the heat detectors, that nevertheless the heat detectors serve
14   their needs, may then make the informed choice to keep their heat detectors instead of returning
15   them for refunds."); *F.T.C. v. Amy Travel Serv., Inc*., 875 F.2d 564, 572 (7th Cir. 1989),("The
16   magistrate correctly acknowledged the existence of satisfied customers in computing the amount
17   of defendants' liability—customers who actually took vacation trips were excluded when the
18   magistrate computed the amount of restitution awarded.")

19   Regardless of if, when, and how a restitutionary award should be adjusted to account for
20   benefits some consumers may have received notwithstanding deceptive marketing, it appears to be
21   an issue on which defendant bears the burden of proof at step two of the framework. *See CashCall*
22   *II,* 2023 WL 2009938, at *9. Here, defendants offered evidence suggesting many of their
23   customers were satisfied with their services, but as CFPB points out, defendants failed to show
24   how many, if any, of those supposedly satisfied customers had become aware of the
25   misrepresentations in the marketing process. More fundamentally, defendants failed to offer any
26   evidence to quantify any benefit its customers received, such that any restitutionary award could
27   be adjusted on that basis. Accordingly, any suggestion in the prior order that restitution was

1   properly denied because defendants' customers may have obtained some benefits ceases to be
2   applicable.
3   　　　All that said, the CFPB still has not met its burden to establish that the restitutionary award
4   it seeks is warranted, for reasons alluded to throughout the prior Opinion and Order, though
5   perhaps with insufficient clarity. As the Opinion and Order observed, the CFPB asked for
6   restitution in an amount representing the setup fees *all* of Nationwide's customers paid in the
7   relevant time period, deducting only those refunds previously made. Of the various marketing
8   practices and representations found to be false or misleading, however, the only category that
9   implicated Nationwide's entire customer base, were the representations regarding the timing of the
10  savings customers would realize from utilizing defendants' program.
11  　　　Relying in part on the analysis of the CFPB's expert, and in part on the text of the
12  representations, the Opinion and Order found that at least some of the representations were "likely
13  to mislead consumers acting reasonably under the circumstances." That finding was sufficient to
14  support defendants' *liability*, and therefore the civil penalties and the injunctive relief. The
15  Opinion and Order also found, however, that defendants' approach to calculating savings was
16  consistent with the method lenders must use in describing interest in Truth In Lending Act
17  disclosures, and that, with some exceptions, the representations could be characterized as literally
18  truthful. While not spelled out in the prior decision, the implication was that while some customers
19  were likely to be misled for the reasons explained, others likely were not. To establish liability, the
20  CFPB was not required to prove that all, or virtually all consumers would be misled by
21  defendants' marketing, and the CFPB did not so prove.
22  　　　As the CFPB correctly asserts, under *Figgie*, a court must presume that consumers relied
23  on the defendant's misrepresentations in paying for a product once a government enforcement
24  agency "has proved that the defendant made material misrepresentations, that they were widely
25  disseminated, and that consumers purchased the defendant's product." *Figgie*, 994 F.2d at 605-06.
26  Presuming reliance on an unambiguously false representations, however, does not answer the
27  question of what percentage of consumers were actually mislead by a literally truthful

representation that only had the *capability* to mislead.

The CFPB acknowledges that at step one of the *Gordon* framework, it "bears the burden of proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains." 819 F.3d at 1195. It has not met that burden here, because it is seeking restitution for its *entire* customer base, when it did not prove that the representations in issue likely misled all or virtually all of its customers. All its customers can be presumed to have relied on the representations, but they cannot all reasonably be presumed to have been *misled* by the representations, which were largely literally true and consistent with interest calculations in truth-in-lending disclosures.

The CFPB has not offered an approach for correlating any restitution award to the numbers of customers who were actually misled. Accordingly, while the liability finding remains supported, and the previously imposed civil penalties and injunctive relief are warranted, the CFPB has failed to show this is a case where an award of restitution is "appropriate." *See* 12 U.S.C. § 5565(a) ("The court . . . in an action or adjudication proceeding brought under Federal consumer financial law, shall have jurisdiction to grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law . . . ").[4]

C. Motion for release of funds in escrow

While these matters were pending, defendants filed a motion for "return of property" in which they sought to recover approximately $410,000 that was paid to CFPB under an agreement among the parties when defendants sold their prior headquarters building in Ohio. Defendants represent they were forced to sell the building to pay overdue mortgage and tax obligations. The CFPB had filed abstracts of the judgment in this action in several Ohio counties, thereby encumbering all of defendants' real property in those places.

---

[4] Defendants renew their argument that CFPB cannot recover both civil penalties and restitution. Although of no consequence given the denial of restitution, that argument fails for the reasons stated in the prior Order and Opinion.

The CFPB's judgment lien on the former headquarters building was, of course, junior to the mortgage and tax liabilities, but defendants could not deliver clear title to the buyer without satisfying the CFPB's lien. After an exchange of various proposals, the parties reached an agreement that net sale proceeds would be paid into the CFPB's Civil Penalty Fund, where they could "be held and returned if a final judgment is entered in favor of Mr. Lipsky and Nationwide." The transferred net proceeds would "be considered civil money penalties under the November 8, 2017 judgment and deposited in the Civil Penalty Fund of the Bureau as required by 12 U.S.C. § 5497(d)." The agreement further provided, "[i]f Defendants prevail on their appeal of this action and any court order makes clear that the Bureau cannot retain the funds as civil money penalties, the Bureau will comply with the terms of such an order."

The effect of the present order, of course, is to reaffirm the prior judgment. Any argument that defendants were entitled to return of the monies between the issuance of the Ninth Circuit's mandate and this decision fails. First, defendants' insistence that the mandate itself somehow required return of the monies, or compelled this court to order such a return, is belied by the terms of the mandate, which was silent as to the status of the judgment, or any funds previously collected thereunder. The mandate said nothing other than that the previously entered judgment of the court of appeal had taken effect as of the date of the mandate. Dkt. No. 381. The judgment of the court of appeal, embodied in its memorandum opinion, was stated as "we vacate the district court's order and remand, allowing it to reassess the case under the changed legal landscape since its initial order and opinion." Dkt. No. 380.

It is therefore at best unclear as to whether the prior judgment was vacated, as opposed to merely the order. Assuming, however, that the better reading is that both the order and the judgment were vacated, that would not somehow automatically entitle defendants to return of the funds. Had defendants not sold the property and entered into an agreement with the CFPB regarding disposition of the sales proceeds, defendants would have had whatever remedies Ohio law provides (or does not provide) under circumstances like these to have the lien removed pending a new final judgment. Instead, the question is effectively one of contract—the agreement

the parties reached when defendants wished to sell the property governs when and if defendants may become entitled to return of the funds.

It is not self-evident this court even has jurisdiction to decide what is effectively a breach of contract claim brought by defendants against the CFPB regarding the funds. Assuming, however, that the court has ancillary jurisdiction because the matter relates to enforcement of the judgment, defendants' contention that they became entitled to return of the funds when the mandate issued fails under the clear terms of the parties' agreement. Despite defendants' efforts to characterize aspects of the remand as favorable to them, at this juncture they cannot be said to have "prevailed on appeal" and no final judgment in their favor has been entered.

Defendants' further argument that the retention of the funds constitutes an unconstitutional taking borders on frivolous. Thus, to the extent not mooted by the outcome in this order, defendants' motion for return of property is denied.

### III. CONCLUSION

Subject to the modifications and supplemental findings discussed above, the prior Order and Opinion is reaffirmed. A separate judgment in the same form as the prior judgment will be entered.

**IT IS SO ORDERED**.

Dated: August 28, 2024

_____
RICHARD SEEBORG
Chief United States District Judge